```
 1            IN THE COURT OF COMMON PLEAS

 2         PHILADELPHIA COUNTY, PENNSYLVANIA

 3                      - - -

 4   UNCHALEE VONG et al      :FEBRUARY TERM 03

 5        vs.                 :

 6   MALY YAN et al           :2882

 7                      - - -

 8              Oral deposition of

 9   Maly Yan, taken pursuant to Notice, held

10   at the law offices of Christie, Pabarue,

11   Mortensen & Young Services, 1880 JFK

12   Boulevard, 10th Floor, Philadelphia, PA,

13   on Wednesday, September 24, 2003, at

14   12:45 p.m., before John W. Begley, a

15   Federally Approved Registered

16   Professional Reporter - Notary Public in

17   and for the Commonwealth of Pennsylvania.

18                      - - -

19           ESQUIRE DEPOSITION SERVICES

20                   15th Floor

21          1880 John F. Kennedy Boulevard

22         Philadelphia, Pennsylvania 19103

23                 215 - 988-9191

24
```

66

```
 1        Q.   Prior to June 18, 2001 on
 2   how many occasions had you driven the van
 3   to or from Pack & Process?
 4        A.   Like what do you mean?  Can
 5   you repeat that?
 6        Q.   Well, let me ask you this:
 7   When did you first begin driving the van?
 8   In 2001 when did you first begin driving
 9   the van to or from Pack & Process?
10        A.   In May.
11        Q.   And we are talking about May
12   of 2000, so a month before the accident,
13   roughly?
14        A.   Yes.
15            MR. HULLER:  I'm sorry,
16        Rafael.  That was 2001, I think
17        you meant to say --
18            MR. VILLALOBOS:  2001.
19            THE WITNESS:  Yes.
20   BY MR. VILLALOBOS:
21        Q.   And why did you start
22   driving the van in May 2001?
23        A.   Because my father got his
24   license suspended.
```

67

```
 1        Q.   Was your father customarily
 2   the person who would drive that van?
 3        A.   Yes.
 4        Q.   And was your father paid by
 5   someone to drive that van?
 6        A.   Yes, Lam.  Mr. Thatch.
 7        Q.   And when you began to drive
 8   the van in May 2001, a month or so before
 9   the accident --
10        A.   Yes.
11        Q.   -- were you paid by anyone
12   to drive that van?
13        A.   I get paid from Pack &
14   Process and I also get paid from Mr. Lam.
15        Q.   Now, what were you paid by
16   Pack & Process for; for working as a
17   quality technician or were you paid by
18   Pack & Process to drive the van?
19            MR. URBAN:  Objection to the
20        form of the question.
21            Go ahead.
22            THE WITNESS:  As a person
23        working as a control.
24   BY MR. VILLALOBOS:
```

68

```
 1        Q.   You were not paid by Pack &
 2   Process to drive the van in May or June
 3   of 2001?
 4            MR. URBAN:  Objection to the
 5        form of the question.
 6            THE INTERPRETER:  I'm sorry.
 7        I wasn't sure she understand the
 8        question because the answer --
 9            MR. MC NULTY:  That's all
10        right.  Just translate what she
11        said.
12            THE INTERPRETER:  The answer
13        is I get paid from Mr. Thatch as a
14        transporter driving the van,
15        taking people to work there.
16   BY MR. VILLALOBOS:
17        Q.   So in May and June of 2001
18   Mr. Thatch was paying you to transport
19   workers between Philadelphia and
20   Wilmington?
21        A.   Yes.
22        Q.   Did anyone at Pack & Process
23   ever instruct you to drive a vehicle?
24        A.   My supervisor told me.
```

69

```
 1        Q.   Your supervisor told you to
 2   drive a vehicle?
 3        A.   Yes, transferring people to
 4   work and also working as an employee
 5   there.
 6        Q.   What supervisor was it that
 7   told you to transport people to and from
 8   work?
 9        A.   Sterling.
10        Q.   Sterling Newsome?
11        A.   Yes.
12        Q.   And when was it that
13   Sterling Newsome told you to drive a van
14   to transport workers?
15        A.   After my father got his
16   license suspended.
17        Q.   Under what circumstances was
18   it that Sterling Newsome first came to
19   you and spoke to you about driving a
20   vehicle?
21        A.   Because he does not want my
22   father to leave the place and he does not
23   want to lose us from the company.
24        Q.   So what did Sterling Newsome
```

70

1  say to you?
2      A.  Told me to bring people to
3  work into that company and also work at
4  that company as employee.
5      Q.  And did Sterling Newsome
6  provide you with a vehicle to drive or
7  would you just drive your van?
8      A.  Drive my own vehicle.
9      Q.  Did Sterling Newsome or Pack
10 & Process pay you to drive the van in May
11 and June of 2001?
12         MR. URBAN:  You mean
13     directly or indirectly?
14         MR. VILLALOBOS:  Directly.
15         THE WITNESS:  Yes, Pack &
16     Process paid me.
17 BY MR. VILLALOBOS:
18     Q.  As opposed to Mr. Thatch.
19     A.  Actually, Mr. Thatch paid me
20 for transporting.
21     Q.  Did you ever receive any
22 monies directly from Pack & Process for
23 transporting workers from Wilmington to
24 Philadelphia or from Philadelphia to

71

1  Wilmington?
2      A.  No.
3      Q.  Who approached you first
4  about driving the van in May and June of
5  2001 after your father's license was
6  suspended?
7          MR. URBAN:  Objection.  She
8      just said Sterling Newsome.
9          MR. VILLALOBOS:  I'm going
10     to ask her a follow-up.  You will
11     understand.  Your father or
12     Sterling Newsome.  This is the
13     balance of the question.  I wasn't
14     done.
15         MR. MC NULTY:  That question
16     has been asked and answered.  You
17     are changing the question to get,
18     to try to get a different answer
19     to the question.
20         MR. VILLALOBOS:  No, I'm
21     trying to complete a question.  I
22     wanted to ask who was the one that
23     approached her first, her father
24     or Sterling Newsome.

72

1          MR. MC NULTY:  I think that
2      question has been asked and
3      answered.
4          MR. URBAN:  She answered
5      that.
6          MR. MC NULTY:  That's been
7      covered.
8          MR. VILLALOBOS:  She
9      answered that Sterling was the
10     person at Pack & Process who
11     approached her.  I want to know at
12     some point in time before that her
13     father said Hey, look.  I can't
14     drive, et cetera.
15         MR. MC NULTY:  Objection to
16     the form of the question.
17         You can answer the question.
18         THE WITNESS:  Mr. Thatch.
19 BY MR. VILLALOBOS:
20     Q.  Mr. Thatch approached you
21 first?
22     A.  Yes.
23         MR. VILLALOBOS:  I want to
24     take a five minute break and we

73

1      will come back.
2          (Deposition recessed)
3  BY MR. VILLALOBOS:
4      Q.  Back on the record.
5          Just so that I have a clear
6  understanding of who and how and when you
7  were approached to drive, I'm going to
8  break it down person by person.  Okay?
9      Q.  When did Mr. Thatch, in May
10 or June of 2001, when did Mr. Thatch
11 first approach you and ask you to drive
12 the van?
13         MR. URBAN:  Objection to the
14     form of the question.
15         THE WITNESS:  It was in May
16     2001.
17 BY MR. VILLALOBOS:
18     Q.  And do you know why he
19 approached you to drive the van?
20     A.  Because he couldn't find
21 other people to drive and it is hard for
22 him to look for anybody else, so --
23     Q.  And this is after your
24 father's license was suspended?

**Page 90**

1  given to your father or could it be
2  either one of you that would receive
3  gasoline money?
4      A.   If my father is the person
5  driving the van transporting people he
6  would be the one to get the gas money; if
7  I am the one who was the driver I would
8  get the gas money.
9      Q.   And how often would you
10 receive gasoline money from Mr. Thatch?
11     A.   Once a week.
12     Q.   And do you recall how much
13 money you would receive for gasoline each
14 week?
15     A.   20, sometimes $30.
16     Q.   And other than the
17 conversation between Mr. Thatch and your
18 father, do you have any other reason to
19 believe that Pack & Process was giving
20 money to Mr. Thatch in order to
21 compensate drivers for gasoline?
22     MR. MC NULTY: Objection to
23    the form of the question.
24    You can answer.

**Page 91**

1     THE INTERPRETER: I'm sorry.
2    Can you repeat that again?
3 BY MR. VILLALOBOS:
4     Q.   Sure. Other than the
5 conversation that your father had with
6 Mr. Thatch, do you have any other reason
7 to believe that Pack & Process was giving
8 money to Mr. Thatch to be distributed to
9 drivers to reimburse them for gasoline
10 expenses?
11     A.   Can you repeat the question?
12     Can I repeat the question?
13     MR. VILLALOBOS: I will just
14    have it read back.
15     (The last question was read
16    back by the Court Reporter).
17     THE WITNESS: Yes
18 BY MR. VILLALOBOS:
19     Q.   And what other basis for
20 that belief do you have?
21     A.   Mr. Lam told Pack & Process
22 to gave it.
23     Q.   Mr. Lam told whom?
24     A.   To my dad.

**Page 92**

1     Q.   But other than that does she
2 have any reason to believe that Pack &
3 Process was reimbursing drivers for
4 gasoline?
5     A.   Yes.
6     Q.   And what, then, is the basis
7 for your believing that Pack & Process
8 was paying, in essence, for the gasoline?
9     A.   I say because Mr. Lam told
10 my father that money is coming from Pack
11 & Process.
12     Q.   And that's the only reason?
13     A.   Yes.
14     MR. VILLALOBOS: I have no
15    further questions for you.
16     ---
17 BY MR. HOFFMAN:
18     Q.   I would just like to ask a
19 couple questions about this form that you
20 were given. (Indicating).
21     MR. URBAN: Is that Maly Yan
22    Exhibit 4?
23     MR. HOFFMAN: The warm
24    wishes of welcome back from Pack &

**Page 93**

1    Process.
2 BY MR. HOFFMAN:
3     Q.   When you received this form,
4 did you have a belief that the conditions
5 that were set forth on this form
6 represented a change in your work
7 relationship with Pack & Process?
8     A.   Yes, in a way.
9     Q.   Well, let me see what we
10 mean by in a way. Before you signed this
11 form did you believe that as a condition
12 of your employment with Pack & Process
13 you were to assist the transport of labor
14 to Pack & Process?
15     A.   My supervisors told me that
16 starting from this date that I sign,
17 which is July 24, I can no longer
18 transport people to work there.
19     Q.   But before you signed this
20 did you have a belief that as a condition
21 of your employment of working at Pack &
22 Process that you were to assist in the
23 transport of clients to Pack & Process?
24     MR. MC NULTY: Wait a

94

1  minute. Didn't she just answer
2  that one? I'm going to object.
3      MR. HOFFMAN: Was her answer
4  yes?
5      MR. MC NULTY: Yes.
6      MR. HOFFMAN: So we have an
7  answer yes.
8  BY MR. HOFFMAN:
9      Q.  Did you believe, prior to
10 signing this, when you were transporting
11 workers to Pack & Process, that you were
12 transporting people to Pack & Process to
13 assist Pack & Process?
14     A.  Well, yes, but at the time
15 when I was transporting people to work
16 there, I never received this kind of
17 document. This is the first time I
18 received this document, which is under
19 date that I signed. (Indicating).
20     Q.  You received this document
21 after the accident?
22     A.  Yes.
23     MR. HOFFMAN: No further
24 questions.

95

1      MR. MC NULTY: Does anyone
2  else have any questions?
3      (There were none).
4      MR. VILLALOBOS: Okay. The
5  deposition is over.
6      (Witness excused.)
7      (Deposition concluded at
8  2:45 p.m.)

96

CERTIFICATE
---

   I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

_____
John W. Begley, RPR
Dated: September 25, 2003

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

97

INSTRUCTIONS TO WITNESS

   Please read your deposition over carefully and make any necessary changes. You should assign a reason in the appropriate column on the errata sheet for any change made.
   After making any change which has been noted on the following errata sheet, along with the reason for any change, sign your name to the errata sheet and date it.
   You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition. You must sign in the space provided.
   Return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the transcript by you.