# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PACK AND PROCESS, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Case No. 05-0022 (KAJ) |
| | ) | |
| MALY YAN | ) | |
| | ) | |
| Defendant. | ) | |

*************************************

| | | |
|---|---|---|
| YAN THOU, et. al | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-00513 (KAJ) |
| | ) | |
| PACK & PROCESS, INC., et. al. | ) | CONSOLIDATED CASES |
| | ) | |
| Defendants. | ) | |

## ST. PAUL MERCURY INSURANCE COMPANY
## AND PACK & PROCESS, INC.'S MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Ian Connor Bifferato (#3273)
Joseph K. Koury (#4272)
Bifferato, Gentilotti, Biden & Balick
1308 Delaware Avenue
P.O. Box 2165
Wilmington, DE 19899
(302) 429-1900

Francis J. Deasey, Esq.
Henri Marcel, Esq.
Deasey, Mahoney & Bender, Ltd.
1800 John F. Kennedy Blvd., Suite 1300
Philadelphia, PA 19103-2978
(215)587-9400

Dated: August 7, 2006

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CONCISE STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    Maly Yan Was Not Within The Course And Scope of Her Employment
           With Pack & Process At The Time Of Her Accident on June 18, 2001 . . . . . . . . 6

      C.    The St. Paul Policy Does Not Provide Coverage To Maly Yan For the June 18,
           2001 Accident. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF CITATIONS

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986)............................6

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)...................................6

*Coates v. Murphy*, 270 A.2d 527, 528 (Del. 1970).....................................6

*Derrickson v. American National Fire Insurance Co.*, 538 A.2d 1113 (Del. 1988)..........25

*Draper v. Olivere Paving & Construction Co.*, 181 A.2d 565, 570 (Del. 1962)..............7

*Histed v. DuPont*, 621 A.2d 340, 345 (Del. 1993). ....................................9

*J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*,
76 F.3d 1245, 1251 (1st Cir. 1996)..................................................6

*Sarko v. Penn-Del Directory Co.*, 968 F. Supp. 1026, 1031 (E.D. Pa. 1997)...............6

*Stevens v. State of Delaware*, 802 A.2d 939, 945 (Del. Super. Ct. 2002)..................13

<u>Restatements</u>

Restatement 2d of Agency, Section 228 ...........................................6, 7

Restatement 2d of Agency, Section 229 ...........................................7, 8

## NATURE AND STAGE OF THE PROCEEDING

This declaratory judgment action was filed on January 14, 2005. It relates to a policy of insurance issued by St. Paul Mercury Insurance Company ("St. Paul") to a Delaware corporation, Pack & Process, Inc. ("Pack & Process") and whether the policy affords coverage for claims asserted in several actions filed in the Philadelphia, Pennsylvania Court of Common Pleas and in New Castle County, Delaware, arising out of a June 2001 motor vehicle accident which took place in Delaware. Maly Yan, a Pack & Process employee, was the owner and operator of the van involved in the accident, which was transporting 19 temporary workers from the Pack & Process facility in Delaware to their homes in Pennsylvania. This action seeks a declaration that Maly Yan was not an agent/employee of Pack & Process June 18, 2001, and was not in the course and scope of her employment with Pack& Process while transporting temporary employees on that day.

On February 23, 2005, Maly Yan, and certain temporary workers and filed a declaratory judgment action against Pack & Process and St. Paul in the United States District Court for the Eastern District of Pennsylvania, which was eventually transferred to this Court and consolidated with the instant declaratory judgment action. Ms. Yan seeks a declaration that she was an agent/employee of Pack & Process on June 18, 2001; was acting in the course and scope of her employment with Pack & Process while transporting temporary employees to and from the Pack & Process factory; and that St. Paul and Pack & Process are responsible for the Ten Million Dollar judgment imposed upon Maly Yan in a related proceeding in the Philadelphia, Pennsylvania Court of Common Pleas.

Discovery has been completed, and this matter is now ripe for disposition.

## SUMMARY OF ARGUMENT

1.    Maly Yan does not fit the test set forth in Restatement 2d of Agency, Sections 228 and 229, adopted by the Delaware Supreme Court, and was not within the scope of her employment with Pack & Process at the time of the June 18, 2001 accident.

2.    Maly Yan is not an insured or a protected person under the St. Paul Policy and neither St. Paul nor Pack & Process are obligated to indemnify Maly Yan for the June 18, 2001 accident.

## CONCISE STATEMENT OF FACTS

This insurance coverage action arises from an auto accident that occurred on June 18, 2001, on Interstate 495 in Delaware. At the time of the accident, defendant, Maly Yan, was driving a van that she owned, in which she was transporting approximately nineteen (19) temporary workers.   See Complaint filed in the Consolidated Case No. 05-00513, Exhibit "A" at ¶ 31.   In June of 2001, Ms. Yan was employed by Pack & Process in New Castle, Delaware as a Quality Control Line Inspector, where she inspected products to ensure that they met relevant specifications.  (Maly Yan Deposition; 9/24/03; 54:1-12, attached as Exhibit "B" ).  Ms. Yan was not hired by Pack & Process to drive a vehicle; was never paid by Pack & Process to drive a vehicle; was never authorized to drive a vehicle nor to transport other workers on Pack & Process' behalf; was never expected to drive a vehicle as part of her employment with Pack & Process; and was never requested by Pack & Process, Inc. to drive a vehicle or to transport workers on its behalf.  (Steve Ames Deposition; 6/27/06; 214:24-215:16; attached as Exhibit "C").   Rather, prior to June 18, 2001, Pack & Process had contracted with a temporary employment agency, Lam Staff, Inc.,  for the supplying and transporting of temporary workers to Pack & Process at its Delaware factory.  (See Steve Ames Deposition; 6/27/06; 69:13-72:18; attached as Exhibit "C"); see also Exhibit "H" contract between Pack & Process and Lam Staff, Inc.).

As a result of the accident, Maly Yan was named as a defendant in a number of suits filed in the Philadelphia Court of Common Pleas by certain of the injured passengers, and by the estates of certain of the deceased passengers (hereinafter the "Underlying Tort Actions").   (See Amended Complaint in this Action, Exhibit  "D" at ¶ 10).

-3-

One of the Underlying Tort Actions, brought by Yan Thou (individually and as administrator of the estates of Oeurn Mam, deceased, and Navy Yan, deceased), Chan Yan, Thua Son and Chieu Thi Huynh, named only one defendant -- Maly Yan.   Yan Thou, who was injured in the accident, is Maly Yan's father.  Oern Mam, who died in the accident, was Maly Yan's mother.  Navy Yan, who also died in the accident, was Maly Yan's brother.  Chan Yan, who was injured in the accident, is Maly Yan's aunt.   This action will be referred to herein as the "Intra-Family Action."  Counsel for plaintiffs in the Intra-Family Action was the Philadelphia law firm of Kline & Specter, the same firm that is now representing Maly Yan in the instant action.

The Intra-Family Action was submitted to a bench "trial" before the Honorable Sandra J. Moss on January 14 and 20, 2005.  As the transcripts of the "trial" demonstrate, see Exhibits " E" and "F" hereto, the rules of evidence were essentially suspended during the "trial", as plaintiffs' attorney was permitted to testify as to what witnesses "would say" had they been present; expert reports were admitted into evidence without objection; and no real defense to liability or damages was presented by Maly Yan.  See, e.g., Exhibit "E" at 9.  At the conclusion of the "trial" on January 20, 2005, Judge Moss assessed damages to each plaintiff, resulting in a total award of $10,228,467.00.  See Exhibit "F" at 38-39.

During the "trial", the parties entered into a Stipulation executed by Judge Moss, (see Exhibit "J" hereto), pursuant to which Maly Yan agreed to assign her rights to any insurance proceeds to which she may be entitled to the plaintiffs.  Id. at ¶¶ 2(b) and (c).  In exchange, plaintiffs waived their rights to execute against Maly Yan's personal assets.  Id. at ¶ 2(b).

-4-

This action was filed on January 14, 2005, prior to Judge Moss assessing damages on January 20, 2005, and before Maly Yan filed her declaratory judgment action in Pennsylvania on February 23, 2005. St. Paul seeks a declaratory judgment that, under a policy of insurance issued to Pack & Process covering the period May 1, 2001 to May 1, 2002, Maly Yan was not driving a "covered auto" at the time of the Accident, was not a "permitted user" or "protected person", and is not an insured, additional insured, or otherwise entitled to coverage under the policy. (A certified copy of the relevant insurance policy is attached hereto as Exhibit "G"; the policy is referred to herein as the "Policy".) The Policy contained general liability, auto and excess umbrella coverage with primary limits of $1 million per event and $10 million umbrella coverage, for a total of $11 million. See Exhibit "G".

## ARGUMENT

### A.    Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure is designed to secure a just, speedy

and inexpensive determination. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Pursuant

to Rule 56(c), a court should enter summary judgment when the record reveals that "there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52

(1986). An issue is genuine only if the evidence is such that a reasonable jury could find for the

non-moving party. *See id.* at 251. The non-moving party cannot escape summary judgment by

introducing "a mere scintilla of evidence" in her favor or by relying on "conclusory allegations,

improbable inferences, and unsupported speculation." *Sarko v. Penn-Del Directory Co.*, 968 F.

Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted); *J. Geils Band Employee Benefit Plan v.*

*Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996).

### B.    Maly Yan Was Not Within The Course And Scope of Her Employment With Pack & Process At The Time Of The Accident on June 18, 2001

The Delaware Supreme Court has adopted the test set forth in the Restatement 2d of

Agency, Section 228 to determine an employee's scope of employment. *Coates v. Murphy*, 270

A.2d 527, 528 (Del. 1970). Section 228 of the Restatement 2d of Agency states as follows:

§ 228 General Statement

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Restatement 2d of Agency*, § 228.    Furthermore, many factors enter into the decision as to whether or not a particular tort was committed by a servant within the scope of her employment. *Draper v. Olivere Paving & Construction Co.*, 181 A.2d 565, 570 (Del. 1962). Section 229 of the Restatement 2d of Agency, sets forth the kind of conduct that falls within the scope of employment as follows:

§ 229 Kind of Conduct Within Scope of Employment

(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.

(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

-7-

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

The central issue in this matter is whether Maly Yan's conduct in driving the van that was involved in the June 18, 2001 motor vehicle accident was within her scope of employment as a Quality Control Line Inspector with Pack & Process.  Pursuant to the standards set forth in Section 228 above, Ms. Yan's driving of the van was not within the scope of her employment with Pack & Process if it was different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve Pack & Process.

Questions relating to the course and scope of employment are highly factual. *Histed v. DuPont*, 621 A.2d 340, 345 (Del. 1993).   Thus, they must be resolved under a totality of the circumstances test. *Id.*   Questions relating to the course and scope of employment are decided by the court if the answer is clearly indicated. *See* Comment (d) Restatement 2d of Agency Section 228. The evidence produced in this matter clearly establishes as a matter of law, that Ms. Yan's conduct in driving the van on June 18, 2001 was not within her scope of employment with Pack & Process; and Ms. Yan's duties as a Quality Control Line Inspector did not encompass driving a van.   Ms. Yan has acknowledged that driving a van to transport  temporary workers to and from Pack & Process was not within the scope of employment as a Quality Control Technician with Pack & Process:

> Q.     Tell me what a quality control technician does.  In other words, what are your duties and responsibilities on the average day at Pack & Process as a quality control technician?
>
> A.     Like checking on the candies bag, examining the candies bag.  Make sure there's no rip, no tears on it.
>
> Q.     What other duties and responsibilities did you have as a quality control technician?
>
> A.     That's all I do.

(Maly Yan Deposition; 9/24/03; 54:1-12, attached as Exhibit "B" ).

Ms. Yan also testified regarding the time limits of her position at Pack & Process:

> Q.     Did you punch a clock when you went to work?
>
> A.     Yes, yes, I punch every time I come in and every time I come out from work.

(Maly Yan Deposition; 6/5/06; 68:2-5; attached as Exhibit "I").   Furthermore, Ms. Yan has admitted on numerous occasions that her father, and later she herself, transported temporary

-9-

workers to and from Pack & Process on behalf of Lam Staff, Inc., the temporary employment

agency that contracted with Pack & Process to deliver temporary workers to Pack & Process

factory, and not on behalf of Pack & Process.

> Q.    Okay, Now, why is it that your father purchased a 15 passenger van, to the
>        extent that you know?
>
> ...
>
> THE WITNESS: We need it for our business.
>
> Q.    For your business?
>
> A.    Yes.
>
> Q.    And what business is that you needed that 15-passenger van for?
>
> A.    I transport people to work at Pack & Process and Lam.

(Maly Yan Deposition; 9/24/03; 22:24-23:15; attached as Exhibit "B" ).  Ms. Yan testified

further:

> Q.    Are you familiar with a company by the name of Lam Staff?
>
> A.    Yes.
>
> Q.    And how is it that you are familiar with that company?
>
> A.    That person contact me to provide workers.
>
> Q.    And when you say "that person", who is that person?
>
>> A.    The name is Lam.
>
> Q.    Okay.  Are you familiar with a gentlemen by the name of Thatch.
>
>> A.    Like what?  What was the name.
>
>> Q.    Suasaday Thatch.
>
> A.    Yes.
>
> Q.    And who is that individual, to your knowledge?
>
>> A.    It is my agency.
>
> Q.    It is your agency?
>
> A.    Yes, the person who ask me to take people to work.
>
> Q.    Okay.  So Mr. Thatch is associated in some fashion with Lam Staff?
>
> A.    Yes.

...

Q.    For instance, do you know if he's the owner or president of Lam Staff, or would he simply be an employee of Lam Staff?

A.    I believe it is the owner of that place.

Q.    You said that he approached you for some reason. Could you tell me what he approached you for?

A.    He came to ask me to provide or transport people to work at Pack & Process.

...

Q.    And when was it that he approached you to transport people to Pack & Process?

A.    In 1995.

Q.    And did you, in fact, transport people to Pack & Process as requested by this gentleman back in 1995?

...

THE WITNESS:    My father, in 1995, my father was the one who transported people to work.

Q.    Okay. And was that at the request of Mr. Thatch?

A.    Yes.

Q.    And, to her knowledge, was her father paid for transporting people to Pack & Process?

A.    Yes.

Q.    And to her knowledge, who was it that paid her father to transport these individuals to Pack & Process?

A.    Mr. Thatch.

...

Q.    At some point in time, though, in 2001 did you cease working directly for Mr. Thatch and then become an employee of Pack & Process?

THE WITNESS: Actually, for both.

Q.    What do you mean by "actually for both"?

A.    I get paid from Pack & Process, I got a check from them, and also I get paid being a transporter for people, taking peoples there.

Q.    And who would pay you for being a transporter?

A.    Mr. Thatch.

-11-

(Maly Yan Deposition; 9/24/03; 37:2-40:8; attached as Exhibit "B" ).

Ms. Yan testified further as follows:

> Q.    Okay.  On June 18, 2001, was it your understanding that in order to
> continue working at Pack & Process that you would have to be the drive of
> that van?
>
> ...
>
> THE WITNESS:  Yes.
>
> Q.    And who was it that placed that requirement on you?
>
> A.    Mr. Thatch.  Still Mr. Thatch.

(Maly Yan Deposition; 9/24/03; 84:21-85:10; attached as Exhibit "B").  Ms. Yan testified

further:

> Q.    In June of 2001, you were being paid by check as an inspector for Pack &
> Process, correct.
>
> A.    Yes.
>
> Q.    And David paid you in cash for transporting passengers, correct?
>
> A.    Yes.
>
> Q.    And did any of the passengers pay you any money?
>
> A.    No.
>
> ...
>
> Q.    So you would get somewhere between $300 and $450 a week in cash from
> David to transport passengers?  David Thatch, I mean.
>
> A.    That's correct.

(Maly Yan Deposition; 6/5/06; 104:3-22; attached as Exhibit "I").

The foregoing testimony completely contradicts Ms. Yan's assertion that her scope of

employment with Pack & Process included transporting temporary workers to the Pack &

Process factory.  In fact, this testimony clearly establishes that Ms. Yan was serving her own self

-12-

interest and not that of Pack & Process when she drove the van at the time of the accident. The foregoing testimony is also consistent with the testimony of Steve Ames, President of Pack & Process, who testified that Pack & Process contracted with Lam Staff, Inc. for the supply and transportation of temporary workers to Pack & Process. (Steve Ames Deposition; 6/27/06; 83:8-17; attached as Exhibit "C"). Ms. Yan established only that the consideration she received for the transportation of temporary workers to and from Pack & Process factory came from Lam Staff, Inc. She has never established that she received any consideration from Pack &Process for this transportation.

In relation to Pack & Process, Ms. Yan's driving of the van at the time of the accident was more analogous to her simply traveling to and from her place of employment. Delaware follows the "going and coming" rule, which in essence precludes an employee from receiving workers' compensation benefits for injuries sustained while traveling to and from the worker's place of employment. *Stevens v. State of Delaware*, 802 A.2d 939, 945 (Del. Super. Ct. 2002). Interestingly, despite her claim that she was in the course and scope of her employment with Pack & Process at the time of the accident, Ms. Yan has never filed for workers' compensation benefits through Pack & Process. (Maly Yan Deposition; 6/5/06; 54:17-21; attached as Exhibit "I").

Ms. Yan is likely address the above inconsistencies by pointing to the testimony in which she asserts that someone from Pack & Process did, in fact, instruct her to transport temporary workers as part of her duties as a quality control line inspector. In this regard, Ms. Yan initially testified as follows:

Q.    Did anyone at Pack & Process ever instruct you to drive a vehicle?

A.    My supervisor told me.

Q.    Your supervisor told you to drive a vehicle?

A.    Yes, transferring people to work and also working as an employee there.

Q.    What supervisor was it that told you to transfer people to and form work?

A.    Sterling.

Q.    Sterling Newsome?

A.    Yes.

(Maly Yan Deposition; 9/24/03; 68:22-69:11; attached as Exhibit "B").  Sterling Newsome was

the Pack & Process production manager from 1999 through 2002.  This evidence, however, does

not establish that Ms. Yan's driving of the van on June 18, 2001 was within the course and scope

of her employment with Pack & Process.  Mr. Newsome's testimony in this regard adds context

to Ms. Yan's claim as follows:

Q.  She was also, just like you, sat down for a deposition on September 24, 2003.
She was sworn under oath and I'll go through with you again some stuff.  She was
asked on page 69, line 6, the question was posed to her, this was by
Mr.Villalobos, who is defense counsel.  What supervisor was it that told you to transport people
to and from work.  Her answer was Sterling.  The question was then posed to her, Sterling
Newsome?  And her answer was yes.  Do you disagree with that?

A.  I think that I said to her one time, but not in a official capacity, I said, she
asked how are we going to get back and forth to work.  And said, I guess you'll
have to drive.  But that was not in an official capacity of Pack and Process.  That
was just as two friends talking.

Q.  That conversation, did that occur at the plant?

A.  Yes.

Q.  So it occurred, it occurred during the hours in which she was working as a QC
operator?

A.  It was either some time during the day there one time.

Q.  She was on the clock at the time that you had this conversation, correct?

A.  Correct.  But I didn't make it in the official capacity of being plant supervisor.

-14-

Q.  Did you express that to her, and say listen, we're having this conversation just as two friends and this is in no way, I'm in no way talking to you as your supervisor?

A.  I guess I assumed.

Q.  But you didn't explicitly say that to her.

A.  I didn't say, Maly, you're going to have to do it, no.

Q.  The next question was and when it was, and when was it that Sterling Newsome told you to drive the van to transport workers.  And her answer was after my father got his license suspended.  As far as the time frame is concerned, do you agree with that?

A.  It was after that, yes.

Q.  Okay.  And then the next question was under what circumstances was it that Mr. Sterling Newsome first came to you and spoke to you about driving the vehicle.  And the answer was because he did not want my father to leave the place, and he does not want to lose us from the company.  Would you agree with that?

A.  Yes, I'll agree with that.

Q.  And then it says, so what did Sterling Newsome say to you.  Answer, told me to bring people to work into the company and also work at the company as employee.  Do you remember having that conversation with her?

A.  I would say that's sort of chopped up there but it's, probably discussed.  But, once again, that was as two friends talking, not as me being –I wasn't her supervisor.  Cheryl was her supervisor.  She worked for Cheryl.  I made two separate, even though I was responsible for both of them, I maintained deferitian (ph.) between the two.  Cheryl ran her department, I ran mine.

Q.  But like you said, I understand that.  But you were responsible for Cheryl and for Maly, correct?

A.  Theoretically, yes.

Q.  The next question was did Sterling Newsome  provide you with a vehicle to drive or would you just drive your van.  Answer drive my own vehicle. Any reason to disagree with that?

A.  True.

Q.  Okay.  Then the next question posed to her was did Sterling Newsome or Pack and Process pay you to drive the van in May and June of 2001.  Another attorney chimed in, you mean directly or indirectly.  Mr. Villalobos said directly and the witness says, yes, Pack and Process paid me.

A.  If they did I wasn't aware of it.

Q.  Okay.

-15-

A.  Because she was off the clock.  And I had to review the hours every week.
So, if she was being paid it was by somebody else.

(Sterling Newsome Deposition; 6/9/06; 118:7-123:9; attached as Exhibit "K").  Mr. Newsome

testified further:

Q.  And at some point in time were you made aware of the fact that Maly Yan
was going to drive the van instead of Kenny Chow?

A.  Yes.

Q.  When were you notified of that?

A.  Maybe a day or two before the accident.

Q.  And who presented that information to you.

A.  Maly.

Q.  Maly approached you?

A.  She just said she -- we was just casually talking one time and she said she's
going to start driving.

Q.  Was Steven Ames ever made aware of that fact?

A.  No.

Q.  Prior to this conversation you had with Maly Yan, you had known who she
was?

A.  Yes.

Q.  And you knew that she was a direct employee of Pack and Process, she was a
quality, a QC person, correct?

A.  Correct.

Q.  Was there any concern of yours that she would be, if in fact, let's start this
way.  Your understanding was that it was -- Maly Yan was going to start driving
the van?

A.  Correct.

Q.  Who was she doing that for?

A.  Her father.

Q.  And was she receiving any, if you know, any compensation from anybody
else besides Pack and Process for driving, do you know if she was receiving any
other compensation, other than the compensation that Pack and Process was
providing to her?

A.  She wasn't being compensated by Pack and Process to drive.

-16-

Q. My question was a little different. She was being paid on the books for the services she was providing for Pack and Process as QC person, correct?

A. Correct.

Q. Do you know if separate and apart from that she was getting any money on the side from anybody else about -- relating to her transporting workers?

A. I told her she would have to talk to David Thach to see of he would pay her a couple hours a week, I mean a couple hours a day.

Q. Did you talk to David Thach in that regard?

A. No.

Q. Do you know if Maly Yan ever did?

A. I really don't know because she had an accident a couple days later.

Q. Did you ever bring it up to Steve Ames that Maly Yan, who was a direct employee of Pack and Process, was also going to be transporting workers?

A. As long as she was off the clock, we didn't care.

(Sterling Newsome Deposition; 6/9/06; 82:24-85:8; attached as Exhibit "K"). Mr. Newsome

testified further:

Q. Did Maly Yan ever approach you or did she ever approach you and ask you for permission to drive the van to and from?

A. No.

Q. Did she ever express to you any concerns about working for two different agent -- to different companies at the same time?

...

THE WITNESS: No, as long as she was off the clock we had no control over what she did as long as -- that was her business.

Q. Do you know if Maly Yan ever approached anybody in the Pack and Process organization to ask for their permission to drive these workers to and from work?

A. To my knowledge, no.

Q. Do you know if she ever approached David Thach or someone from Lam Staffing and asked them to ask someone in Pack and Process for permission for her to drive?

A. I don't know.

Q. Did David Thach or anybody from Lam Staffing approached you asking if it was okay if Maly Yan could transport these people?

A. No.

-17-

Q.  Anybody else from the Lam organization approach you and ask you if it was okay if Maly would drive the van?

A.  No.

(Sterling Newsome Deposition; 6/9/06; 88:1-89:8; attached as Exhibit "K").  Mr. Newsome adds

the following context:

Q.  Do you know what her position was as a permanent employee?

A.  Quality control was her primary position.

Q.  Was she a quality control line inspector?

A.  Yes.

Q.  Was she a quality control line inspector on June 18, 2001?

A.  Yes.

Q.  Are you familiar with the job duties of a quality control line inspector at Pack and Process?

A.  Yes.

Q.  Were any quality control line inspectors employed at Pack and Process hired by Pack and  Process to drive vehicles?

A.  No.

Q.  Were any employees of Pack and Process hired by Pack and Process to drive the temporary workers to the plants?

A.  No.

Q.  Was Maly Yan hired by Pack and Process to drive a vehicle?

A.  No.

Q.  Did Pack and Process ever pay Maly Yan for driving a vehicle?

A.  To my knowledge, no.

Q.  Was Maly Yan ever authorized to drive a vehicle on behalf Pack and Process?

A.  To my knowledge, no.

Q.  Was Maly Yan ever expected to drive a vehicle on behalf of Pack and Process?

A.  No.

Q.  Was driving a vehicle within the course and scope of the duties of Maly Yan as a quality line inspector at Pack and Process?

A.  No.

...

-18-

Q.  Did Maly Yan ever ask you for permission to drive a car or a van?

A.  No, she never asked me permission to, no.

Q.  Did you have anything to do with the decision of Maly Yan to drive the van on June 18, 2001 or any other days that she drove the van prior to that date?

A.  I don't think so.

Q.  Did you ever request that Maly Yan drive the van on behalf of Pack and Process?

A.  No.

Q.  Did you ever instruct or order Maly Yan to drive a van on behalf of Pack and Process?

A.  I may have mentioned it casually but not in a, as much as a production supervisor.

Q.  Did you ever have any discussions with Steve Ames regarding Maly Yan driving the van?

A.  No.

Q.  To your knowledge whose responsibility was it for making the arrangements to transfer or to transport the workers to and from Pack and Process?

A.  The temporary agency.

...

Q.  We talked about this a little bit on in the time you and I had together, but I just want to make it clear.  You will agree that you had a conversation with Maly Yan whereby she told you that her dad's license was suspended, correct?

A.  Correct.

Q.  And in that conversation you said to her, well, then you're going to have to drive, right?

A.  I said I guess you'll have to drive.

Q.  Okay.

...

Q.  What was the context of the conversation that you had with Maly Yan about her driving the van?

A.  She was telling me that Ken was being transferred and then she said that my dad can't

drive anymore.  I said, well, you got a license, you can drive.  That's all I said.

(Sterling Newsome Deposition; 6/9/06; 145:1-148:12; attached as Exhibit "K").  Given the

foregoing testimony, Ms. Yan can only assert that, at best, Mr. Newsome's statements to her led

her to believe that Pack & Process was requiring her to transport workers to and from the factory.

However, given the context of Mr. Newsome and Ms. Yan's testimony, this assertion has no

basis in fact.  Even if, arguendo, Ms. Yan did have a basis for believing as such, there is no

authority that establishes that an employee's belief can translate into actual course and scope of

employment.  Furthermore, when Ms. Yan was questioned about her claim that Mr. Newsome

instructed her to drive the van, she testified as follows:

> Q.    And when was it that Sterling Newsome told you to drive a van to transport workers?
>
> A.    After my father got his license suspended.
>
> Q.    Under what circumstances was it that Sterling Newsome first came to you and spoke to you about driving a vehicle?
>
> A.    Because he does not want my father to leave the place and he does not want to lose us from the company.
>
> ...
>
> Q.    So what did Sterling Newsome say to you?
>
> A.    Told me to bring people to work into that company and also work at the company as employee.
>
> Q.    And did Sterling Newsome provide you with a vehicle to drive or would you just drive your van?
>
> A.    Drive my own vehicle.
>
> Q.    Did Sterling Newsome or Pack & Process pay you to drive the van in May and June of 2001?
>
> ...
>
> THE WITNESS: Yes, Pack & Process paid me.
>
> Q.    As opposed to Mr. Thatch.
>
> A.    Actually, Mr. Thatch paid me for transporting.

Q.    Did you ever receive any monies directly from Pack & Process for transporting workers from Wilmington to Philadelphia or from Philadelphia to Wilmington?

A.    No.

...

Q.    Who approached you first about driving the van in May and June of 2001 after your father's license was suspended?

...

THE WITNESS:  Mr. Thatch.

...

Q.    Mr. Thatch approached you first?

A.    Yes.

(Maly Yan Deposition; 9/24/03; 69:12-72:22; attached as Exhibit "B").

Interestingly, at her subsequent deposition, when asked whether any employee of Pack & Process ever told her that it was part of her job to transport temporary workers to and from Pack & Process, Ms. Yan failed to even mention Mr. Newsome, and gave a different answer:

Q.    Now, did any employee of Pack & Process ever tell you that it was part of your job to transport worker to and from Pack & Process?

A.    David and Steve who told me to do that.

Q.    Well, David who?

A.    David, Sday

Q.    David Thatch?

A.    Yes.

Q.    And Steve who?

A.    The boss in the company.

Q.    Did Steven – does Steven, the boss, ever tell you directly that you had to drive workers to and from Pack & Process?

A.    No, he did not.  He just told David.

Q.    Now, how do you know Steve told David that?

-21-

A.    Because David told me that Steve was agree to allow me to transport
worker to and from the company.

...

Q.    Other than David telling you that, did anyone else ever tell you that it was
part of your job to transport workers to and from Pack & Process?

A.    No, just David.

(Maly Yan Deposition; 6/5/06; 98:9-100:6; attached as Exhibit "I" ).  In addition, when

specifically asked for the facts supporting her position that driving the van was in the course and

scope of her employment with Pack & Process, Ms. Yan stated:

Q.    And what I'm asking you is other than David Thatch telling you that
Steve, the boss, said it was okay for you to drive workers to and from work, do
you have any other facts that support that position that it was part of your job to
drive workers to and from work?

A.    The only thing I know for sure, that Steve told David and asked me to
drive the van.

Q.    And you know that for sure because that's what David Thatch told you,
correct?

A.    Yes.

Q.    And other than the - other than David Thatch telling you that, do - are you
aware of any other facts that support your position that it was part of your job to
drive workers to and from work?

A.    I don't have any other evidence beside that, but the fact is that if David or
Steve, if they don't agree with what I have done, they should have suspend me a
long time ago.

(Maly Yan Deposition; 6/5/06; 109:14-110: 9; attached as Exhibit "I" ).  This evidence offered

by Ms. Yan is simply insufficient to establish that she was in the course and scope of her

employment with Pack & Process at the time of the accident, and should be contrasted with the

deposition statements of Steve Ames, President of Pack & Process, that  Ms. Yan was not hired

by Pack & Process to drive a vehicle; was never paid by Pack & Process to drive a vehicle; was

never authorized to drive a vehicle nor to transport other workers on Pack & Process' behalf; was

never expected to drive a vehicle as part of her employment with Pack & Process; and was never

requested by Pack & Process, Inc. to drive a vehicle or to transport workers on its behalf. (Steve

Ames Deposition; 6/27/06; 214:24-215:16; attached as Exhibit "C").

Ms. Yan's testimony also establishes that her belief that her scope of employment with

Pack & Process included transporting temporary workers to and from the factory is based on her

mistaken perception of the relationship between Pack & Process, Lam Staff, Inc. and herself. In

this regard, Ms. Yan testified as follows:

Q.    Is the reason you are sure that your father got paid by Pack & Process is
      because David Thatch told you?

A.    David Thatch never say anything about that, but I saw him paying my
      father when he got money from the company.

Q.    Who did you see pay your father?

A.    I saw David gave the money to my father.

Q.    All right. How much did – what did David – what did David Thatch give
      your father cash? Did he give your father cash?

A.    He got check from the company, and he cash that check and gave my
      father cash.

Q.    So your father got cash from David Thatch, correct?

A.    That's correct.

Q.    Okay. And did you ever see Pack & Process give a check to David
      Thatch?

A.    I never seen it, but every time the payment is up, David always get the check from
      that company.

Q.    How did you know he get a check if you didn't see him get it?

A.    There was one day when I met him by chance, and I ask him where he's
      going, and he told me that he just got a check from the company.

Q.    Do you know anything about the agreement between David Thatch and
Pack & Process for the - for workers to be supplied to Pack & Process?

A.    No, I don't know.

Q.    So you never saw Pack & Process give your father any money directly for
      transporting people, is that correct?

A.    They didn't give any money directly to my father because my father just a
      subcontract with David.

(Maly Yan Deposition; 6/5/06; 62:21-64:10; attached as Exhibit "I").  Ms. Yan testified further:

Q.    Okay.  Have you ever received any money directly from Pack & Process
      for transporting people to and from Pack & Process?

A.    I have received payment from David, and David say that he received the
      money from the company.

Q.    So the answer to my question would be no, that you have not received
      money directly from Pack & Process for transporting passengers, is that
      correct?

A.    Yes.

(Maly Yan Deposition; 6/5/06; 97:22-98:8; attached as Exhibit "I").  Ms. Yan's testimony in this

regard establishes only that she may have had a mistaken belief about any implications to her of

Pack & Process' relationship with the temporary staffing agency.  Neither Ms. Yan nor her father

were paid by Pack & Process for transporting Pack & Process temporary workers, and,

additionally, neither Ms. Yan nor her father had any idea of the relationship between Pack &

Process and Lam Staff, Inc.  Simply put, there is no authority that establishes that an employee's

belief, mistaken or otherwise, can translate into actual course and scope of employment.

As stated above, Ms. Yan's conduct in driving the van on the date of the accident was

clearly not of the same general nature as that which she was authorized by Pack & Process to

perform as a quality control technician, nor was it incidental to the conduct authorized by Pack &

Process.  As such, it was not within her scope of employment with Pack & Process.

Furthermore, Ms. Yan has produced no evidence to establish that, pursuant to Section 229 (2) of

the Restatement 2d of Agency, although not authorized, Ms. Yan's driving of the van on June 18,

-24-

2001 was so similar to or incidental to her authorized conduct as a quality control technician as to be within the scope of her employment with Pack & Process.

### C.   The St. Paul Policy Does Not Provide Coverage To Maly Yan For the June 18, 2001 Accident

If the language of a policy of insurance is clear and unambiguous, there is no basis for judicial construction to determine its meaning. *Derrickson v. American Nat'l Fire Ins. Co.*, 538 A.2d 1113 (Del. 1988). Absent such ambiguity, there is no need, or authority, for a court to apply rules of construction which require an insurance contract to be construed in favor of the insured. *Id.*

The relevant general liability language of the St. Paul Policy clearly and unambiguously sets forth terms that reveal that Ms. Yan did not quality as an insured or protected person at the time of her accident. Under the provision entitled "Who is Protected Under This Agreement", employees of a corporation are protected persons "<u>only</u> for work done within the scope of their employment by the corporation or the employees performance of duties related to the conduct of the corporation." ( See Exhibit "G", Form 47500 Rev. 1-96, at pp. 5-6 of 22 (emphasis added)). Since driving the van at the time of the accident was not "work done within the scope of [her] employment by [Pack & Process]" and because she was not performing "duties related to the conduct of [Pack & Process's] business," Ms. Yan does not qualify as an insured or protected

person under the general liability portion of the Policy.[1]

The van that Ms. Yan was driving at the time of the accident was not a "covered auto" as the term is used in the Policy. (See Exhibit "G", Form 44449 Rev. 12-93 at pp. 1-10). The auto coverage portion of the Policy includes a summary setting forth the type of auto coverage that the Policy provides, indicating that the Policy provides auto liability protection for "any auto". (See Exhibit "G", Form 44460 Ed. 4-91). The policy defines "any auto" as "any owned rented, leased, or borrowed auto." Additionally, "any auto" includes hired, nonowned, newly acquired, replacement and temporary substitute autos." (Exhibit "G", Form 44449 Rev. 12-93 at p. 4 of 10).[2][3][4][5][6] Clearly, Pack & Process did not own, rent, lease or borrow Ms. Yan's van. Thus, Ms.

---

[1]Moreover, the "auto" exclusion in the general liability portion of the Policy bars coverage for all claims arising out of the accident because the Policy "does not cover bodily injury, property damage, or medical expenses that result from the ownership, maintenance, use, or operation of any auto owned, operated, rented, leased, or borrowed by any protected person." (Exhibit "G", Form 47500 Rev. 1-96, at p. 10 of 22). Because Ms. Yan was not a protected person within the context of the Policy, this exclusion does not come into play. However, assuming that Ms. Yan were a covered person, the exclusion would apply and thus bar coverage.

[2]The Policy defines "hired autos" as "any auto that you hire, rent, lease or borrow form others, other an your employees or members of their households." (Exhibit "G", Form 44449 Rev. 12-93 at p. 4 of 10).

[3]The Policy defines "nonowned autos" as "any auto that [Pack & Process] does not own, hire rent lease or borrow; and is used in the conduct of [Pack & Process'] business." Nonowned autos under this provision include autos owned by employees, but only while such autos are being used in the conduct of Pack & Process' business. (Exhibit "G", Form 44449 Rev. 12-93 at p. 4 of 10).

[4]The Policy defines "newly acquired autos" as "any additional auto that [Pack & Process] acquire while this [Policy] is in effect." (Exhibit "G", Form 44449 Rev. 12-93 at p. 4 of 10).

[5]The Policy defines "replacement autos" as "any auto that replaces a covered auto." (Exhibit "G", Form 44449 Rev. 12-93 at p. 4 of 10).

[6]The Policy defines "temporary substitute autos" as "any auto not owned by [Pack & Process] while it's being used, with permission of its owner, as a temporary substitute for a...

Yan's van at the time of the accident was not a "hired auto" under the Policy.  Since the van Ms.

Yan was driving at the time of the accident was not "being used in the conduct of [Pack &

Process'] business," Ms. Yan's van was not an "nonowned auto" under the Policy.   In addition,

the van that Ms. Yan was driving at the time of the accident does not meet the definition of a

newly acquired, replacement or temporary substitute auto.  Thus, there is no coverage under the

auto portion of the Policy.[7]

With respect to the umbrella excess portion of the Policy, Ms. Yan does not qualify as a

"protected person" and therefore has no coverage under that aspect of the policy.  (See Exhibit

"G", Form 47550 Rev. 3-96 at pp. 1-20).  As with the general liability portion of the Policy, the

umbrella excess portion of the Policy includes a provision entitled  "Who is Protected Under

This Agreement".   (See Exhibit "G", Form 47550 Rev. 3-96 at p. 6-7 of 20).   Under this

provision,  employees of a corporation are protected persons "only for work done within the

scope of their employment by the corporation or the employees performance of duties related to

the conduct of the corporation."  (See Exhibit "G", Form 47500 Rev. 3-96, at p. 7 of 20

(emphasis added)).   Since driving the van at the time of the accident was not "work done within

---

covered auto...which can't be used because it: (i) has broken down; (ii) has been damaged,
destroyed or stolen; or (iii) is being repaired or serviced."  (Exhibit "G", Form 44449 Rev. 12-93
at p. 4 of 10).

[7]Furthermore, notwithstanding that the van Ms. Yan was driving was not "any auto" as
defined in the Policy, there is additionally no coverage as a "permitted user", defined therein as
"any person...to whom [Pack & Process] has given permission to use a covered auto [Pack &
Process] owns, rents, leases, hires, or borrows." (See Exhibit "G", Form 44449 Rev. 12-93 at p. 5
of 10).  That is because this provision does not consider an employee driving an auto she owns as
a "permissive user" under the Policy. (See Exhibit "G", Form 44449 Rev. 12-93 at p. 5 of 10
(excluding from "permitted user" an employee or member of an employee's household "if the
covered auto is owned by that employee or member of that employee's household[ ]")).

-27-

the scope of [her] employment by [Pack & Process]" and because she was not performing "duties related to the conduct of [Pack & Process's] business," Ms. Yan does not qualify as an insured or protected person under the umbrella excess portion of the Policy.

## CONCLUSION

St. Paul and Pack & Process respectfully submit that this Court should grant their Motion for Summary Judgment and enter an Order declaring that Maly Yan was not within the course and scope of her employment with Pack & Process at the time of her accident on June 18, 2001, and that St. Paul and Pack & Process are not required to indemnify Maly Yan for her June 18, 2001 accident.

Dated: August 7, 2006          Respectfully submitted,
        Wilmington, DE

_____
Ian Connor Bifferato (#3273)
Joseph K. Koury (#4272)
Bifferato, Gentilotti, Biden & Balick
1308 Delaware Avenue
P.O. Box 2165
Wilmington, Delaware 19899
(302) 429-1900

            and

Francis J. Deasey, Esq.
Henri Marcel, Esq.
Deasey, Mahoney & Bender, Ltd.
1800 John F. Kennedy Blvd., Suite 1300
Philadelphia, Pennsylvania 19103-2978
(215)587-9400

*Attorneys for Plaintiffs*