# EXHIBIT B
# PART 1

1

```
 1            IN THE COURT OF COMMON PLEAS

 2        PHILADELPHIA COUNTY, PENNSYLVANIA

 3                   - - -

 4    UNCHALEE VONG et al      :FEBRUARY TERM 03

 5          vs.                :

 6    MALY YAN et al           :2882

 7                   - - -

 8               Oral deposition of

 9    Maly Yan, taken pursuant to Notice, held

10    at the law offices of Christie, Pabarue,

11    Mortensen & Young Services, 1880 JFK

12    Boulevard, 10th Floor, Philadelphia, PA,

13    on Wednesday, September 24, 2003, at

14    12:45 p.m., before John W. Begley, a

15    Federally Approved Registered

16    Professional Reporter - Notary Public in

17    and for the Commonwealth of Pennsylvania.

18                   - - -

19         ESQUIRE DEPOSITION SERVICES

20               15th Floor

21       1880 John F. Kennedy Boulevard

22       Philadelphia, Pennsylvania 19103

23            215 - 988-9191

24
```

2

1    A P P E A R A N C E S :
2    WAPNER, NEWMAN, WIGRIZER & BRECHER
3    BY:  ROBERT S. MILLER, ESQUIRE
4    10000 Sagemore Drive - Suite 10202
5    Marlton, New Jersey  08053
6    Phone:  856 - 983-9800
7    Representing the Plaintiffs Unchalee Vong
8    and Lawrence Vong, h/w and Donkeo
9    Phravichit
10
11   DRANOFF ASSOCIATES
12   BY:  STEVEN M. DRANOFF, ESQUIRE
13   121 South Broad Street - Suite 1210
14   Philadelphia, PA 19107
15   Phone:  215 - 732-3333
16   Representing the Plaintiffs Soly Chan
17   Thorn Bun Khem (Lam Khem deceased, and
18   Lang Khem, deceased)
19
20
21
22
23
24

4

1    GEROLAMO, MC NULTY, DIVIS & LEWBART, PC
2    BY:  KEVIN R. MC NULTY, ESQUIRE
3    225 South 15th Street
4    Lewis Tower Building - Suite 1600
5    Philadelphia, PA 19102
6    Phone:  215 - 790-8400
7    Representing the Defendant Maly Yan
8
9    CONRAD, O'BRIEN, GELLMAN & ROHN
10   BY:  KELLY G. HULLER, ESQUIRE
11   1515 Market Street - 16th Floor
12   Philadelphia, PA 19102
13   Phone:  215 - 864-8083
14   Representing the Defendants Motiva
15   Enterprises, LLC, Charles P. Reistle,
16   Jr., and Richard P. Reistle, Sr.
17
18   ALSO PRESENT:  Steve Ames
19          Leam Leendavy Koung,
20          Interpreter
21          John D. Leer
22
23
24

3

1    KLINE & SPECTER
2    MARK HOFFMAN, ESQUIRE
3    1525 Locust Street - 19th Floor
4    Philadelphia, PA  19102
5    Phone:  215 - 772-1300
6    Representing the Plaintiffs
7    Thou Yan, Oeurm Man, deceased, Navy Yan,
8    deceased, Chan Yan, Thuha, son, Chieu Thi
9    Huynh and Bay Nguyen
10
11   CHRISTIE, PABARUE, MORTENSEN & YOUNG
12   BY:  RAFAEL M. VILLALOBOS, JR., ESQUIRE
13   1880 JFK Boulevard - 10th Floor
14   Philadelphia, PA 19103
15   Phone:  215 - 587-1682
16   Representing the Defendant Pack and
17   Process, Inc.
18
19   GOLOMB, HONIK & LANGER
20   BY:  JOSEPH J. URBAN, ESQUIRE
21   121 South Broad Street - 9th Floor
22   Philadelphia, PA 19107
23   Phone:  215 - 985-9177
24   Representing the Deponent

5

1
2          - - -
3        I N D E X
4          - - -
5    Testimony of Maly Yan          PAGE
6    By Mr. Villalobos          9, 88
7    By Mr. Urban          87
8    By Mr. Hoffman          92
9          - - -
10       E X H I B I T S
11
12   EXHIBIT    DESCRIPTION          PAGE
13   Maly Yan 1  Invoice from Family    31
14        Dodge dated 6/12/01
15   Maly Yan 2  Time card for Maly Yan 57
16        dated 6/23/01
17   Maly Yan 3  Application for    64
18        benefits of Maly Yan
19        dated 6/18/01
20   Maly Yan 4  Consultation record   77
21        from Christiana Care
22   Maly Yan 5  Memorandum to    81
23        Maly Yan from Steve
24        Ames dated 7/27/01

6

```
 1
 2          DEPOSITION SUPPORT INDEX
 3
 4   Direction to Witness Not To Answer
 5   Page  Line      Page  Line
 6   25    11        75    11
 7   27    11        76    16
 8   33    24        77    1
 9   59    23        78    16
10   61    7
11   Request For Production of Documents
12   Page  Line      Page  Line
13   none
14   Stipulations
15   Page  Line      Page  Line
16   6     9-16
17
18   Questions Marked
19   Page  Line   Page  Line
20   none
21
22
23
24
```

8

```
 1              - - -
 2           EXAMINATION
 3              - - -
 4       MR. URBAN: I would just
 5   like to make a statement, a brief
 6   statement for the record regarding
 7   the September 23rd letter that Mr.
 8   Villalobos sent to Mr. Honik from
 9   my office indicating that the
10   questioning today would be solely
11   with regard to the jurisdictional
12   questions subject to the
13   preliminary objections. There
14   will be no questions regarding
15   liability or damages today. Thank
16   you.
17       MR. VILLALOBOS: I intended
18   to place a similar statement on
19   the record. In essence, this
20   deposition is in preparation for
21   an upcoming hearing which is
22   scheduled for October first of
23   this year before Judge Bernstein
24   referential to our outstanding
```

7

```
 1
 2       THE COURT REPORTER: Usual
 3   stipulations?
 4       MR. VILLALOBOS: That's
 5   fine.
 6       MR. URBAN: That's fine, but
 7   I would like the deponent to read
 8   and sign the transcript.
 9              - - -
10       (It is hereby stipulated by
11   and among counsel for the
12   respective parties that the
13   sealing, filing and certification
14   are waived, and that all
15   objections, except as to the form
16   of the questions, be reserved
17   until the time of trial.)
18              - - -
19       Leam Leendavy Koung,
20   Interpreter, sworn.
21              - - -
22       Maly Yan, after having first
23   been duly sworn, was examined and
24   testified as follows:
```

9

```
 1   preliminary objections related to
 2   jurisdictional issues. I do not
 3   intend to delve into liability
 4   issues today, nor do I intend to
 5   delve into damages issues today,
 6   however, we obviously reserve our
 7   right to re-depose Ms. Yan at a
 8   later date regarding those issues
 9   which are not going to be covered
10   today.
11       Does anyone here in this
12   room have a different
13   understanding or differ with
14   respect to the substantive intent
15   of this deposition?
16       MR. MILLER: That's correct.
17       MR. VILLALOBOS: Everyone is
18   nodding in the negative.
19              - - -
20   BY MR. VILLALOBOS:
21       Q.  All right. Ms. Yan, my name
22   is Rafael Villalobos and I am counsel for
23   Pack & Process. Pack & Process, as you
24   know --
```

10

1      THE INTERPRETER: I'm sorry.
2   Go ahead.
3   BY MR. VILLALOBOS:
4      Q.   What I would like to know,
5   just for purposes of housekeeping, I
6   guess, is how well can you understand and
7   speak English, because I think if you
8   understand and speak it well enough
9   perhaps we can use the interpreter as a
10  crutch rather than to translate every
11  words spoken during the course of the
12  deposition.
13      MR. URBAN: I would prefer
14   not to. I think we should just go
15   through the interpreter. Ms. Yan
16   speaks wonderful English, but in
17   the context of this deposition, I
18   think we would be much better
19   off if we just stuck with the
20   interpreter.
21      MR. VILLALOBOS: That's
22   fine.
23  BY MR. VILLALOBOS:
24      Q.   As I said, my name is Rafael

11

1   Villalobos and I am counsel for Pack &
2   Process?
3      A.   Okay.
4      Q.   You are sitting in a
5   deposition, and a deposition is basically
6   a question and answer session.
7      A.   Yes.
8      Q.   I'm going to be asking you
9   questions today and you, in turn, will
10  have an opportunity to answer my
11  questions. Once I'm done some of the
12  other attorneys present in the room today
13  may likewise ask you some questions.
14  Now, you are under oath. I want you to
15  understand that given the fact that you
16  are under oath, the testimony that you
17  give here today is going to have the same
18  weight as it would if you were in from of
19  a judge and a jury. Do you understand
20  that?
21      Do you understand that?
22      A.   Yes.
23      Q.   Also, all of your responses
24  need to be verbal. Even though you are

12

1   speaking to me through an interpreter, I
2   need you to say "yes" or "no" as opposed
3   to nods of the head or hand gestures. Do
4   you understand that?
5      A.   Yes.
6      Q.   You are represented here
7   today by two different attorneys. Those
8   attorneys have the right to object to
9   some questions which I may ask during the
10  course of the deposition. If, in fact,
11  they object I would just ask that you
12  hold on a moment, allow us to resolve the
13  objection, and then we can resume your
14  testimony.
15      A.   Okay.
16      Q.   Also, if you don't
17  understand one of my questions, for
18  whatever reasons, please tell the
19  interpreter and she, in turn, will
20  communicate to me that you don't
21  understand the question, and I will
22  repeat it or rephrase it.
23      A.   Yes.
24      Q.   Also, if for whatever

13

1   reasons you would like to take a break,
2   and obviously this deposition centers
3   around a very unfortunate event in your
4   life, but for whatever reasons, if you
5   would like to take a break for a few
6   moments to compose yourself, just let us
7   know.
8      A.   Yes.
9      Q.   All right. That concludes
10  the instructions. What I would like to
11  get into now is some biographical
12  information about you.
13      THE INTERPRETER: Before we
14   continue, can I also ask her to,
15   when she says anything relating to
16   a person, to indicate a sex of a
17   person instead of just saying a
18   person. It would be hard to
19   translate, since I don't know the
20   sex of the person.
21      MR. VILLALOBOS: Absolutely.
22      THE INTERPRETER: Yes.
23   Thank you.
24  BY MR. VILLALOBOS:

14

1    Q.    What is your full name,
2  ma'am?
3    A.    Maly Yan.
4    Q.    Are you known by any other
5  names or aliases?
6    A.    No.
7    Q.    What's your date of birth?
8    A.    December 29, 1978.
9    Q.    And where were you born?
10   A.    In Cambodia.
11   Q.    And when did you come to
12 this country?
13   A.    In 1992.
14   Q.    And what is your status here
15 in the United States of America?
16   A.    I live here.
17   Q.    Are you an American citizen
18 or are you a resident alien?
19   A.    Green card.
20   Q.    And you have a Social
21 Security number?
22   A.    Yes.
23   Q.    And what is that?
24   A.    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.

15

1    Q.    Ma'am, are you married or
2  single?
3    A.    I was married; now I'm
4  divorced.
5    Q.    When you were married, did
6  you go by a different name at that time?
7    A.    No.
8    Q.    And when were you married
9  and when were you divorced?
10   A.    I was married in 1998.  2001
11 is when I was divorced.
12   Q.    And do you have any
13 children?
14   A.    One child.
15   Q.    A boy or a girl?
16   A.    Girl.
17   Q.    And how old is your
18 daughter?
19   A.    Four years old.
20   Q.    And what's your current
21 address?
22   A.    2007 9th Street.  19148 is
23 the ZIP code.
24   Q.    And how long have you lived

16

1  at that address?
2    A.    Six years.
3    Q.    And with whom do you reside?
4    A.    My dad, my brother, and my
5  in-law.
6        THE INTERPRETER:  She hasn't
7  indicated a sex.
8        THE WITNESS:  And my
9  daughter and my nephew.
10 BY MR. VILLALOBOS:
11   Q.    Let me just get this
12 straight.  Your father, brother,
13 daughter, nephew, and in-law singular or
14 in-laws plural?
15   A.    It is my brother's wife.
16 Just one.
17   Q.    Okay.  And is this a house
18 or an apartment?
19   A.    It is a house.
20   Q.    And do you own the home or
21 is this a rental property.
22        MR. MC NULTY:  Objection.
23 Relevance.
24        MR. VILLALOBOS:  Well, you

17

1  can object to the form of the
2  question.  Relevance is an
3  evidentiary issue.  If you want to
4  instruct her not to answer --
5        MR. MC NULTY:  We have
6  limits on what the deposition is
7  by agreement.
8        MR. VILLALOBOS:  I
9  understand that.  I'll tell you
10 the relevance of these issues
11 outside the hearing of the
12 witness.  That's fine.  Or do you
13 want to just direct her not to
14 answer?
15        MR. MC NULTY:  I'm going to
16 direct her not to answer.
17        What was the question?
18        MR. VILLALOBOS:  I just
19 wanted to know if it was a rental
20 property or they own the home.
21        MR. MC NULTY:  Go ahead.
22 She can answer.
23        THE WITNESS:  My uncle's.  I
24 rent it.

**18**

1  BY MR. VILLALOBOS:
2      Q.   Now, how long has your
3  father resided at that specific address?
4      A.   Six years.
5      Q.   And how about your brother?
6      A.   Also six years.
7      Q.   And the same for your
8  sister-in-law, I believe it would be?
9      A.   They just got married.  For
10 two years.
11     Q.   And this is the home that
12 your mother and your other brother
13 resided in as well?
14     A.   Yes.
15     Q.   And did they live there
16 during the latter part of the 1990's?
17     A.   No, I wasn't in United
18 States yet.
19     Q.   Well, she was --
20         MR. MC NULTY:  The later
21 part of the 1990's.
22         MR. VILLALOBOS:  Yes.
23 BY MR. VILLALOBOS:
24     Q.   For instance, 1998, 1999.

**19**

1      A.   We live there ever since.
2      Q.   And did you go to school
3  here in this country?  Elementary school,
4  for instance?
5      A.   I started high school.
6      Q.   And in what year did you
7  start high school here?
8      A.   1994.
9      Q.   And what high school was
10 that?
11     A.   Furness High School.
12     Q.   Furness, and that's here in
13 Philadelphia?
14     A.   Yes.
15     Q.   And did you graduate from
16 that high school?
17     A.   Yes.
18     Q.   And in what year did you
19 graduate?
20     A.   In 1998.
21     Q.   Since 1998 did you further
22 your education at all?  Did you take any
23 college courses or train for any
24 certificate, type of certification?

**20**

1      A.   No.
2      Q.   Are you able to understand
3  the spoken word in English?
4      A.   I can understand some.
5      Q.   And can you understand the
6  written word in English?
7      A.   Yes, some.
8      Q.   And are you able to write,
9  yourself, in English?
10     A.   Yes.
11     Q.   And when you were in high
12 school here in Philadelphia were you
13 required to take English language
14 classes, courses in the ability to speak
15 English?
16     A.   Yes.
17     Q.   I want to talk to you, I'm
18 going to switch gears for a moment and I
19 want to talk to you about the van that
20 you were driving back on June 18, 2001.
21 All right?
22     A.   Yes.
23     Q.   It is my understanding that
24 it was a 1992 Dodge van.  Is that

**21**

1  accurate?
2      A.   Yes.
3      Q.   And was the van bought by
4  you or someone in your family, or was the
5  van leased by you or someone in your
6  family?
7      A.   I bought that van.
8      Q.   You bought the van
9  personally?
10     A.   My father bought it.
11     Q.   When it was purchased, was
12 it purchased with cash or was a loan
13 taken out in order to purchase the
14 vehicle?
15     A.   It was cash.  Paid off.
16     Q.   Do you have any
17 documentation related to the purchase of
18 that vehicle, any receipts or any other
19 paper documents related to your purchase
20 of that vehicle?
21         MR. MC NULTY:  And he
22         doesn't mean here today; he means
23         at all.
24         MR. VILLALOBOS:  Right.

**22**

```
1          THE WITNESS:  No, not at
2     all.
3     BY MR. VILLALOBOS:
4          Q.   And do you recall how much
5     the vehicle cost when it was purchased?
6          A.   It was about 11,000.
7          Q.   And when was it that you
8     purchased it?
9          MR. MC NULTY:  Can we just
10    clear up, was it her who purchased
11    it, her father, or both?
12         THE WITNESS:  At first it
13    was under my father name when it
14    was bought, and then later on,
15    after I was driving back, it was
16    transferred to my name.
17    BY MR. VILLALOBOS:
18         Q.   And the monies that were
19    spent on the vehicle, were they your
20    father's monies, the ten or 11,000?  Were
21    they his monies that were used to
22    purchase the vehicle or were they yours?
23         A.   It was my dad money.
24         Q.   Okay.  Now, why is it that
```

**23**

```
1     your father purchased a 15-passenger van,
2     to the extent that you know?
3          MR. URBAN:  Objection to the
4     form of the question.
5          You can answer.
6          THE WITNESS:  We need it for
7     our business.
8     BY MR. VILLALOBOS:
9          Q.   For your business?
10         A.   Yes.
11         Q.   And what business is that
12    that you needed that 15-passenger van
13    for?
14         A.   I transport people to work
15    at Pack & Process and Lam.
16         Q.   We are going to talk about
17    that in some great detail, but before I
18    do I want to ask you some more questions
19    about the vehicle.
20         Was the vehicle registered
21    in your father's name or was the vehicle
22    registered in your name?
23         MR. MC NULTY:  Objection.
24         MR. HOFFMAN:  Objection.  At
```

**24**

```
1     what time?
2          MR. URBAN:  When?
3          MR. VILLALOBOS:  At the time
4     the vehicle was purchased?
5          MR. URBAN:  When?  The
6     transfer to her name may, in some
7     eyes, may be considered a purchase
8     or repurchase by her as well.
9          MR. VILLALOBOS:  When the
10    vehicle first came into the
11    possession of her family, was it
12    registered in her name or her
13    father's name.
14         MR. URBAN:  When it first
15    came into the possession of her
16    father or her, in her name?
17         MR. VILLALOBOS:  Her father.
18         MR. URBAN:  Well, ask that
19    question.
20         THE WITNESS:  Yes.
21    BY MR. VILLALOBOS:
22         Q.   And at some point in time
23    was the vehicle then registered in your
24    name rather than in your father's name?
```

**25**

```
1          A.   Yes.
2          Q.   And do you know when that
3     took place, that the registration of the
4     vehicle was transferred from your
5     father's name to your name?
6          A.   Around April 2001.
7          Q.   Is there any particular
8     reason why the vehicle was transferred
9     from your father's name into your name in
10    April of 2001?
11         A.   My father got his license
12    suspended.
13         Q.   So are you telling me that
14    he wasn't able to drive the vehicle, and
15    therefore he transferred it to someone
16    else's name, that being your name?
17         MR. URBAN:  Objection to the
18    form of the question.
19         MR. MC NULTY:  Objection to
20    the form of the question.  She is
21    not going to answer that question.
22    I instruct her not to answer.
23         MR. VILLALOBOS:  Excuse me.
24         MR. MC NULTY:  She's not
```

26

1    going to answer that.
2        MR. VILLALOBOS:  You are
3    instructing her not to answer?
4        MR. MC NULTY:  Yes.
5        MR. VILLALOBOS:  That's
6    fine.
7    BY MR. VILLALOBOS:
8        Q.   Do you know what company
9    insured that vehicle in 2001?
10       A.   I believe it was
11   Independence something.
12       Q.   Did you apply for the
13   insurance for that vehicle or did some
14   other person apply for the insurance for
15   that vehicle?
16       A.   My dad help me.
17       Q.   Your dad helped you?
18       A.   Yes, he took me to that
19   place.
20       Q.   Okay.  In whose name was the
21   application submitted?  Do you have any
22   idea?
23       A.   My name.
24       Q.   Did you pay for the

27

1    insurance each month, on an annual basis,
2    or some other basis?
3        A.   I believe it was once a
4    month.
5        Q.   But were you the individual
6    who made the payments on a monthly basis,
7    or did your father, or did some other
8    person?
9        A.   My father.
10       Q.   And do you have any idea how
11   much those payments were?
12       A.   I believe it was over $200.
13       Q.   Now, if something went wrong
14   with the vehicle, for instance, if the
15   vehicle needed maintenance, who would pay
16   for the maintenance on the vehicle in
17   2001?
18       MR. URBAN:  Objection.  I
19   instruct her not to answer.
20       MR. VILLALOBOS:  On what
21   basis?
22       MR. URBAN:  It is getting
23   into issues far beyond
24   jurisdictional issues.

28

1        MR. VILLALOBOS:  I don't
2    think so.  This has to do with
3    agency, it has to do with personal
4    jurisdiction.  From our
5    standpoint, quite frankly, this is
6    a vehicle that was owned, insured
7    and registered by Maly Yan and her
8    family; not Pack & Process.
9    During the course of this
10   deposition I intend to establish
11   that Pack & Process didn't own the
12   vehicle, didn't register the
13   vehicle, didn't insure the
14   vehicle, didn't pay to maintain
15   the vehicle, didn't put gas in the
16   vehicle's tank, nor did we
17   reimburse Maly Yan or her father
18   for those expenses, so to the
19   extent that agency or personal
20   jurisdiction is invoked by those
21   issues, I think it is relevant and
22   I think it is within the scope.  I
23   don't intend to delve too deeply
24   into the topic, but nonetheless I

29

1    think I'm entitled to ask who
2    maintained the vehicle, whether
3    Pack & Process reimbursed her
4    family for maintaining that
5    vehicle, or whether those were
6    expenses that she and her family
7    incurred separate and a part from
8    any relationship with Pack &
9    Process.
10       MR. URBAN:  But the
11   questions you pose in your
12   statement I may find acceptable;
13   the one that you asked, which is,
14   I believe, where it was that she
15   had maintenance work done, or
16   whether or not she obtained that
17   the maintenance --
18       MR. VILLALOBOS:  I didn't
19   ask where.
20       MR. URBAN:  Whether she got
21   the maintenance work done, I think
22   is beyond the jurisdictional
23   issues and I would instruct her
24   not to answer those types of

**30**

1    questions.
2        MR. VILLALOBOS: Maybe
3    there's a misunderstanding between
4    us, because I don't think I asked
5    where.
6        MR. MC NULTY: Is the
7    question if the vehicle needed
8    repairs who paid for it?
9        MR. VILLALOBOS: Yes.
10       MR. MC NULTY: Is that okay
11   with you?
12       MR. URBAN: Who paid for it?
13       MR. VILLALOBOS: Yes.
14       MR. URBAN: That's fine. I
15   can live with that.
16       THE WITNESS: My father.
17   BY MR. VILLALOBOS:
18       Q.   I'm going to show you some
19   records that I have from Family Dodge. I
20   will distribute it around the table. All
21   I'm going to ask is do you have any
22   documentation regarding payment of these
23   expenses related to repair of the
24   vehicle. If you have any documentation,

**31**

1    I would ask that you give the
2    documentation to your counsel.
3        A.   Yes.
4        Q.   Once everybody has a copy,
5    I'm going to ask you a few questions
6    about this document.
7        MR. MC NULTY: Are you
8    marking this?
9        MR. VILLALOBOS: I'm going
10   to mark it as Maly Yan 1.
11   (Indicating).
12       (The above-referred-to
13   document was marked as Maly Yan
14   Exhibit 1 for identification).
15       MR. URBAN: And what's the
16   question?
17       MR. VILLALOBOS: I'm going
18   to ask her if she has any
19   documentation related to who paid
20   these invoices, and I also have
21   some questions with respect to the
22   business telephone numbers that
23   are listed for Maly Yan at the top
24   left of the first page of this

**32**

1    packet.
2    BY MR. VILLALOBOS:
3        Q.   The first question is do you
4    recognize this document at all, ma'am?
5        A.   No, I haven't seen this
6    before. (IN).
7        Q.   Do you see your name at the
8    top left of this first page?
9        A.   Yes.
10       Q.   And that's your address
11   below your name?
12       A.   Yes.
13       Q.   And before that you see a
14   residence telephone number?
15       A.   Not this one. (Indicating).
16       Q.   Below the address there's a
17   telephone number.
18       A.   That's not it.
19       Q.   Next to the residence
20   telephone number there's a business phone
21   number. I believe it reads
22   267 - 254-4187. Do you see that number,
23   ma'am?
24       A.   Yes.

**33**

1        Q.   Do you know what telephone
2    number that is, to what business or to
3    what place of work that number belongs?
4        MR. URBAN: Objection to the
5    form of the question.
6        MR. MC NULTY: Objection to
7    the form of the question.
8        You can answer.
9        THE WITNESS: I don't know.
10   BY MR. VILLALOBOS:
11       Q.   Is that the Pack & Process
12   telephone number?
13       A.   I don't really remember Pack
14   & Process phone number.
15       Q.   Is that the still phone
16   number for Lam Staff or Lam Services?
17       A.   I really don't know.
18       Q.   Towards the bottom right of
19   this first page it says total invoice
20   $603.22. Do you see that, ma'am?
21       A.   Yes.
22       Q.   Do you have any
23   documentation or receipts, for instance,
24   related to who paid this invoice?

34

1    A.   I don't know.
2    Q.   Do you have any
3  understanding as to who paid this
4  invoice?
5        MR. MC NULTY: I'm going to
6    object. If she doesn't know how
7    would she have an understanding?
8        MR. VILLALOBOS: She doesn't
9    know if there's documentation.
10   I'm asking if she has an
11   understanding as to who would have
12   paid.
13       MR. MC NULTY: I'm going to
14   object to the form and I'm not
15   going to let her answer.
16 BY MR. VILLALOBOS:
17   Q.   Do you have any reason to
18 believe that Pack & Process paid this
19 $603.22 for the maintenance of this
20 vehicle?
21   A.   No.
22   Q.   I would like to flip into, I
23 believe it is, the seventh page. It is
24 another invoice dated June 14, 2001. It

35

1  looks just like the first page.
2        MR. URBAN: What's the Bates
3    number?
4        MR. VILLALOBOS: The Bates
5    number is eight, 008.
6  BY MR. VILLALOBOS:
7    Q.   Same question with respect
8  to the total invoice amount, which is
9  $783.93. Do you have any idea who paid
10 for this service on this van?
11   A.   It is probably my dad.
12   Q.   Would you have any
13 documentation or receipts regarding who
14 would have paid this amount for the
15 repair of this van?
16       MR. MC NULTY: Objection to
17   the form of the question.
18       You can answer.
19       THE WITNESS: I really don't
20   know.
21 BY MR. VILLALOBOS:
22   Q.   Do you have any reason to
23 believe that Pack & Process would have
24 paid for the repairs on that van?

36

1    A.   No.
2    Q.   As of June, I'm done with
3  this document for the time being, as of
4  June 2001 could you please tell me who
5  purchased the gasoline that would go into
6  that vehicle?
7        MR. URBAN: Is your question
8    whether or not she would be
9    reimbursed for gasoline?
10       MR. VILLALOBOS: No, I
11   haven't gotten there yet.
12       MR. URBAN: Okay.
13       MR. VILLALOBOS: That's the
14   next question.
15       MR. URBAN: That's fine.
16       MR. VILLALOBOS: Who bought
17   the gas, and the next question is,
18   if someone else other than her
19   did, did someone reimburse her.
20       THE WITNESS: Myself.
21 BY MR. VILLALOBOS:
22   Q.   Were you reimbursed for the
23 monies that you had spent to put gas in
24 that van in June 2001?

37

1    A.   No.
2    Q.   Are you familiar with a
3  company by the name of Lam Staff?
4    A.   Yes.
5    Q.   And how is it that you are
6  familiar with that company?
7    A.   That person contact me to
8  provide workers.
9    Q.   And when you say "that
10 person", who is that person?
11   A.   The name is Lam.
12   Q.   Okay. Are you familiar with
13 a gentleman by the name of Thatch.
14   A.   Like what? What was the
15 name.
16   Q.   Suasaday Thatch.
17   A.   Yes.
18   Q.   And who is that individual,
19 to your knowledge?
20   A.   It is my agency.
21   Q.   It is your agency?
22   A.   Yes, the person who ask me
23 to take people to work.
24   Q.   Okay. So Mr. Thatch is

38

1 associated in some fashion with Lam
2 Staff?
3    A.   Yes.
4    Q.   And what is your
5 understanding of Mr. Thatch's
6 relationship to Lam Staff?
7    A.   I really don't know.
8    Q.   For instance, do you know if
9 he's the owner or president of Lam Staff,
10 or would he simply be an employee of Lam
11 Staff?
12    A.   I believe it is the owner of
13 that place.
14    Q.   And you said that at some
15 point in time this gentleman approached
16 you to find people or transport people on
17 his behalf or on behalf of his company?
18        MR. URBAN:  Objection to the
19    form of the question.
20        MR. MC NULTY:  Objection. I
21    don't think that's what she said.
22 BY MR. VILLALOBOS:
23    Q.   You said that he approached
24 you for some reason.  Could you tell me

40

1    Q.   And, to her knowledge, was
2 her father paid for transporting people
3 to Pack & Process?
4    A.   Yes.
5    Q.   And to her knowledge, who
6 was it that paid her father to transport
7 these individuals to Pack & Process?
8    A.   Mr. Thatch.
9    Q.   And what I'm going to do is
10 ask you about some other companies and
11 then we are going to get into more detail
12 about transportation issues.
13        Are you familiar with a
14 company called Point & Fortune?
15    A.   No.
16    Q.   How about a company called
17 Asian Plus?
18    A.   I don't know.
19    Q.   Okay. How about a gentleman
20 by the name of Bob Macknis?
21    A.   American?
22    Q.   Yes.
23    A.   Yes.
24    Q.   And how do you know

39

1 what he approached you for?
2    A.   He came to ask me to provide
3 or transport people to work at Pack &
4 Process.
5    Q.   Okay. Did you know this
6 gentleman before then?
7    A.   No.
8    Q.   And when was it that he
9 approached you to transport people to
10 Pack & Process?
11    A.   In 1995.
12    Q.   And did you, in fact,
13 transport people to Pack & Process as
14 requested by this gentleman back in 1995?
15        MR. URBAN:  Objection to the
16    form of the question.
17        You can answer.
18        THE WITNESS:  My father, in
19    1995, my father was the one who
20    transported people to work.
21 BY MR. VILLALOBOS:
22    Q.   Okay. And was that at the
23 request of Mr. Thatch?
24    A.   Yes.

41

1 Mr. Macknis?
2    A.   He work at Pack & Process.
3    Q.   Okay. Do you know what his
4 job title or his position was at Pack &
5 Process?
6    A.   At the time he was a
7 manager.
8    Q.   And what time was that?
9 What time frame?
10    A.   Since 1995. I believe it
11 was in 1997 or 1998 was when he was
12 retired.
13    Q.   While you were working at
14 Pack & Process, at some point during the
15 1990's did you work with Mr. Robert
16 Macknis?
17    A.   That American man?
18    Q.   Yes.
19    A.   Which part of the years
20 again?
21    Q.   During the 1990's, before he
22 retired, did she work with Mr. Macknis at
23 Pack & Process?
24    A.   Yes.

**42**

1    Q.    And was he one of her bosses
2    or supervisors?
3    A.    Yes.
4    Q.    Likewise, how about a woman
5    by the name of Cheryl Staniszewski?
6    A.    She's my supervisor on QC.
7    Q.    Is that quality control?
8    A.    Yes.
9    Q.    And during what time frame
10   did you work with Cheryl Staniszewski in
11   quality control at Pack & Process?
12   A.    In 1998.
13   Q.    How about in 2001?
14   A.    Yes.
15   Q.    And she was your supervisor
16   at that time?
17   A.    Yes.
18   Q.    How about a gentleman by the
19   name of Sterling Newsome?
20   A.    Yes.
21   Q.    And did you work with him at
22   Pack & Process as well?
23   A.    Yes.
24   Q.    And was he one of your

**43**

1    supervisors or bosses at Pack & Process?
2    A.    Yes.
3    Q.    And would he have been your
4    boss or supervisor in 2001 as well as
5    Cheryl Staniszewski was?
6    A.    Yes.
7    Q.    And, lastly, do you know
8    someone by the name of Susi Hadi or Susi
9    Hadi?
10   A.    I don't really recognize the
11   name.
12   Q.    What I would like to do is
13   ask you about your employment history
14   with Pack & Process.
15   A.    All right.
16   Q.    When was it that you first
17   worked at Pack & Process, and I'm
18   distinguishing that between worked for
19   Pack & Process, and I will explain it,
20   but why don't you give her that part of
21   that and then I will explain the balance
22   of it.
23        MR. MC NULTY:  I'm not sure
24   she understands the distinction.

**44**

1        MR. URBAN:  Objection.
2    BY MR. VILLALOBOS:
3        Q.    What I'm going to be doing
4    is asking about your working physically
5    at Pack & Process, but it is my
6    understanding that while working at Pack
7    & Process, depending upon the time frame,
8    you worked as both an employee of Pack &
9    Process --
10       MR. MC NULTY:  Wait a
11   minute.  Shouldn't you be asking
12   her questions as opposed to
13   telling her --
14       MR. VILLALOBOS:  I'm giving
15   her my understanding as a
16   backdrop.  If she disagrees,
17   that's fine, but I'm just trying
18   to give her an understanding
19   because I'm going to distinguish
20   between working for versus working
21   at.
22       MR. MC NULTY:  Why don't
23   just ask her that?
24       MR. URBAN:  I think that

**45**

1    would be better.
2        MR. VILLALOBOS:  I tried and
3    then you said she didn't
4    understand, and the interpreter
5    didn't understand.
6        MR. MC NULTY:  No, I think
7    the question is in 1998 who did
8    you work for and have her answer.
9        MR. VILLALOBOS:  Okay.
10       MR. MC NULTY:  Who paid your
11   salary?
12       MR. VILLALOBOS:  That's
13   fine.
14       MR. MC NULTY:  That's what I
15   would prefer you do.
16       MR. VILLALOBOS:  Sure.
17   BY MR. VILLALOBOS:
18       Q.    When was it that you first
19   began to work at Pack & Process?  Was it
20   1998?
21       A.    You mean like by paying by?
22       Q.    That's what I'm trying to
23   avoid.  When did you physically go to a
24   Pack & Process facility and work there,

46

1  regardless of who it was that was paying
2  you?
3      MR. URBAN: She didn't
4  understand.
5      Re-ask the question, please.
6  BY MR. VILLALOBOS:
7      Q.  The question is when did you
8  first work at, physically work at, Pack &
9  Process?
10      MR. URBAN: Why don't you
11  say which year?
12  BY MR. VILLALOBOS:
13      Q.  Which year was it that you
14  first worked at Pack & Process?
15      A.  In 1995.
16      Q.  And in 1995 were you paid by
17  Pack & Process or were you paid by some
18  other company?
19      A.  It was another person.
20      Q.  And who was that other
21  person that paid you as opposed to Pack &
22  Process?
23      A.  Mr. Thatch.
24      Q.  And what was your job title?

47

1      A.  It was pretty much packing
2  candies.
3      Q.  In 1995, when you initially
4  worked at Pack & Process, did you drive a
5  vehicle?
6      A.  No.
7      Q.  From 1995 until what year
8  did you initially work at Pack & Process?
9      A.  Starting year 2001 is when I
10  entered into working for Pack & Process.
11      Q.  Okay. So from 1995 until
12  2001 did you work continuously at Pack &
13  Process?
14      A.  Yes.
15      Q.  Was there any period of time
16  between 1995 and 2001 when you, for
17  whatever reason, stopped working at Pack
18  & Process?
19      A.  When I was pregnant.
20      Q.  Okay. And during that time
21  period between 1995 and 2001, while you
22  were working at Pack & Process, were you
23  paid by Mr. Thatch as opposed to Pack &
24  Process during that whole time frame?

48

1      A.  Yes.
2      Q.  During that time frame,
3  between 1995 and 2001, while you were
4  working for Mr. Thatch at Pack & Process,
5  how did you get to work every day?
6      MR. URBAN: Objection to the
7  form of the question.
8      Go ahead. You can answer.
9      THE WITNESS: I drove my
10  vehicle.
11  BY MR. VILLALOBOS:
12      Q.  Okay. And what vehicle was
13  that?
14      A.  The 1992 vehicle.
15      Q.  Did you drive it to and from
16  Pack & Process between 1995 and 2001 on a
17  daily basis?
18      A.  At first my father was the
19  one who drove the vehicle, and then
20  several months before the accident
21  happened I was the one who was driving
22  the vehicle.
23      Q.  I'm going to ask you some
24  more questions about that in a few

49

1  moments.
2      At some point in 2001 did
3  your job title change at Pack & Process?
4      A.  Yes.
5      Q.  And what did your job title
6  change to?
7      A.  I was packing candies and
8  putting into boxes.
9      Q.  At some point in time,
10  though, in 2001 did you cease working
11  directly for Mr. Thatch and then become
12  an employee of Pack & Process?
13      MR. URBAN: Objection to the
14  form of the question.
15      THE WITNESS: Actually, for
16  both.
17  BY MR. VILLALOBOS:
18      Q.  What do you mean by
19  "actually for both"?
20      A.  I get paid from Pack &
21  Process, I got a check from them, and
22  also I get paid being a transporter for
23  people, taking peoples there.
24      Q.  And who would pay you for

50

1  being a transporter?
2       A.   Mr. Thatch.
3       Q.   Let me ask you about quality
4  control. It is my understanding that in
5  2001 you began working in the capacity of
6  a quality control technician rather than
7  a packer.
8       A.   Yes.
9       Q.   And in that capacity were
10 you working for Cheryl Staniszewski?
11      A.   Yes.
12      Q.   And was she your direct
13 supervisor?
14      A.   Yes.
15      Q.   And when did you transition
16 from being a packer to a quality control
17 technician? What month and year?
18      A.   I think it was in February.
19      Q.   Of 2001?
20      A.   Yes.
21      Q.   And who was it that hired
22 you at Pack & Process to be a quality
23 control technician?
24      A.   Ms. Cheryl.

51

1       Q.   Ms. Who?
2       A.   The person named Cheryl.
3       Q.   Cheryl?
4       A.   Cheryl.
5       Q.   And were you hired as a
6  full-time employee or a part-time
7  employee?
8       A.   Full-time.
9       Q.   And were you receiving a
10 salary or were you paid at an hourly
11 rate?
12      MR. MC NULTY: Objection to
13 the form of the question. It can
14 be the same.
15      MR. VILLALOBOS: Well, an
16 hourly wage earner making X number
17 of dollars per hour versus someone
18 who receives a salary for a year.
19 I'm trying to differentiate
20 between the two.
21      MR. URBAN: Okay.
22      THE WITNESS: By hours.
23 BY MR. VILLALOBOS:
24      Q.   And how much were you paid

52

1  per hour as a quality control technician
2  as of February 2001?
3       A.   7.50 an hour.
4       Q.   And was that an increase in
5  your pay over what you received when you
6  were working for Mr. Thatch?
7       A.   Yes.
8       Q.   And how much was it that you
9  were receiving from Mr. Thatch when you
10 were working for him as opposed to Pack &
11 Process?
12      MR. URBAN: Objection to the
13 form of the question.
14      You can answer.
15      THE WITNESS: When I was
16 working for him he paid me three
17 dollars a person.
18 BY MR. VILLALOBOS:
19      Q.   To transport people?
20      A.   Yes.
21      Q.   Three dollars per person per
22 day?
23      A.   Yes.
24      MR. URBAN: But the question

53

1  is in relation to when she was
2  being paid by Mr. Thatch to work
3  at Pack & Process, what did he pay
4  her.
5       THE WITNESS: Like I say, by
6  person.
7       MR. MC NULTY: Not in
8  relation to taking people back and
9  forth from work. When she
10 physically was working in the
11 plant, as opposed to --
12      MR. VILLALOBOS: As a
13 packer.
14      MR. MILLER: In 2001.
15      THE WITNESS: When I was
16 working for cash or after I work
17 with check?
18 BY MR. VILLALOBOS:
19      Q.   Well, let's do it both ways.
20 How much did you get when you were being
21 paid cash?
22      A.   5.50.
23      Q.   And how about by check?
24      A.   7.50.

54

1    Q.   Tell me what a quality
2  control technician does.  In other words,
3  what are your duties and responsibilities
4  on the average day at Pack & Process as a
5  quality control technical?
6    A.   Like checking on the candies
7  bag, examining the candies bag.  Make
8  sure there's no rip, no tears on it.
9    Q.   What other duties and
10 responsibilities did you have as a
11 quality control technician?
12   A.   That's all I do.
13   Q.   Okay.  Were there different
14 shifts in 2001?  Between February and
15 June were there different shifts that you
16 could work at Pack & Process?
17   A.   Yes.
18   Q.   And which shift were you on
19 between February of 2001 and June 2001
20 when the accident took place?
21   A.   Could you repeat the
22 question again?
23   Q.   Sure.  When would your work
24 day start, when you were a quality

55

1  control technical, between February and
2  June of 2001?
3    A.   Starting at six in the
4  morning to 4:30 in the afternoon.
5    Q.   And when you would arrive in
6  the morning did you have to punch a
7  clock?
8    A.   Yes.
9    Q.   And at the end of your shift
10 did you, again, have to punch a clock?
11   A.   Yes.
12   Q.   What was your understanding
13 of what that meant?  In other words, what
14 was your understanding of the
15 significance of punching the clock at the
16 beginning of your shift and punching the
17 clock at the end of your shift?
18        MR. MC NULTY:  Objection to
19     the form of the question.
20        THE WITNESS:  It is just to
21     show that if I showed up to work
22     late or not late.
23 BY MR. VILLALOBOS:
24   Q.   Did Pack & Process pay you

56

1  for the work you did during the period of
2  time between punching in in the morning
3  and punching out at the end of the shift?
4    A.   Yes.
5    Q.   Between punching out at the
6  end of your shift and punching out the
7  following morning did Pack & Process pay
8  you for anything you did during that time
9  frame?
10        MR. URBAN:  Objection to the
11     form of the question.
12        THE WITNESS:  I really don't
13     understand what you are trying to
14     say.
15 BY MR. VILLALOBOS:
16   Q.   Were you paid by Pack &
17 Process for any activities that you were
18 engaged in after you would punch the
19 clock at the end of your work shift?
20   A.   No.
21        MR. URBAN:  Objection to the
22     form of the question.
23 BY MR. VILLALOBOS:
24   Q.   While working as an employee

57

1  of Pack & Process did you ever work in
2  the State of Pennsylvania?
3        MR. URBAN:  Objection to the
4     form of the question.
5        THE WITNESS:  No.
6  BY MR. VILLALOBOS:
7    Q.   Did you always work in the
8  State of Delaware?
9    A.   Yes.
10        MR. URBAN:  Objection to the
11     form of the question.
12        THE WITNESS:  Yes.
13 BY MR. VILLALOBOS:
14   Q.   What I would like to do is
15 show you a few other documents.
16     This is going to be Exhibit
17 Maly Yan 2.  (Indicating).
18        (The above-referred-to
19     document was marked as Maly Yan
20     Exhibit 2 for identification)
21 BY MR. VILLALOBOS:
22   Q.   Do you recognize this
23 document?
24   A.   Yes.

58

1    Q.    Could you tell me what it
2  is?
3    A.    That was after I work there
4  after the accident.
5    Q.    This is after the accident?
6  (Indicating).
7    A.    I'm not so sure.
8    Q.    Do you see it has your name
9  on the top in the center of this
10 document?
11   A.    Yes.
12   Q.    And above your name to the
13 right it says pay period ending --
14   A.    Yes.
15   Q.    And then below your name, do
16 you see where it says 23-June-01?
17   A.    Yes.
18   Q.    It is my understanding that
19 this time card represents the time card
20 from the week during which the accident
21 occurred.
22         You can object to the
23 question.
24         MR. MC NULTY:  Go ahead and

59

1  ask the question.
2         MR. VILLALOBOS: I'm just
3  laying a foundation.
4         MR. MC NULTY:  We are
5  getting there.
6  BY MR. VILLALOBOS:
7    Q.    As you see, there's only one
8  column, it says second day, where there
9  are times punched in and punched out.  Do
10 you see that?
11         MR. MC NULTY:  Objection to
12 the form of the question.  The
13 interrogatory is okay; it is the
14 lead-in that's the problem.
15         MR. VILLALOBOS: That's
16 fine.
17 BY MR. VILLALOBOS:
18   Q.    By way of foundation, do you
19 recall what day of the week the accident
20 took place?
21   A.    It was June 18, 2001.
22   Q.    Do you recall the day of the
23 week?  In other words, Monday?  Tuesday?
24 Wednesday?

60

1    A.    It was Monday.
2    Q.    I'm going to represent to
3  counsel that particular day, June 18,
4  2001, was, in fact, a Monday.  It is my
5  understanding that this is the time sheet
6  or time card that was punched in and
7  punched out on that date.
8          In any event, the question
9  is do you see what time of day you
10 punched in on June 18, 2001?
11         MR. MC NULTY:  I'm objecting
12 to the form of the question and
13 instruct her not to answer that
14 question.
15         MR. VILLALOBOS:  On what
16 basis?
17         MR. MC NULTY:  Because what
18 you are doing, Rafael, is you are
19 saying here's the information.
20 Here's what it says.  And you are
21 giving the information; she's not
22 giving the information.
23         MR. VILLALOBOS:  Sure.
24         MR. MC NULTY:  Ask her if

61

1  she recalls what time she punched
2  in that day.
3         MR. VILLALOBOS:  Sure.
4  BY MR. VILLALOBOS:
5    Q.    Do you recall what time you
6  punched in on June 18, 2001?
7    A.    Around 5:30 probably is the
8  time that I usually arrived, but the time
9  that I start to work is six o'clock.
10   Q.    Can you tell by looking at
11 Maly Yan 2, this document, what time you
12 punched in on this particular day?
13   A.    Do you know what day of the
14 week this card show?
15   Q.    It is a seven-day week.  It
16 is my understanding the first day
17 represents Sunday, so the second day
18 would represent Monday.
19         She asked me to clarify so
20 that's what I'm doing.
21         MR. MC NULTY:  I have no
22 problem with that.  The problem is
23 that you asked her the question.
24 Now you are telling her that this

**62**

1    is the time card that matches up.
2    She doesn't know that.
3         MR. URBAN: And her
4    confusion and unwillingness to
5    subscribe to the basis for your
6    question, I think, makes the
7    question unfair.
8         MR. VILLALOBOS: Sure.
9         MR. URBAN: I would instruct
10   her not to answer.
11   BY MR. VILLALOBOS:
12       Q.   You do recognize the fact
13   that what's been marked as Maly Yan 2 is
14   a time card. Is that fair?
15       A.   What I want to know is what
16   day this card show with the punch card.
17       Q.   Well, we know that it
18   indicates at the top that it is for the
19   week or the pay period ending June 23,
20   2001.
21        MR. URBAN: Objection to the
22   form of the question.
23        MR. MC NULTY: We don't
24   know. We think. We know that

**63**

1    that's what you are saying.
2         MR. VILLALOBOS: The
3    document speaks for itself.
4         MR. MC NULTY: Can I --
5         MR. VILLALOBOS: Sure. Go
6    ahead.
7         MR. MC NULTY: Why don't you
8    just ask her what time she clocked
9    out? I'm not trying to tell you
10   how to take your deposition.
11        MR. VILLALOBOS: Sure.
12        MR. MC NULTY: Why don't you
13   ask her whether she punched out
14   before the accident happened?
15   Doesn't that get you to the same
16   answer?
17        MR. VILLALOBOS: Absolutely.
18   I was planning on asking her that,
19   too, so I will just cut to the
20   chase.
21   BY MR. VILLALOBOS:
22       Q.   Do you recall if you punched
23   out before the accident took place?
24       A.   Yes.

**64**

1         MR. VILLALOBOS: What I
2    would like to do, then, is have
3    another document marked. This is
4    going to be Maly Yan 3. There are
5    going to be one or two brief
6    questions about this particular
7    document. (Indicating).
8         (The above-referred-to
9    document was marked as Maly Yan
10   Exhibit 3 for identification)
11   BY MR. VILLALOBOS:
12       Q.   Go ahead and take a look at
13   that, please.
14        Ma'am, do you recognize this
15   document?
16       A.   I'm not so sure.
17       Q.   Do you see your signature
18   anywhere on this document?
19       A.   Yes, underneath that.
20       Q.   And is it dated?
21       A.   Yes.
22       Q.   And what's the date?
23       A.   It was dated August 2, 2001.
24       Q.   Above your signature do you

**65**

1    see where the form asks for your employer
2    and address?
3        A.   Yes.
4        Q.   And what's listed there as
5    your employer?
6        A.   Pack & Process.
7        Q.   And beside that it asks for
8    occupation. Do you see what it says
9    under the word "occupation"?
10       A.   Yes.
11       Q.   And it does not say driver;
12   correct?
13       A.   Yes.
14       Q.   What I would like to do is
15   ask some questions about June 18, 2001.
16        Did you drive the van to
17   Pack & Process on the morning of June 18,
18   2001?
19       A.   Yes.
20       Q.   And you also drove the van
21   or you were headed back to Philadelphia
22   after your shift at Pack & Process on
23   June 18, 2001?
24       A.   Yes.

66

1    Q.   Prior to June 18, 2001 on
2 how many occasions had you driven the van
3 to or from Pack & Process?
4    A.   Like what do you mean? Can
5 you repeat that?
6    Q.   Well, let me ask you this:
7 When did you first begin driving the van?
8 In 2001 when did you first begin driving
9 the van to or from Pack & Process?
10    A.   In May.
11    Q.   And we are talking about May
12 of 2000, so a month before the accident,
13 roughly?
14    A.   Yes.
15    MR. HULLER: I'm sorry,
16 Rafael. That was 2001, I think
17 you meant to say --
18    MR. VILLALOBOS: 2001.
19    THE WITNESS: Yes.
20 BY MR. VILLALOBOS:
21    Q.   And why did you start
22 driving the van in May 2001?
23    A.   Because my father got his
24 license suspended.

67

1    Q.   Was your father customarily
2 the person who would drive that van?
3    A.   Yes.
4    Q.   And was your father paid by
5 someone to drive that van?
6    A.   Yes, Lam. Mr. Thatch.
7    Q.   And when you began to drive
8 the van in May 2001, a month or so before
9 the accident --
10    A.   Yes.
11    Q.   -- were you paid by anyone
12 to drive that van?
13    A.   I get paid from Pack &
14 Process and I also get paid from Mr. Lam.
15    Q.   Now, what were you paid by
16 Pack & Process for; for working as a
17 quality technician or were you paid by
18 Pack & Process to drive the van?
19    MR. URBAN: Objection to the
20 form of the question.
21    Go ahead.
22    THE WITNESS: As a person
23 working as a control.
24 BY MR. VILLALOBOS:

68

1    Q.   You were not paid by Pack &
2 Process to drive the van in May or June
3 of 2001?
4    MR. URBAN: Objection to the
5 form of the question.
6    THE INTERPRETER: I'm sorry.
7 I wasn't sure she understand the
8 question because the answer --
9    MR. MC NULTY: That's all
10 right. Just translate what she
11 said.
12    THE INTERPRETER: The answer
13 is I get paid from Mr. Thatch as a
14 transporter driving the van,
15 taking people to work there.
16 BY MR. VILLALOBOS:
17    Q.   So in May and June of 2001
18 Mr. Thatch was paying you to transport
19 workers between Philadelphia and
20 Wilmington?
21    A.   Yes.
22    Q.   Did anyone at Pack & Process
23 ever instruct you to drive a vehicle?
24    A.   My supervisor told me.

69

1    Q.   Your supervisor told you to
2 drive a vehicle?
3    A.   Yes, transferring people to
4 work and also working as an employee
5 there.
6    Q.   What supervisor was it that
7 told you to transport people to and from
8 work?
9    A.   Sterling.
10    Q.   Sterling Newsome?
11    A.   Yes.
12    Q.   And when was it that
13 Sterling Newsome told you to drive a van
14 to transport workers?
15    A.   After my father got his
16 license suspended.
17    Q.   Under what circumstances was
18 it that Sterling Newsome first came to
19 you and spoke to you about driving a
20 vehicle?
21    A.   Because he does not want my
22 father to leave the place and he does not
23 want to lose us from the company.
24    Q.   So what did Sterling Newsome

70

1  say to you?
2      A.   Told me to bring people to
3  work into that company and also work at
4  that company as employee.
5      Q.   And did Sterling Newsome
6  provide you with a vehicle to drive or
7  would you just drive your van?
8      A.   Drive my own vehicle.
9      Q.   Did Sterling Newsome or Pack
10  & Process pay you to drive the van in May
11  and June of 2001?
12          MR. URBAN:  You mean
13  directly or indirectly?
14          MR. VILLALOBOS:  Directly.
15          THE WITNESS:  Yes, Pack &
16  Process paid me.
17  BY MR. VILLALOBOS:
18      Q.   As opposed to Mr. Thatch.
19      A.   Actually, Mr. Thatch paid me
20  for transporting.
21      Q.   Did you ever receive any
22  monies directly from Pack & Process for
23  transporting workers from Wilmington to
24  Philadelphia or from Philadelphia to

71

1  Wilmington?
2      A.   No.
3      Q.   Who approached you first
4  about driving the van in May and June of
5  2001 after your father's license was
6  suspended?
7          MR. URBAN:  Objection.  She
8  just said Sterling Newsome.
9          MR. VILLALOBOS:  I'm going
10  to ask her a follow-up.  You will
11  understand.  Your father or
12  Sterling Newsome.  This is the
13  balance of the question.  I wasn't
14  done.
15          MR. MC NULTY:  That question
16  has been asked and answered.  You
17  are changing the question to get,
18  to try to get a different answer
19  to the question.
20          MR. VILLALOBOS:  No, I'm
21  trying to complete a question.  I
22  wanted to ask who was the one that
23  approached her first, her father
24  or Sterling Newsome.

72

1          MR. MC NULTY:  I think that
2  question has been asked and
3  answered.
4          MR. URBAN:  She answered
5  that.
6          MR. MC NULTY:  That's been
7  covered.
8          MR. VILLALOBOS:  She
9  answered that Sterling was the
10  person at Pack & Process who
11  approached her.  I want to know at
12  some point in time before that her
13  father said Hey, look.  I can't
14  drive, et cetera.
15          MR. MC NULTY:  Objection to
16  the form of the question.
17          You can answer the question.
18          THE WITNESS:  Mr. Thatch.
19  BY MR. VILLALOBOS:
20      Q.   Mr. Thatch approached you
21  first?
22      A.   Yes.
23          MR. VILLALOBOS:  I want to
24  take a five minute break and we

73

1  will come back.
2          (Deposition recessed)
3  BY MR. VILLALOBOS:
4      Q.   Back on the record.
5          Just so that I have a clear
6  understanding of who and how and when you
7  were approached to drive, I'm going to
8  break it down person by person.  Okay?
9      Q.   When did Mr. Thatch, in May
10  or June of 2001, when did Mr. Thatch
11  first approach you and ask you to drive
12  the van?
13          MR. URBAN:  Objection to the
14  form of the question.
15          THE WITNESS:  It was in May
16  2001.
17  BY MR. VILLALOBOS:
18      Q.   And do you know why he
19  approached you to drive the van?
20      A.   Because he couldn't find
21  other people to drive and it is hard for
22  him to look for anybody else, so --
23      Q.   And this is after your
24  father's license was suspended?

74

1    A.    Yes.
2    Q.    And what did Mr. Thatch say
3 to you when he first approached you?
4    A.    He said that I can still
5 work at Pack & Process as employee there
6 and also for me to transport people to
7 work there it shouldn't be a problem.
8    Q.    Did your father ever come to
9 you and ask you to drive workers to Pack
10 & Process in May or June of 2001?
11    A.    Yes.
12    Q.    When was it that your father
13 asked you if you could drive?
14    A.    After they suspended his
15 license.
16    Q.    Do you recall who came to
17 you first, whether it was Mr. Thatch or
18 your father?
19       MR. MC NULTY:  Objection.
20    The question was asked and
21    answered.
22 BY MR. VILLALOBOS:
23    Q.    You can answer the question.
24    A.    My father told Mr. Thatch

75

1 that I cannot transport or drive the
2 vehicle anymore because his license got
3 suspended and Mr. Thatch told me that --
4 I told him that I can drive people.
5    Q.    Just so that I'm clear on
6 this, did you speak directly with
7 Mr. Thatch or was this information
8 communicated between you and Mr. Thatch
9 through your father?
10    A.    He spoke to my father.
11    Q.    Did you, personally, speak
12 with Mr. Thatch about this issue?
13    A.    No.
14    Q.    You indicated earlier that
15 you had had a conversation with Sterling
16 Newsome about driving the van.  Did he
17 tell you to drive the van or did he ask
18 you if you could help out by driving the
19 van?
20       MR. URBAN:  Objection to the
21    form of the question.
22       MR. MC NULTY:  Objection to
23    the form of the question.  I
24    instruct her not to answer.

76

1 BY MR. VILLALOBOS:
2    Q.    Do you remember the words
3 that Mr. Newsome used when he first spoke
4 with you about driving the van?
5    A.    He told me that I can still
6 work at Pack & Process as an employee
7 there and also I can also transport
8 people to work there.  It's not going to
9 be a problem.
10    Q.    Did you ask Mr. Newsome for
11 permission to drive or did he come to you
12 to discuss the issue of your driving?
13    A.    He came to talk to me.
14    Q.    Other than you, after your
15 father's license was suspended, did
16 anyone else drive that van to and from
17 Pack & Process?
18    A.    No.
19    Q.    For instance, if you were
20 out sick, if you were absent from work
21 one day, is there someone else that could
22 have stepped in to drive the van in May
23 or June of 2001?
24       MR. MC NULTY:  Objection to

77

1    the form of the question.  I
2    instruct her not to answer.
3 BY MR. VILLALOBOS:
4    Q.    Are you aware of any other
5 persons who drove that van in May or June
6 of 2001 other than yourself and other
7 than your father?
8       MR. MC NULTY:  Objection.
9    Instruct her not to answer.
10       MR. VILLALOBOS:  I would
11    like to have this marked as Maly
12    Yan 4.  (Indicating).
13       (The above-referred-to
14    document was marked as Maly Yan
15    Exhibit 4 for identification).
16       MR. URBAN:  Maybe your
17    question is going to be harmless
18    enough, but I have an objection
19    just looking at this, but where
20    are you going with this?
21       MR. VILLALOBOS:  Go halfway
22    down the narrative -- off the
23    record.
24       (Off the record discussion).

78

1      We can go back on the
2   record.
3   BY MR. VILLALOBOS:
4      Q.   Ma'am, Maly Yan Exhibit 4 is
5   a document which is entitled Christiana
6   Care Health Services Consultation.  Do
7   you have a recollection of having a
8   conversation with one of the doctors at
9   Christiana Hospital during which you
10  communicated to that healthcare provider
11  that you were helping your father to
12  drive the van?
13         MR. MC NULTY:  Objection to
14     the form of the question.
15         You can answer the question.
16         THE WITNESS:  I don't know.
17     I don't know about it.
18  BY MR. VILLALOBOS:
19     Q.   Do you have any recollection
20  of having spoken with a psychiatrist or a
21  psychologist at all regarding the
22  accident or the purpose for your driving
23  the vehicle on that particular date?
24         MR. URBAN:  Objection to the

79

1   form of the question.
2          MR. MC NULTY:  Objection to
3      the form of the question.  I
4      instruct her not to answer the
5      question.
6          MR. VILLALOBOS:  I don't
7      want to get into healthcare
8      issues.
9          MR. MC NULTY:  You asked her
10     two different things.  I would
11     just ask you to break the question
12     down, please.
13         MR. VILLALOBOS:  Sure.
14  BY MR. VILLALOBOS:
15     Q.   Do you have any recollection
16  of any conversations with any
17  psychiatrists or psychologists at
18  Christiana Hospital during the course of
19  your hospitalization?
20     A.   No.
21     Q.   Do you recall having any
22  conversations with Cheryl Staniszewski
23  regarding switching from the day shift to
24  the night shift at Pack & Process?

80

1      A.   Yes, I used to have that
2   kind of conversation.
3      Q.   Do you recall whether you
4   were ever asked to switch from the day
5   shift to the night shift?
6      A.   No.  No, I did not.
7      Q.   Do you have any recollection
8   of ever saying to Cheryl Staniszewski
9   that you wanted to stay on the day shift?
10     A.   Yes, I have.
11     Q.   Under what set of
12  circumstances did that conversation come
13  about?
14     A.   I wasn't sure, but I
15  remember, I believe she asked me if I can
16  work the night shift just because she
17  doesn't have enough people working the
18  night shift.
19     Q.   Do you remember what you
20  said in response?
21     A.   I told her that I can't.
22     Q.   And why couldn't you?
23     A.   For one I have --
24         THE INTERPRETER:  I'm sorry.

81

1   There's one word that she said.  I
2   don't know, it doesn't tell me if
3   she was pregnant or she had a
4   baby.
5          THE WITNESS:  I have a child
6      at time.  I have a baby and at the
7      same time I was providing
8      transporting people to work at
9      Pack & Process.  Yes, I have.
10         MR. VILLALOBOS:  I have
11     another document that I would like
12     to mark at Maly Yan Exhibit 5.
13     (Indicating).
14         (The above-referred-to
15     document was marked as Maly Yan
16     Exhibit 5 for identification)
17  BY MR. VILLALOBOS:
18     Q.   I want you to take a moment
19  to review the document.
20         Off the record.
21         (Off the record discussion)
22  BY MR. VILLALOBOS:
23     Q.   Let's go back on the record.
24         You have had an opportunity

82

1  to look at what's been marked as Maly Yan
2  Exhibit 5. First of all, do you
3  recognize this document?
4      A.  Yes, I do remember.
5      Q.  And is that your signature
6  that appears at the bottom of the
7  document?
8      A.  Yes.
9      Q.  And what's the date that
10  appears next to your signature?
11      A.  July 24, 2001.
12      Q.  Do you remember when it was
13  that you first saw this document?
14      A.  It was after the accident.
15  I went back to work at that place.
16      Q.  When you returned to work,
17  did you have a discussion with Mr. Ames
18  about your driving a vehicle?
19      A.  I believe the discussion was
20  that when I come back to work at that
21  place, after the accident, I can not
22  drive people to work there anymore.
23      Q.  And who was it that told you
24  that?

83

1      A.  Mr. Steve Ames. And my
2  supervisor.
3      Q.  And who was your supervisor?
4      A.  Cheryl.
5      Q.  Cheryl Staniszewski.
6      A.  Yes.
7      Q.  Now, when you received this
8  document were you able to read the
9  document?
10      A.  Yes.
11      Q.  And were you able to
12  understand what the document says?
13      A.  Yes.
14      Q.  And was it your
15  understanding that driving was not a
16  condition of your employment at Pack &
17  Process?
18      MR. DRANOFF:  As of what
19  time?
20      MR. MC NULTY:  Objection to
21  the form of the question.
22      MR. URBAN:  Objection
23  BY MR. VILLALOBOS:
24      Q.  As of June 24, 2001, when

84

1  this document was signed and dated.
2      A.  But I received this document
3  after the accident occurred. I did not
4  receive this document or have I read
5  anything like this before the accident
6  exist.
7      Q.  I understand that, but my
8  question is is it your understanding that
9  as of July 2001 driving a vehicle was not
10  a condition of your employment with Pack
11  & Process?
12      A.  What do you mean by that? I
13  don't understand it.
14      Q.  As of July 2001 was it your
15  understanding that you were -- if you
16  were to drive a vehicle that it was not a
17  requirement to drive the vehicle, a
18  requirement of Pack & Process?
19      A.  I still don't understand the
20  question.
21      Q.  Okay. On June 18, 2001, was
22  it your understanding that in order to
23  continue working at Pack & Process that
24  you would have to be the driver of that

85

1  van?
2      MR. URBAN:  Objection to the
3  form of the question.
4      Go ahead.
5      THE WITNESS:  Yes.
6  BY MR. VILLALOBOS:
7      Q.  And who was it that placed
8  that requirement on you?
9      A.  Mr. Thatch. Still
10  Mr. Thatch.
11      Q.  If you didn't drive the van
12  as of May or June of 2001 how would you
13  have gotten to work?
14      MR. MC NULTY:  Objection.
15  BY MR. VILLALOBOS:
16      Q.  You can answer.
17      A.  If I don't get to drive that
18  van?
19      Q.  Yes.
20      A.  I use my own vehicle to
21  work.
22      Q.  Okay. I'm going to go back
23  to a conversation that you had with
24  Cheryl Staniszewski for a moment. When

86

1  you said that you could not switch from
2  day shift to night shift, what was
3  Cheryl's response to you?
4       A.   That I will find someone
5  else to work.
6       MR. VILLALOBOS: I'm just
7  going to look over my notes for a
8  moment.  If somebody else has some
9  questions, they can follow up.
10       MS. HULLER:  I have no
11  questions.
12       MR. MC NULTY:  Steve, any
13  questions?
14       MR. DRANOFF:  Let me confer
15  with counsel.
16       MR. URBAN:  I can ask a
17  couple of questions just to clear
18  a couple of things up.
19       MR. DRANOFF:  At this point,
20  as things stand, I do not have any
21  questions.  Depending upon if
22  there's any further questioning we
23  might want some follow up.
24       MR. URBAN:  I just have two

87

1  things that I wanted to clarify in
2  the testimony.
3           - - -
4  BY MR. URBAN:
5       Q.   You had indicated in your
6  testimony earlier that you were not
7  reimbursed for gas.  Were you ever given
8  extra money for gas by anyone?
9       A.   Well, Pack & Process would
10  give it to Lam and Lam would give it to
11  me.
12       Q.   And they would give you some
13  extra money for gas sometimes as well?
14       A.   Yes.
15       Q.   Did Sterling Newsome ever
16  tell you how many workers to bring the
17  next day?
18       A.   He only -- that person only
19  spoke to Mr. Lam.
20       Q.   I'm sorry.  Did Sterling
21  ever speak to you directly about how many
22  workers to bring?
23       A.   Sometime, if Sterling
24  doesn't get to speak with Mr. Lam, then

88

1  he would speak with my father.
2       Q.   And how many workers would
3  he tell you to bring?
4       A.   If they only need like a few
5  people, then my father will hear from
6  them.
7       Q.   So it depended on how many
8  workers Pack & Process requested?
9       A.   Yes.
10       MR. URBAN:  No further
11  questions.
12       MR. VILLALOBOS:  I have some
13  questions regarding reimbursements
14  for gasoline.
15           - - -
16  BY MR. VILLALOBOS:
17       Q.   You testified a moment ago
18  that it is your understanding that Pack &
19  Process would give money to Mr. Thatch
20  which, in turn, Mr. Thatch would give to
21  you for reimbursement for gasoline.  What
22  do you base that statement upon?
23       A.   Because Mr. Lam told my
24  father.

89

1       Q.   Okay.  And how were the
2  monies, to your knowledge, distributed
3  between Pack & Process to Mr. Lam?
4           When you say Mr. Lam, I
5  think you mean Mr. Thatch?
6       A.   Yes.
7       Q.   How were the monies
8  transmitted, to your knowledge, between
9  Pack & Process and Mr. Thatch for
10  gasoline reimbursement?
11       A.   Pack & Process will give a
12  check to Lam, which is Mr. Thatch, and
13  Mr. Thatch gave me cash.
14       Q.   And did you ever see any of
15  these checks that were given to
16  Mr. Thatch from Pack & Process?
17       A.   No, never.
18       Q.   Were you given any or seen
19  any type of itemization for what the
20  monies represented that were being paid
21  by Pack & Process to Mr. Thatch?
22       A.   No, never seen it.
23       Q.   When gasoline money was
24  given, was it given to you or was it

90

1  given to your father or could it be
2  either one of you that would receive
3  gasoline money?
4       A.   If my father is the person
5  driving the van transporting people he
6  would be the one to get the gas money; if
7  I am the one who was the driver I would
8  get the gas money.
9       Q.   And how often would you
10  receive gasoline money from Mr. Thatch?
11      A.   Once a week.
12      Q.   And do you recall how much
13  money you would receive for gasoline each
14  week?
15      A.   20, sometimes $30.
16      Q.   And other than the
17  conversation between Mr. Thatch and your
18  father, do you have any other reason to
19  believe that Pack & Process was giving
20  money to Mr. Thatch in order to
21  compensate drivers for gasoline?
22           MR. MC NULTY:  Objection to
23      the form of the question.
24           You can answer.

91

1           THE INTERPRETER:  I'm sorry.
2      Can you repeat that again?
3  BY MR. VILLALOBOS:
4       Q.   Sure.  Other than the
5  conversation that your father had with
6  Mr. Thatch, do you have any other reason
7  to believe that Pack & Process was giving
8  money to Mr. Thatch to be distributed to
9  drivers to reimburse them for gasoline
10  expenses?
11      A.   Can you repeat the question?
12      Can I repeat the question?
13           MR. VILLALOBOS:  I will just
14      have it read back.
15           (The last question was read
16      back by the Court Reporter).
17           THE WITNESS:  Yes
18  BY MR. VILLALOBOS:
19      Q.   And what other basis for
20  that belief do you have?
21      A.   Mr. Lam told Pack & Process
22  to gave it.
23      Q.   Mr. Lam told whom?
24      A.   To my dad.

92

1       Q.   But other than that does she
2  have any reason to believe that Pack &
3  Process was reimbursing drivers for
4  gasoline?
5       A.   Yes.
6       Q.   And what, then, is the basis
7  for your believing that Pack & Process
8  was paying, in essence, for the gasoline?
9       A.   I say because Mr. Lam told
10  my father that money is coming from Pack
11  & Process.
12      Q.   And that's the only reason?
13      A.   Yes.
14           MR. VILLALOBOS:  I have no
15      further questions for you.
16           - - -
17  BY MR. HOFFMAN:
18      Q.   I would just like to ask a
19  couple questions about this form that you
20  were given.  (Indicating).
21           MR. URBAN:  Is that Maly Yan
22      Exhibit 4?
23           MR. HOFFMAN:  The warm
24      wishes of welcome back from Pack &

93

1      Process.
2  BY MR. HOFFMAN:
3       Q.   When you received this form,
4  did you have a belief that the conditions
5  that were set forth on this form
6  represented a change in your work
7  relationship with Pack & Process?
8       A.   Yes, in a way.
9       Q.   Well, let me see what we
10  mean by in a way.  Before you signed this
11  form did you believe that as a condition
12  of your employment with Pack & Process
13  you were to assist the transport of labor
14  to Pack & Process?
15      A.   My supervisors told me that
16  starting from this date that I sign,
17  which is July 24, I can no longer
18  transport people to work there.
19      Q.   But before you signed this
20  did you have a belief that as a condition
21  of your employment of working at Pack &
22  Process that you were to assist in the
23  transport of clients to Pack & Process?
24           MR. MC NULTY:  Wait a

94

1  minute. Didn't she just answer
2  that one? I'm going to object.
3      MR. HOFFMAN: Was her answer
4  yes?
5      MR. MC NULTY: Yes.
6      MR. HOFFMAN: So we have an
7  answer yes.
8  BY MR. HOFFMAN:
9      Q.   Did you believe, prior to
10 signing this, when you were transporting
11 workers to Pack & Process, that you were
12 transporting people to Pack & Process to
13 assist Pack & Process?
14     A.   Well, yes, but at the time
15 when I was transporting people to work
16 there, I never received this kind of
17 document. This is the first time I
18 received this document, which is under
19 date that I signed. (Indicating).
20     Q.   You received this document
21 after the accident?
22     A.   Yes.
23     MR. HOFFMAN: No further
24 questions.

95

1      MR. MC NULTY: Does anyone
2  else have any questions?
3      (There were none).
4      MR. VILLALOBOS: Okay. The
5  deposition is over.
6      (Witness excused.)
7      (Deposition concluded at
8  2:45 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

96

1           - - -
2      CERTIFICATE
3           - - -
4
5      I hereby certify that the
6  witness was duly sworn by me and that the
7  deposition is a true record of the
8  testimony given by the witness.
9
10
11
12
13  _____
14  John W. Begley, RPR
15  Dated: September 25, 2003
16
17  (The foregoing certification of this
18  transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying shorthand
22  reporter.)
23
24

97

1  INSTRUCTIONS TO WITNESS
2      Please read your deposition
3  over carefully and make any necessary
4  changes. You should assign a reason in
5  the appropriate column on the errata
6  sheet for any change made.
7      After making any change
8  which has been noted on the following
9  errata sheet, along with the reason for
10 any change, sign your name to the errata
11 sheet and date it.
12     You are signing it subject
13 to the changes you have made in the
14 errata sheet, which will be attached to
15 the deposition. You must sign in the
16 space provided.
17     Return the original errata
18 sheet to the deposing attorney within
19 thirty (30) days of receipt of the
20 transcript by you.
21
22
23
24

**98**

```
 1      - - - - - - - -
 2        E R R A T A
 3      - - - - - - - -
 4    PAGE    LINE    CHANGE
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
```

**100**

```
 1                 LAWYER'S NOTES
 2    PAGE      LINE
 3    _____
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
```

**99**

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2      I, _____, do
 3    hereby certify that I have read the
 4    foregoing pages, _____, and that the
 5    same is a correct transcription of the
 6    answers given by me to the questions
 7    therein propounded, except for the
 8    corrections or changes in form or
 9    substance, if any, noted in the attached
10    Errata Sheet.
11    _____
12    Date
13    _____
14    Signature
15
16    Subscribed and sworn to before me this
17    _____
18    day of _____, 2003.
19
20    My Commission expires: _____
21
22    _____
23    Notary Public
24
```