# EXHIBIT B

CONDENSED COPY

```
1.            IN THE UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF DELAWARE
3
    ST. PAUL MERCURY INS. CO.  : CASE NO. 05-0022 (KAJ)
4            and                :
    PACK & PROCESS, INC.         :
5                                :
                                 :
             vs                  :
6                                :
    MALY YAN                     :
7   _____
    YAN THOU, et al.             : CASE NO. 05-00513 (KAJ)
8                                :
             vs                  :
9                                :
    PACK & PROCESS, INC., et al:
10                        -  -  -
11               MONDAY, JUNE 5, 2006
                          -  -  -
12
13
14              Continuing videotape deposition of
15   MALY YAN, taken at the law offices of DEASEY,
16   MAHONEY & BENDER, LTD., 1800 John F. Kennedy
17   Boulevard, Suite 1300, Philadelphia, Pennsylvania,
18   on the above date, beginning at 10:20 a.m., before
19   Susan Lauer, Court Reporter-Notary Public, there
20   being present.
                          -  -  -
21
22            LOVE COURT REPORTING, INC.
                  1500 MARKET STREET
23            12TH FLOOR, EAST TOWER
          PHILADELPHIA, PENNSYLVANIA  19102
24                 (215) 568-5599
```

Maly Yan

Page 47

```
 1        APPEARANCES
 2
 3   DEASEY, MAHONEY & BENDER, LTD.
     BY: FRANCIS J. DEASEY, ESQUIRE
 4   1800 John F. Kennedy Boulevard
     Suite 1300
 5   Philadelphia, Pennsylvania 19103
     (215) 587-9400
 6   Counsel for Plaintiffs, St. Paul Mercury Insurance
     Company and Pack & Process, Inc.
 7
     KLINE & SPECTER, P.C.
 8   BY: JONATHAN M. COHEN, ESQUIRE
     1525 Locust Street, 19th Floor
 9   Philadelphia, Pennsylvania 19102
     (215) 772-1000
10   Counsel for Plaintiffs, Yan Thou, et al. and Maly
     Yan
11
12   COSTIGAN & COSTIGAN
     BY: RICHARD COSTIGAN, ESQUIRE
13   1315 Walnut Street
     Suite 902
14   Philadelphia, Pennsylvania 19107
     (215) 546-7215
15   Counsel for Defendants, Zair Shah, Khan Gul, Salim
     Khan, Estate of Mohammed Azim
16
17   ALSO PRESENT: RICK CARROLL, THE VIDEOGRAPHER
               SOKUNTHEA CHAN, THE INTERPRETER
18               YAN THOU
19
20
21
22
23
24        - - -
```

Page 48

```
 1        DEPOSITION SUPPORT INDEX
 2
 3   DIRECTIONS NOT TO ANSWER:
 4   PAGES: 78
 5
 6
 7
 8   REQUESTS FOR DOCUMENTS OR INFORMATION:
 9   PAGES: None
10
11
12
13   STIPULATIONS AND/OR STATEMENTS:
14   PAGE: 5
15
16
17
18
19   MARKED QUESTIONS:
20   PAGES: None
21
22
23
24
```

Page 49

```
 1             INDEX
                - - -
 2
     WITNESS
 3
     MALY YAN
 4
     EXAMINATION               PAGE
 5
     By: Mr. Deasey              52
 6   By: Mr. Cohen              120
 7
 8              EXHIBITS
 9   NUMBER      DESCRIPTION      PAGE
10   St. Paul-1  Interrogatories       72
11   St. Paul-2  Insurance application   89
12   St. Paul-3  Family Dodge invoice   101
13   St. Paul-4  Invoice           103
14   St. Paul-5  Complaint         110
15
16
17
18
19
20
21
22
23
24
```

Page 50

```
 1        (By agreement of counsel, the
 2   reading, signing, sealing, certification and
 3   filing are waived; and all objections,
 4   except as to the form of the question, are
 5   reserved until the time of trial.)
 6             - - -
 7        THE VIDEOGRAPHER: Your Honor,
 8   members of the jury, the following is a
 9   videotape deposition. My name is Rick
10   Carroll. I work for Videotape Deposition
11   Services. This deposition is being taken on
12   Monday, the 5th of June, 2006. We are at
13   1800 JFK Boulevard in Philadelphia. This is
14   being taken in the consolidated cases of
15   St. Paul Mercury Insurance Company and
16   Pack & Process, Incorporated versus Maly Yan
17   and the case of Yan Thou, et al. versus
18   Pack & Process, et al., in a case filed in
19   the U.S. District Court for the District of
20   Delaware, Docket No. and Term 05-0022
21   (KAJ).
22        Present today for the taking of this
23   deposition is the witness, Maly Yan, along
24   with interpreter, Sokunthea Chan. She is
```

2 (Pages 47 to 50)

Love Court Reporting, Inc.

Maly Yan

**Page 51**

1 testifying at the request of Mr. Deasey.
2     Counsel present will now introduce
3 themselves.
4     MR. DEASEY: My name is Frank
5 Deasey. I represent St. Paul Mercury
6 Insurance Company and Pack & Process, Inc.
7 as the plaintiff in case No. 05-0022. Those
8 same parties are defendants in a companion
9 case, Docket No. 05-00513.
10     MR. COSTIGAN: Good morning, my name
11 is Richard Costigan, and I represent Zair
12 Shah, Kahn Gul, and the Estate of Mohammed
13 Azim.
14     MR. COHEN: If it please the Court,
15 my name is Jonathan Cohen. I represent Yan
16 Thou individually and in his capacity as the
17 administrator of the estates of Oeurn Mam
18 and Thuha Son, Chieu Thi Huynh, Bay Nguyen,
19 Maly Yan, Vannak Yan, Chan Yan, and also the
20 estate of Navy Yan.
21     THE VIDEOGRAPHER: The court
22 reporter is Sue Lauer of First (sic)
23 Reporting Services, 1500 Market Street in
24 Philadelphia. Ms. Lauer will now swear in

**Page 52**

1 the interpreter and the witness.
2
3     MALY YAN, after having been first
4 duly sworn, was examined and testified as
5 follows:
6     - - -
7     EXAMINATION
8     - - -
9 BY MR. DEASEY:
10   Q. Ms. Yan, good morning. My name is
11 Frank Deasey. We've met before. I represent Pack &
12 Process, Inc. and St. Paul Mercury Insurance
13 Company.
14     Before the deposition -- we're here
15 to continue with your deposition. Do you understand
16 that?
17   A. Yes.
18   Q. And before we came here today did
19 you have an opportunity to have a telephone call
20 with this interpreter?
21   A. That was before?
22   Q. Yes. It was sometime last week, was
23 it not?
24   A. Yes.

**Page 53**

1   Q. Were you satisfied that the
2 interpreter was interpreting Cambodian into English
3 correctly?
4   A. Yes.
5   Q. And to the extent you understand
6 English, were you satisfied that he was interpreting
7 English into Cambodian correctly?
8   A. Yes.
9   Q. If at any point in time today you
10 feel that the interpreter is not interpreting what
11 you are saying correctly, will you agree to tell me?
12   A. Yes.
13   Q. Have you ever met this interpreter
14 before?
15   A. No.
16   Q. Has -- to your knowledge has he
17 interpreted any depositions or court proceedings in
18 any of the cases that arise out of this accident?
19   A. No.
20   Q. Between the date of your last
21 deposition, which was April 27, 2006, and today have
22 you had the opportunity to read the transcript of
23 your deposition?
24   A. No, I have not.

**Page 54**

1   Q. Has anyone read it to you?
2   A. No.
3   Q. You understand that you're under
4 oath today?
5   A. Yes.
6   Q. Do you understand what it means to
7 take an oath?
8   A. Speak about the truth.
9   Q. We -- at your last deposition before
10 we stopped it, I was asking you about some questions
11 about disability. And you had told me that -- that
12 you were receiving $630 per month; is that true?
13   A. That's correct.
14   Q. How long have you been receiving
15 that?
16   A. About two years until now.
17   Q. Okay. I also was asking you about
18 Workers' Compensation benefits, and I believe you
19 had told me that you were -- you have not applied
20 for Workers' Compensation benefits; is that correct?
21   A. That's correct.
22   Q. And I think you had told me you
23 don't know anything about Workers' Compensation
24 benefits; is that correct?

3 (Pages 51 to 54)

Love Court Reporting, Inc.

Maly Yan

**Page 55**

1   A.   That's correct.
2   Q.   Have you ever -- have you had a job
3   in the United States other than at Pack & Process?
4   A.   No.
5   Q.   And while -- while you were employed
6   at Pack & Process you never filed any type of claim
7   for Workers' Compensation benefits; is that correct?
8   A.   That's correct.
9   Q.   In connection with the benefits that
10  you do receive, you told me that you went to see a
11  doctor that is -- that was located near Broad
12  Street; is that correct?
13  A.   Yes.
14  Q.   Can you be any more specific about
15  the address of the doctor you went to see?
16  A.   I was sent to that place by the SSI
17  worker and, therefore, I don't know exactly the
18  address of that doctor.
19  Q.   Were you represented by a lawyer
20  when you applied for benefits?
21  A.   There was no -- no lawyer.
22  Q.   How did you know that you were --
23  that you were entitled to apply for benefits?
24  A.   I don't know exactly, but I just

**Page 56**

1   went to the place to check it out, to see if I am
2   eligible to get that benefit or not when I got in
3   accident.
4   Q.   How did you know where to go?
5   A.   One of my neighbor told me about
6   that, and they brought me to that place.
7   Q.   Who was the neighbor?
8   A.   I forget his name.
9   Q.   Do you have any paperwork at home
10  concerning your application for benefits?
11  A.   I think so.
12  Q.   Do you have an application?
13  A.   After I fill out this application
14  form they -- and I gave to them, so they -- they
15  kept it.
16  Q.   You didn't keep -- you didn't get a
17  copy back?
18  A.   I think I have it.
19  Q.   Okay. Ms. Yan, when did you first
20  begin working at Pack & Process?
21  A.   I begin working in 1998.
22  Q.   And when you first went to work at
23  Pack & Process, what was your job, what did you do?
24  A.   It depends. Sometime they ask me to

**Page 57**

1   put the candy in the box; sometime they ask me to
2   leave -- to move the box.
3   Q.   How long did you put candy in the
4   boxes or move boxes around?
5   A.   I cannot say for sure because at
6   that time sometime I work, sometime I don't work,
7   because I have my baby at that time.
8   Q.   When you first went to work at
9   Pack & Process, were you paid directly by
10  Pack & Process, or paid by somebody else?
11  A.   I got it directly from the packing
12  company.
13  Q.   Was it a check or in cash?
14  A.   It was a check.
15  Q.   And when you first went to work
16  there, how much did you make?
17  A.   Seven dollars.
18  Q.   Is that $7 an hour?
19  A.   That's correct.
20  Q.   And between the time you first
21  started working at Pack & Process and the time of
22  the accident, how many times did you take off
23  because you were having children?
24  A.   During that time got off one or two

**Page 58**

1   weeks at a time and then I go back to work, but
2   during the accident year I go to work all the time.
3   Q.   How many children did you have --
4   have you had between the time you went to work for
5   Pack & Process and the time of the accident?
6   A.   I had one.
7   Q.   One child. When you first started
8   working at Pack & Process, how did you get to
9   your -- to the job?
10  A.   I went to that place with my
11  father. My father used to be the worker
12  transporter.
13  Q.   Your father drove a vehicle and you
14  rode in the vehicle to work; is that correct?
15  A.   That was before, but during the
16  accident years I am the one who drove the car.
17  Q.   No, no. I'm asking you when you
18  first started working at Pack & Process, did your
19  father drive the vehicle to work?
20  A.   Yes.
21  Q.   And this is your father who's here
22  with us today sitting next to your attorney?
23  A.   Yes.
24  Q.   And what type of vehicle did your

4 (Pages 55 to 58)

Maly Yan

Page 59

1  father drive when you first started working for
2  Pack & Process?
3      A.    It was Chevrolet Ram.
4      Q.    A van?
5      A.    That's correct.
6      Q.    The same van that was involved in
7  the accident?
8      A.    That's correct.
9      Q.    And how many people did your father
10 drive to work?
11     A.    Depends. Sometimes 10 people,
12 sometimes 12 people, sometimes 13 people. It depend
13 on the company's need.
14     Q.    Did you pay your father for
15 transportation?
16     A.    The company paid for him.
17     Q.    What company?
18     A.    Pack & Process.
19     Q.    How do you know that?
20     A.    Because my father talked to the
21 company.
22     Q.    Other than your father -- well, let
23 me withdraw the question.
24            Did your father tell you that

Page 60

1  Pack & Process was paying him?
2      A.    He didn't tell me about that, but he
3  say that the company pay for him. So if the company
4  didn't pay for him, how can he pay for the other
5  worker?
6      Q.    I want to know, how do you know that
7  Pack & Process paid him?
8      A.    Because the other guy's name -- by
9  name Sdey -- (interruption by the court reporter.)
10            THE INTERPRETER:  By name Sdey.
11            MR. DEASEY:  The other guy's what?
12 May?
13            THE WITNESS:  His American name is
14 David.
15            MR. DEASEY:  Oh, okay.  The other
16 guy's name --
17            THE INTERPRETER:  Sdey.
18            MR. DEASEY:  Sdey?
19            THE INTERPRETER:  Yeah.
20            THE WITNESS:  Say that the company
21 pay my father.
22 BY MR. DEASEY:
23     Q.    Okay.  You're talking about David
24 who's -- who's real -- one of his names is Sdey,

Page 61

1  right?
2      A.    His American name is David, and his
3  Cambodian name is Sdey.
4      Q.    What is his American last name; do
5  you know?
6      A.    I don't know exactly.
7      Q.    David Thatch, does that sound
8  familiar?
9      A.    Maybe, because he's Vietnamese.
10     Q.    Is it your testimony that David
11 Thatch told you that Pack & Process was paying your
12 father to transport workers?
13     A.    That's correct.
14     Q.    Do you have any -- do you have any
15 other knowledge -- or let me withdraw the question.
16            Other than David Thatch telling you
17 that Pack & Process paid your father, do you have
18 any other information that would prove that Pack &
19 Process paid your father for transportation?
20     A.    I didn't know exactly at that time.
21 The only thing that I did was just working and get
22 paid, and I know for sure that he got paid from that
23 company.
24     Q.    I understand.  I understand, but

Page 62

1  that's not my question, ma'am.
2            My question is other than David
3  Thatch telling you, do you have any other facts to
4  support your testimony that your father was paid by
5  Pack & Process to transport workers?
6      A.    I don't have any -- any proof to
7  support that, but I know for sure that he got the
8  money from that company and --
9      Q.    And do you --
10            THE INTERPRETER:  Sorry.  I'm sorry.
11 Ask her to repeat that question again -- the
12 answer again.
13            THE WITNESS:  I don't have any
14 evidence other than that to support the
15 payment that my father got from the company,
16 but I know for sure that he got the payment
17 from that company, and at that time I just
18 working and get paid from my father, and I
19 don't want to interfere with his business.
20 BY MR. DEASEY:
21     Q.    Is the reason you are sure that your
22 father got paid by Pack & Process is because David
23 Thatch told you?
24     A.    David Thatch never say anything

5 (Pages 59 to 62)

Love Court Reporting, Inc.

Maly Yan

Page 63

1  about that, but I saw him paying my father when he
2  got money from the company.
3      Q.    Who did you see pay your father?
4      A.    I saw David gave the money to my
5  father.
6      Q.    All right. How much did — what did
7  David — what did David Thatch give your father,
8  cash? Did he give your father cash?
9      A.    He got check from the company, and
10 he cash that check and gave my father cash.
11     Q.    So your father got cash from David
12 Thatch, correct?
13     A.    That's correct.
14     Q.    Okay. And did you ever see Pack &
15 Process give a check to David Thatch?
16     A.    I never seen it, but every time the
17 payment is up, David always get the check from that
18 company.
19     Q.    How do you know he got a check if
20 you didn't see him get it?
21     A.    There was one day when I met him by
22 chance, and I ask him where he's going, and he told
23 me that he just got a check from the company.
24     Q.    Do you know anything about the

Page 64

1  agreement between David Thatch and Pack & Process
2  for the — for workers to be supplied to Pack &
3  Process?
4      A.    No, I don't know.
5      Q.    So you never saw Pack & Process give
6  your father any money directly for transporting
7  people; is that correct?
8      A.    They didn't give any money directly
9  to my father because my father just a subcontract
10 with David.
11     Q.    Thank you.
12         Now, did any — before you started
13 driving the van, did anyone other than your father
14 drive the van to take workers to and from Pack &
15 Process?
16     A.    I don't know the other driver
17 because there were two or three vans at that time,
18 but — (interruption by the court reporter.)
19         MR. DEASEY: Vans.
20         THE INTERPRETER: Two or three
21     vans. (Continuing for the witness.)
22         THE WITNESS: So I know for sure
23     that one van was driving by me.
24 BY MR. DEASEY:

Page 65

1      Q.    Did — did you ever see any other
2  workers pay your father for transportation?
3      A.    I don't know exactly because I was
4  not involved in his business. I just working.
5      Q.    You never talked to your father
6  about how much money he was making transporting
7  people to and from work?
8      A.    When he drove the van, I was not
9  with him. I have my own family and we live
10 separately.
11     Q.    I understand. I'm asking you did
12 you ever speak with your father about his
13 arrangement for making money by driving people to
14 and from work?
15     A.    No.
16     Q.    Were you close to your father in
17 1998, 1999?
18     A.    Yes. We were close, but at the time
19 we have — I have my own family so after work I just
20 went back to my family.
21     Q.    At some point in time did you become
22 an inspector at Pack & Process?
23     A.    Yes.
24     Q.    And were you a quality control

Page 66

1  inspector?
2      A.    Yeah.
3      Q.    When did you become a quality
4  control inspector?
5      A.    That was the accident years.
6      Q.    Did you become a quality control
7  inspector in 2001 or before?
8      A.    That was before 2001.
9      Q.    Was it in the year 2000?
10     A.    That's correct.
11     Q.    And what did you do as a quality
12 control inspector?
13     A.    I check the candy bag if they have
14 enough air. (Interruption by the court reporter.)
15         THE WITNESS: If they have enough
16     air inside or not. If the bag didn't have
17     enough air, I just asked them to put more
18     air.
19 BY MR. DEASEY:
20     Q.    When you became a quality control
21 inspector, who paid you, Pack & Process or somebody
22 else?
23     A.    Pack & Process the one who pay me.
24     Q.    Did they pay you by check?

6 (Pages 63 to 66)

Maly Yan

Page 67

1    A.    Yes.
2    Q.    Did you get paid by the hour?
3    A.    Yes, by the hours depending on how
4    many hours I work.
5    Q.    How much did you get paid per hour?
6    A.    First I got $7.
7    Q.    Did you ever get more than that
8    before the date of the accident?
9    A.    No.
10   Q.    Did you -- did you have supervisors?
11   A.    Yes, I did.
12   Q.    And who were the supervisors?
13   A.    Her name is Charlen (ph).
14   Q.    Cheryl?
15   A.    Cheryl.
16   Q.    And did you have another supervisor?
17   A.    No, it was just one supervisor.
18   Q.    And did you work the same number of
19   hours every week?
20   A.    Yes.
21   Q.    How many hours per week did you
22   average?
23   A.    Forty hours.
24   Q.    Did you have to clock in?  Did you

Page 68

1    have to -- let me withdraw the question.
2         Did you punch a clock when you went
3    to work?
4    A.    Yes, yes, I punch every time I come
5    in and every time I come out from work.
6    Q.    And did you understand that you
7    would get paid by Pack & Process for the number of
8    hours that appeared on your punch card?
9    A.    Yes.
10   Q.    And did -- was -- did you work
11   during the day or at night?
12   A.    The daytime.
13   Q.    And when did your day start and when
14   did it end?
15   A.    At that place they work ten hours
16   per day from Monday to Thursday and get off Friday,
17   Saturday, and Sunday.
18   Q.    Did the shift ever change before the
19   date of the accident?
20   A.    There were -- there are two shift of
21   work at that place.
22   Q.    Did you ever work the second shift?
23   A.    No.
24   Q.    Was Cheryl your supervisor the week

Page 69

1    before the accident?
2    A.    Yes, she was.
3    Q.    Did -- was Cheryl on vacation the
4    week of the accident?
5    A.    I forgot.  That was long time ago.
6    Q.    Did Cheryl come -- did Cheryl tell
7    you the week before the accident that you needed to
8    change to the night -- the second shift?
9    A.    Yes, she -- she did tell me about
10   that, but I did not accept it because I have to take
11   care of my children at nighttime.
12   Q.    I understand that.  I'm just
13   asking -- the question I'm asking is, did Cheryl
14   tell you that you would need to work the second
15   shift the week -- let me withdraw the question.
16        In the week before the accident did
17   Cheryl tell you that you were going to be
18   transferred to the second shift?
19   A.    Yes, she did tell me about that.
20   Q.    And she -- did she tell you that the
21   change would take place when she returned from
22   vacation?
23   A.    Yes, she did say about that.
24   Q.    And did you tell her you could not

Page 70

1    do that?
2    A.    Yes, I did.
3    Q.    And you told her you couldn't do it
4    because of your situation with your children,
5    correct?
6    A.    Yes.
7    Q.    Okay.  The -- going back to your job
8    at Pack & Process; when you became an inspector, did
9    you have anybody who worked directly under you or
10   for you?
11   A.    No.
12   Q.    Were there any other quality control
13   inspectors working with you?
14   A.    What that mean exactly?
15   Q.    Was there another quality control
16   inspector working at the same time you were working?
17   A.    My other sister who did the same
18   job.
19   Q.    And what was -- what was your
20   sister's name?
21   A.    Her name is Channoeun Yan.
22   Q.    When did you get your Pennsylvania
23   driver's license?
24   A.    In 1997.

7 (Pages 67 to 70)

Love Court Reporting, Inc.

Maly Yan

Page 71

1   Q.   Did you have one in 1995?
2   A.   No, I never --
3   Q.   Let me withdraw the question.
4        Did you first get your driver's
5   license in 1997?
6   A.   That's correct.
7   Q.   And you -- and did you have a valid
8   driver's license in 2001?
9   A.   Yes.
10  Q.   Was your driver's license ever
11  suspended or revoked between 1997 and 2001?
12  A.   No.
13  Q.   Okay. Ms. Yan, I'm going to have
14  the court reporter mark as Exhibit-1 some Answers to
15  Interrogatories.
16           - - -
17        (Exhibit St. Paul-1 was marked for
18   identification.)
19           - - -
20  BY MR. DEASEY:
21  Q.   Ms. Yan, have you -- have you seen
22  that document before today?
23  A.   No, I did not.
24  Q.   Can you take -- turn to the last

Page 72

1   page. Is that your signature?
2        MR. COHEN: Objection.
3        THE VIDEOGRAPHER: We are now going
4   off the video record. The time is 11:04.
5        MR. COHEN: The copy you handed me
6   ends with a signature block for attorneys
7   only. Do you have one that has a
8   verification on it?
9        MR. DEASEY: Sure. Let's re-mark
10  it.
11           - - -
12        (Exhibit St. Paul-1 was remarked for
13   identification.)
14           - - -
15        (Discussion off the record.)
16           - - -
17        MR. DEASEY: Let's go back on the
18   record.
19        All right. Let's go back on the
20   video record.
21        THE VIDEOGRAPHER: We are now on the
22   video record. The time is 11:05.
23  BY MR. DEASEY:
24  Q.   I'm going to hand you another

Page 73

1   Exhibit-1 which does have a verification.
2        MR. COHEN: This looks like a
3   different set of interrogatories. Is
4   that -- was that your intention?
5        MR. DEASEY: I don't know why
6   this got copied like this.
7        MR. COHEN: They may be the same.
8   It's just hard to tell with them separately,
9   because I don't have them in front of me.
10  The print's different on the face page.
11        MR. DEASEY: These are -- we're on
12  the record?
13        MR. COHEN: Yes.
14        THE VIDEOGRAPHER: Yes.
15        MR. DEASEY: What I handed you
16  before was the answers to a document
17  request. That's why there wasn't a
18  verification. These are the
19  interrogatories.
20        MR. COHEN: Okay. So this is meant
21  to be Exhibit 1? These are interrogatory
22  responses?
23        MR. DEASEY: Correct.
24  BY MR. DEASEY:

Page 74

1   Q.   Ms. Yan, can you tell me, is the
2   last page of that, is that your signature?
3   A.   Yes.
4   Q.   Have you ever seen this document
5   before?
6   A.   There were too many document that
7   were sent to me so I don't know exactly which one is
8   which one.
9   Q.   Well, why don't you take a minute
10  and look through it and see if you recognize any
11  portion of that document?
12        And while --
13        MR. COHEN: Wait. Do you want the
14  interpreter to read it all in her native
15  language?
16        MR. DEASEY: No, I want her to look
17  through it to see if she recognizes it.
18        MR. COHEN: Well, it's in English.
19        MR. DEASEY: I understand it's in
20  English. When it was presented to her, I
21  presume it was in English, too.
22        MR. COHEN: You haven't laid any
23  foundation for that, so I'm going to object
24  to it.

8 (Pages 71 to 74)

Love Court Reporting, Inc.

Maly Yan

Page 75

```
 1          Let me make an objection.
 2          THE VIDEOGRAPHER:  We are now going
 3   off the video record.  The time is 11:07.
 4          MR. COHEN:  I'm objecting to this
 5   question.  There's probably some better way
 6   to do this, but you're asking the witness to
 7   say whether or not she recognizes a document
 8   that's written in the English language, and
 9   I don't know if you want her to say she
10   recognizes the formatting, the print, the
11   text, or the content.  I presume you're
12   going for content, in which case this
13   doesn't quite make sense.
14          MR. DEASEY:  Are you instructing her
15   not to answer?
16          MR. COHEN:  If you give the
17   interpreter a chance to go over the document
18   with her as you would do with verbal
19   questions, I think it's an appropriate
20   question.  I wouldn't instruct her not to
21   answer.
22          MR. DEASEY:  You're going to
23   instruct her not to answer --
24          MR. COHEN:  No, I just said I would
```

Page 76

```
 1   not.  So if you let the interpreter
 2   translate portions for her, much as you're
 3   doing with spoken words, I don't think we'll
 4   have a problem.
 5          MR. DEASEY:  Are you going to
 6   instruct her not to answer the question?
 7          MR. COHEN:  That's all I'm saying.
 8   The witness has an interpreter.  I've made
 9   myself clear.
10          MR. DEASEY:  Well, then she'll
11   answer the question.
12          Let's go back on.
13          Let's go back on the video record.
14          THE VIDEOGRAPHER:  We are now on the
15   video record.  The time is 11:08.
16   BY MR. DEASEY:
17      Q.  Let me go back and ask my question
18   again, Ms. Yan.  Do you recognize the document
19   that's in front of you?
20          MR. COHEN:  Again, objection.
21   Objection.
22          THE VIDEOGRAPHER:  We are now going
23   off the video record.
24          MR. COHEN:  Again, objection to the
```

Page 77

```
 1   vagueness of your question.  Do you mean the
 2   content of the document, the colors, the
 3   shape?  You're not considering the fact that
 4   there's an interpretation.  Unless you
 5   qualify the question somehow, I'm going to
 6   have to tell her not to answer it because
 7   it's not a fair question.
 8          And also, again, if you have the
 9   interpreter translate it and tell her what
10   it is in her native language because
11   interpretation from her language to English
12   is required both from spoken English and
13   written English, then it would be
14   appropriate.
15          MR. DEASEY:  You can object all you
16   want, but there's no basis under federal
17   rules for you to instruct her not to
18   answer.  And if she doesn't want to answer
19   the questions, we'll bring her back again.
20   That's fine with me.  It doesn't really --
21          MR. COHEN:  Well --
22          MR. DEASEY:  Let me finish.  Let me
23   finish.  Okay?  Then you can have your say.
24          MR. COHEN:  Okay, go ahead.
```

Page 78

```
 1          MR. DEASEY:  And it doesn't really
 2   matter to me how we do this.  This is the
 3   second time; we can do it a third time if
 4   you want.
 5          I'm simply asking her if she
 6   recognizes the document.  I don't really
 7   care what color it is, what language it's
 8   in.  I'm asking the questions here.  When
 9   you want to follow up, you follow up.
10          MR. COHEN:  Okay.  I'm going to
11   instruct the witness not to answer as you
12   are not permitting the witness to have a
13   document in English translated to her in her
14   native language, which is entirely
15   inappropriate.
16          And there is a basis under the
17   federal rules to refuse to permit a
18   non-English speaking witness to be forced to
19   answer certain questions without her
20   interpreter.
21   BY MR. DEASEY:
22      Q.  Okay.  We'll just bring you back.
23          MR. DEASEY:  Let's go back.
24          MR. COHEN:  Actually, you're now
```

9 (Pages 75 to 78)

Maly Yan

Page 79

1  threatening the witness that you'll bring
2  her back. You'll have to get an order to do
3  that.
4      If you'd like to ask probably the
5  best question, which you haven't, which is
6  can she read it in English, which you don't
7  want to ask her for some reason, maybe we
8  could avoid all this.
9      MR. DEASEY: When it's your
10  deposition, Mr. Cohen --
11      MR. COHEN: No, actually this is
12  not --
13      MR. DEASEY: When it's your
14  deposition, you can --
15      MR. COHEN: This is also my
16  deposition.
17      MR. DEASEY: When it comes your
18  time, you can ask the questions you want to
19  ask the witness. Until then, I'll ask the
20  questions, you can make the objections, you
21  can instruct her to answer, you can say
22  anything you want, but I'll do the
23  questioning during my period of the
24  deposition. All right?

Page 80

1      MR. COHEN: You're laughing? Let's
2  put on the record counsel's now laughing.
3      MR. DEASEY: No, let's put on the
4  record I'm smirking at these childish antics
5  of yours.
6      MR. COHEN: Childish antics?
7      MR. DEASEY: Why don't we just get
8  on with the deposition.
9      MR. COHEN: Childish? Was it
10  childish last time when you stood up and you
11  said you don't even believe that she needs
12  an interpreter.
13      MR. DEASEY: No, that was the
14  truth.
15      MR. COHEN: Oh, okay.
16      MR. DEASEY: Let's -- let's get --
17      Is that it?
18      All right. Let's go back on the
19  video.
20      THE VIDEOGRAPHER: We are now on the
21  record. The time is 11:13.
22  BY MR. DEASEY:
23      Q.  Ms. Yan, your attorney has
24  instructed you not to answer the question so I'm

Page 81

1  going to move on.
2      Let's go back to the last page of
3  the document. You've identified that as your
4  signature, correct?
5      A.  Yes.
6      Q.  And did you have -- do you know what
7  that last page says?
8      A.  I don't know for sure because that
9  paper was sent to me from my -- from my lawyer --
10  lawyer office. So I know that this is a legal
11  document so I got to sign.
12      Q.  Did you understand it before you
13  signed it?
14      A.  I don't read English, but I know
15  for -- this paper was sent to me from my lawyer so I
16  got to sign.
17      Q.  Did somebody translate it for you
18  before you signed it?
19      A.  No. No, I know that this document
20  was sent from my lawyer so I just sign.
21      Q.  Who told you to sign it? Well, let
22  me withdraw the question. Did anyone other than
23  your -- let me withdraw the question.
24      Did anyone other than your lawyer

Page 82

1  tell you to sign it?
2      A.  Before other document that I receive
3  from my lawyers, I call to my lawyer to check, but
4  up to that my lawyers told me to sign all the
5  document that was sent to me. So when I get the
6  document, I just sign it.
7      Q.  When you got this document that says
8  verification, were there any other documents that
9  came with it?
10      A.  I don't recall it because there were
11  too many documents sent to me.
12      Q.  Do you ever recall sitting down and
13  answering written questions for your lawyer?
14      A.  I -- I recall, but there were too
15  many times. I don't know which one is which one.
16      Q.  Do you recall ever sitting down with
17  your lawyer in this case that is filed in Delaware
18  and answering written questions that have been sent
19  to you, or sent to your lawyer?
20      A.  The only thing I recall is that my
21  lawyer told me that we have a -- some kind of
22  question and answer from someone from the Delaware.
23      Q.  Did you ever sit down with any
24  lawyer and an interpreter and go through written

10 (Pages 79 to 82)

Maly Yan

Page 83

1  questions that had been sent to you in the Delaware
2  lawsuit?
3     A.   No.
4     Q.   Did you ever sit down, and without
5  an interpreter, with your lawyer and answer written
6  questions that had been sent to you in -- in
7  connection with this lawsuit in Delaware?
8     A.   No.
9     Q.   Do you know what an interrogatory
10 is?
11       THE INTERPRETER: Trouble. I need
12    lawyer to explain about the --
13       MR. DEASEY: Interrogatories are
14    written questions sent by one party to
15    another party.
16       THE WITNESS: No, because I don't
17    understand English.
18 BY MR. DEASEY:
19    Q.   Have you ever -- have you ever read
20 a legal document that's been translated into your
21 language --
22       MR. DEASEY: (To the interpreter)
23    Go ahead.
24 BY MR. DEASEY:

Page 84

1     Q.   -- in connection with this lawsuit?
2     A.   No, I did not.
3     Q.   Have you ever read written questions
4  that were filed in the Delaware lawsuit that had
5  been translated into your language?
6     A.   No, I have not.
7     Q.   Do you know when -- the van that
8  your father drove you to work when you first worked
9  at Pack & Process, do you know when he purchased
10 that van?
11    A.   No, I don't.
12    Q.   Do you know why your father's
13 license was suspended?
14    A.   Because my father didn't pay the
15 ticket so they suspend his driver license.
16    Q.   When was his license suspended?
17    A.   It was in the year of the accident.
18    Q.   The year of the accident, is that
19 what you said? The year of the accident?
20    A.   Yes, during that year.
21    Q.   When during that year?
22    A.   Before the accident.
23    Q.   When before the accident?
24    A.   I don't recall, but I know for sure

Page 85

1  that during that year.
2     Q.   Well, was it a day before the
3  accident?
4     A.   He didn't -- my father didn't know
5  exactly when his driver license was suspended, but
6  it seemed like they send the letter to him, but he
7  did not receive it. So he didn't know exactly when
8  the driver license was suspended.
9     Q.   When did your father stop driving
10 the van before the date of the accident?
11    A.   When he was arrested by a police
12 officer and the police officer told him that his
13 driver license was suspended.
14    Q.   How long before the accident did
15 that happen?
16    A.   It was a month.
17    Q.   Where was your father arrested a
18 month before the accident?
19    A.   When he pick up the worker.
20    Q.   When he got the what?
21       THE INTERPRETER: When he pick up
22    the worker at their house.
23 BY MR. DEASEY:
24    Q.   Okay. Was it in Pennsylvania?

Page 86

1     A.   Yes.
2     Q.   And was he picking up workers to
3  take them to Pack & Process?
4     A.   Yes.
5     Q.   And were you in the van?
6     A.   I was not at that time. At that
7  time he unload the people from his van.
8     Q.   Who drove you to work from the date
9  that your father was arrested by the police until
10 the date of the accident?
11    A.   There was someone else send from
12 David to replace my father and to drive the van for
13 one week.
14    Q.   And who was that?
15    A.   I don't know him.
16    Q.   And that was for one week?
17    A.   Yes.
18    Q.   All right. And then the next week
19 who drove the van?
20    A.   After that week that was me.
21    Q.   And did you start driving on a
22 Monday?
23    A.   Yes.
24    Q.   And drove Monday, Tuesday,

11 (Pages 83 to 86)

Maly Yan

Page 87

1  Wednesday, and Thursday?
2      A.    Yes.
3      Q.    And you had off that Friday?
4      A.    Yes.
5      Q.    And why did you drive the van that
6  first Monday that you drove everybody in to work?
7      A.    Because at that time there was no
8  other driver so David asked me to drive the van.
9      Q.    And David is David Thatch, correct?
10     A.    Yes.
11     Q.    And did David -- when David asked
12 you that, what day of the week was it?
13     A.    No, I don't recall.
14     Q.    Was it Monday morning or before
15 Monday morning?
16     A.    Okay. That was on Thursday,
17 Thursday before Monday. That was the last day of
18 the week, the workweek. David told me that he
19 didn't have any other driver, and he asked me to
20 drive the van so I told -- but I told him that I
21 could not drive the van because I was -- I was
22 working for the company. And so he told me that he
23 going to discuss this issues with Steve.
24     Q.    And other than saying that to you on

Page 88

1  Thursday, did you have any other conversation on --
2  on Thursday with David about driving the van?
3      A.    He has asked me to drive the van at
4  the lunchroom, and he told me that if Steve agree
5  that I would -- I could drive the van, I would drive
6  the van.
7      Q.    What -- where -- what lunchroom?
8      A.    In the company building.
9      Q.    At Pack & Process?
10     A.    That's correct.
11     Q.    Anybody else present when you had
12 that conversation?
13     A.    No, there was just me and David.
14     Q.    Did you ever -- did your father ever
15 give you the van? Well, let me withdraw the
16 question.
17         Did you ever take title to the van?
18     A.    What that mean exactly?
19     Q.    Own the van. Did you ever own the
20 van?
21     A.    Not before, but after my father
22 driver license was suspended, I own the van because
23 he sold that van to me.
24     Q.    How much did you pay for it?

Page 89

1      A.    I pay him $3,000.
2      Q.    Cash or check?
3      A.    Pay him monthly.
4      Q.    Monthly? By check or cash?
5      A.    Cash.
6      Q.    Did you purchase insurance for the
7  van?
8      A.    Yes, I did.
9      Q.    Who paid for the insurance?
10     A.    I did.
11     Q.    Do you remember filling out an
12 application for insurance?
13     A.    Yes.
14         - - -
15         (Exhibit St. Paul-2 was marked for
16 identification.)
17         - - -
18 BY MR. DEASEY:
19     Q.    Ms. Yan, I'm handing you a document
20 that we've marked as Yan-2. Can you take a look at
21 that document, please?
22     A.    (Witness reviews document.)
23     Q.    Does your signature appear anywhere
24 on that document?

Page 90

1      A.    Yes.
2      Q.    Where?
3      A.    Right here.
4      Q.    What page are you looking at, the
5  last page?
6      A.    Yes.
7      Q.    And --
8      A.    And the second last page.
9      Q.    Okay.
10     A.    And also the second page from the
11 first page.
12     Q.    Did you -- is any of the other
13 handwriting on this -- on this document yours?
14     A.    I know for sure that my -- the
15 signature is mine.
16     Q.    Well, look at the first page where
17 it says applicant's name. Do you see that?
18     A.    Yes.
19     Q.    Did you -- did you write in your
20 name?
21     A.    I think the -- the insurance people
22 wrote that.
23     Q.    Did you go to somebody's office to
24 get this insurance?

12 (Pages 87 to 90)

Maly Yan

**Page 91**

1    A.    Yes.
2    Q.    Was there a translator there?
3    A.    My brother-in-law was there.
4    Q.    Did they -- did your brother-in-law
5    read the questions to you in Cambodian?
6    A.    Yes.
7    Q.    And did you -- did you provide the
8    information to answer the questions?
9    A.    Yes.
10   Q.    And if you -- first page underneath
11   the word occupation, do you see that?
12   A.    Yes.
13   Q.    Is that your Social Security number
14   under there?
15   A.    Yes.
16   Q.    And was your occupation at the time
17   you applied for insurance an inspector?
18   A.    I know for sure that at that time I
19   told them that I need the insurance, but I didn't --
20   I didn't tell them what kind of work I do.
21   Q.    Do you know whether -- who was there
22   with you, your brother-in-law or brother?
23   A.    That was my brothers.
24   Q.    Your brothers.  And they -- did they

**Page 92**

1    interpret for you that day?
2    A.    Yes.
3    Q.    Did you hear any of your brothers
4    telling the insurance agent that you were an
5    inspector at Pack & Process?
6    A.    That was too long.  I don't recall.
7    Q.    You don't recall?  Is that what you
8    said, you don't recall?
9    A.    (Indicating.)
10   Q.    Okay.  Go to page 2, Ms. Yan.  Do
11   you see the section that says applicant
12   questionnaire?
13   A.    Yes.
14   Q.    Did some -- did one of your brothers
15   interpret those questions for you?
16   A.    I don't recall.  It was too long.
17   Especially I don't remember well after the accident.
18   Q.    Do you recall -- did -- did you
19   answer those questions?  Did you put the check marks
20   in those boxes on page 2?
21   A.    I didn't do it, and I'm not sure who
22   did it.
23   Q.    Do you see the portion underneath
24   there that says, applicant, please read and sign?

**Page 93**

1    A.    Yes.
2    Q.    Did you have that read to you in
3    Cambodian?
4    A.    I don't know exactly, but I know for
5    sure that time that after fill out all this
6    application form, they ask me to sign.
7    Q.    I know.  My question was, did -- did
8    one of your brothers translate the language under
9    applicant, please read and sign before you signed
10   that page?
11   A.    No.
12   Q.    Did you know what you were signing?
13   A.    The only thing I know, that I'm
14   buying the insurance from that company and I got to
15   sign.
16   Q.    Go to the next page, please.  Is
17   that -- that's your signature on that page?
18   A.    Yes.
19   Q.    Did somebody translate this page to
20   you before you signed it?
21   A.    No, the insurance guy just asked me
22   to sign.
23   Q.    Do you know what -- do you know what
24   limited tort means?

**Page 94**

1    A.    No, not exactly.
2    Q.    Okay.  The last page, you've
3    identified that as the signature of yours at the
4    bottom?
5    A.    Yes.
6    Q.    Did anyone translate that
7    language -- or excuse me, that writing to you in
8    Cambodian before you signed the last page?
9    A.    No.
10   MR. DEASEY:  Why don't we take a
11   break, five minutes.
12   THE VIDEOGRAPHER:  We are now going
13   off the record.  The time is 11:40.
14   - - -
15   (A brief recess was taken.)
16   - - -
17   THE VIDEOGRAPHER:  We are now on the
18   record.
19   BY MR. DEASEY:
20   Q.    Ms. Yan, did your father apply for
21   Social Security benefits?
22   A.    I know for sure that he did receive
23   the same amounts of money as me, 600 something, but
24   I don't know how he applied.  (Interruption by the

13 (Pages 91 to 94)

Love Court Reporting, Inc.

Maly Yan

Page 95

1  court reporter.)
2        THE INTERPRETER: Six hundred
3  something. (Interruption by the court
4  reporter.)
5        MR. DEASEY: Ask her to repeat the
6  answer.
7        THE INTERPRETER: Let me ask her
8  to repeat --
9  BY MR. DEASEY:
10       Q.   Let me withdraw the question.
11       Did you go with your father to the
12  office when he applied for Social Security benefits?
13       A.   No.
14       Q.   So you never translated for your
15  father when he was attempting to get any type of
16  benefits?
17       A.   No, because my English is not good.
18       Q.   Did you ever go with your father
19  when he attempted to get welfare?
20       A.   No.
21       Q.   So you -- did you ever translate for
22  your father when he was attempting to obtain any
23  type of welfare benefits?
24       A.   No.

Page 96

1        Q.   So if there's a note in the welfare
2  records for your father that says you translated for
3  him, that would be wrong?
4        A.   Because I never been with him. I
5  think they have their own interpreter at that
6  place. (Interruption by the court reporter.)
7        THE INTERPRETER: Their own -- they
8  have their own interpreter at that place.
9  BY MR. DEASEY:
10       Q.   So the answer is they'd be wrong,
11  the note would be wrong?
12       A.   Yes.
13       Q.   Did you ever apply for public
14  assistance or welfare?
15       A.   Yes.
16       Q.   Did you receive it?
17       A.   Yes, I did. I received the food
18  stamp --
19       Q.   Are you still -- I'm sorry.
20       A.   -- and the medical assistance.
21       Q.   Are you still receiving food stamps
22  and medical assistance?
23       A.   Yes.
24       Q.   And what do you receive -- let me

Page 97

1  withdraw the question.
2        Did you go down to the Snyder
3  office?
4        A.   Yes, I did.
5        Q.   On Buttonwood Street?
6        A.   I went to the office between 10
7  Street and Spring Garden.
8        Q.   Do you recognize a doctor by the
9  name of -- I'll give it to the interpreter.
10       A.   He's my family doctor and my
11  father's family doctor.
12       Q.   Okay. At -- at the time your father
13  sold the van to you, did he own any other cars?
14       A.   You're asking about -- you're asking
15  me or are you asking my father?
16       Q.   First your father.
17       A.   He own another car, but that car was
18  sold long time ago.
19       Q.   Did you own any cars at the time
20  your father sold you the van?
21       A.   No, did not.
22       Q.   Okay. Have you ever received any
23  money directly from Pack & Process for transporting
24  people to and from Pack & Process?

Page 98

1        A.   I have received payment from David,
2  and David say that he received the money from the
3  company.
4        Q.   So the answer to my question would
5  be no, that you have not received money directly
6  from Pack & Process for transporting passengers; is
7  that correct?
8        A.   Yes.
9        Q.   Now, did any employee of Pack &
10  Process ever tell you that it was part of your job
11  to transport workers to and from Pack & Process?
12       A.   David and Steve who told me to do
13  that.
14       Q.   Well, David who?
15       A.   David, Sdey.
16       Q.   David Thatch?
17       A.   Yes.
18       Q.   And Steve who?
19       A.   The boss in the company.
20       Q.   Did they tell you that together or
21  in separate discussions?
22       A.   Steve told David and asked David to
23  tell me.
24       Q.   Did Steven -- does Steven, the boss,

14 (Pages 95 to 98)

Love Court Reporting, Inc.

Maly Yan

Page 99

1  ever tell you directly that you had to drive workers
2  to and from Pack & Process?
3      A.   No, he did not. He just told David.
4      Q.   Now, how do you know Steven told
5  David that?
6      A.   Because David told me that Steve was
7  agree to allow me to transport worker to and from
8  the company.
9      Q.   Did David tell you that in a
10  conversation or over the telephone or some other
11  means?
12     A.   Over the telephone.
13     Q.   And when did that happen?
14     A.   After I returned home.
15     Q.   Home from where?
16     A.   From working.
17     Q.   But when in relation to the
18  accident?
19     A.   I don't recall exactly, but I know
20  for sure that it was in the afternoon after I
21  finished working.
22     Q.   David -- David told you that Steve,
23  the boss, said it was okay for you to drive
24  passengers; is that what David said?

Page 100

1      A.   Yes.
2      Q.   Other than David telling you that,
3  did anyone else ever tell you that it was part of
4  your job to transport workers to and from Pack &
5  Process?
6      A.   No, just David.
7      Q.   Okay. Now, who paid for the gas in
8  the van when you were transporting workers to and
9  from work?
10     A.   Payment on the car, you mean?
11     Q.   No. Who -- who -- who paid for the
12  gas when you put gas in the van?
13     A.   Steve pay me $30 a week for gas.
14     Q.   Steve paid you -- Steve, the boss
15  man, paid you directly $30 a week for gas?
16     A.   Steve asked David to bring that
17  money to me.
18     Q.   How do you know that?
19     A.   Because David told me that Steve
20  pay -- pay me $30 for gas per week.
21     Q.   So the only -- so it's David Thatch
22  told you that Steven gave him money to give to you
23  for gas; is that correct?
24     A.   Yes.

Page 101

1      Q.   You never spoke with Steve, the
2  boss, about this directly, did you?
3      A.   No, because we never met.
4      Q.   You never received money directly
5  from Steven, the boss, for gas for the van, did you?
6      A.   No, because Steve gave that money to
7  David, and David pay me.
8      Q.   And the only reason you believe that
9  Steve gave that money to David is because that's
10  what David told you, correct?
11     A.   Yes.
12     Q.   Before the date of the accident but
13  during the period of time you were driving, did you
14  have any repairs made to the van?
15     A.   Yes, I did repair.
16     Q.   And who paid for the repairs?
17     A.   I'm the one who paid.
18     Q.   Let me show you what we'll mark as
19  three, I guess.
20              ---
21         (Exhibit St. Paul-3 was marked for
22     identification.)
23              ---
24  BY MR. DEASEY:

Page 102

1      Q.   I'll show you and your counsel.
2         Do you have -- is that -- do you
3  have Exhibit 3 in front of you?
4      A.   Which one?
5      Q.   The document, is that -- okay. Is
6  that your signature at the bottom?
7      A.   It is my brother's signature.
8      Q.   Okay. Do you recall your car being
9  serviced at Family Dodge in June of 2001?
10     A.   Yes.
11     Q.   And the cost was about $783?
12     A.   Yes.
13     Q.   And you paid for that?
14     A.   Yes.
15     Q.   And you were not paid any -- you
16  were not paid any money by David Thatch or Steve,
17  the boss, for this repair, were you?
18     A.   Because I'm the one responsible to
19  pay all the repair on the car.
20     Q.   I understand that. Is the answer
21  no, you did not get paid by David or Steve, the
22  boss?
23     A.   That's correct.
24     Q.   Let me show you what's -- we'll mark

15 (Pages 99 to 102)

Love Court Reporting, Inc.

Maly Yan

Page 103

1  as 4.
2          ----
3          (Exhibit St. Paul-4 was marked for
4     identification.)
5          ----
6  BY MR. DEASEY:
7      Q.    I'll show you and your counsel
8  Exhibit 4. Do you recognize the signature on
9  Exhibit 4?
10     A.    My brother's signature.
11     Q.    And do you recall having some work
12 done on the van regarding the steering?
13     A.    Yes.
14     Q.    And did you pay for the service that
15 was rendered in June of 2001 to correct the steering
16 problem?
17     A.    Yes.
18     Q.    It was about $603?
19     A.    Yes.
20     Q.    And am I – is it true that neither
21 David Thatch nor Steve, the boss, paid you the $603
22 to have the van steering repaired; is that true?
23     A.    Yes.
24     Q.    Now, in June of 2001 you were being

Page 104

1  paid in – in – by – in check – let me withdraw
2  the question.
3          In June of 2001 you were being paid
4  by check as an inspector for Pack & Process,
5  correct?
6      A.    Yes.
7      Q.    And David paid you in cash for
8  transporting passengers, correct?
9      A.    Yes.
10     Q.    And did any of the passengers pay
11 you any money?
12     A.    No.
13     Q.    And how much did you get paid – or
14 let me withdraw the question.
15          Were you – were there approximately
16 anywhere from 10 to 15 people in the van during that
17 period of time?
18     A.    That's correct.
19     Q.    So you would get somewhere between
20 300 and $450 a week in cash from David to transport
21 passengers? David Thatch, I mean.
22     A.    That's correct.
23     Q.    And did David Thatch tell you what
24 route to take from Philadelphia down to Pack &

Page 105

1  Process?
2      A.    No, he did not –
3      Q.    Did anyone –
4      A.    – because I know how to get there.
5      Q.    Did anyone from Pack & Process tell
6  you what road to take to get from Philadelphia down
7  to the Pack & Process plant?
8      A.    What you mean by asking me these
9  questions? That mean that I don't know how to get
10 there or what?
11     Q.    I just want to know if somebody from
12 Pack & Process told you which roads to take to and
13 from Pack & Process.
14     A.    No.
15     Q.    Did anyone from Pack & Process tell
16 you how many people could be in the van?
17     A.    No, no one told me about that, but
18 it depend on how many people they need.
19     Q.    I understand that. I'm asking did
20 anyone from Pack & Process tell you how many people
21 you could put in the van on any day?
22     A.    No.
23     Q.    Other than David Thatch telling you
24 that Steve told him it was okay for you to drive

Page 106

1  people to and from work, do you have any other facts
2  to support your position?
3          MR. DEASEY:  Translate that.
4          THE INTERPRETER:  (Complies.)
5  BY MR. DEASEY:
6      Q.    To support your position that you
7  were working for Pack & Process at the time of the
8  accident?
9          MR. COHEN:  Objection.
10         THE VIDEOGRAPHER:  We are now going
11 off the video record.
12         MR. COHEN:  The objection is to the
13 form of the question in that it's phrased in
14 terms of a legal conclusion in asking the
15 witness to allege facts that would support a
16 legal conclusion. That's not her job in
17 this case.
18         MR. DEASEY:  Let's go back on the
19 record.
20         THE VIDEOGRAPHER:  We are now on the
21 video record.
22 BY MR. DEASEY:
23     Q.    I'm going to ask the question again,
24 and your attorney's objection is stated. So unless

16 (Pages 103 to 106)

Love Court Reporting, Inc.

Maly Yan

Page 107

1  he feels the need to repeat it, he doesn't have to
2  repeat it for me.
3           MR. COHEN: No, you can answer.
4  BY MR. DEASEY:
5       Q.    Other than David Thatch telling you
6  that Steve, the boss man, said it was okay for you
7  to drive workers to and from work, do you have any
8  other facts to -- to support your position that you
9  were working for Pack & Process at the time of the
10 accident?
11          MR. COHEN: Objection.
12          MR. COSTIGAN: Objection.
13          THE VIDEOGRAPHER: We are now going
14 off the record. We are now going off the
15 record. The time is 12:15.
16          MR. COHEN: I realize it's the same
17 question. I'm not trying to be difficult,
18 but since you repeated it, I felt obligated
19 to repeat the objection so I'm not deemed to
20 have waived it. I didn't know if we had
21 that understanding, but I've seen that issue
22 before.
23          MR. DEASEY: Okay. I thought I had
24 made it clear. Let me make it clear. Your

Page 108

1  objections are noted on the record. You
2  don't need --
3           MR. COSTIGAN: I have the same
4  objection.
5           MR. DEASEY: And one objection is
6  good for everybody as far as I'm concerned.
7  But your objections are -- your objections
8  are noted on the record and you don't need
9  to raise them again. They will not be
10 deemed waived by St. Paul Mercury Insurance
11 and Pack & Process, Inc.
12          Okay. Let's go back on and I'll try
13 it one more time.
14          THE VIDEOGRAPHER: We are now on the
15 video record. The time is 12:15.
16 BY MR. DEASEY:
17      Q.    Other than David Thatch telling you
18 that Steve, the boss, told you -- told him it was
19 okay for you to drive workers to and from work, do
20 you have any other facts to support your position
21 that you were working for Pack & Process at the time
22 of the accident?
23      A.    I don't understand. I don't really
24 understand the question.

Page 109

1       Q.    Well, do you -- do you understand
2  that your lawyers are contending or alleging that
3  you were working for Pack & Process at the time of
4  the accident; do you understand that?
5       A.    Yes.
6       Q.    And do you further understand that
7  your lawyers are alleging that it was part of your
8  job to drive the van, part of your job for Pack &
9  Process to drive the van?
10      A.    Yes.
11      Q.    And do you agree with that
12 allegation -- with that position?
13      A.    Yes.
14      Q.    And what I'm asking you is other
15 than David Thatch telling you that Steve, the boss,
16 said it was okay for you to drive workers to and
17 from work, do you have any other facts that support
18 that position that it was part of your job to drive
19 workers to and from work?
20      A.    The only thing I know for sure, that
21 Steve told David and asked me to drive the van.
22      Q.    And you know that for sure because
23 that's what David Thatch told you, correct?
24      A.    Yes.

Page 110

1       Q.    And other than the -- other than
2  David Thatch telling you that, do -- are you aware
3  of any other facts that support your position that
4  it was part of your job to drive workers to and from
5  work?
6       A.    I don't have any other evidence
7  beside that, but the fact is that if David or Steve,
8  if they don't agree with what I have done, they
9  should have suspend me a long time ago.
10      Q.    Have you ever heard of a company by
11 the name of Lam Staffing?
12      A.    No.
13      Q.    Do you know what companies David
14 Thatch owned back in 2001?
15      A.    No. I have not had any contact so I
16 don't know.
17          MR. DEASEY: Let's have this
18 marked.
19          - - -
20          (Exhibit St. Paul-5 was marked for
21 identification.)
22          - - -
23 BY MR. DEASEY:
24      Q.    I want you to take a look at the

17 (Pages 107 to 110)

Love Court Reporting, Inc.

Maly Yan

Page 111

1  exhibit we've marked as four.
2      THE REPORTER: Five.
3  BY MR. DEASEY:
4      Q.    Five, excuse me. I'm sorry.
5      Did -- Ms. Yan, did you authorize
6  your attorneys to file a complaint in federal court
7  here in Philadelphia against Pack & Process, Inc.
8  and St. Paul Mercury Insurance Company?
9      A.    I don't recall.
10     Q.    Do you ever recall having a legal
11 document translated to you that was entitled
12 complaint that had been filed on your behalf in
13 federal court in Philadelphia?
14     A.    I don't recall that. I don't know
15 anything about that because everything --
16 (interruption by the court reporter.)
17     THE INTERPRETER: I don't know
18     anything about that because my lawyers write
19     everything.
20 BY MR. DEASEY:
21     Q.    Well, my question was, did anyone
22 ever translate a legal document to you entitled
23 complaint that was filed on your behalf in any
24 court?

Page 112

1      MR. COHEN: Objection.
2      THE VIDEOGRAPHER: We are now going
3  off the video record. The time is 12:22.
4      MR. COHEN: The question is
5  objectionable. It would assume certain
6  facts not in evidence, and the form is vague
7  and potentially misleading. I'm not saying
8  deliberately, but the question assumes that
9  the witness knows what a complaint is, knows
10 what a legal document is, and understands
11 what specifically you're referring to.
12     MR. DEASEY: Let's go back on the
13 record.
14     THE VIDEOGRAPHER: We are now on the
15 video record. The time is 12:23.
16 BY MR. DEASEY:
17     Q.    I'll ask the question again,
18 Ms. Yan. Did anyone ever translate for you a legal
19 document which was a complaint which was filed on
20 your behalf in any court?
21     A.    It was too long. Don't recall.
22     Q.    I'm talking about a document that
23 was a legal document that was filed on your behalf
24 in March of 2005. Did you ever have a legal

Page 113

1  document entitled a complaint translated to you?
2      A.    I think I remember it.
3      Q.    You think you remember? Who
4  translated the document?
5      A.    I don't -- I don't -- I don't
6  remember who was the interpreter.
7      Q.    Was it a relative?
8      A.    There was my brother who interpret
9  for my father.
10     Q.    I'm talking about you, ma'am. Who
11 interpreted or translated the document for you?
12     A.    You mean in court or elsewhere?
13     Q.    Elsewhere.
14     A.    In court there was a female
15 interpreter.
16     Q.    Ma'am, the document in front of you,
17 it's entitled Exhibit 5. It's a complaint that your
18 attorneys filed on your behalf in federal court in
19 Philadelphia sometime in March, 2005. Do you recall
20 ever having that complaint translated for you?
21     MR. COHEN: Objection.
22     THE VIDEOGRAPHER: We are now going
23 off the video record. The time is 12:26.
24     MR. COHEN: Yeah, again, Mr. Deasey,

Page 114

1  just because you say it's a complaint,
2  doesn't mean she knows what it is or even
3  knows what anybody might have been reading
4  from when they are translating to her. The
5  question is leaving out some steps, and so
6  objection in that regard.
7      MR. DEASEY: Let's go back on the
8  record.
9      THE VIDEOGRAPHER: We are now on the
10 video record. The time is 12:27.
11 BY MR. DEASEY:
12     Q.    Did anyone ever translate this
13 document for you that was filed in the federal
14 court?
15     A.    Yes.
16     Q.    Who?
17     A.    I don't recall. I don't recall his
18 name, but he -- he used to work in the court in the
19 Chinatown area.
20     Q.    And who was present when it was
21 translated for you?
22     A.    It was my lawyer.
23     Q.    Anybody else?
24     A.    Me and interpreter.

18 (Pages 111 to 114)

Love Court Reporting, Inc.

Maly Yan

Page 115

1    Q.    And --
2    A.    And there was a judge in the
3    courtroom. There was a judge in the courtroom.
4    Q.    Okay. I'm talking about something
5    else. I'm not talking about a courtroom. I'm
6    talking about this document that is in front of you,
7    Exhibit 5.
8          Did anyone interpret or translate
9    that document for you that was filed on your behalf?
10   A.    Yes.
11   Q.    Who? Who translated it?
12   A.    I don't know the name of the
13   interpreter because their interpreter was sent over
14   by my lawyer.
15   Q.    Was anyone present with you when the
16   interpreter translated the document?
17   A.    There were me, my lawyer, and the
18   interpreter.
19   Q.    And where -- where did the
20   translation take place?
21   A.    In my lawyer office.
22   MR. DEASEY: Okay. Off the record
23   for two -- let's go off the record for two
24   seconds.

Page 116

1    THE VIDEOGRAPHER: We are now going
2    off the record.
3          - - -
4          (Discussion held off the record.)
5          - - -
6    THE VIDEOGRAPHER: We are now on the
7    record.
8    BY MR. DEASEY:
9    Q.    Ms. Yan, who paid -- in 2001 in the
10   month before the accident, who paid for your car
11   insurance?
12   A.    I'm the one who paid the insurance
13   because the cars belong to me.
14   Q.    And did you get paid any money from
15   David Thatch to reimburse you for your car
16   insurance?
17   A.    No, because insurance, I have to pay
18   the insurance.
19   Q.    Did you get paid any money by
20   anybody from Pack & Process to reimburse you for
21   your car insurance?
22   A.    No.
23   Q.    Incidentally, when's the last time
24   you saw David Thatch?

Page 117

1    A.    Before the accident.
2    Q.    When's the last time you spoke with
3    him?
4    A.    I don't recall, but I talk to him
5    when he needs to talk to me or I need to talk to
6    him.
7    Q.    Well, have you spoken to him this
8    year?
9    A.    I never see him after the accident.
10   Q.    I understand. Did you talk to him
11   on the telephone this year?
12   A.    No.
13   Q.    2005, did you talk to him on the
14   telephone?
15   A.    No.
16   Q.    Why do you need -- why do you say
17   you need to talk to him?
18   A.    You're asking me when was the last
19   time that I talk to him. I just want to let you
20   know that after the accident I never seen him and I
21   never talk with him.
22   Q.    After the accident did you speak
23   with Steve, the boss, about your job?
24   A.    No.

Page 118

1    Q.    After the accident did you speak
2    with any of your supervisors about your job?
3    A.    No.
4    Q.    Did you come back to work after the
5    accident?
6    A.    Yes. I went to work for one week
7    because I need money to help my father, but after
8    the -- after one week I got sick. I cannot go back
9    to work.
10   Q.    How did you get to work for that one
11   week?
12   A.    Someone drove me to work.
13   Q.    Someone drove you to work? Who
14   drove you to work?
15   A.    A driver from the company.
16   Q.    A van? Was it in a van?
17   A.    Yes.
18   Q.    What company?
19   A.    The driver who transport people from
20   and to the company.
21   Q.    What was the driver's name?
22   A.    I don't know.
23   Q.    Is he American?
24   A.    Cambodian.

19 (Pages 115 to 118)

Maly Yan

**Page 119**

1   Q.  Cambodian? Did he work at Pack &
2 Process?
3   A.  Yes, he did.
4   Q.  And what -- did he drive one of
5 David Thatch's vans?
6   A.  I don't know exactly, but I just
7 told him that I need a ride for one week.
8   Q.  Do you -- do you -- do you know who
9 paid him to drive?
10   A.  I don't know. I'm not involved in
11 that business.
12   Q.  You didn't pay him each day to get a
13 ride, did you?
14   A.  No, I did not because I just need
15 help for just one week.
16   Q.  And you didn't see anybody from
17 Pack & Process pay him to drive people to and from
18 work, did you?
19   A.  No, I don't know. I did not know.
20   Q.  And you didn't see David Thatch pay
21 him, did you?
22   A.  No, I don't know because I don't
23 know how he get paid because -- (interruption by the
24 court reporter).

**Page 120**

1   THE WITNESS: -- it's not my
2 business.
3   THE INTERPRETER: I don't know how
4 he got paid. It is not my business to know
5 it.
6   MR. DEASEY: Thank you, Ms. Yan. I
7 don't have any more questions.
8   MR. COSTIGAN: I have no questions.
9   ---
10   EXAMINATION
11   ---
12 BY MR. COHEN:
13   Q.  I have a few questions.
14   Ms. Yan, did you ever go to school
15 that taught you to read English?
16   A.  The only thing I know that when I
17 got here, I went to regular school. I don't know if
18 it's designed for reading or not, but I know for
19 sure that I got here, I go to regular school.
20   Q.  What was the school called?
21   A.  I went to Southwalk School first.
22 (Interruption by the court reporter.)
23   THE INTERPRETER: South, Southwalk
24 9th Street.

**Page 121**

1 BY MR. COHEN:
2   Q.  Did you learn to read English at
3 school?
4   A.  Yes, just the regular word.
5   Q.  Just a regular word?
6   A.  Yes.
7   Q.  So you can read some words, but not
8 all words in English, right?
9   A.  That's correct.
10   Q.  Do you think you are able to
11 accurately read legal documents in English?
12   A.  No.
13   Q.  Okay. These documents that
14 Mr. Deasey's been putting in front of you that he
15 called legal documents, can you read these in
16 English without the interpreter translating for you?
17   A.  No, I can't. I don't know the legal
18 term.
19   Q.  Okay. Can you read this paragraph
20 25 where I'm pointing?
21   A.  I don't know how to read the right
22 word. (Interruption by the court reporter.)
23   THE INTERPRETER: Read the right
24 word.

**Page 122**

1 BY MR. COHEN:
2   Q.  Okay. Can you -- can you try to
3 read that word?
4   It starts in paragraph 25 for the
5 record of Exhibit 5.
6   What does that word say?
7   A.  I think I read, but I don't
8 understand what it is.
9   Q.  Okay. Can -- what does that word
10 sound like if you read it in English?
11   A.  I cannot read it because I don't
12 think I read it the right way.
13   Q.  What do you think it is? What's
14 your best guess?
15   A.  I don't know.
16   MR. COHEN: For the record, the word
17 in English is defendant.
18 BY MR. COHEN:
19   Q.  Did you --
20   MR. COHEN: (To the interpreter)
21 Oh, go ahead.
22 BY MR. COHEN:
23   Q.  Did you know that St. Paul has you
24 as a defendant in this case?

20 (Pages 119 to 122)

Maly Yan

Page 123

1    A.    No, I don't.
2    Q.    Maly, you were asked about something
3    in the case called interrogatories by Mr. Deasey.
4    Do you remember that earlier today?
5    A.    Yes.
6    Q.    Did you know that interrogatories
7    are the lawyer's word for questions?
8    A.    Yeah.
9    Q.    In your family you have a brother
10   who is pretty good with English, right?
11   A.    Yes.
12   Q.    His name is what?
13   A.    Vannak.
14   Q.    Do you hear lawyers and American
15   people call him Dizo?
16   A.    Yes. That is American name, Dizo.
17   Q.    Is it Dizo's signature who you saw
18   on the documents from the car dealership that were
19   in Exhibit 4 and 3? I'm pointing to those now.
20   A.    Yes.
21   Q.    Now, you paid the money for the
22   repairs, right?
23   A.    Yes.
24   Q.    But Dizo had to read the documents

Page 124

1    because they're in English, right?
2    A.    Yes.
3    Q.    Sometimes did Dizo read questions to
4    you that came from lawyers so you could answer him
5    in your language and he could speak to the lawyers
6    in English?
7    A.    Yes.
8    Q.    And were the questions he asked you
9    from the lawyers about the accident and your job and
10   things like that?
11   A.    Yes.
12   Q.    When he asked you the questions, do
13   you know specifically what documents he got the
14   questions from?
15   A.    I just know that all this -- these
16   questions were from lawyer.
17   Q.    Okay. But you can't tell me --
18   THE VIDEOGRAPHER: We're now going
19   off the record. This completes tape No. 1.
20   MR. COHEN: End of the tape?
21   THE VIDEOGRAPHER: Yeah.
22   MR. COHEN: Okay. We'll take a
23   break.
24   - - -

Page 125

1    (A brief recess was taken.)
2    - - -
3    THE VIDEOGRAPHER: We are now on the
4    record. This commences tape No. 2.
5    BY MR. COHEN:
6    Q.    Ms. Yan, do you even know which
7    questions that your brother asked you about, for
8    example, your job and your accident, came from which
9    documents and from which lawyers?
10   A.    The only thing I know, that my
11   brother told me all these questions were from the
12   court of Delaware.
13   MR. COHEN: Okay. That's all.
14   Thank you.
15   MR. COSTIGAN: I have no questions.
16   MR. DEASEY: No questions.
17   THE VIDEOGRAPHER: This concludes
18   the videotape deposition of Maly Yan. We're
19   now going off the record.
20   MR. DEASEY: Why don't we take a
21   half hour.
22   - - -
23   (The deposition of Maly Yan was
24   concluded at 12:55 p.m.)

Page 126

1    CERTIFICATION
2    I HEREBY CERTIFY that I am a Court
3    Reporter and Notary Public.
4    I FURTHER CERTIFY that the witness
5    was sworn to testify to the truth.
6    I FURTHER CERTIFY that the foregoing
7    is, to the best of my ability, a true and accurate
8    transcript of the testimony taken stenographically
9    by me at the time, place, and date hereinbefore set
10   forth.
11   I FURTHER CERTIFY that I am neither
12   a relative, employee, attorney nor counsel to any of
13   the parties to the action, and that I am neither a
14   relative nor employee of such attorney or counsel
15   and that I am not financially interested in the
16   action.
17   _____
     Court Reporter
18   Susan Lauer
19
20   (The foregoing certification of this
21   transcript does not apply to any production of the
22   same by any means, unless under the direction,
23   control and/or supervision of the certifying
24   reporter.)

21 (Pages 123 to 126)

Love Court Reporting, Inc.

Maly Yan

Page 127

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

LAWYER'S NOTES

Page   Line   Notation

22 (Page 127)