# EXHIBIT D
# PART 1

# In The Matter Of:

*St. Paul Mercury Insurance Company, et al v.*
*Maly Yan, et al*

---

*Steven Ames*
*June 27, 2006*

---

*B&R Services for Professionals, Inc.*
*235 S. 13th Street*
*Philadelphia, PA  19107*
*(215) 546-7400*
*FAX (215) 985-0169*

Original File 062706CY.V1, Pages 1-224

**Word Index included with this Min-U-Script®**

This Page Intentionally Left Blank

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ST. PAUL MERCURY       :  CIVIL ACTION NO. 05-
INSURANCE COMPANY,        0022 (KAJ)
and PACK & PROCESS, INC.:
-vs-                   :
MALY YAN               :

YAN THOU, Individually :  C.A. NO. 05-0513(KAJ)
and as Administrator of
the Estate of OEURN MAM,:
Deceased and NAVY YAN,
Deceased et al.        :
-vs-                   :
PACK & PROCESS, INC.   :
and ST. PAUL MERCURY
INSURANCE COMPANY      :

         Videotape deposition of STEVEN AMES,
taken on behalf of Maly Yan, in the Law Offices
of KLINE & SPECTER, P.C., The Nineteenth Floor,
1525 Locust Street, Philadelphia, Pennsylvania,
on Tuesday, June 27, 2006, commencing at or about
10:50 a.m., before Colleen A. Young, R.P.R.,
C.S.R. - Notary Public.

        B & R SERVICES FOR PROFESSIONALS, INC.
               235 SOUTH 13th STREET
          PHILADELPHIA, PENNSYLVANIA 19107
                  (215) 546-7400
         B&R Services for Professionals, Inc.

B&R Services for Professionals, Inc.

---

**Page 2**

[1] APPEARANCES:
[2]     KLINE & SPECTER, P.C.
        BY:  JOSHUA VAN NAARDEN, ESQUIRE
[3]     The Nineteenth Floor
        1525 Locust Street
[4]     Philadelphia, Pennsylvania  19102
        (215) 772-1000
[5]     Counsel for Maly Yan
[6]     COSTIGAN & COSTIGAN,
        BY:  RICHARD COSTIGAN, ESQUIRE
[7]     1315 Walnut Street
        Suite 902
[8]     Philadelphia, Pennsylvania  19107
        (215) 546-7215
[9]     Counsel for Plaintiffs Khan Gul, Zair Shah,
        and the Estate of Mohammed Azim
[10]
        DEASEY, MAHONEY & BENDER, LTD
[11]    BY:  FRANCIS DEASEY, ESQUIRE
        1800 John F. Kennedy Blvd.
[12]    Suite 1300
        Philadelphia, Pennsylvania  19103
[13]    (215) 587-9400
        Counsel for Defendant St. Paul Mercury
[14]    Insurance Company and Pack & Process, Inc.
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

        B&R Services for Professionals, Inc.

---

**Page 3**

[1]            DEPOSITION SUPPORT INDEX
[2] REQUESTS FOR DOCUMENTS OR INFORMATION
    PAGES:  None
[3]
[4] STIPULATIONS AND/OR STATEMENTS
    PAGES:  5
[5]
[6] MARKED QUESTIONS:
    PAGES:  23-5
[7]
[8] INSTRUCTION TO WITNESS NOT TO ANSWER
[9] PAGES:  28-4
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

         B&R Services for Professionals, Inc.

---

**Page 4**

[1]              I N D E X
[2] WITNESS                            PAGE
[3] Steven Ames
[4]     By Mr. Van Naarden          7-217
[5]     By Mr. Deasey                 214
[6]     By Mr. Costigan                -
[7]
[8]          E X H I B I T S
[9]
[10] NO.                               PAGE
[11] Ames-1    Purchase Order & Addendum   69
[12] Ames-2    Insurance Policy           104
[13] Ames-3    Certificate Of Insurance   108
[14] Ames-4    P & P Invoices             109
[15] Ames-5    Invoices                   118
[16] Ames-6    Packet of Invoices         125
[17] Ames-7    7/98 Employment Application 129
[18] Ames-8    2/01 Employment Application 132
[19] Ames-9    7/27/01 Work Return Memo    167
[20] Ames-10   Memorandum                 190
[21] Ames-11   Signed Checks              191
[22] Ames-12   3/13/03 Letter             180
[23] Ames-15   Affidavit                  183
[24]

         B&R Services for Professionals, Inc.

---

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 5

[1]     (It is stipulated and agreed by and
[2] between counsel that the sealing, filing and
[3] certification of the within deposition be
[4] waived; and that all objections, except as to
[5] the form of the question, be reserved until
[6] the time of trial.)
[7]     — — —
[8]     VIDEO TECHNICIAN:  We are now on the
[9] record.  This is videotape for the United
[10] States District Court in the Eastern District
[11] of Delaware.  I am Jeffrey Reed.  I am a
[12] professional videographer for Court Media,
[13] Incorporated, 4201 Church Road, 227, Mount
[14] Laurel, New Jersey.
[15]     Present here today on behalf of Maly
[16] Yan, defendant in the lead case, at the
[17] offices of Kline & Specter 1525 Locust Street
[18] on the 17th floor, Philadelphia,
[19] Pennsylvania.  There are two captions in this
[20] case.  The complete caption will be listed on
[21] the stenographic record for the sake of
[22] brevity.
[23]     The lead case is Saint Paul Mercury
[24] Insurance Company, and Pack & Process,

Page 6

[1] Incorporated, plaintiffs, versus Maly Yan
[2] defendant, Civil Action Number 05-0022.
[3]     The second case is Yan Thou,
[4] Individually and as Administrator of
[5] the Estate of Oeurn Mam, deceased, and Navy
[6] Yan, deceased et al, versus Pack & Process,
[7] Inc., and St. Paul Mercury Insurance Company,
[8] Civil Action Number 05-0513.
[9]     There are several counsel present
[10] including counsel for defendant Maly Yan and
[11] counsel for Saint Paul Mercury Insurance
[12] Company.  The complete list of appearances
[13] will be listed on the stenographic record by
[14] the court reporter.
[15]     Our deponent is Steven Ames.  Today's
[16] date is Tuesday, the 27th of June, 2006.  The
[17] approximate time is 10:52 a.m., and our court
[18] reporter will now swear in the witness.
[19]     STEVEN AMES, having been duly sworn
[20] was examined and testified as follows:
[21]     MR. VAN NAARDEN:  Before we begin, I
[22] just want to put on the record two things.
[23]     First is that today's deposition was
[24] noticed for 10:00 a.m.  Due to an accident on

Page 7

[1] 95, and in addition to some technical
[2] difficulties, we are now beginning at 10:51.
[3]     Additionally, noticed for later today
[4] was to be the deposition of the corporate
[5] designee of Saint Paul.  Plaintiff's counsel
[6] was notified -- or defendants' in the lead
[7] action were notified yesterday via letter
[8] that Saint Paul would be unable to produce
[9] their corporate designee for later today.
[10] It's been represented that they will produce
[11] the corporate designee at a later date, even
[12] if that date is after the discovery date set
[13] forth by Judge Jordan.
[14]     MR. DEASEY:  That is correct.  This is
[15] Francis Deasey on behalf of Saint Paul
[16] Mercury Insurance Company, and Pack &
[17] Process, Inc., and counsel's representation
[18] is correct.
[19] BY MR. VAN NAARDEN:
[20] Q.   Okay.  Good morning, Mr. Ames.
[21] A.   Good morning.
[22] Q.   I introduced myself briefly to you before
[23] we began this process, but just formally, my name
[24] is Josh Van Naarden, and I'm an attorney here at

Page 8

[1] the law firm of Kline & Specter, and we represent
[2] Maly Yan.  Okay?
[3] A.   Yes.
[4] Q.   You were defilled -- deposed in a related
[5] matter on September 18th of 2003, correct?
[6] A.   Yes.
[7] Q.   And do you remember sitting for that
[8] deposition?
[9] A.   Yes.
[10] Q.   Between that time and today, have you been
[11] deposed at any time?
[12] A.   I believe I have, but in another matter.
[13] Q.   Okay.  And you believe one time or more
[14] than one time?
[15] A.   One time.
[16] Q.   And what other one time that you were
[17] deposed, just give me a thumbnail as to what it
[18] was about?
[19] A.   An oil spill took place in my house.
[20] Q.   Okay.  Was there some type of lawsuit in
[21] connection with the oil spill at your house?
[22] A.   Yes.
[23] Q.   Is that something where you filed suit, or
[24] suit was filed against you, or something

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 9

[1] different?
[2] **A.** I filed suit.
[3] **Q.** Okay. How long ago did you -- were you
[4] deposed in that matter?
[5] **A.** I'm not sure, but I would say it's within
[6] the scope of a year.
[7] **Q.** And is that a litigation still pending?
[8] **A.** Yes, it is.
[9] **Q.** Okay. I'm just going to tell you, prior to
[10] you being deposed in that other matter, were you
[11] given instructions as to the way that the
[12] deposition was going to be held?
[13] **A.** Yes, I was.
[14] **Q.** Okay. And you were also given those
[15] instructions back in September of 2003, correct?
[16] **A.** I believe I was.
[17] **Q.** I am going to tell you that those
[18] instructions are going to dictate the way that we
[19] do the deposition here today, with the one caveat
[20] that we're doing this under video.
[21] **A.** Okay.
[22] **Q.** Have you ever had your deposition taken
[23] under video before?
[24] **A.** I have not.

Page 10

[1] **Q.** Okay. As you sit here today, are you the
[2] president of Pack & Process, Incorporated?
[3] **A.** Yes, I am.
[4] **Q.** And have you held that position since 1986?
[5] **A.** That's correct.
[6] **Q.** And my understanding is that in 1986 you
[7] bought the company from your father Herbert Ames?
[8] **A.** That's correct.
[9] **Q.** And your father Herbert M. Ames was the
[10] founder of Pack & Process, Incorporated, correct?
[11] **A.** Yes.
[12] **Q.** And Pack & Process is a company that is
[13] incorporated under the laws of the State of
[14] Delaware; is that accurate?
[15] **A.** That is accurate.
[16] **Q.** And since its inception has always been
[17] incorporated under the laws of Delaware; is that
[18] true?
[19] **A.** Yes.
[20] **Q.** I've read over your deposition back in
[21] 2003. I just want to confirm a few things.
[22] Okay?
[23] **A.** Okay.
[24] **Q.** Based on reading your deposition, my

Page 11

[1] understanding is that before you became president
[2] in '86 you also had various other positions
[3] within the organization, that being Pack &
[4] Process; is that true?
[5] **A.** Will you repeat that.
[6] **Q.** Sure.
[7] Prior to 1986 when you bought the
[8] company from your father, you had
[9] other position -- you held other positions within
[10] the Pack & Process organization?
[11] **A.** I'm not sure that's true.
[12] **Q.** Prior to becoming president, were you vice
[13] president?
[14] **A.** Yes.
[15] **Q.** Okay. And prior to becoming vice
[16] president, didn't you work at the factory as a
[17] machine operator at points in time, and a
[18] blender, and a quality control person?
[19] **A.** Yes, but not -- I did that during various
[20] vacations from previous work, or from college, or
[21] something along those lines. I wasn't
[22] necessarily a full-time employee at that point.
[23] **Q.** Were you paid for the time that you spent
[24] working?

Page 12

[1] **A.** Yes, sir. Yes, I was.
[2] **Q.** Okay. When you were vice president for
[3] whatever period of time that you served as vice
[4] president, was your father president?
[5] **A.** Yes, he was.
[6] **Q.** As you sit here today, how many plants does
[7] Pack & Process currently operate?
[8] **A.** None.
[9] **Q.** You will agree with me that when your
[10] deposition was taken in 2003 that there was
[11] approximately five or six plants that you -- that
[12] you owned, not all of them were being operated at
[13] the time; is that accurate?
[14] **A.** That is correct.
[15] **Q.** All right. Well, take me through what has
[16] happened since 2003 as far as the structure and
[17] the ownership of properties as it relates to Pack
[18] & Process?
[19] **A.** Well, the ownership of the properties don't
[20] relate to Pack & Process. The -- except for one
[21] property.
[22] The production, I chose to start
[23] slowing down. I saw a different situation from a
[24] business point of view that I did not

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 13

[1] particularly like, and my decision was to start
[2] slowing down the business and bringing it to a —
[3] to a — a close.
[4] Q.    What was it about observations that you
[5] made about the business that you did not
[6] particularly like?
[7] A.    Well, business, in general, started getting
[8] very much more difficult with the concept of
[9] purchasing such as Walmart, where my clients,
[10] which were typically food manufacturers, used to
[11] have a lot more -- a lot larger price range
[12] within work -- within which work could be done.
[13]     And as Walmart became more powerful
[14] they started putting tremendous price pressures
[15] on -- on their clients, and their clients had to
[16] find ways of getting their price -- getting costs
[17] out of their -- their product.  And B, the
[18] ability to have the same margins as previous
[19] were -- were -- were passing.
[20]     Also, the format under which my
[21] father started the company was one in which we
[22] were kind of a specialty contract packager
[23] focusing on new production introductions.  New
[24] product introductions were -- typically came out

Page 14

[1] of a research budget, and they were not
[2] particularly tight.  It was something that
[3] worked.  The success was important, though, to
[4] get out.  You need a test market at a particular
[5] time, and they had to line up with -- with
[6] advertisements.  So there is really a key aspect
[7] to being able to do what you had to do with a new
[8] product at a very specific part of the time.
[9]     That concept of test marketing
[10] really went away in the late '80s, early '90s.
[11] And the push in the industry was more towards out
[12] sourcing on a general basis and really
[13] became a factor of price, price, price.  And we
[14] weren't really well set up for -- for that kind
[15] of efficiency.  We had several small plants.
[16] What we could offer a client was production in a
[17] building where nobody else could get in there,
[18] their competitors couldn't see what was being
[19] done.  There was a certain amount of secrecy,
[20] there was a certain amount of -- of privacy to
[21] the whole thing, and now the push was to large
[22] production, and where we would have to typically
[23] want to move machines from one plant to another
[24] and do this huge setup, it would have been better

Page 15

[1] off to have a very large plant and have the same
[2] machinery doing the same sort of work, and if the
[3] machine wasn't working it would just sit there.
[4]     So we were just not well laid out
[5] for the change from -- from -- a test market, and
[6] when successful, lead into the client's own
[7] production.  And I -- I saw this as a great
[8] problem.  Plus, each year the issue of
[9] transportation, which was a negative issue for
[10] us, became worse and worse from the point of view
[11] most of our food stocks and raw materials were
[12] coming from the midwest, and then we would
[13] distribute back to the rest of the country.
[14]     And the co-packers who were -- who
[15] were located in the -- in the center of the
[16] country around Chicago, Indiana, that was the
[17] advantageous position.  And each year our clients
[18] would say to us, you know, we -- we like to work
[19] with you but, and it was getting more and more
[20] difficult, and I wasn't willing to -- to -- to
[21] open another operation in the middle of the
[22] country.  And all of these things were
[23] handwriting on the wall.  Plus the State of
[24] Delaware in its wisdom made it very difficult

Page 16

[1] from a workmen's comp -- I don't mean workmen's
[2] comp, from a health insurance point of view, laws
[3] they passed there, and the way the insurance
[4] companies were interpreting these things, made it
[5] almost impossible for me to have health insurance
[6] for -- for people who wanted it in the company.
[7]     All these things, I mean, there
[8] were a million other little -- little details.
[9] The industry was getting much more complicated.
[10] The -- the -- the problems associated with food
[11] production were getting far more complicated.  The
[12] cost of starting a project was far higher, and
[13] the remeun- -- the remuneration was less.
[14]     And at the same time I had some
[15] health problems, and I didn't have children who
[16] were looking to come into the business, and I am
[17] saying to myself, hey, time to settle it down a
[18] bit, and that's what I did.
[19] Q.    Was there -- can -- can you pinpoint a
[20] point in time, and I'm not asking for a day, I'm
[21] asking for a month and a year, where you made
[22] that decision, we're going --
[23] A.    No.
[24] Q.    -- to be slowing the business down?

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 17

[1]  A.  No. I was a gradual.
[2]  Q.  And explain to me how from -- well, let's
[3]  go back to September of -- of 2003 when you were
[4]  deposed. When you were deposed, at that point in
[5]  time, had you made a decision to start slowing
[6]  down the business?
[7]  A.  I don't recall it at that -- at what point
[8]  it was.
[9]  Q.  Do you believe it was at the time that you
[10]  were deposed at 2003 or after?
[11]  A.  I don't see a reason to guess.
[12]        COURT REPORTER: I'm sorry?
[13]        THE WITNESS: I don't see a reason
[14]     to guess.
[15]  BY MR. VAN NAARDEN:
[16]  Q.  Take me through what you did in starting to
[17]  slow down the -- the business?
[18]  A.  Well, I did not renew a lease in the
[19]  building that I had leased, and that was a key
[20]  step. And I fixed up one of my older plants to
[21]  to -- to house some of the production. That was
[22]  a key step.
[23]  Q.  Which property was that?
[24]  A.  1400 B Street.

Page 18

[1]  Q.  The property that you leased, where was
[2]  that property located?
[3]  A.  3 Boulden Circle.
[4]  Q.  So you decided not to renew the lease?
[5]  A.  Correct.
[6]  Q.  When did the lease expire?
[7]  A.  I don't remember exactly. I would say
[8]  2000. I don't remember. I don't remember.
[9]  That's guessing.
[10]  Q.  Do you have documentation as far as the
[11]  lease that you had for that property?
[12]  A.  No.
[13]  Q.  You didn't retain any of that?
[14]  A.  Do I have it here? No, I don't.
[15]        MR. DEASEY: If he had it here, or
[16]     has it?
[17]  MR. VAN NAARDEN:
[18]  Q.  Do you -- do you still have it?
[19]  A.  I don't know. I may or may not.
[20]  Q.  Did the lease expire after 2003?
[21]  A.  No, I think it was before 2003.
[22]  Q.  Other than deciding not to renew the lease
[23]  and fixing up the 1400 B Street property to house
[24]  some of the materials, what else did you do to

Page 19

[1]  slow down the -- the business?
[2]  A.  There was negotiation with -- with a
[3]  particular client who had been a major client and
[4]  we had never had a contract with. And they came
[5]  by and said they had been bought by a -- I'm
[6]  sorry -- that's a mistake. But they
[7]  had -- they had a new president who came from a
[8]  different company. Normally, their people came
[9]  from within. And it came through to the people
[10]  that I dealt with that they, for the amount of
[11]  business that we did, they wanted to have a
[12]  contract in hand.
[13]        And I -- I said to my contract, I
[14]  said look, this is going to be difficult, it
[15]  always is, when we have to go through a contract,
[16]  but look, send -- send it into me, and I -- I
[17]  will tell you the parts that I have problems with
[18]  and see what we can get out -- get out from
[19]  there.
[20]        And bottom line is that they --
[21]  they -- they asked in their contract for me to be
[22]  responsible for things that I should simply not
[23]  be responsible for, simply not businesslike. And
[24]  I picked up the worst four or five items and

Page 20

[1]  tried to negotiate those, and long story short,
[2]  they didn't want it. And as a result I lost
[3]  probably my biggest client.
[4]  Q.  What was the name of that client?
[5]  A.  Do I have to disclose these things?
[6]        MR. DEASEY: Let's me just -- let's
[7]     go off the record.
[8]        VIDEO TECHNICIAN: Off the record.
[9]     11:06.
[10]        (Whereupon a discussion was held off
[11]     the video record.)
[12]        MR. DEASEY: This is confidential
[13]     information. In this case, I don't think it
[14]     can lead to the admissibility of any relevant
[15]     evidence, and also it's well beyond the scope
[16]     of the corporate designee which we have in
[17]     this case, so to the extent --
[18]        THE WITNESS: Very candidly --
[19]        MR. DEASEY: Hold on. I mean is it
[20]     necessary for you to know this, Josh? He
[21]     treats it as a trade secret.
[22]        MR. VAN NAARDEN: Is it a trade secret
[23]     as to who the client is that he is
[24]     negotiating with?

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 21

[1]       MR. DEASEY: That he was negotiating
[2]   with. Here's the point, if you guys want to
[3]   press it and the judge orders him to do it,
[4]   he will simply sign an affidavit and tell you
[5]   who the client was. How is that?
[6]       MR. VAN NAARDEN: All right.
[7]       VIDEO TECHNICIAN: On the record.
[8]   11:08.
[9]   BY MR. VAN NAARDEN:
[10]  Q.   About disclosing the name of the client,
[11]  approximately how much of Pack & Process'
[12]  business, at the time that you were negotiating
[13]  with whoever this client was, made up...
[14]  A.   It could be at times anywhere between 25 to
[15]  50 percent of our work.
[16]  Q.   As a result of these failed negotiations,
[17]  that client had refused to do business with Pack
[18]  & Process?
[19]  A.   I think -- I think it was either immediate
[20]  or soon thereafter.
[21]  Q.   Okay.
[22]  A.   I don't think we had a direct answer from
[23]  that desire to negotiate, I think it went on for
[24]  a little while and then kind of petered out.

Page 22

[1]   Q.   Okay. How, if at all, did that affect the
[2]   company?
[3]   A.   Well, it drove us from a situation which
[4]   was sometimes profitable to not being
[5]   particularly profitable.
[6]   Q.   At the time that this -- this client and
[7]   Pack & Process parted ways, how many plants at
[8]   the time were operating?
[9]   A.   It's always a difficult question to answer,
[10]  but typically the answer is either one or two.
[11]  Q.   And of those one or two, can you tell me
[12]  which properties they were?
[13]  A.   One was 1400 B Street, and the other was
[14]  1001 East 7th Street.
[15]  Q.   When we talk about which plants are in
[16]  operation, and you said one or two depending
[17]  on -- on -- on any given time, when you have one
[18]  or two in operation, did Pack & Process still own
[19]  different plant locations just -- and they --
[20]  they just weren't in operation?
[21]  A.   Pack & Process did not own the locations.
[22]  Q.   All right. So they didn't own 1400 B
[23]  Street?
[24]  A.   No.

Page 23

[1]   Q.   That was a leased property?
[2]   A.   Yes.
[3]   Q.   Who did you lease it from?
[4]   A.   502 LLC.
[5]   Q.   Is 502 LLC a company for which you have any
[6]   ownership interest in?
[7]   A.   Yes.
[8]       MR. DEASEY: Off the record. Let's
[9]   go off the record a minute.
[10]      VIDEO TECHNICIAN: Off the record.
[11]  11:10.
[12]      (Whereupon a discussion was held off
[13]  the video record.)
[14]      MR. DEASEY: Again, I will object
[15]  and at this point in time, unless, Josh, you
[16]  can convince me otherwise. This is well
[17]  beyond the scope of the notice of corporate
[18]  deposition that we got in this case. It has
[19]  nothing to do with the corporate structure of
[20]  his companies, related companies, ownership
[21]  of properties.
[22]      MR. VAN NAARDEN: Sure, it has to do
[23]  with other corporations that he has an
[24]  ownership interest in, and to be quite frank,

Page 24

[1]   if he is -- if he is leasing another company
[2]   for which Pack & Process has a plant, through
[3]   a company that he owns, we have a right to
[4]   know that.
[5]       MR. DEASEY: I'm talking about the
[6]   notice of deposition responding to where in
[7]   here is it?
[8]       MR. VAN NAARDEN: First of all, I
[9]   would just say in this notice for deposition
[10]  it indicates that the corporate designee
[11]  should be prepared to discuss, obviously, the
[12]  incident described in plaintiff's complaint,
[13]  including any and all documents requested in
[14]  discovery. Requested in discovery, and I
[15]  don't have the actual requests in front of
[16]  me, but they're pretty standard, refer to the
[17]  ownership of property in relation to Pack &
[18]  Process, and any information contained about
[19]  ownership of the particular property sites
[20]  where Pack & Process are located and do
[21]  business.
[22]      Now, if Mr. Ames leases a particular
[23]  property from an entity that he has an
[24]  ownership interest, that is totally related.

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 25

[1]     MR. DEASEY: Can I see that a moment?
[2]     Actually, the discovery -- well, no.
[3] I mean, respectfully the notice of corporate
[4] designee asks for four specific areas of
[5] inquiry, none of which have anything to do
[6] with the ownership of any plants, properties
[7] or, for that matter, the company itself. It
[8] asks for the deponent to bring with them
[9] records in their possession, custody, or
[10] control that refer, relate to, or pertain to
[11] the incident described in plaintiff's
[12] complaint, including any and all documents
[13] requested in discovery regarding the
[14] employment of Yan Thou and Maly Yan.
[15]     Nowhere in this notice does it talk
[16] about the interrelationship of companies.
[17] The written discovery that we got asks only
[18] about 3 Boulden Circle, it doesn't ask with
[19] respect to any other properties that Pack &
[20] Process may have leased, owned, occupied, or
[21] etcetera.
[22]     So it's well beyond the scope, and I
[23] don't think it's -- I don't think you're
[24] entitled to inquire into the areas that is

Page 26

[1] beyond the scope of the corporate designee.
[2]     MR. VAN NAARDEN: The only thing that
[3] I would mention is that the complaint that
[4] was filed originally in the Eastern District
[5] of Pennsylvania and then transferred and
[6] consolidated in Delaware lists Pack &
[7] Process, obviously, as a defendant, and there
[8] are questions as far as indemnification that
[9] relate to the employment relationship between
[10] Maly Yan and Pack & Process, and whether or
[11] not Saint Paul is obligated to cover it.
[12]     MR. DEASEY: I agree with that.
[13]     MR. VAN NAARDEN: If it is determined
[14] that Saint Paul does not have coverage under
[15] their insurance policy, the assets of Pack &
[16] Process become extremely relevant.
[17]     Now we can do this now. I mean, if
[18] you want to object and instruct your client
[19] not to answer, which I will put on the record
[20] is not proper, as I see it, that is fine, and
[21] we will bring Mr. Ames back here on another
[22] day and ask him these questions.
[23]     MR. DEASEY: But asset discovery is
[24] not permissible in discovery. Asset

Page 27

[1] discovery is permissible once you get a
[2] verdict or judgment, and I assume that's
[3] where we were going here. That is not
[4] permissible at this point in time.
[5]     Let me just put my statement on the
[6] record. I will object and instruct Mr. Ames
[7] not to respond to any questions with respect
[8] to ownership, his ownership, or other related
[9] companies other than Pack & Process, Inc., or
[10] the activities of these other related
[11] companies for several reasons.
[12]     Number one, he is being produced here
[13] in response to a notice of corporate
[14] deposition of Pack & Process, Inc. Nowhere
[15] in the notice of corporate deposition does it
[16] refer to anything regarding his involvement
[17] in what could be described as related or
[18] unrelated companies, or his personal business
[19] matters. In fact, there are four categories
[20] that are listed in the notice and we can mark
[21] the notice. I don't want to burden the
[22] record with what the notice asks for.
[23]     But there are four inquiries, none of
[24] which have anything to do with his

Page 28

[1] relationship with companies other than Pack &
[2] Process, Inc. So for that matter, excuse me,
[3] for those reasons I will object and instruct
[4] him not to answer because he is not here to
[5] testify either as an individual, or as a
[6] corporate designee on those matters.
[7]     MR. VAN NAARDEN: I would ask that the
[8] transcript be marked at that particular
[9] portion.
[10]     VIDEO TECHNICIAN: On the record.
[11] 11:17.
[12] BY MR. VAN NAARDEN:
[13] Q.   We were talking about the 1400 B Street
[14] property which you said is not owned by Pack &
[15] Process, correct?
[16] A.   That's correct.
[17] Q.   You said it was leased?
[18] A.   Correct.
[19] Q.   The 1000 or that 1001 East 7th Street
[20] property, is that owned by Pack & Process?
[21] A.   No, it's not.
[22] Q.   That is leased?
[23] A.   Yes.
[24] Q.   Is it leased by the same company -- leased

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 29

[1] from the same company that you lease the 1400 B
[2] Street property from?
[3] A.  No.
[4] Q.  A different property -- a different
[5] company?
[6] A.  Yes.
[7] Q.  As you sit here today, are there any
[8] properties for which Pack & Process owns that you
[9] do what are you bus-- Pack & Process-related
[10] business out of?
[11] A.  No.
[12] Q.  Back in 2003, were there any properties
[13] that Pack & Process owned for which they did
[14] business out of?
[15] A.  No.
[16] Q.  At any time since -- since you've been
[17] president, and since 1986, have there ever been
[18] any properties that you actually owned that you
[19] were doing Pack & Process business from?
[20]      MR. DEASEY:  You mean that Pack &
[21]   Process owned?
[22] BY MR. VAN NAARDEN:
[23] Q.  That Pack & Process owned?
[24] A.  No.

Page 30

[1] Q.  It was always a situation where you were
[2] leasing?
[3] A.  Yes.
[4] Q.  Okay.  As you sit here today, do you -- are
[5] you currently leasing any properties in order to
[6] pursue Pack & Process business?
[7] A.  No.
[8] Q.  As you sit here today, does -- does Pack &
[9] Process, Incorporated still do business?
[10] A.  Yes.
[11] Q.  What -- what is the state of -- of affairs
[12] at Pack & Process?  What are you doing currently?
[13] A.  Selling machinery.
[14] Q.  When you say selling machinery, you mean
[15] like selling off machinery?
[16] A.  Yes.
[17] Q.  Are you in the final stages of closing down
[18] what was once Pack & Process?
[19] A.  I don't know how you would define the
[20] closing stages.
[21] Q.  Okay.  Well, when you say selling
[22] machinery, what machinery currently are you
[23] selling?
[24] A.  Machinery that I have left over that is not

Page 31

[1] being used anymore.
[2] Q.  Are you currently manufacturing, packing,
[3] or selling any material?
[4] A.  No.
[5] Q.  Pack & Process?
[6] A.  No.
[7] Q.  When did you stop producing and -- and
[8] selling products?
[9]      MR. DEASEY:  You mean packaging
[10]   candies?
[11]      MR. VAN NAARDEN:  Packaging candies.
[12]      MR. DEASEY:  Things like that?
[13]      MR. VAN NAARDEN:  And delivering them.
[14]      THE WITNESS:  I would say it's going
[15]   to be close to two years.  I think we had one
[16]   job that jagged in there later on.  It's
[17]   getting close to two years.  Maybe a year and
[18]   a half.
[19] BY MR. VAN NAARDEN:
[20] Q.  I'm not going to hold you to it, but
[21] somewhere around 2004?
[22] A.  Approximately.
[23] Q.  Okay.  What -- what is your intention as
[24] far as where do you see Pack & Process going to

Page 32

[1] in the future?
[2] A.  I don't know.
[3] Q.  After you -- you're finished selling off
[4] all -- all the property?
[5]      MR. DEASEY:  You have --
[6]      MR. DEASEY:  You mean the equipment?
[7] BY MR. VAN NAARDEN:
[8] Q.  Selling off all the equipment, what -- what
[9] do you intend to do?
[10] A.  I don't -- I don't have a plan.
[11] Q.  Other than yourself -- you're currently
[12] president?
[13] A.  Yes.
[14] Q.  And are you the sole owner of -- of Pack &
[15] Process?
[16] A.  Yes.
[17] Q.  Does anybody else have an ownership
[18] interest in Pack & Process?
[19] A.  No.
[20] Q.  Has -- since 1986 to today, has that always
[21] been the case?
[22] A.  Yes.
[23] Q.  How many -- today, how many employees does
[24] Pack & Process have?

Min-U-Script®                B&R Services for Professionals, Inc.

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames<br>June 27, 2006

Page 33

[1] **A.** It has two employees not -- not counting
[2] me. It has two employees and one part-time
[3] employee.
[4] **Q.** What are the names of the employees?
[5] **A.** Dennis DeLong.
[6] **Q.** What does Dennis DeLong do?
[7] **A.** He is a mechanic.
[8] **Q.** Okay. That's one.
[9] **A.** Robert Hassey.
[10] **Q.** What does Robert Hassey do?
[11] **A.** He is a clerk.
[12] **Q.** A secretary?
[13] **A.** Kind of a -- not really a secretary. He
[14] will answer the phones.
[15] **Q.** And then who is the temporary?
[16] **A.** Steve Eslinger.
[17] **Q.** I don't know if I asked you this before,
[18] but, have you changed addresses since September
[19] of '03?
[20] **MR. DEASEY:** Which one, business or
[21] personal?
[22] **MR. VAN NAARDEN:** Personal addresses.
[23] **THE WITNESS:** Yes, I have.
[24] **BY MR. VAN NAARDEN:**

Page 34

[1] **Q.** Okay. Well, what is your current address?
[2] **A.** 7621 Monteverde Lane, West Palm Beach,
[3] Florida.
[4] **Q.** Oh, you moved to West Palm?
[5] **A.** Yes.
[6] **Q.** How long have you lived in West Palm for?
[7] **A.** It's going to be close to a year.
[8] **Q.** Your previous address was 15 Walnut Green
[9] Road in Greenville, --
[10] **A.** And it still is.
[11] **Q.** -- Delaware?
[12] You still have that property, too?
[13] **A.** Yes.
[14] **Q.** Okay. How much of the year do you spend in
[15] West Palm?
[16] **A.** That's to be determined, but it's probably
[17] a little more in West Palm Beach, and a little
[18] less in -- in Delaware.
[19] **Q.** How long has Dennis DeLong been an employee
[20] of Pack & Process?
[21] **A.** I'm guessing now. I would say ten years.
[22] Give or take two years.
[23] **Q.** And Robert Hessey?
[24] **A.** Hassey.

Page 35

[1] **Q.** Hassey.
[2] **A.** I would say about 15 years, give or take a
[3] couple.
[4] **Q.** And Steve Islinger?
[5] **A.** Eslinger.
[6] **Q.** Eslinger.
[7] **A.** I would say 30 years, give or take a
[8] couple, with a break in -- the middle someplace.
[9] **Q.** And what responsibility does Steve have,
[10] currently, at the -- at the business?
[11] **A.** Steve was my number two guy. He -- he
[12] manages most of the daily operation that takes
[13] place, whatever it is. He -- he sees that Bob
[14] does what he is suppose to do, gathers records as
[15] they have to be gathered, and just -- just makes
[16] sure things that -- that documents are kept as --
[17] as needed, or documents are gotten rid of as we
[18] don't need them anymore.
[19] **Q.** You understand, as you are here today, that
[20] there was an accident with some of the, whether
[21] they were permanent or temporary employees of the
[22] Pack & Process back in -- in June of 2001.
[23] **MR. DEASEY:** Objection to form.
[24] You can answer it.

Page 36

[1] **THE WITNESS:** I'm not sure what the
[2] question was.
[3] **BY MR. VAN NAARDEN:**
[4] **Q.** You are aware that there was as an accident
[5] in June of -- of 2001 involving some of the
[6] temporary and some permanent employees of Pack &
[7] Process?
[8] **A.** Yes.
[9] **Q.** Okay. I want to ask you some questions
[10] about the state of affairs at Pack & Process in
[11] June of 2001. So the next slew of questions I'm
[12] going to ask, I am going to ask you to assume
[13] that what I'm talking about is June of 2001.
[14] Okay?
[15] **A.** Okay.
[16] **Q.** All right. Tell me about how many plants
[17] were being operated and/or leased by Pack &
[18] Process in June of 2001?
[19] **MR. DEASEY:** Why don't you break
[20] it down. Operation.
[21] **THE WITNESS:** From an operational
[22] point of view, I believe we were working, and
[23] I'm not sure, I believe we were working in
[24] three plants at that point. And when I say

Page 37

[1]    working three plants, that does not mean that
[2]    three plants were running every day.
[3]        For instance, there was a project in
[4]    which we were packaging tea which was a
[5]    particular dusty operation, and it was -- it
[6]    was -- the product itself, tea, does not take
[7]    well to products like spices being near them.
[8]    So for that reason we would isolate that
[9]    production in a plant, I think at -- at that
[10]    time it was in Plant 1, and there was no
[11]    other production in Plant 1; however, that
[12]    plant may be -- may be operated 20 percent of
[13]    the time, 15 percent of the time, 30 percent
[14]    of the time. That's one operation.
[15]    A second operation might have to do
[16]    with some strong spices which would not fit
[17]    well into the operation at Boulden Circle.
[18]    You know, I think we did do spices at Boulden
[19]    Circle. I think -- I think Plant 1 and
[20]    Boulden Circle that was -- that was operating
[21]    at that time
[22]    BY MR. VAN NAARDEN:
[23]    Q.   Would you consider -- was there any --
[24]    A.   I could be wrong, but it's...

Page 38

[1]    Q.   Did you consider Pack & Process to have a
[2]    headquarters as far as one of the -- one of the
[3]    leased properties that -- that -- that was the
[4]    center location for your business?
[5]    A.   Yes.
[6]    Q.   And -- and was that the Boulden Circle
[7]    address?
[8]    A.   Yes, that was.
[9]    Q.   Okay. Is that where the administrative
[10]    offices, if there were any, were?
[11]    A.   Yes.
[12]    Q.   Did any of the other leased properties have
[13]    administrative offices?
[14]    A.   They may have had on a temporary basis.
[15]    Most likely at that time not.
[16]    Q.   Did you have an office in the Boulden
[17]    Circle address?
[18]    A.   Yes, I did.
[19]    Q.   How many employees did Pack & Process
[20]    employ in June of 2001?
[21]    A.   I would guess somewhere in the neighborhood
[22]    of 50.
[23]    Q.   And how many different -- do you have
[24]    different divisions, like -- like administrative

Page 39

[1]    division and a mechanical division?
[2]    A.   We didn't have divisions, but -- but it did
[3]    break down that way, yes.
[4]    Q.   Okay. So other than the administrative
[5]    department, that's my word, I understand that you
[6]    might -- we're on the same page, right?
[7]    A.   Right.
[8]    Q.   Mechanical production and quality control,
[9]    were there any other departments?
[10]    A.   I would -- I would accept that as a -- as
[11]    a -- as a grouping.
[12]    Q.   Okay. And back in 2001, can you take those
[13]    four groups and break them down as far as how
[14]    many employees were working, estimate --
[15]    A.   Estimate.
[16]    Q.   -- during 2001?
[17]    A.   Estimate plus amount is 25 percent.
[18]    Q.   Oh, okay.
[19]    A.   Administrative, I would say six or seven.
[20]    Q.   People?
[21]    A.   Yeah.
[22]    Q.   Okay.
[23]    A.   Quality control, four or five. Mechanical,
[24]    eight or nine. And production, including QC, I

Page 40

[1]    would say somewhere around 20, 25.
[2]    Q.   Back in 2001, who was the health care
[3]    through?
[4]    A.   I don't understand the question.
[5]    Q.   Sure. You provided health care benefits
[6]    to your employees?
[7]    A.   Yes.
[8]    Q.   Back in 2001?
[9]    A.   Yes.
[10]    Q.   Was it through MAMSI?
[11]    A.   It may have been. I don't recall.
[12]    Q.   Well, at some point you -- you said, I
[13]    think later on, that the State of Delaware made
[14]    it kind of hard as far as the health care
[15]    situation was, correct?
[16]    A.   Yes.
[17]    Q.   All right. Did you ever have a health care
[18]    insurance through anyone but MAMSI?
[19]    A.   Yes.
[20]    Q.   Who were the other ones?
[21]    A.   Oh, golly. After MAMSI -- I just got a
[22]    letter from them yesterday. I can't think of it
[23]    right now.
[24]    Q.   Did you have a computer system back in

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 41

[1]    2001?
[2]    A.    A computer system?  We had computers, yes.
[3]    Q.    What were the computers used for?
[4]    A.    Mostly inventory tracking.
[5]    Q.    Did you have a phone system?
[6]    A.    Yes.
[7]    Q.    Well, first of all, as far as the computer
[8]    system, was there a retention policy as far as
[9]    materials that you would hold onto?
[10]   A.    No.  We really didn't have a policy.
[11]   Q.    Tell me what the normal practice was as far
[12]   as retaining the computer-generated documents, if
[13]   there was one?
[14]   A.    They would relate probably to the project,
[15]   and most projects had a life span, and then we
[16]   had certain obligations to keep certain
[17]   documentation, including QC documentation, for
[18]   two years after date of production.  And then
[19]   after that -- and that includes sample retention
[20]   as well.  After that we would want to get rid of
[21]   it.
[22]   Q.    How about for employees, did you retain
[23]   employee documentation?
[24]   A.    Yes.

Page 42

[1]    Q.    How long would you retain that information?
[2]    A.    Those, I think, were kept.
[3]    Q.    Kept to this day?
[4]    A.    I believe so, yes.
[5]    Q.    As far as Pack & Process is concerned, back
[6]    in 2001, were there any vehicles used solely for
[7]    Pack & Process business?
[8]    A.    Solely for Pack & Process business, yes.
[9]    Q.    And back in 2001, what vehicles were being
[10]   used?
[11]   A.    We had a small 20 or 24 foot truck, and
[12]   basically, we would use that -- we had a small
[13]   20 -- 24 foot truck.
[14]   Q.    What would -- what would it be used for?
[15]   A.    Primarily, to take garbage to the dump.
[16]   Sometimes to move machinery between plants.
[17]   Q.    Other than the 20 foot truck, any other
[18]   vehicles that were used for Pack & Process
[19]   business?
[20]   A.    That's not the same question you asked
[21]   before.  The first question you asked was
[22]   exclusively for Pack & Process business.
[23]   Q.    Were there other vehicles that -- that were
[24]   used for both -- whatever reasons, but in some

Page 43

[1]    way connected with Pack & Process?
[2]    A.    Yes.
[3]    Q.    And what vehicles would that be?
[4]    A.    We had several vehicles that we leased for
[5]    supervisors.  We -- I had a personal vehicle.
[6]             What year are we talking about,
[7]    2001?
[8]    Q.    Correct.
[9]    A.    My mother had a personal vehicle.
[10]   Q.    What vehicle did you have?
[11]   A.    I had a Mercedes 350 SDL, 1991.
[12]   Q.    What did your mom have?
[13]   A.    She had a Lexus.
[14]   Q.    Do you know the model?
[15]   A.    I -- I'm not sure the point of time.  There
[16]   was a 400 -- a 400 or 410, and then -- and then
[17]   she got a 4 -- 430 or something.  I'm -- I'm not
[18]   real sure of that.
[19]   Q.    Any other vehicles besides the Lexus and
[20]   the Mercedes, and the 20 foot truck?
[21]   A.    There was a --
[22]             MR. DEASEY:  Supervisors?
[23]             MR. VAN NAARDEN:  Supervisors were
[24]   using.

Page 44

[1]             THE WITNESS:  There was a pickup truck
[2]    that was used generically.
[3]    BY MR. VAN NAARDEN:
[4]    Q.    Anything else?
[5]    A.    I think that was all, but I think it's been
[6]    submitted in a sheet to you.
[7]    Q.    In addition to the vehicles that you just
[8]    described, were there any type of construction, or
[9]    any other type of construction, or, I guess,
[10]   vehicles used internally, inside the actual
[11]   factories?
[12]   A.    Yes, there were forklifts.
[13]   Q.    Approximately, how many forklifts?
[14]   A.    I'm estimating, 12, 13, 14.
[15]   Q.    Were there forklifts in the Boulden Circle
[16]   property?
[17]   A.    Yes.
[18]   Q.    Were there forklifts in some of the other
[19]   leased properties?
[20]   A.    Yes.
[21]   Q.    If you weren't presently doing a project in
[22]   some of the other properties, would you still
[23]   have forklifts there?
[24]   A.    Yes.

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 45

[1] **Q.** And is it fair to say that there are
[2] certain employees that are authorized to use the
[3] forklifts?
[4] **A.** Yes.
[5] **Q.** Back in 2001, did you allow temporary
[6] workers to utilize forklifts?
[7] **A.** If they were trained and had a license,
[8] yes.
[9] **Q.** In 2001?
[10]       **MR. DEASEY:** Let me get a
[11] clarification. When you say temporary
[12] workers, are you talking about laborers that
[13] were obtained through various temporary
[14] employment agencies?
[15]       **MR. VAN NAARDEN:** We will -- we will
[16] get to that, but yeah.
[17]       **MR. DEASEY:** Did you -- I just wanted
[18] to --
[19]       **THE WITNESS:** My assumption was that
[20] you were talking about temporary workers
[21] through the agency.
[22] **BY MR. VAN NAARDEN:**
[23] **Q.** Okay.
[24]       **MR. DEASEY:** That's fine. Thank

Page 46

[1] you. I'm sorry.
[2] **BY MR. VAN NAARDEN:**
[3] **Q.** Did Pack & Process have any gasoline cards
[4] whereby if -- if an employee was utilizing one of
[5] the vehicles they can use the gas card for gas?
[6] **A.** Yes.
[7] **Q.** How many gas cards did you have in 2001?
[8] **A.** My recollection, three.
[9] **Q.** Three. And what -- what gasoline companies
[10] were they through?
[11] **A.** I don't remember.
[12] **Q.** Do you know who was, and I -- I don't need
[13] the actual name of the employee, but the name of
[14] the position that employee who would have held
[15] that you would have given those cards to, if at
[16] all?
[17] **A.** Well, there was one for me, there was one
[18] for the office, and they meted it out, and then I
[19] think there was a second one for the office and I
[20] think they meted that out.
[21] **Q.** What you say meted it out, what do you
[22] mean?
[23] **A.** They gave it under -- what were considered
[24] appropriate conditions.

Page 47

[1] **Q.** And --
[2] **A.** I think the program was once a month for
[3] the supervisors, sometimes once a month for
[4] mechanics if they could justify a certain amount
[5] of activity, activity being inter-plant movement.
[6] **Q.** Okay. Got it.
[7]       Would you ever -- were -- the
[8] individuals that you gave the cards to and it was
[9] circulating around the office, were they given
[10] some discretion as to how to mete out the
[11] gasoline cards?
[12]       **MR. DEASEY:** Objection to form.
[13] You can answer.
[14]       **THE WITNESS:** Could you repeat it?
[15] **BY MR. VAN NAARDEN:**
[16] **Q.** Sure. The -- when -- when the credit
[17] cards, the gas cards were in the office and were
[18] being meted out to different people, who made the
[19] decision as to whether or not the card could go
[20] out to a certain employee?
[21] **A.** I think I set the policy, and the policy
[22] was interpreted and -- and put into effect by the
[23] office manager.
[24] **Q.** Was there ever a situation, that you can

Page 48

[1] remember, that the gasoline card was given out to
[2] a certain employee and you didn't find out about
[3] it until after that fact?
[4] **A.** I generally wouldn't find out after the
[5] fact. I usually get a recap that showed what --
[6] what happened.
[7] **Q.** Were there certain employees that were
[8] given authorization to -- to mete out the
[9] gasoline cards to other employees?
[10] **A.** Yes.
[11] **Q.** And who would that -- that have been?
[12] **A.** Steve Eslinger.
[13] **Q.** Anybody else but Steve?
[14] **A.** He would -- he would -- he would designate
[15] somebody.
[16] **Q.** Okay. You said there was a recap memo.
[17] Did I hear you right?
[18] **A.** I believe so, yes.
[19] **Q.** And who would have done those recap memos
[20] in -- in relation to these credit cards?
[21] **A.** Somebody who worked for Steve. I forget
[22] who did it.
[23] **Q.** Was that something that would have been
[24] retained?

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 49

[1]  A.  I don't know.

[2]  Q.  Your -- Pack & Process currently has a

[3]  website, correct?

[4]  A.  Well, it still does, yes.

[5]  Q.  Is -- that website still accurate as

[6]  I -- as you sit here --

[7]  A.  No.

[8]  Q.  -- today?  All right.

[9]       When was the last time you were on

[10]  the website?

[11]  A.  That I personally was on the website?

[12]  Q.  Yes.

[13]  A.  A good couple of years ago.

[14]  Q.  When you became president in '86, prior to

[15]  you being appointed -- taking over that position,

[16]  did Pack & Process seek out temporary labor for

[17]  the -- for the factory?

[18]  A.  Do you want to rephrase that question?

[19]  Q.  Sure.

[20]       In 1986, when you became president,

[21]  prior to -- to when you actually became

[22]  president, and your dad was president, was Pack &

[23]  Process ever involved in getting temporary

[24]  laborers to come to the factory and work?

Page 50

[1]  A.  Not that I know of.

[2]  Q.  How -- before you became president, how was

[3]  Pack & Process filling their jobs?

[4]  A.  We would put an ad in the local newspaper,

[5]  or sometimes go to radio and advertise.

[6]  Q.  And the people who were actually hands-on

[7]  doing the work, were they all employees of Pack &

[8]  Process prior to '86?

[9]  A.  I'm not clear what your question is.

[10]  Q.  Sure.  You said that you would put ads in

[11]  the paper, correct?

[12]  A.  Right.

[13]  Q.  And then people would come in and answer

[14]  the ad?

[15]  A.  Right.

[16]  Q.  All right.  And then you would employ them

[17]  to work at Pack & Process?

[18]  A.  Some of them we would employ, correct.

[19]  Q.  Okay.  Obviously, you didn't employ

[20]  everybody that came in.  I understand that.  But

[21]  some of them you would employ?

[22]  A.  Yes.

[23]  Q.  And those would be direct employees of --

[24]  of Pack & Process?

Page 51

[1]  A.  That's correct.

[2]  Q.  All right.  Prior to '86, was -- did you

[3]  ever seek out a temporary employment agency to

[4]  provide workers for you?

[5]  A.  I don't believe so.

[6]  Q.  When did that start?  When -- when did Pack

[7]  and -- as we sit here today, we can both agree

[8]  that at some point Pack & Process went out and

[9]  sought these temporary labor agencies to provide

[10]  work for Pack & Process, correct?

[11]  A.  Yes.

[12]  Q.  When did that begin?

[13]  A.  I would estimate that we took some stabs

[14]  with temporary labor in '87 and used some local

[15]  agencies to provide labor.

[16]  Q.  And from '87 up to and until -- well,

[17]  let's do it this way.  Was there a point in time

[18]  where you stopped using temporary laborers --

[19]  A.  I --

[20]  Q.  -- in '86?

[21]  A.  I think so.  The project in '87 ended and

[22]  typical in our business there was a dramatic slow

[23]  down.

[24]  Q.  In '87?

Page 52

[1]  A,  Yes.

[2]  Q.  Okay.  So you stopped using them at some

[3]  point in '87?

[4]  A.  I would imagine.  You know, I'm not

[5]  absolutely sure about this, but -- but as my

[6]  recollection is that's -- we would have stopped

[7]  for a period of time.

[8]  Q.  Did you then start up again using -- using

[9]  temporary labor agencies?

[10]  A.  At a -- at a later period we did, yes.

[11]  Q.  When would that have been, approximately?

[12]  A.  In the '90s.

[13]  Q.  And then when you started using them in the

[14]  '90s, how long a period of time did you utilize

[15]  those type of companies?

[16]  A.  I'm -- I'm surmising, and I -- I can't tell

[17]  you this factually, but I presume, we stopped and

[18]  started, stopped and started, got some

[19]  experience, and then we started having some --

[20]  some beneficial experience and saw some of the

[21]  benefits of using some of these temporary

[22]  agencies.  And then it became a bigger part of our

[23]  business.

[24]  Q.  Was there a period of time where you

Page 53

[1] totally stopped using the temporary employment
[2] agencies?
[3] A.   There may have been due to slowdowns in --
[4] in our work.
[5] Q.   In 2003 when you were deposed, was the
[6] company still utilizing the temporary employment
[7] agencies?
[8] A.   Yes.
[9] Q.   Okay.  Today, are you using them?
[10] A.   No.
[11] Q.   Okay.  So when was the last time that you
[12] used a temporary employment agency?
[13] A.   The last time I used one?  After the
[14] accident we did -- when we started to slowdown we
[15] used less and less, and -- and I think it just
[16] kind of faded out of the picture, I guess, about
[17] 2004.  2003, maybe.  I don't -- I don't know.
[18] Q.   What did you feel were the benefits of
[19] using the temporary employment agencies?
[20] A.   There were several different benefits.  The
[21] nature of our business was -- it was never
[22] consistent, it was a contract house.  We could be
[23] very slow, we could be very busy.  We could be
[24] busy and the client have a need for a second

Page 54

[1] shift.  We sometimes had to do rapid expansions
[2] and rapid, what is the right word?  Rapid...
[3]     MR. DEASEY:  Contractions?
[4]     THE WITNESS:  Contractions.  Thank
[5] you.
[6]     And -- and the amount of work that
[7] went into hiring with -- without the use of
[8] temporaries, but just hiring people off the
[9] street was dramatic.  The amount of -- of --
[10] of documentation that you would have to have,
[11] to make sure they were a citizen, you know,
[12] three pieces of -- of information, the amount
[13] of work getting them onto our pay system, and
[14] then the fact that we could hire five people
[15] on Monday, three people show up on Tuesday,
[16] and only one person show up on Wednesday, and
[17] then hire another five on Thursday and go
[18] through that same succession, it just was a
[19] very, very wearing and very difficult
[20] process.
[21]     And at the same time we were getting a
[22] lot of people, we were attracting lot of
[23] people who had to come to work because their
[24] unemployment claims had run out, or they had

Page 55

[1] to show up or apply for work, or they would
[2] not be eligible for unemployment.  There --
[3] there were a lot of people showing up that
[4] really didn't want to work, and so there is a
[5] lot of sifting through, and a lot of -- a lot
[6] of -- a lot of difficulty in managing the
[7] help.
[8]     And we would always get through that.
[9] We would always be able to put a crew
[10] together, but after taking a crew and -- and
[11] training, and getting there could take three,
[12] four, five weeks.  And -- and all that time
[13] is something that, you know, there was a
[14] drive to become efficient on the production
[15] line.  And until you had a good crew, you
[16] know, your -- your efficiency always
[17] suffered, and as a corollary to efficiency
[18] suffering, quality suffered.  So it was a --
[19] it was a very difficult point.  And the use
[20] of temporary agencies solved several of those
[21] problems very, very quickly.  One, we didn't
[22] have to go through that whole interview
[23] process.  Two, you could pretty clearly tell
[24] people how many you needed, and those people

Page 56

[1] would be delivered to the plant.  And they
[2] were working -- willing workers.  It was a --
[3] it was a good relation.  It was a -- it was a
[4] positive kind of situation.
[5] BY MR. VAN NAARDEN:
[6] Q.   When we talked earlier about back in 2001
[7] you said 50 some employees, and we went through
[8] the breakdown of the different areas that these
[9] employees were working, these temporary laborers
[10] that would come into the factory, is that in
[11] addition to the 50 employees that you mentioned?
[12] A.   Yes.  When I talk about employees, they're
[13] my employees.  Temporaries were -- were just as
[14] such.  It's a whole different class.  They were
[15] somebody else's employees.  They may have been
[16] workers in the plant, but they are not my
[17] employees.
[18] Q.   Back in 2001, approximately how many of
[19] these temporary employees were in the factory?
[20]     MR. DEASEY:  At any --
[21] BY MR. VAN NAARDEN:
[22] Q.   At any given time?
[23] A.   Well, once, again, the question you ask is
[24] there is a year there, and in the beginning of

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 57

[1] the year, if I recollect, we were at the
[2] beginning of a very major, a very big, and very
[3] difficult program. And I think we were running,
[4] I think we were running around the clock, and
[5] on -- on one particular line I think there was 45
[6] people to staff that line alone. So you're
[7] talking about 45 times 290, plus other programs,
[8] there could have been a 110, 120 people as
[9] temporary workers in the plant.
[10]        MR. DEASEY: That's at the
[11] beginning, though.
[12]        THE WITNESS: At the beginning of the
[13] year.
[14] BY MR. VAN NAARDEN:
[15] Q.  How about in June of '01?
[16] A.  In June, I think it was down to about 45,
[17] 50 temps.
[18] Q.  Okay. Was there an individual at the plant
[19] that was directly in charge of supervising these
[20] temporary employees?
[21] A.  That's -- that's -- I wouldn't phrase a
[22] question that way, or if you -- if you phrase
[23] that question I can't answer that. I can't
[24] answer that.

Page 58

[1] Q.  Well, why can't you answer?
[2] A.  It's not the way it worked.
[3] Q.  Well, tell me how it worked in June of '01?
[4] A.  Excuse me. I appreciate it.
[5]        The way the system worked was that
[6] we would -- we would, and when I say we, I'm
[7] really talking about production supervisor,
[8] production manager, would work with the leaders
[9] of the temp agencies, and he would instruct those
[10] leaders as to how to place people, where to place
[11] people, so forth and so on.
[12]        And so we wouldn't really manage
[13] the temporary employees, we would manage the
[14] leaders.
[15] Q.  Okay. And who was the individual who was
[16] managing the leaders in June of 2001?
[17] A.  2001? I believe that was Sterling Newsome.
[18] Q.  Back in June of 2001, can you give me an
[19] approximation of how many leaders there were at
[20] the factory?
[21] A.  Leaders would typically, and this is not me
[22] defining them, this is -- this is -- this is the
[23] agency defining them, leaders were the people
[24] that drove the vans. Depending on the particular

Page 59

[1] time there may been -- may have been three or
[2] four vans -- in the beginning of the year there
[3] were three or four vans per shift, two shifts, so
[4] you have a common number of leaders.
[5]        At this time if there were -- if
[6] there were 45, 50 people there should have been
[7] about three vans and three leaders.
[8] Q.  You said that it's not -- you don't define
[9] them that way, but it's the, I guess, the
[10] temporary labor agency that define them as being
[11] the -- the drivers. Is that what you -- what you
[12] said?
[13] A.  The leaders, yes.
[14] Q.  Okay. Where -- is there some kind of
[15] written documentation whereby they define what
[16] the role of a leader is, or even the fact that
[17] there is a leader?
[18] A.  I don't know of any. That would be their
[19] internal document.
[20] Q.  So when you say define, did someone define
[21] it for you verbally?
[22] A.  I -- I -- I came to that understanding,
[23] yes.
[24] Q.  And that's with every -- every temporary

Page 60

[1] labor employment agency that you worked for?
[2] A.  I didn't work for.
[3] Q.  That -- that -- that you contracted with?
[4] A.  I -- I believe so, yes.
[5] Q.  There were various different of these labor
[6] companies that you had contracted with over the
[7] years, correct?
[8] A.  Yes.
[9] Q.  All right. And was there a standard type
[10] of agreement form that each one of these
[11] companies would have to sign in to in order -- in
[12] order to -- to provide you with the work?
[13] A.  Yes.
[14] Q.  And was it pretty much the same for
[15] every -- for every single one of the employment
[16] agencies?
[17]        MR. DEASEY: The contract, or --
[18] BY MR. VAN NAARDEN:
[19] Q.  The contracts. Were they the same?
[20] A.  There may have been certain details that
[21] were changed and may have evolved over time, but
[22] yes, it was the same standard form.
[23] Q.  Kenney Packers, does that -- does that name
[24] mean anything to you?

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 61

[1]   A.   Yes.
[2]   Q.   Is Kenney Packers one of the temp agencies
[3]   that provided workers for you?
[4]   A.   I believe so, yes.
[5]   Q.   Okay. And how about ABC, is ABC another
[6]   en- -- entity that provided workers to you?
[7]   A.   I believe so, yes.
[8]   Q.   Cinacin (ph), does that sound right?
[9]   A.   No.
[10]  Q.   Okay. And then there is Lam Personnel
[11]  Staffing. You've heard of that firm prior --
[12]  A.   Yes.
[13]  Q.   That company before?
[14]  A.   Yes, although under different names. I'm
[15]  not sure, I think sometimes we heard it as Lam
[16]  Staff, Lam Personnel Staff. There -- there were
[17]  some different names.
[18]  Q.   Before we get into some -- some of the
[19]  documents in preparation for you coming here
[20]  today and being deposed, did you review any
[21]  documents?
[22]  A.   Yes, I did.
[23]  Q.   And what did you review?
[24]  A.   Various documents that I think we are going

Page 62

[1]   to be discussing today.
[2]   Q.   Can you pinpoint any particular document
[3]   that you remember reviewing?
[4]   A.   If you want to point to it, I can pinpoint
[5]   it, but I can't pin- --
[6]   Q.   Well, approximately, how many documents did
[7]   you look at before you came in today?
[8]   A.   I would say 15, 20.
[9]   Q.   Let me just also state that at any time you
[10]  need a break, you let me know.
[11]  A.   Okay.
[12]  Q.   And I will be happy to let you have that
[13]  break.
[14]  A.   That's pretty nice of you.
[15]  Q.   Thanks.
[16]       MR. DEASEY: He's a nice guy.
[17]       MR. VAN NAARDEN: I try to be nice.
[18]       MR. DEASEY: He's a nice guy.
[19]  BY MR. VAN NAARDEN:
[20]  Q.   Was there an individual at Lam Staffing
[21]  that was your contact person?
[22]  A.   No.
[23]  Q.   Do you know who David Thach is?
[24]  A.   Yes.

Page 63

[1]   Q.   Was he an individual that you had had
[2]   contact with at Lam Staffing?
[3]   A.   I had spoken to David, yes.
[4]   Q.   Do you know him by any other names?
[5]   A.   Yes.
[6]   Q.   And would that be Suasaday Thach?
[7]   A.   I knew him as Suasaday Thach, yes.
[8]   Q.   Any -- any other names that you knew him by
[9]   besides those two?
[10]  A.   No.
[11]  Q.   How was it that you first became involved
[12]  with Lam Staffing?
[13]  A.   I think they were the successor company to
[14]  something else, and I don't remember the name.
[15]  Q.   And when it was the previously named
[16]  company, was David Thach still the contact
[17]  person?
[18]  A.   I believe he was. Well, actually not. You
[19]  know, I can't answer that. I can't answer that.
[20]  Q.   Well, why can't you?
[21]  A.   David Thach was always in the background.
[22]  By this time -- by this time, David was in
[23]  another business. He was in a beer distributor
[24]  by the year -- I'm approximating -- 2000, he was

Page 64

[1]   in a beer distributorship.
[2]   Q.   Okay.
[3]   A.   And he wasn't really around, but he somehow
[4]   was the guy who had this thing going.
[5]   Q.   Was there several -- when -- when -- and
[6]   somewhere around 2000 when David Thach became --
[7]   began doing some type of liquor dis- --
[8]   distribution, was he still involved in Lam
[9]   Staffing?
[10]  A.   I believe he was, but, you know, I don't
[11]  know.
[12]  Q.   Okay.
[13]  A.   I -- I wasn't -- when you say is he your
[14]  contact person, I -- I didn't -- I didn't have
[15]  relationships where I called David Thach. That
[16]  was not the way it worked.
[17]  Q.   My -- my understanding, correct me if I'm
[18]  wrong, that the product manager would --
[19]  A.   The production manager.
[20]  Q.   The production manager would talk to these
[21]  temporary employment agencies. Is that -- is
[22]  that accurate?
[23]  A.   Yes.
[24]  Q.   And during this period of time, at least in

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 65

[1]    June, it would have been Sterling Newsome?
[2]    A.  Yes, sir.
[3]    Q.  Did you ever meet David Thach?
[4]    A.  Yes, sir.
[5]    Q.  Approximately, how many times did you meet
[6]    him?
[7]    A.  I saw him maybe 30, 40 times.
[8]    Q.  Did you know how it was that David Thach
[9]    was paid?  Physically, how he was paid?  What I
[10]   mean by that is, do you know if you mailed him a
[11]   check, do you know if you handed him a check, do
[12]   you know if you paid him cash?
[13]        MR. DEASEY:  Let me just get a
[14]   clarification.  Are you talking about David
[15]   Thach individually now, or --
[16]        MR. VAN NAARDEN:  Lam Staffing.
[17]        MR. DEASEY:  Okay.  I'm sorry.  Thank
[18]   you.
[19]        THE WITNESS:  Typically, a -- a check
[20]   was handed to them.  Someone would pick up a
[21]   check.
[22]   BY MR. VAN NAARDEN:
[23]   Q.  Do you know how often that would have
[24]   happened?

Page 66

[1]    A.  Weekly.
[2]    Q.  So, would it be safe to say that David --
[3]    someone from Lam Staffing would have been on the
[4]    Pack & Process premises at least once a week to
[5]    pick up a check?
[6]    A.  Yes.
[7]    Q.  Did you have an understanding that at least
[8]    traditionally it was David Thach who came to pick
[9]    up the check?
[10]   A.  No.  No.
[11]   Q.  Were there any other individuals from Lam
[12]   Staffing that you can recall showing up and
[13]   asking for the check?
[14]   A.  Yes.
[15]   Q.  Can you give me their names?
[16]   A.  I -- I'm not real good at this, but one guy
[17]   I think was Mataday, and don't ask me to spell
[18]   it.
[19]   Q.  Is Mataday male or female?
[20]   A.  A male.
[21]   Q.  Mataday?
[22]        MR. DEASEY:  It's M-A-T-T-A, D-E-E,
[23]   I think.
[24]   BY MR. VAN NAARDEN:

Page 67

[1]    Q.  Did you ever need -- have -- ever have any
[2]    conversations with Mataday?
[3]    A.  I may have.  Nothing -- nothing
[4]    substantial.
[5]    Q.  Did he speak English?
[6]    A.  I don't recall.
[7]    Q.  Okay.  You don't recall if he spoke English
[8]    at all?
[9]    A.  Put it this way, I had very, very difficult
[10]   time understanding David.  I -- I couldn't
[11]   communicate with David.  Mataday, I think was a
[12]   relative of his, and most times it was hello.
[13]   That's it.  That was -- that was the end of my
[14]   conversation.
[15]   Q.  Do you know if Sterling Newsome was able to
[16]   communicate with Mataday?
[17]   A.  I think he could effectively tell him how
[18]   many people he needed.
[19]   Q.  Okay.  Does -- to best of your knowledge,
[20]   does Sterling Newsome speak any language --
[21]   languages in addition to English?
[22]   A.  At that time, I don't think he did, but I
[23]   don't know.
[24]   Q.  Okay.  Do you know how you became aware of

Page 68

[1]    Lam Staffing, of their existence?
[2]    A.  No.
[3]    Q.  Did you have an ad in the paper requesting
[4]    for temporary employment agencies to contact you?
[5]    A.  No.
[6]    Q.  Was that something that you left to
[7]    Sterling Newsome to do?
[8]    A.  No.
[9]    Q.  Is that something that you did?
[10]        MR. DEASEY:  To do what?
[11]        MR. VAN NAARDEN:  Attempt to contact
[12]   an individual to provide temporary labor.
[13]        THE WITNESS:  I think I answered the
[14]   question before.  I think -- I think they
[15]   were a successor company to a previous
[16]   company that was part of the same -- same
[17]   group.
[18]   BY MR. VAN NAARDEN:
[19]   Q.  Did you have Lam Staffing sign a separate
[20]   contract or agreement --
[21]   A.  Yes.
[22]   Q.  -- for Pack & Process?
[23]   A.  Yes.
[24]   Q.  Is that because you understood that it was

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 69

[1]  a sep- -- a different entity from the other
[2]  entity that you had been previously doing
[3]  business with?
[4]  A.   Yes.
[5]  Q.   And I will mark as Ames-1 a copy of a
[6]  purchase order and then an addendum to a purchase
[7]  order. I will ask you if you take a look at it
[8]  and tell me if you recognize it?
[9]        (Whereupon Exhibit Ames-1 was
[10]  marked for identification.)
[11]        THE WITNESS: Yes, I do.
[12]  BY MR. VAN NAARDEN:
[13]  Q.   Okay. And describe for me what Exhibit-1
[14]  is?
[15]        MR. DEASEY: Hold on a second.
[16]  Okay.
[17]        THE WITNESS: I'm sorry. What did you
[18]  ask?
[19]  BY MR. VAN NAARDEN:
[20]  Q.   I said, can you describe for me what that
[21]  document is?
[22]  A.   The first page is a purchase order.
[23]  Q.   And who is the purchase order with? Who
[24]  are the parties involved in the purchase order?

Page 70

[1]        MR. DEASEY: Objection.
[2]        THE WITNESS: The parties are Lam
[3]  Staff, Inc. and Pack & Process, Inc.
[4]  BY MR. VAN NAARDEN:
[5]  Q.   Okay. At the bottom of the page it says
[6]  authorized signature. Do you recognize whose
[7]  signature that is?
[8]  A.   Yes.
[9]  Q.   And whose signature is that?
[10]  A.   Steve Eslinger.
[11]  Q.   Okay. Would one of these purchase orders
[12]  be generated for each time you needed laborers at
[13]  the factory?
[14]  A.   I -- I can't answer that question the way
[15]  you're asking.
[16]  Q.   Well, why would you -- why would -- why
[17]  would Steve sign this? What -- what is this
[18]  doc- -- document used for?
[19]        MR. DEASEY: The first page?
[20]        MR. VAN NAARDEN: The first page.
[21]  What is it used for?
[22]        THE WITNESS: This was to authorize
[23]  the use of this company to supply labor at a
[24]  given rate under the terms and conditions

Page 71

[1]  shown.
[2]  BY MR. VAN NAARDEN:
[3]  Q.   And it says -- you will agree with me that
[4]  it says the date of order, October 6th of 2000,
[5]  correct?
[6]  A.   Correct.
[7]  Q.   Is that the first time that you had entered
[8]  into one of these purchase orders with Lam
[9]  Staffing?
[10]  A.   I would believe with Lam Staffing, yes.
[11]  Q.   So that was the first time?
[12]  A.   I believe so, yes.
[13]  Q.   When you traditionally would use a laborer,
[14]  a -- a temporary employment agency, is this
[15]  the -- the purchase order that you traditionally
[16]  use?
[17]  A.   Something along those lines, yes.
[18]  Q.   And if you flip over to the second page it
[19]  says, Addendum to Purchase Order.
[20]  A.   Right.
[21]  Q.   All right? Do you recognize what that is?
[22]  A.   Yes.
[23]  Q.   What is it?
[24]  A.   That's the contract that we seek to control

Page 72

[1]  the project with.
[2]  Q.   And who are the parties to this particular
[3]  contract?
[4]  A.   Lam Staff, Inc. and Pack & Process, Inc.
[5]  Q.   Other than this -- this purchase order and
[6]  the addendum to the purchase order, are there any
[7]  other documents memorializing your agreement with
[8]  Lam Staff, Inc. to provide services to Pack &
[9]  Process?
[10]  A.   Not that I recall.
[11]  Q.   So this was like a -- what I'm trying to --
[12]  to tie down, it was a one time agreement, a
[13]  purchase order, and an addendum that you -- both
[14]  parties signed, and that was going to be the
[15]  agreement that was going to dictate the
[16]  relationship between the parties; is that
[17]  accurate?
[18]  A.   That's accurate.
[19]  Q.   Okay. So even if down the line -- well,
[20]  let me ask you this. If they were going to
[21]  provide a certain amount of labor, laborers for a
[22]  particular period of time, and then you said no,
[23]  I no -- no longer need any right now because a
[24]  project ended, and then at some point in time

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 73

[1] another project popped up, would you sign an
[2] additional agreement, or would you just go by
[3] this agreement --
[4] A.   With --
[5] Q.   -- or something different?
[6]       MR. DEASEY: With Lam Staffing?
[7]       MR. VAN NAARDEN:  With Lam Staffing.
[8]       THE WITNESS:  That's hypothetical.  It
[9] depends on time and -- and whether to get an
[10] intervening contractor.  I -- I can't answer
[11] that question.
[12] BY MR. VAN NAARDEN:
[13] Q.   Well, do you know if that was ever the
[14] case?
[15] A.   I don't know if that was ever the case.
[16] Q.   Okay.  Do you know that it was not ever the
[17] case?
[18] A.   Yeah -- say that again.
[19] Q.   Sure.  Do you believe that at any time you
[20] entered into an agreement with Lam Staffing to
[21] provide services to Pack & Process other than
[22] this purchase order and addendum that is dated
[23] October 6th of 2000?
[24] A.   And then stopped and then started again?

Page 74

[1] Q.   Correct.
[2] A.   Oh, after a period -- a long period of
[3] time?
[4] Q.   Any period of time.
[5] A.   Would you define period of time as a week?
[6] Q.   If it's -- if it's a week.  Any period of
[7] time?
[8]       MR. DEASEY:  He's trying to find
[9] out is -- is there a subsequent contract, I
[10] guess, is what he is trying to find out.  Is
[11] there a subsequent contract between Pack &
[12] Process and Lam Staff?
[13]       THE WITNESS:  No.  I doubt it.  I
[14] doubt -- I don't know, but I doubt it.
[15] BY MR. VAN NAARDEN:
[16] Q.   Is it safe to say you haven't seen one?
[17] A.   I haven't seen one recently for sure.
[18] Q.   Okay.  In preparation for your deposition
[19] today, is this one of the documents that you
[20] looked at?
[21] A.   Yes.
[22] Q.   All right.  And you read it?
[23] A.   I scanned it, yes.
[24] Q.   On the signature page at the back of the

Page 75

[1] addendum, do you recognize the signature of the
[2] individual under the Pat's -- Pack & Process,
[3] Incorporated?
[4] A.   Yes.
[5] Q.   And is that again Steve's signature?
[6] A.   No.
[7] Q.   Whose signature is it?
[8] A.   It's mine.
[9] Q.   Okay.  And then under -- underneath it
[10] there is something written and it looks like a
[11] date.  It says 10/6 of 2000?
[12] A.   That looks -- it looks like that.  Is that
[13] what it is?  Yeah, I guess so.  Sorry about that.
[14] Q.   Is that your handwriting?
[15] A.   Yeah.  I got to believe it is, yes.
[16] Q.   After Steven Ames -- Steven Ames, what's --
[17] what's written in hand, does it say pres.?
[18] A.   President, yes.
[19] Q.   Okay.  And under Lam Staff, Inc. it says
[20] Mata- -- Mataday?
[21] A.   I think Mataday.
[22] Q.   That's who -- that's you believe it to be,
[23] correct?
[24] A.   Yes.

Page 76

[1] Q.   Do you actually recall, as you sit here
[2] today, sitting down with an individual from Lam
[3] Staffing and entering into this agreement?
[4] A.   Yes.
[5] Q.   All right.  And when you entered into the
[6] agreement, who else was present in the room
[7] besides yourself and the individual signing for
[8] Lam Staffing, if anybody?
[9] A.   Steve Eslinger.
[10] Q.   He was there?
[11] A.   Yes.
[12] Q.   Anybody else from Lam Staffing?
[13] A.   I don't believe so.
[14] Q.   Do you know if David Thach was there?
[15] A.   I'm pretty sure he was not.
[16] Q.   Did you -- were you given any information
[17] that the individual that was signing on -- on
[18] behalf of Lam Staffing had the authority to enter
[19] into this agreement?
[20] A.   I think -- I think I may have been told
[21] indirectly that he was the new owner of the
[22] agency.
[23] Q.   Okay.  The addendum to the purchase order,
[24] do you know who drafted it?

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 77

[1]  A.  I believe I do.
[2]  Q.  Who would that be?
[3]  A.  An attorney named Jerry Grossman.
[4]  Q.  Is that an attorney that at some point or
[5]  another represented Pack & Process?
[6]  A.  Yes. Now he may have staffed it out, but
[7]  I -- you know, I spoke to Jerry.
[8]  Q.  How about the purchase order on the first
[9]  page, is that something -- who -- who would have
[10]  generated that document?
[11]  A.  Can I see that?
[12]      I'm not sure. I'm not -- I really
[13]  don't know. That could -- that could have
[14]  evolved over time. It could have been -- I don't
[15]  know the answer to that.
[16]  Q.  Okay. Other than the -- and you said you
[17]  reviewed the addendum to the purchase order,
[18]  correct?
[19]  A.  Yes.
[20]      MR. DEASEY: He said he scanned it.
[21]  That's all right.
[22]  BY MR. VAN NAARDEN:
[23]  Q.  Did you read it, or did you scan it?
[24]  A.  I scanned it.

Page 78

[1]  Q.  Okay. What -- what does scanning mean,
[2]  you didn't read it word for word?
[3]  A.  I read it very quickly.
[4]  Q.  Okay. Is there anything when you were
[5]  scanning it that you believed to be absent from
[6]  this document that was part of the agreement with
[7]  Lam Staffing?
[8]  A.  I'm not sure I follow your question.
[9]  Q.  Sure. Are there any terms and conditions,
[10]  or duties and responsibilities as -- as you scan
[11]  through this document that you said to yourself,
[12]  hey, wait a second, they were suppose to do X,
[13]  and it's not written in this agreement?
[14]  A.  Well, there were various things that were
[15]  understood that -- that are not in this
[16]  agreement.
[17]  Q.  And -- and what are those things that --
[18]  that you believe were understood but not
[19]  contained in this agreement?
[20]  A.  That they would wear uniforms or -- or
[21]  blouses, you know, to -- to -- to cover -- to
[22]  cover clothing that wouldn't be coming -- that
[23]  would be coming in inappropriately dressed. I
[24]  can't think of the word. Not blouse, but...

Page 79

[1]      MR. DEASEY: Smock?
[2]      THE WITNESS: A smock. Wear a smock.
[3]  They would wear closed shoes. There -- there
[4]  were various other understandings.
[5]  BY MR. VAN NAARDEN:
[6]  Q.  Those understandings that you're talking
[7]  about, are they contained in -- in some other
[8]  type of agreement, written agreement?
[9]  A.  I don't know where they are. I think this
[10]  was under -- understood verbally.
[11]  Q.  When you say uniforms, and then I think
[12]  you -- you went onto say that smocks?
[13]  A.  Right.
[14]  Q.  Is that something that was provided by Lam
[15]  Staffing or provided by --
[16]  A.  They would --
[17]  Q.  -- Pack & Process, or some other type of
[18]  entity?
[19]  A.  They were suppose to be dressed that way.
[20]  And from time to time they were not, and from
[21]  time to time we would supply them with smocks and
[22]  charge them for it.
[23]  Q.  Other than the uniform, and I'm using that
[24]  term loosely because you've clarified it, other

Page 80

[1]  than that requirement, anything in addition that
[2]  you thought, hey, wait a second, it's not in this
[3]  contract, but it was understood?
[4]  A.  Uh, actually, there are things. Can we
[5]  take a break at this point?
[6]      MR. VAN NAARDEN: Absolutely.
[7]      VIDEO TECHNICIAN: We're off the
[8]  record.
[9]      (Whereupon a short recess was held.)
[10]      VIDEO TECHNICIAN: On the record.
[11]  12:21.
[12]  BY MR. VAN NAARDEN:
[13]  Q.  What, in addition, to the addendum and the
[14]  purchase order do you believe to be not contained
[15]  in -- in -- in the actual --
[16]  A.  There were all kind of operational things.
[17]  You know, we took two ten minute breaks. Part of
[18]  the day -- at the end of the day we had to clean
[19]  up. Sometimes we would have to stay later.
[20]  Sometimes we would leave early. There were a lot
[21]  of practical aspects to it that -- that -- that
[22]  occurred.
[23]  Q.  Okay. If you look at the actual document,
[24]  do you have it in front of you still? We're

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

**Page 81**

[1] talking about the addendum to the purchase order.
[2] A. Uh-huh.
[3] Q. The first paragraph, the last sentence, I'm
[4] just asking if I am reading this right, this
[5] addendum and the purchase order to which it is
[6] attached are hereinafter collectively referred to
[7] as quote, unquote agreement.
[8] A. You're talking about the first paragraph?
[9] Q. Yeah. The last -- last sentence.
[10] A. This addendum and purchase order... yes.
[11] Q. Okay. I read it correctly, right?
[12] A. Yes.
[13] Q. So now I'm just going to refer to this as
[14] the -- as the agreement, and if I do that, we're
[15] both on the same page.
[16] A. Yes.
[17] Q. All right. Then it talks about services.
[18] LSI, which -- that's Lam, correct?
[19] A. Yes.
[20] Q. Will provide to P & P, Pack & Process,
[21] those individuals, LSI personnel, to perform the
[22] job/functions listed below.
[23]     All right. Is that one of the
[24] purchases of this agreement, to outline the

**Page 82**

[1] responsibilities --
[2] A. Yes.
[3] Q. -- and duties of LS -- Lam Staffing?
[4] A. Yes.
[5] Q. All right. And it talks -- there is a
[6] heading, Factory Workers, correct?
[7] A. Yes.
[8] Q. Then it goes onto say, that this agreement
[9] shall begin on the date the purchase -- the
[10] purchase order -- on the date the purchase order
[11] to which this addendum is attached is approved by
[12] LSI, and shall continue until the date on which
[13] one party note -- notifies the other of its
[14] desire to terminate this agreement.
[15]     Correct? I read -- I read it
[16] right, right?
[17] A. Correct.
[18] Q. All right. Now this -- you will agree with
[19] me that this was entered into on -- on -- in
[20] October of 2000, correct?
[21] A. Correct.
[22] Q. All right. So at some point after October
[23] of 2000, did you ever notify LSI of the desire to
[24] determinate this agreement?

**Page 83**

[1] A. I don't recall. I may have.
[2] Q. Would you have done that in writing?
[3] A. I don't recall.
[4] Q. At the date that this accident occurred,
[5] June 18th of 2001, do you believe that this
[6] agreement was still in effect?
[7] A. Yes.
[8] Q. Okay. How is it that you compensated
[9] Lam -- LSI for their services? What I mean by
[10] that is, what was your understanding as to what
[11] you were paying for in relation to -- to -- to
[12] the work that LSI was to be performing for you?
[13] A. We were paying for delivered temporary
[14] workers at an hourly rate times the number of
[15] hours they worked, and we would get an invoice
[16] which reflected that, and we would pay the
[17] invoice.
[18] Q. You would get an invoice from LSI; is that
[19] what you're telling me?
[20] A. Yes.
[21] Q. And that would contain -- that invoice
[22] would be the number of hours that they provided
[23] to you had worked on any given period of time?
[24] A. Correct.

**Page 84**

[1] Q. All right. And -- and that was usually
[2] done at the end of each week, or -- or at the end
[3] of every two weeks?
[4] A. Each week.
[5] Q. Each week.
[6]     Okay. And you were paying,
[7] according to the purchase order, 725 an hour,
[8] correct?
[9] A. That's correct.
[10] Q. It didn't matter who the worker was, they
[11] were getting 725 an hour?
[12]     MR. DEASEY: Well --
[13] BY MR. VAN NAARDEN:
[14] Q. Through Lam Staffing?
[15]     MR. DEASEY: I object to the
[16] question. I think he said he paid Lam
[17] Staffing 725 an hour for every worker. What
[18] the worker was getting from Lam Staffing he
[19] didn't get into that.
[20] BY MR. VAN NAARDEN:
[21] Q. Sure.
[22]     Was it your understanding that you
[23] were paying Lam Staffing 725 for each hour that
[24] the -- the laborer provided by them was working?

Page 85

[1]  A.  Yes.
[2]  Q.  Okay.  Did you have an understanding as to
[3]  how much that actual worker was actually
[4]  receiving from Lam Staffing?
[5]  A.  No.  Just that it met the federal criteria.
[6]  Q.  And -- and what gave you that knowledge
[7]  that -- that -- that it met some type of
[8]  threshold?
[9]  A.  I think we asked them to show it.
[10]  Q.  And that's something that they provided to
[11]  you?
[12]  A.  I think we went through that calculation,
[13]  yes.
[14]  Q.  This hourly rate that we're -- we're
[15]  talking about, was there anybody in your factory
[16]  that verified the number of hours that these
[17]  Lam -- LSI employees were working?
[18]  A.  Yes.
[19]  Q.  And who would that have been?
[20]  A.  It was several people.
[21]  Q.  In -- in June of 2001, do you know which
[22]  individuals were actually responsible for
[23]  insuring that the time sheets were correct?
[24]  A.  Yes.

Page 86

[1]  Q.  And who would that have been?
[2]  A.  It would have been the line supervisors on
[3]  a daily basis.  They would have signed off, we
[4]  have X number of people for this line.  Each of
[5]  those sheets would have been handed in on a daily
[6]  basis, and then, I believe, and I could be wrong
[7]  about this, that my secretary or administrative
[8]  assistant would compile those and come up with a
[9]  total number of hours, a total number of people,
[10]  and independent -- independent of her, the
[11]  invoice would come in, and go to a different
[12]  person, and then the two had to be justified to
[13]  make sure that our numbers are saying the same
[14]  thing as their numbers.
[15]  Q.  So all the people that you just described,
[16]  the line supervisor, the administrative
[17]  secretary, and there was somebody else?
[18]  A.  Yes.
[19]  Q.  What were their names back in -- in June
[20]  2001 of -- in June.
[21]  A.  Mina -- Mina Dobson.
[22]  Q.  Dobson?
[23]  A.  Was the person who would get the invoice,
[24]  and I could be wrong about this, but I -- but I

Page 87

[1]  think it was Mina Dobson would get the invoice
[2]  and do her calculation.
[3]  Q.  She's a line supervisor?
[4]  A.  No.  She -- she was the -- the accounting
[5]  clerk.
[6]  Q.  Okay.
[7]  A.  My secretary was administrative assistant.
[8]  She would gather the information from the line
[9]  supervisors on a daily basis.
[10]  Q.  Who was your administrative secretary?
[11]  A.  Dorothy Stanley.
[12]  Q.  And who would have been the line
[13]  supervisor?  Who was doing the checkup on a daily
[14]  basis?
[15]  A.  Most likely, Sterling, or -- and/or it
[16]  could have been a night shift supervisor.
[17]  Q.  These temporary employees, when they came
[18]  to the factory, were they actually punching in --
[19]  A.  No.
[20]  Q.  -- to a time clock?
[21]  A.  I'm sorry.  No.
[22]  Q.  Was there a sign-in sheet?
[23]  A.  No.
[24]  Q.  So how is it that these individuals,

Page 88

[1]  whether it be this Sterling Newsome, Dorothy
[2]  Stanley, Mina Dobson, how were they able to
[3]  accurately assess how long these workers were in
[4]  the factory and working?
[5]  A.  We knew what time they arrived.
[6]  Q.  Okay.
[7]  A.  And knew what -- what time they left.
[8]  Q.  That's basically how you calculated it?
[9]  A.  (Indicating).
[10]  Q.  Yes?
[11]  A.  Yes.
[12]  Q.  What about lunch or -- or break time, how
[13]  was -- how was --
[14]  A.  Yes.
[15]  Q.  Did you have a way of -- of determining,
[16]  you know, when lunchtime was and -- and deduct
[17]  that from the hourly rate?
[18]  A.  Yes.
[19]  Q.  And how -- how were you able to do that?
[20]  A.  The line would stop at a certain time, and
[21]  it would start at a certain time.
[22]  Q.  So you were able to -- to determine when
[23]  the workers were actually doing Pack & Process
[24]  work by when the production line was up and when

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 89

[1] it was down?
[2] A. Correct.
[3] Q. So was it your understanding, back in 2001,
[4] that you were going to be responsible for paying
[5] Lam Staffing for the amount of time that the LSI
[6] employees walked in the door to the time they
[7] left the factory? Is that your understanding?
[8] A. The time they worked, yes.
[9] Q. Okay.
[10]        MR. DEASEY: The time they worked
[11] or the time they walked out?
[12]        THE WITNESS: The time they worked.
[13] BY MR. VAN NAARDEN:
[14] Q. Okay. And, again, that's what we
[15] discussed, because there were periods of time
[16] when they were actually in the building when
[17] production was down and you weren't paying them
[18] for that?
[19] A. No. That's not quite what I was saying.
[20] Q. Well, then, correct me.
[21] A. Well, as a generalization, if the
[22] production line starts at 6 o'clock and they get
[23] there at 5:50 they would played (sic) when the
[24] production line started at 6 o'clock. And if the

Page 90

[1] production line went down at 4 o'clock they
[2] were -- they -- they were stopped being paid at 4
[3] o'clock. The next five minutes they may have
[4] been gathering their things and -- and --
[5] leaving.
[6]        MR. DEASEY: I think he was talking
[7] about during lunch and breaks. Is that what
[8] you wanted to know?
[9] BY MR. VAN NAARDEN:
[10] Q. Well, no, I think you clarified it. I think
[11] we're all on the same page. I understand.
[12]        So just to clarify, it's not when
[13] they walk in the door, it's when production
[14] starts?
[15] A. Correct.
[16] Q. Got it.
[17]        And if we went back, and we will in
[18] a couple of minutes, but we looked at the
[19] invoices and we looked at the checks paid to LSI,
[20] do you believe that if we broke it down hour per
[21] hour, it would correspond with the invoices for
[22] the number of employees provided by LSI, and the
[23] amount of time that production was going on in
[24] the factory?

Page 91

[1] A. It should -- it should be, yes.
[2] Q. Okay. Now under factory workers under --
[3] under terms of agreement it has something called
[4] service fee.
[5] A. Yes.
[6] Q. Do you see where that says -- it says that?
[7] A. Yes.
[8] Q. Under number three?
[9] A. Yes.
[10] Q. Okay. Did you ever pay Lam Staffing a
[11] quote, unquote service fee?
[12] A. I don't believe so.
[13] Q. So that is something that is in this
[14] agreement, but was -- there was -- there was an
[15] understanding that you would not be responsible
[16] for paying a service fee; is that accurate?
[17] A. Well, I don't think it ever came up.
[18] Q. Okay. What was your understanding as to
[19] when the quote, unquote service fee would come up
[20] and you would be --
[21] A. I --
[22] Q. -- responsible to pay?
[23] A. I think there was some language put in
[24] there that just -- just never was used.

Page 92

[1] Q. Did you have any conversations with the
[2] attorney that drafted this addendum to the
[3] purchase order, and you don't have to tell me the
[4] exact contents of the -- of the conversation, but
[5] did you have a conversation with him before this
[6] addendum was drafted?
[7] A. Before which addendum was drafted?
[8] Q. The addendum to the purchase order that
[9] we're going through. You said that -- I think
[10] his name was...
[11] A. Jerry Grossman.
[12] Q. Jerry Grossman. Drafted for you, or at
[13] least gave to you?
[14] A. Yeah. I think we had an open-end
[15] conversation saying, look, this is what I'm
[16] doing, how should this be handled.
[17] Q. Okay. Then it goes on to talk about the
[18] duties and rights of LSI, correct? Number four.
[19] A. Yes.
[20] Q. It says, LSI agrees to provide the
[21] following services to Pack & Process under this
[22] agreement, and then there are ten numbers
[23] corresponding to the services that LSI will be
[24] providing to Pack & Process, correct?

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 93

[1] A. Right.
[2] Q. All right. Is there any -- anything in
[3] those ten, and I want you to take your time and
[4] look at it, anything within those ten enumerated
[5] services provided by LSI that states that LSI
[6] will be responsible for transporting workers from
[7] their homes to the factory?
[8] A. Oh, it's -- it's not in there, but it's
[9] someplace else.
[10] Q. Okay. It's somewhere else in this
[11] particular contract?
[12] A. Yeah.
[13] Q. Okay. Why don't you point out to me where
[14] you believe the language is that supports the
[15] fact that Lam Staffing will be responsible serve --
[16] transporting workers from their homes to the
[17] actual factory?
[18] A. First of all, it was understood because
[19] that's the way it had always been and -- and
[20] every other temporary agency does that. Second
[21] of all, Lam Staffing will be -- I'm sorry.
[22]      MR. DEASEY: Tell him what
[23] document.
[24]      THE WITNESS: I'm looking at page one,

Page 94

[1]      the purchase order.
[2] BY MR. VAN NAARDEN:
[3] Q. Okay.
[4] A. Lam Staff, Inc. is also responsible for
[5] providing Delaware workers.
[6] Q. Now, that was actual -- I mean, this
[7] doesn't say that they -- explicitly say that they
[8] are going to be transporting the workers to the
[9] factory, does it?
[10]      MR. DEASEY: I object. The document
[11] says what it says, but you can answer.
[12]      THE WITNESS: That's what I -- what I
[13] read it to -- to mean.
[14] BY MR. VAN NAARDEN:
[15] Q. Well, there -- there is no actual word
[16] there transportation, is there?
[17] A. I will repeat my answer. That's the way I
[18] read it to be.
[19] Q. So you --
[20]      MR. DEASEY: Is there -- well, I
[21] will stipulate that the word transportation
[22] didn't appear in what he read to you, Josh.
[23] BY MR. VAN NAARDEN:
[24] Q. Okay.

Page 95

[1] A. I'll -- I'll also answer that -- that if I
[2] was going to put up a brick wall in the building
[3] it wouldn't be stipulated that -- that -- that
[4] the driver is going to drive to -- into -- into,
[5] you know, into my plant. There is an assumption
[6] there.
[7] Q. The contract that you entered into, this
[8] agreement, was for Lam Staffing to provide
[9] workers to work in your factory. Isn't -- isn't
[10] that basically what it is?
[11] A. Right.
[12] Q. All right. Other than the contents of this
[13] purchase order and the addendum to purchase
[14] order, is there any document that you believe
[15] exists that actually sets out with specificity
[16] the fact that Lam Staffing is to provide
[17] transportation for the workers from their home to
[18] the factory?
[19]      MR. DEASEY: Objection to form.
[20] You can answer.
[21]      THE WITNESS: No.
[22] BY MR. VAN NAARDEN:
[23] Q. Did you ever have any discussions with
[24] David Thach or any individual at LSI about the

Page 96

[1] fact that they were to provide transportation
[2] services for these workers?
[3] A. Absolutely.
[4] Q. And who did you have those conversations
[5] with?
[6] A. With David Thach.
[7] Q. And when you talked with David Thach, you
[8] were able to communicate with him?
[9] A. No, but I -- I would always be with
[10] somebody else when I was with David Thach,
[11] because I had trouble understanding him.
[12] Q. So --
[13] A. But I would -- I would make a statement,
[14] Bob would make sure that David understood, David
[15] would repeat it back to -- to Bob, and that was
[16] kind of the program.
[17] Q. You're talking about Bob -- Bob Has --
[18] Hassey?
[19] A. No, Bob Magnus.
[20] Q. Who is Bob Magnus?
[21] A. Bob Magnus was the production manager
[22] before Sterling.
[23] Q. Did you -- in addition to conversations
[24] that you would have had with David Thach in the

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 97

[1] presence of Bob Magnus, did you have
[2] conversations in the presence of Sterling
[3] Newsome?
[4] **A.** I don't recall that. I may have, but I
[5] don't recall.
[6]     **MR. COSTIGAN:** I will step out, but
[7] please continue as long as you like. I hope
[8] to be back around 2 o'clock or 2:30.
[9]     **MR. DEASEY:** We have permission to
[10] continue?
[11]     **MR. COSTIGAN:** Yes.
[12]     **MR. DEASEY:** Thank you. I appreciate
[13] that.
[14]     (Whereupon Mr. Costigan leaves the
[15] deposition.)
[16] **BY MR. VAN NAARDEN:**
[17] **Q.** Under six, and -- and we're on page three,
[18] there are some general provisions of this
[19] agreement, and I want to go over them with you.
[20]     **MR. DEASEY:** Page three?
[21]     **MR. VAN NAARDEN:** Yes.
[22]     **MR. DEASEY:** All right.
[23] **BY MR. VAN NAARDEN:**
[24] **Q.** Number six, it says, general provisions,

Page 98

[1] correct?
[2] **A.** Yes.
[3] **Q.** And under A it says, this agreement, and
[4] Exhibit A incorporated by reference herein, is
[5] the entire agreement between the parties and
[6] supersedes any previous agreement or
[7] representation, written or oral, with respect to
[8] the subject matter between Pack & Process and
[9] LSI.
[10]     Did I read that correctly?
[11] **A.** Yes.
[12] **Q.** And did you read that before you signed
[13] this document?
[14] **A.** Yes, I did.
[15] **Q.** All right.
[16]     So you understood then that any
[17] type of oral agreement that you may or may not
[18] have had with Lam Staffing would have been
[19] superseded by the actual contents and terms in
[20] this agreement; is that accurate?
[21] **A.** Are you talking about delivered help again?
[22] **Q.** I'm talking --
[23]     **MR. DEASEY:** Listen --
[24]     **THE WITNESS:** Okay.

Page 99

[1]     **MR. DEASEY:** Listen to the question.
[2]     **MR. VAN NAARDEN:** You can read back
[3] the question.
[4]     (Whereupon the court reporter read
[5] back as follows:
[6]     Question: All right.
[7]     So you understood then that any type
[8] of oral agreement that you may or may not
[9] have had with Lam Staffing would have been
[10] superseded by the actual contents and terms
[11] in this agreement; is that accurate?)
[12]     **THE WITNESS:** Yes. That is accurate.
[13] **BY MR. VAN NAARDEN:**
[14] **Q.** Okay.
[15]     Now if we flip -- we've already
[16] been through the signature page. Beyond that
[17] there is a form that has Lam Staffing,
[18] Incorporated on the top. Do you see where I'm
[19] talking?
[20] **A.** Yes.
[21] **Q.** All right. Have you seen this document
[22] before?
[23] **A.** Yes.
[24] **Q.** And what is it?

Page 100

[1] **A.** This is the form on which they would
[2] provide their labor for billing purposes, their
[3] invoice.
[4] **Q.** And is this a form that you provided to
[5] them to fill out, or vice versa, did -- did they
[6] provide it already filled out to you?
[7] **A.** I think we suggested the form and they
[8] filled it out.
[9] **Q.** Okay. The next page is a copy of the State
[10] of Delaware, Division of Revenue, Temporary
[11] License Receipt. Do you know what this is?
[12] **A.** I believe I -- I know what it is.
[13] **Q.** Well, what do you believe it is?
[14] **A.** I believe this is a document that came from
[15] the State of Delaware that says that they have
[16] this temporary license. Lam Staff has this
[17] temporary license.
[18] **Q.** Do you know what a temporary license is
[19] for?
[20]     **MR. DEASEY:** You mean this type of
[21] temporary license?
[22]     **MR. VAN NAARDEN:** Yes. This type of
[23] temporary license.
[24]     **THE WITNESS:** Not really, no.

---

B&R Services for Professionals, Inc.

Min-U-Script®

(25) Page 97 - Page 100

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 101

[1] BY MR. VAN NAARDEN:
[2] Q. All right. Under officer it says Regina V.
[3] Gray. Do you see where it says that?
[4] A. Yes.
[5] Q. Do you know who that is?
[6] A. No.
[7] Q. The next page, it looks like a federal tax
[8] deposit coupon.
[9] A. Right.
[10] Q. Do you know what this is for?
[11] A. What it's for? No.
[12] Q. Have you ever seen a document like this
[13] before?
[14] A. I may have. I don't recall.
[15] Q. Beyond that it has -- there is a
[16] certificate of liability insurance that is dated
[17] October 16th of 2000.
[18]         MR. DEASEY: It's not in our
[19]     packet.
[20]         MR. VAN NAARDEN: Oh, you don't
[21]     have that? Interesting. I will give you --
[22]     give it to you.
[23]         THE WITNESS: Okay.
[24] BY MR. VAN NAARDEN:

Page 102

[1] Q. Do you see what I'm talking about?
[2] A. Uh-huh?
[3] Q. Yes?
[4] A. Yes.
[5]         MR. DEASEY: Do you see this?
[6] BY MR. VAN NAARDEN:
[7] Q. Have you seen this document before?
[8] A. Yes, I believe I have.
[9] Q. All right. Is this something that you
[10] requested of LSI, and what I mean by that is, did
[11] you request proof of liability insurance?
[12] A. Yes.
[13] Q. And --
[14]         MR. DEASEY: Whoa, whoa, whoa.
[15]     Liability insurance or, -- before you answer
[16]     this, look through this --
[17]         THE WITNESS: Okay.
[18]         MR. DEASEY: -- and see what it says.
[19]         THE WITNESS: Yeah. Well, this was
[20]     for proof of workmen's comp.
[21] BY MR. VAN NAARDEN:
[22] Q. Okay. And the workers' comp, at least
[23] according to this document, was through Princeton
[24] Insurance Company?

Page 103

[1] A. Yes.
[2] Q. And that was something that, under the
[3] terms of the contract, LSI was to provide for its
[4] own employees?
[5] A. Correct.
[6] Q. All right. In addition to certification of
[7] workers' comp, did you also request proof of
[8] liability insurance in that LSI would provide
[9] proof that they had in fact liability insurance?
[10] A. I don't know.
[11] Q. Was -- was your understanding that under
[12] the terms of the contract that was at least
[13] something that you could ask for?
[14] A. I -- I -- I'd have to go look.
[15]         MR. DEASEY: Why don't you look at
[16]     the contract to answer that.
[17] BY MR. VAN NAARDEN:
[18] Q. And I will just refer you to page two,
[19] line -- number ten.
[20] A. Ten.
[21] Q. Yes. Where -- where it says, and I will
[22] read it to you, furnish and keep in full force
[23] and effect during the term of this agreement
[24] workers' compensation insurance covering all LSI

Page 104

[1] personnel upon written request by Pack & Process,
[2] LSI shall furnish a certificate of insurance
[3] verifying coverage for general liability
[4] insurance coverage, and Delaware Workers
[5] Compensation's insurance coverage.
[6]         Did I read that correctly?
[7] A. Yes.
[8] Q. All right. So you knew when you signed
[9] this document that you could have requested that
[10] if you wanted to?
[11] A. That's correct.
[12] Q. All right. Do you know if you ever did?
[13] A. I believe we did.
[14] Q. As you sit here today, without me showing
[15] you the document, do you know what insurance
[16] company had provided insurance for LSI?
[17]         MR. DEASEY: General liability
[18]     insurance?
[19]         MR. VAN NAARDEN: General liability.
[20]         THE WITNESS: No, I don't know
[21]     offhand.
[22] BY MR. VAN NAARDEN:
[23] Q. All right.
[24]         Have you ever heard of First --

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 105

[1] First Financial Insurance Company?
[2] A.  It does not ring a bell.
[3] Q.  Did you ever have any discussions with
[4] anybody from an insurance institution relating to
[5] Lam Staffing having insurance?  And what I mean
[6] by that is, that did -- did you ever -- well,
[7] let's just start with this.
[8] I am going to mark this as
[9] Exhibit-2. I want you to take a look at it and
[10] tell me if you've ever seen it before?
[11] (Whereupon Exhibit Ames-2 was
[12] marked for identification.)
[13] VIDEO TECHNICIAN:  This concludes DV
[14] number one at 12:43 p.m.
[15] VIDEO TECHNICIAN:  Beginning DV two.
[16] 12:45 p.m.
[17] BY MR. VAN NAARDEN:
[18] Q.  I've shown you what -- what I've marked as
[19] Ames-2.  Do you recognize what that document is?
[20] A.  No, I don't recognize it.
[21] Q.  Never saw it before?
[22] A.  I'm not saying I don't -- I've never seen
[23] it before, I don't recognize it.
[24] Q.  Okay.  If you flip over to the second page,

Page 106

[1] you will agree with me that it -- it seems to be
[2] a -- a document from First Financial Insurance &
[3] Company?
[4] A.  Yes.
[5] Q.  All right.  Are you familiar with that
[6] insurance company?
[7] A.  No.
[8] Q.  All right.  And then it says, name insured
[9] and mailing address, Lam Staff.
[10] A.  Yes.
[11] Q.  Okay.  Do you know if this was a document
[12] that you retained in your work files?
[13] A.  I -- I really don't know.  I don't know.
[14] Q.  Who -- who in your organization would have
[15] been responsible for verifying, if at all, the
[16] insurance picture for these temporary labor
[17] agencies?
[18] A.  Dorothy Stanley.
[19] Q.  In addition to Dorothy obtaining a copy of
[20] the insurance policy, did you have an expectation
[21] that she would also follow up and call the
[22] insurance company to further verify the actual
[23] policy?
[24] MR. DEASEY:  Objection to form.

Page 107

[1] What policy are we talking about?
[2] MR. VAN NAARDEN:  This First Financial
[3] Insurance Company policy.
[4] MR. DEASEY:  I -- I object to this.  I
[5] don't think he's testified she obtained this
[6] policy.  Go ahead.  You can answer.
[7] THE WITNESS:  I would have expected
[8] her to do that, yes.
[9] BY MR. VAN NAARDEN:
[10] Q.  Okay.  So -- so in talking -- and not
[11] talking in particular in Lam Staffing, but in
[12] talking about the other employment agencies that
[13] you've dealt with in the past, was Dorothy's
[14] responsibility to obtain a documentation that
[15] they in fact had liability insurance?
[16] A.  And workmen's compensation, yes.
[17] Q.  And in addition to actually getting written
[18] confirmation by way of the actual insurance
[19] policy or the dec sheet, did you have an
[20] expectation that she would then follow up, and
[21] actually call the agency -- to call the insurance
[22] company to further verify that?
[23] A.  No.  If we had a certificate of insurance,
[24] don't know that we would have checked further.

Page 108

[1] Q.  Okay.  Under this First Financial Insurance
[2] Company document, the second page under business
[3] description, you will agree with me it says, temp
[4] agency, packaging of candy.  Correct?
[5] A.  Yes.
[6] Q.  All right.  It doesn't say anything, at
[7] least, under the business description of
[8] providing transportation to and from a factory,
[9] correct?
[10] A.  That's correct, it does not say that.
[11] Q.  Okay.  We can put that aside.
[12] MR. DEASEY:  Are we going to -- are
[13] we going to change the Ames-1 to the document
[14] you had, or do you want to keep the one that
[15] is already marked?
[16] MR. VAN NAARDEN:  It's the same one.
[17] I mean the one that I marked is fine.  Oh,
[18] because it has the extra sheet on it.
[19] MR. DEASEY:  Yes.
[20] MR. VAN NAARDEN:  You know what I'm
[21] going to do?  Here I am -- I am going to
[22] separately mark as Ames-3, I am going to
[23] separately mark as Ames-3, the certification
[24] of workers' comp, and just so we're on the

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

---

Page 109

[1]    same page --
[2]         MR. DEASEY: It's actually,
[3]    certificate of insurance, but, yeah, Ames-3.
[4]    BY MR. VAN NAARDEN:
[5]    Q.   Ames-3 is -- is the certificate of
[6]    insurance, correct?
[7]    A.   Yes.
[8]    Q.   As it relates to Lam Staffing?
[9]         MR. DEASEY: Is that what it is?
[10]         THE WITNESS: Yes.
[11]         MR. VAN NAARDEN: Okay. That's fine.
[12]    Thank you.
[13]         THE WITNESS: Thank you.
[14]         (Whereupon Exhibits Ames-3 and Ames-4
[15]    were marked for identification.)
[16]    BY MR. VAN NAARDEN:
[17]    Q.   Identified as Ames-4 is what I will
[18]    represent to you are the invoices to Pack &
[19]    Process for payment of employee hours submitted
[20]    by Lam Staffing or Lam Staff.
[21]         Would you agree with that?
[22]    A.   Yes.
[23]    Q.   Okay. Now, can I have that back for one
[24]    second?

---

Page 110

[1]         MR. DEASEY: Sure.
[2]    BY MR. VAN NAARDEN:
[3]    Q.   I want to check the -- the top date.
[4]         All right. I want you to go
[5]    through the whole document for me, if you can,
[6]    because there are some -- some things in the back
[7]    of this packet that I would like you to explain
[8]    to me what they are.
[9]         I think the -- the initial forms
[10]    are what we talked about before, which is the
[11]    actual invoice that is filled out by Lam Staffing
[12]    and submitted to Pack & Process, correct?
[13]    A.   Correct.
[14]    Q.   And this was the form that was attached to
[15]    the agreement that we initially talked about,
[16]    correct, except that the form was blank?
[17]    A.   Yes.
[18]    Q.   All right. So it was part of the agreement
[19]    that this was the actual form that they were
[20]    going to use, right?
[21]    A.   Yes.
[22]    Q.   All right. And on the top it says -- it
[23]    has invoice number and then it has --
[24]    A.   On the first page?

---

Page 111

[1]    Q.   Yes. It has invoice number.
[2]    A.   Yes.
[3]    Q.   And then it has invoice date.
[4]    A.   Yes.
[5]    Q.   And what do they mean?
[6]    A.   Invoice number, I believe, is the 23rd week
[7]    of '04.
[8]    Q.   Okay. And then what is the invoice --
[9]    A.   The invoice date is 6/5/04.
[10]    Q.   Does the invoice date correspond with the
[11]    day that Lam Staffing gives it to you?
[12]    A.   I don't know.
[13]    Q.   Okay. And then it says approved by,
[14]    correct? On the right-hand side. Top right.
[15]         MR. DEASEY: Approved by?
[16]         MR. VAN NAARDEN: Does yours not have
[17]    that? Let me see.
[18]         No. Okay.
[19]         At some point in time -- well, let's
[20]    see here. I will show you another -- another
[21]    one.
[22]         MR. DEASEY: Oh, okay.
[23]    BY MR. VAN NAARDEN:
[24]    Q.   And it has a stamp -- it looks like a

---

Page 112

[1]    stamp.
[2]    A.   That's correct.
[3]    Q.   All right. Is that a stamp that you have
[4]    at Pack & Process?
[5]    A.   Yes.
[6]    Q.   All right. And -- and it says approved by
[7]    there, and there is an initial. Do you know who
[8]    that is?
[9]    A.   Yes. It's Mina Dobson.
[10]    Q.   And there is a date?
[11]    A.   Yes.
[12]    Q.   And what is the date?
[13]    A.   Five -- I believe 5/24/01.
[14]    Q.   Was it the practice at Pack & Process that
[15]    all of these invoices would be stamped upon its
[16]    review?
[17]    A.   Yes.
[18]    Q.   Okay. Um --
[19]    A.   Upon its receipt, I should say.
[20]    Q.   Okay. Okay. So some -- so the -- the --
[21]    well, it says, at least approved by, and it's
[22]    initialed. So wouldn't that indicate to you that
[23]    it was not only received, but it was also
[24]    reviewed and approved?

---

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 113

[1] **A.** Yeah. But the stamp goes on when it's
[2] received.
[3] **Q.** Okay. If we go through, again, Ames-4, if
[4] we -- well, on the bottom of the first page is --
[5] is there a total for amount to be paid?
[6] **A.** I'm sorry. On the bottom -- bottom of page
[7] four?
[8] **Q.** No. The -- the first page.
[9] **A.** Yes, there is.
[10] **Q.** Okay. What is the total?
[11] **A.** I believe three -- I believe 3,121.
[12] **Q.** The subtotal or the total?
[13] **A.** I'm looking over here.
[14] **Q.** Okay. And do you believe that corresponds
[15] to all of the hourly -- to the hours that the
[16] individuals enumerated on --
[17] **A.** I --
[18] **Q.** -- that form were working?
[19] **A.** I -- I mean I would have to go -- I would
[20] take some time and calculate this. I don't know.
[21] **Q.** Was that the understanding with Lam
[22] Staffing, that they would only be submitting for
[23] hours that their workers were working?
[24] **A.** Well, there might be -- I'm not sure how

Page 114

[1] this is set up. There may be more than one page
[2] here that sum -- that summarized. This could be
[3] a running subtotal. I -- you know, I just -- I
[4] just don't know what it is yet.
[5] **Q.** Okay. Why don't you flip over to the
[6] second page.
[7] **MR. DEASEY:** The second page?
[8] **BY MR. VAN NAARDEN:**
[9] **Q.** Yeah. Sure. And is that another one of
[10] the same forms?
[11] **A.** Yes.
[12] **Q.** All right. And flip over to the third
[13] page. And, again, is that another one?
[14] **A.** Yes.
[15] **Q.** All right. And flip through, there are a
[16] bunch of those papers and then -- and then there
[17] should be an actual typed-up form. Do you know
[18] who produced this form?
[19] **A.** This, I believe, was done by Mina Dobson.
[20] **Q.** Okay. And what information, if -- if you
[21] know, did Mina Dobson have used in order to
[22] generate this document?
[23] **A.** Well, I'm not so sure. This could have
[24] been done by Dorothy Stanley. I'm not sure. I

Page 115

[1] believe, and I'm not positive, that there were
[2] two sides of this invoice. One was coming from
[3] Pack & Process, one was coming from Lam Staff
[4] that had to be reconciled.
[5] Now, my -- my first feeling is that
[6] this is coming from the Pack & Process side.
[7] **MR. DEASEY:** This being what?
[8] **THE WITNESS:** This sheet.
[9] **MR. DEASEY:** P?
[10] **THE WITNESS:** Page 353.
[11] **MR. DEASEY:** What he's referring to is
[12] Bates stamped 00353.
[13] **THE WITNESS:** Pack & Process side.
[14] And that the total invoice here should be
[15] $20,528.38. Which is shown on the first page
[16] of Ames-4 as the total.
[17] **BY MR. VAN NAARDEN:**
[18] **A.** If you flip -- flip beyond the -- the other
[19] page, page --
[20] **MR. DEASEY:** Keep going?
[21] **BY MR. VAN NAARDEN:**
[22] **Q.** Keep going. There is another one that is
[23] exactly like it or at least similar, correct?
[24] **A.** Yes.

Page 116

[1] **MR. DEASEY:** Let's just see here.
[2] **BY MR. VAN NAARDEN:**
[3] **Q.** The phase -- the page that follows -- that
[4] you're looking at right now, is that also a
[5] document that you believe to be generated by Pack
[6] & Process?
[7] **A.** Well, this has Lam Staff's name on it, so I
[8] don't think it would be our -- out -- I could be
[9] wrong about this one, too. This has Lam Staff.
[10] If it has Lam Staff on it we would not have
[11] generated it.
[12] **Q.** Okay. Following those -- those -- those
[13] computer documents there are a couple of xerox
[14] copies of --
[15] **MR. DEASEY:** 356?
[16] **MR. VAN NAARDEN:** Yeah.
[17] **MR. DEASEY:** Bates Number 356.
[18] **BY MR. VAN NAARDEN:**
[19] **Q.** And what exactly are those?
[20] **A.** Excuse me. This is the information coming
[21] from the production supervisor.
[22] **Q.** What -- what exactly is it?
[23] **A.** This is -- this is showing that on June
[24] 2nd, on this particular sheet, which is sheet 356

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 117

[1] at Boulden on the day shift, actually it's
[2] corrected to Tuesday, May 29th, the hours were
[3] 6:00 a.m. to 5:00 p.m. There is a ten and a half
[4] hour day. I'm reading down.
[5]    Q.   I understand.
[6]    A.   There is a 30 minute lunch break. Pack &
[7] Process signed for 49 people at 6 -- 6 o'clock
[8] a.m., 49 people before lunch, 49 people after
[9] lunch. The Lam Staff supervisor also agreed that
[10] there were 49 people at all three times.
[11]        Then he -- he signed off, and I
[12] believe that's Sterling Newsome. And I'm not
[13] sure of who is signing off here, but if I had to
[14] guess, I would say it's Yan.
[15]    Q.   Okay. Can I have that back a second.
[16]    A.   (Indicating).
[17]        VIDEO TECHNICIAN:   Mr. Ames, your
[18]    mic is sliding down.
[19]        THE WITNESS:   That happens when you
[20]    get old. I'm standing on this one.
[21] BY MR. VAN NAARDEN:
[22]    Q.   Now, the one that you're -- and I'm just
[23] going to hold it for you, but this -- this is
[24] a -- this document that you just described for us

Page 118

[1] is for week ending June 2nd of 2001, correct?
[2]    A.   Yes.
[3]    Q.   And on the top it says Lam Staffing,
[4] Incorporated care of Suasaday Thach?
[5]    A.   Right.
[6]    Q.   And -- and you believe that to also be
[7] David Thach, one in the same?
[8]    A.   Yes.
[9]    Q.   All right. I want to go through them and
[10] do it as Exhibit-5, another invoice, and the
[11] front page, is that -- is that the same type of
[12] invoice form that we discussed earlier?
[13]    A.   Yes, it is.
[14]        (Whereupon Exhibit Ames-5 was
[15]    marked for identification.)
[16] BY MR. VAN NAARDEN:
[17]    Q.   It has Lam Staffing on the front?
[18]    A.   Yes.
[19]    Q.   And there are a couple of those just like
[20] there were in the last packet?
[21]    A.   Yes.
[22]    Q.   And then followed by that is an actual
[23] typewritten form?
[24]    A.   Sub sheet, right.

Page 119

[1]    Q.   And on the top of that form it says Lam
[2] Staffing, Incorporated?
[3]    A.   Yes.
[4]    Q.   All right. If you flip beyond that there
[5] is another sheet that has Lam Staffing,
[6] Incorporated on the top?
[7]    A.   Yes.
[8]    Q.   Flip over. Now this is the same type of
[9] lunch -- 30 lunch minute break verification
[10] sheets, correct?
[11]    A.   Yes.
[12]        MR. DEASEY:   You're talking about
[13]    392?
[14]        MR. VAN NAARDEN:   Correct.
[15]        MR. DEASEY:   Bates Number 392.
[16] BY MR. VAN NAARDEN:
[17]    Q.   Yes?
[18]    A.   Yes.
[19]    Q.   And that is for -- just give me the week
[20] ending date.
[21]    A.   December 30, 2000.
[22]    Q.   Tell me what the name of the company is on
[23] that form?
[24]    A.   Point & Fortune.

Page 120

[1]    Q.   And who is it care of?
[2]    A.   Suasaday Thach.
[3]    Q.   Is Point & Fortune, Incorporated, the name
[4] of the company that is -- that -- that was prior
[5] to Lam Staffing?
[6]    A.   I believe it was.
[7]    Q.   All right. And was it Suasaday Thach as --
[8] as the individual who was, to the best of your
[9] knowledge, in charge of Point & Fortune,
[10] Incorporated?
[11]    A.   I don't know who is in charge, but -- but
[12] he was a key guy, yes.
[13]    Q.   Okay. And then at some point -- so if we
[14] know that that is week ending December of 2000,
[15] and then the one we looked at previous was week
[16] ending June of 2001, do you believe in looking at
[17] these two documents that at some point between
[18] December of 2000 and June of 2001, you stopped
[19] doing business with an entity called Point &
[20] Fortune, Incorporated, and were -- were doing
[21] business with an entity called Lam Staffing,
[22] Incorporated?
[23]    A.   I'm not sure when that started and stopped,
[24] but what -- what was the date of the contract?

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

---

Page 121

[1]  **Q.**  The date of the contract is October.
[2]       **MR. DEASEY:**  October 6th.
[3]  **BY MR. VAN NAARDEN:**
[4]  **Q.**  October 6th of...
[5]       **MR. DEASEY:**  2000.
[6]  **BY MR. VAN NAARDEN:**
[7]  **Q.**  Of 2000.
[8]       **MR. DEASEY:**  I have it right here.
[9]       **MR. VAN NAARDEN:**  Okay.
[10]       **THE WITNESS:**  October 6th of 2000.
[11]  Then I would guess somebody sim -- simply
[12]  picked up a, you know, an old piece of paper
[13]  and -- and put that on.
[14]  **BY MR. VAN NAARDEN:**
[15]  **Q.**  Okay.
[16]       **MR. DEASEY:**  Meaning on Bates
[17]  Number 392?
[18]       **THE WITNESS:**  Yes.
[19]  **BY MR. VAN NAARDEN:**
[20]  **Q.**  Okay.  You can put that aside.
[21]       **MR. DEASEY:**  Josh, whenever you're
[22]  at a convenient place to go into a new
[23]  subject area, maybe we should stop.
[24]       **MR. VAN NAARDEN:**  We can stop now.

---

Page 122

[1]  That's fine.
[2]       **THE WITNESS:**  Why don't -- why we
[3]  order something and let it come up here, or
[4]  you don't want to do it that way?
[5]       **MR. VAN NAARDEN:**  We can do that.
[6]       **VIDEO TECHNICIAN:**  Off the record at
[7]  1:00 p.m.
[8]       (Whereupon a short recess was held.)
[9]       **VIDEO TECHNICIAN:**  On the record 1:42.
[10]  **BY MR. VAN NAARDEN:**
[11]  **Q.**  We're back on the record.
[12]       Before we broke, not immediately
[13]  before we broke, but at some point before we
[14]  broke for a little break, we had gone over these
[15]  invoices that were provided to you by Lam
[16]  Staffing.  You know -- you know, what I'm talking
[17]  about?
[18]  **A.**  Yes.
[19]  **Q.**  All right.  My -- my question is that I have
[20]  a whole package of paper, and you can see I'm
[21]  holding a big thick pile of paper, and in lieu
[22]  of going through each and every one of these
[23]  documents, I want to ask you some general
[24]  questions and see if we can do it that way.

---

Page 123

[1]  Okay?
[2]  **A.**  Okay.
[3]  **Q.**  Based on the invoices that we just went
[4]  through, is it your understanding that you
[5]  were -- you were paying these workers an hourly
[6]  rate, correct?
[7]  **A.**  No.
[8]  **Q.**  Okay.  If it wasn't an hourly rate --
[9]  I'm -- I'm sorry.  That you were paying Lam
[10]  Staffing for them providing their services of
[11]  these workers on -- on an hourly basis?
[12]  **A.**  Yes.
[13]  **Q.**  Okay.  In any of the invoices that -- that
[14]  I showed you, is there any type of specific line
[15]  item corresponding to transportation services?
[16]       **MR. DEASEY:**  I'm sorry.  Are we on,
[17]  like five?  Are we talking about five?
[18]       **MR. VAN NAARDEN:**  Any of the ones,
[19]  yeah, exactly.  The ones that I've -- the
[20]  ones that I've shown you, is there any line
[21]  item corresponding to transportation?
[22]       **THE WITNESS:**  No, there wouldn't be.
[23]  **BY MR. VAN NAARDEN:**
[24]  **Q.**  Okay.  And why wouldn't there be?

---

Page 124

[1]  **A.**  Because that wasn't included.  There -- it
[2]  was an understood item.
[3]  **Q.**  Okay.  And that's what I want to go over.
[4]  You said that it was an understood item?
[5]  **A.**  Yes.
[6]  **Q.**  So did you have an understanding as to how
[7]  Lam Staffing was to be compensated for what you
[8]  say is providing transportation services for the
[9]  workers?
[10]  **A.**  No.
[11]  **Q.**  You -- you don't.  I'm sorry.
[12]  **A.**  I don't know how they calculated that.
[13]  **Q.**  Oh, okay.  Was it something that was
[14]  discussed with you, between you and anybody from
[15]  Lam Staffing?
[16]  **A.**  No, just that it was start of the service.
[17]  **Q.**  And we've been through before, but in the
[18]  agreement that we went through it's -- it's not
[19]  specifically stated in -- in the agreement the --
[20]  term transportation and what the compensation
[21]  is to be for providing transportation, correct?
[22]       **MR. DEASEY:**  Objection to form.  You
[23]  can answer.
[24]       **THE WITNESS:**  It -- yeah, it -- it

---

B&R Services for Professionals, Inc.

Min-U-Script®

(31) Page 121 - Page 124

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 125

[1]       does not say that, but it was clear that it
[2]     was understood.
[3]   BY MR. VAN NAARDEN:
[4]   Q.   Okay.
[5]   A.   And that has been going on for years.  And
[6]     every day vans would pull up, and every day
[7]     people would get out of the vans, and every day
[8]     people would work, and every -- and they -- at
[9]     the end of the day people would get back in vans,
[10]    and every day people would go back home.
[11]  Q.   Okay.
[12]  A.   And it was always through leaders and vans.
[13]  Q.   So other than the fact that what you say is
[14]    an understanding, it's not written anywhere?
[15]  A.   Oh, I don't think it's written, no.
[16]  Q.   Okay.  So —
[17]  A.   Unless -- unless you go back to that first
[18]    page in which it talks about Delaware workers.
[19]  Q.   Providing Delaware workers.
[20]  A.   Right.
[21]  Q.   Okay.  I'm just going to mark this huge
[22]    packet as -- as Ames-6, and I just want to ask
[23]    you, if those are the same type of forms that
[24]    we've already been through, these invoices.  And

Page 126

[1]     you can take your time and look through it.  Just
[2]     look through it if you need to.
[3]         MR. DEASEY:  Well, can we go off
[4]       the record a second?.
[5]         VIDEO TECHNICIAN:  Absolutely.  1:45
[6]       p.m.  We're off the record.
[7]         (Whereupon a discussion was held off
[8]       the video record.)
[9]         MR. DEASEY:  I will stipulate that if
[10]      these have all -- all have Bates numbers of
[11]      P/P, that they were produced by our firm, and
[12]      to the extent that I've briefly glanced
[13]      through them, it appears as if they are
[14]      either invoices, documents related to
[15]      invoices, calculator, you know, runs, adding
[16]      up hours, and adding up different amounts of
[17]      money.  And then these different sheets that
[18]      I think the witness identified as the daily
[19]      sheets that were filled out by Pack & Process
[20]      supervisors and Lam Staff supervisors.  That
[21]      is what they appear to be.  Would you agree
[22]      with that?
[23]         THE WITNESS:  They all relate to the
[24]      invoicing on a weekly basis.

Page 127

[1]         MR. DEASEY:  Great.
[2]         VIDEO TECHNICIAN:  On the record.
[3]       1:47.
[4]   BY MR. VAN NAARDEN:
[5]   Q.   Mr. Ames, we took a brief break, and in
[6]     that time you and your attorney had a chance to
[7]     glance through what has been marked for
[8]     identification as Ames-6.
[9]         Would you agree with me that --
[10]    that the documents that are placed in front of
[11]    you are invoice-related material relating to work
[12]    that was done by Lam Staffing?
[13]  A.   Yes.
[14]  Q.   Okay.
[15]        MR. DEASEY:  Can I just ask a
[16]      question --
[17]        MR. VAN NAARDEN:  Sure.
[18]        MR. DEASEY:  -- while we're on the
[19]      record?
[20]        Since we didn't specifically look at
[21]      the Lam Staffing logo, and you're
[22]      representing that these appear all to have
[23]      been related to temporary labor provided by
[24]      Lam Staffing?

Page 128

[1]         MR. VAN NAARDEN:  Correct.
[2]         MR. DEASEY:  That's fine.
[3]   BY MR. VAN NAARDEN:
[4]   Q.   All right.  Well, my question is, if we
[5]     were to go page by page through these documents,
[6]     do you believe that there would be a line item
[7]     corresponding to transportation services to be
[8]     provided by Lam Staffing and -- and -- and a
[9]     numerical number?
[10]  A.   No, I do not believe that.
[11]  Q.   Okay.  That was -- that was -- that was the
[12]    purpose of going through that.  That's fine.
[13]        As you sit here today, you know who
[14]    Maly Yan is, correct?
[15]  A.   Yes.
[16]  Q.   And she was in fact an employee of Pack &
[17]    Process, correct?
[18]  A.   At times, yes.
[19]  Q.   At times she was a -- a quality control
[20]    person?
[21]  A.   Technician, yes.
[22]  Q.   All right.  And -- and is it safe to say
[23]    that she first started working in the Pack &
[24]    Process plant as an employee of Lam Staffing?

Min-U-Script®              B&R Services for Professionals, Inc.

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 129

[1]  A.  As a -- as an employee of one of their
[2]  predecessor companies.
[3]  Q.  Would it be Fortune?
[4]  A.  I couldn't tell you.
[5]  Q.  You don't know.  Okay.
[6]      But she was a temporary worker?
[7]  A.  Correct.
[8]  Q.  All right.  And at some point she was asked
[9]  if she wanted to stay on as an actual employee of
[10]  Pack & Process, correct?
[11]  A.  Whether she wanted to be employed by Pack &
[12]  Process, yes.
[13]  Q.  And you have retained the file on her, as
[14]  I'm sure you do on all of your employees,
[15]  correct?
[16]  A.  That's correct.
[17]  Q.  And in that file is her application for
[18]  employment, correct?
[19]  A.  That's correct.
[20]      MR. VAN NAARDEN:  All right.  We
[21]  can go off a record a second.
[22]      VIDEO TECHNICIAN:  Off the record.
[23]  1:51.
[24]      (Whereupon a discussion was held off

Page 130

[1]  the record.)
[2]      VIDEO TECHNICIAN:  On the record.
[3]  1:53.
[4]      (Whereupon Exhibit Ames-7 was marked
[5]  for identification.)
[6]  BY MR. VAN NAARDEN:
[7]  Q.  I'm going to show you what I've identified
[8]  as Ames-7, and that's so -- it's -- it's listed
[9]  on the top as Application -- of -- of -- for
[10]  Employment.  Do you recognize this to be the
[11]  ap- -- application for employment that Pack &
[12]  Process uses?
[13]  A.  Yes.
[14]  Q.  All right.  And what is the date as far as
[15]  date of application?
[16]  A.  It appears to be 7, either the 20 or 28,
[17]  '98.
[18]  Q.  And that's -- who is the name of the
[19]  applicant?
[20]  A.  Maly Yan.
[21]  Q.  All right.  And based on reviewing that
[22]  document, is that when you believe Maly Yan
[23]  submitted the first application for per --
[24]  permanent employment at Pack & Process?

Page 131

[1]  A.  Yes.
[2]  Q.  All right.  And it's for -- it says, are
[3]  you available to work, on the front page it says
[4]  full time, correct?  Is that checked off there?
[5]  A.  Yes.
[6]  Q.  Okay.  As far as position applied for, what
[7]  does it say?
[8]  A.  What page?
[9]  Q.  Well, the first line of the first page,
[10]  position applied for.
[11]  A.  It says open.
[12]  Q.  Open, okay.
[13]  A.  It could be operator.  I'm not sure.
[14]  Q.  Okay.
[15]      At some point, did you learn of
[16]  Maly Yan no longer working at Pack & Process
[17]  after nine -- at the time that she submitted that
[18]  employment contract --
[19]  A.  Yes.
[20]  Q.  -- in '98?
[21]      And do you know when that was?
[22]      MR. DEASEY:  You mean the
[23]  employment application?
[24]  BY MR. VAN NAARDEN:

Page 132

[1]  Q.  Yes.  After the employment application?
[2]  A.  I -- I knew about it, generally.  I
[3]  don't -- I don't know when I knew.
[4]  Q.  Okay.  As you sit here today, do you have
[5]  an understanding as to what position she filled
[6]  when she was hired, based on that application?
[7]  A.  Yes, I believe I do.
[8]  Q.  And what would that be?
[9]  A.  She was a packer.
[10]  Q.  And at some point, did her job description
[11]  change from a packer?
[12]  A.  Well, her job description wouldn't have
[13]  been packer, it would have been factory employee.
[14]  Q.  And then, I guess, her -- her
[15]  responsibility as a factory worker employee would
[16]  be as a packer?
[17]  A.  At some point, yes.
[18]  Q.  At some point did that change for Maly Yan?
[19]  A.  Yes, it did.
[20]  Q.  And when it changed, what was her -- what
[21]  did it change to?
[22]  A.  Well, I think she -- she left for a period
[23]  of time, she came back a little later on, and at
[24]  that time, I believe, she was hired again into

Page 133

[1]  the factory, and then I think she transferred
[2]  into -- into quality control.
[3]  Q. And when she left and came back, was that
[4]  all before the -- the accident?
[5]  A. Yes.
[6]     (Whereupon Exhibit Ames-8 was
[7]  marked for identification.)
[8]  BY MR. VAN NAARDEN:
[9]  Q. I have Ames-8 is another application for
[10] employment that is dated February of '01,
[11] correct?
[12] A. Yes.
[13] Q. All right. When she came back, when she
[14] left and she came back, did you make her fill out
[15] a -- a new application?
[16] A. Did I make her do that, no.
[17] Q. Did you ask her to?
[18] A. No.
[19] Q. Did someone in -- in the Pack & Process
[20] organization have her fill out another
[21] application?
[22] A. I presume, yes.
[23] Q. All right. And is that the application
[24] form that you believe she filled out when she

Page 134

[1]  came back after a leave of absence?
[2]  A. Yes.
[3]  Q. Do you know why she left?
[4]  A. My recollection is that she went to New
[5]  England or Massachusetts, I thought with her
[6]  husband, and I thought they were going to live
[7]  there, and then for whatever reason it didn't
[8]  work out she came back. That's -- I don't know
[9]  if I heard that directly, indirectly, I -- but
[10] that's what I believe at this point.
[11] Q. Okay. And -- and knowing the date of
[12] accident was June 18th, '01, and that employment
[13] application was February of '01, it's
[14] approximately five months, give or take, prior to
[15] the accident, correct?
[16] A. I would say four months, but I don't
[17] quibble.
[18] Q. Okay. And during that four months period
[19] of time, you said that she was quality control?
[20] A. Yes.
[21] Q. And what were her -- what were her duties
[22] and responsibilities as a quality control person?
[23] A. As a quality control technician she would
[24] do certain physical tasks on -- on certain lines,

Page 135

[1]  on a repeat basis, and document those tasks by
[2]  filling out certain charts.
[3]  Q. And who was her -- and I believe Cheryl was
[4]  her immediate supervisor?
[5]  A. That's correct.
[6]  Q. And above Cheryl would be Sterling Newsome?
[7]  A. No.
[8]  Q. Who would be above Cheryl?
[9]  A. I would be.
[10] Q. Okay. What type of relationship, as far as
[11] a supervising capacity, did Sterling Newsome have
[12] for the quality control personnel, if any?
[13] A. He didn't.
[14] Q. None?
[15] A. No.
[16] Q. So under no circumstances should -- should
[17] he have been directing the way that a quality
[18] control person was conducting business with --
[19] inside Pack & Process?
[20] A. I -- I wouldn't -- I wouldn't be so
[21] absolute in -- in the way I state that. I would
[22] state that her supervisor was Charlotte -- I'm
[23] sorry, Cheryl. And then in the normal course of
[24] events, Cheryl would tell -- would be her

Page 136

[1]  supervisor.
[2]  Q. Okay.
[3]  A. There could be an event in which Sterling
[4]  who as -- as the plant manager might give her a
[5]  direction to do something and she would always --
[6]  you know, if there is a problem she would go back
[7]  and check with her supervisor. But if her
[8]  supervisor were not around, I presume he would
[9]  give her instruction and she would follow it.
[10] And she would also interface with him when --
[11] when -- when she was working on something, and it
[12] was out of specification. It was her obligation
[13] to inform production that something was going on
[14] that was not right.
[15] Q. Are you aware, as you sit here today, of
[16] any other of Maly Yan's family members that
[17] worked at the factory, whether it be through Lam
[18] Staffing or directly through Pack & Process?
[19] A. Yes.
[20] Q. And -- and as you sit here today, who are
[21] you aware of family members of Maly Yan working
[22] at the factory?
[23] A. Chan Yan.
[24] Q. And that is Maly's sister, correct?

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 137

[1] A. I believe it to be her sister, yes.
[2] Q. Is Chan Yan -- was she a direct employee of
[3] Pack & Process?
[4] A. Yes, she was.
[5] Q. And she went through the same process of --
[6] of filling out an employment application?
[7] A. Yes.
[8] Q. Do you know what position she held?
[9] A. She was a qual-- -- quality control
[10] technician.
[11] Q. Same as Maly Yan?
[12] A. Yes.
[13] Q. Okay. Other than Chan Yan and Maly Yan,
[14] are you aware of anybody else in their family
[15] that worked at Pack & Process?
[16] A. I believe the mother worked at -- at Pack &
[17] Process through the temporary agency as well.
[18] Q. She --
[19] A. From time to time. I don't know if she is
[20] always there.
[21] Q. Oeurn Mam. Does that sound familiar?
[22] A. I don't know how it's pronounced.
[23] Q. Okay. Were you aware of an individual by
[24] the name of Navy Yan who is a -- a younger

Page 138

[1] brother?
[2] A. Not -- not until the -- the accident.
[3] Q. And how about Maly Yan's father?
[4] A. Yes.
[5] Q. Yan Thou?
[6] A. Yes.
[7] Q. Are you aware that he was working at the
[8] factory?
[9] A. Yes.
[10] Q. Now, was he an individual who --
[11] A. For the temporary agency.
[12] Q. Okay. Just to clear that up because we're
[13] talking over each other, your understanding was
[14] that Yan Thou was provided through Lam Staffing
[15] to work at the factory?
[16] A. That's correct.
[17] Q. Was your understanding that for a period of
[18] time prior to the accident Yan Thou was a leader?
[19] A. That's correct.
[20] Q. And, again, we talked before about what
[21] leaders were, but just to sum it up, among other
[22] things, they were the individuals who were going
[23] to be driving the vans?
[24] A. That's correct.

Page 139

[1] Q. Did you ever have any direct contact with
[2] Yan Thou?
[3] A. Other than to say hello, no.
[4] Q. You -- had you ever seen him arrive at the
[5] factory in the van?
[6] A. Most likely, but I -- I can't say
[7] definitely. No -- I don't know that I've seen
[8] him arrive. They -- they got there fairly early.
[9] I may have seen him left -- leave.
[10] Q. Were you always made aware of the number of
[11] employees, number of temporary employees
[12] providing -- provided to your factory on any --
[13] any given day?
[14] A. No.
[15] MR. DEASEY: Objection to form.
[16] THE WITNESS: I'm sorry.
[17] MR. DEASEY: You can answer.
[18] THE WITNESS: No.
[19] BY MR. VAN NAARDEN:
[20] Q. So some -- some days you -- you wouldn't
[21] know how many of the temporary employees would be
[22] showing up?
[23] A. That's correct.
[24] MR. DEASEY: Again, objection to

Page 140

[1] form. You can answer.
[2] THE WITNESS: That's correct.
[3] BY MR. VAN NAARDEN:
[4] Q. Is there someone in your organization who
[5] would have known that information?
[6] A. Yes.
[7] Q. And who would that have been?
[8] A. The production supervisor.
[9] Q. And in June of '01, who would that have
[10] been?
[11] A. Sterling Newsome.
[12] Q. Okay. Traditionally, in -- in that area of
[13] time, in June of '01, when the van would get to
[14] the factory -- we're on the same page, right?
[15] You understand what I'm -- I'm asking you about
[16] the van, right? We're talking about the vans
[17] provided, as you say by Lam Staffing.
[18] A. Yes.
[19] Q. Traditionally, would Sterling Newsome
[20] there when they arrived?
[21] A. When you say there, I -- I presume he would
[22] be inside the plant doing whatever he had to be
[23] doing.
[24] Q. He would be present on -- on the premises?