# EXHIBIT D
# PART 2

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

**Page 141**

[1]   A.  Yes.

[2]   Q.  Did -- were you made aware of any

[3]  conversations that Sterling Newsome had with Yan

[4]  Thou relating to the transportation of workers

[5]  from their homes to Pack & Process?

[6]   A.  I was aware after the accident of an

[7]  alleged conversation.

[8]   Q.  All right. And I want to talk about that

[9]  in a little bit, but prior to the accident, were

[10]  you made aware of any conversations with New --

[11]  Sterling Newsome or any other Pack & Process

[12]  employee had with Yan Thou relating to

[13]  transportation of workers?

[14]   A.  No.

[15]   Q.  Did you have any conver- -- were you aware

[16]  of any conversations between Maly Yan and any

[17]  Pack & Process employee relating to the

[18]  transportation of -- of workers to and from?

[19]   A.  Could -- could you repeat that.

[20]   Q.  Sure. Were you aware, and this is all

[21]  pre-accident, were you aware of any conversations

[22]  between Maly Yan and a Pack & Process employee,

[23]  another Pack & Process employee, other than Maly

[24]  Yan, relating to the transportation of workers?

**Page 142**

[1]   A.  No, I was not aware of any conversation.

[2]   Q.  Did you -- were you aware of any side

[3]  agreements between Pack & Process and Maly Yan

[4]  whereby it was agreed upon that she would provide

[5]  transportation services?

[6]   A.  I'm aware of none.

[7]   Q.  Were you aware of any side agreement

[8]  between Pack & Process and Yan Thou whereby it

[9]  was understood that he would be providing

[10]  transportation services?

[11]   A.  That's -- that's a little fussy. Explain

[12]  that a little better.

[13]   Q.  Sure.

[14]        Were you aware of any side

[15]  agreement other than the --

[16]   A.  What is a side agreement?

[17]   Q.  Any -- anything orally or any written

[18]  document other than the agreement -- agreements

[19]  that we've been through and -- and relating to

[20]  transportation of services and Yan Thou?

[21]        MR. DEASEY: I will object to the

[22]  form. You can answer.

[23]        THE WITNESS: Without having thought

[24]  about this historically, I presume there is

**Page 143**

[1]  an agreement between Yan Thou and Lam Staff

[2]  as to how they are going to do this.

[3]  BY MR. VAN NAARDEN:

[4]   Q.  Right. And -- and my question was a little

[5]  different. My question was, were you aware of

[6]  any -- any type of agreement that you just talked

[7]  about between Pack & Process directly with Yan

[8]  Thou?

[9]   A.  There wouldn't have been any like that.

[10]   Q.  Okay. Now you talked about a conversation

[11]  that you were made aware of after the accident.

[12]        MR. DEASEY: Before you ask him

[13]  that, to the extent that you've heard about

[14]  any of this from counsel, you're not required

[15]  to divulge that. If you heard it from other

[16]  source you can answer the question.

[17]        THE WITNESS: You're talking about

[18]  a -- a perspective?

[19]        MR. DEASEY: Listen -- listen to the

[20]  question.

[21]  BY MR. VAN NAARDEN:

[22]   Q.  And before you answer I am going to preface

[23]  it by telling you this. I don't want to know

[24]  about conversations that had you with counsel,

**Page 144**

[1]  okay? That's privileged, and -- and I don't have

[2]  a right to it, and I don't want to know.

[3]        My question was, in -- in following

[4]  up on a previous answer that you gave that you

[5]  learned afterwards about a conversation that

[6]  occurred. Other --

[7]        MR. DEASEY: He said an alleged

[8]  conver - --

[9]  BY MR. VAN NAARDEN:

[10]   Q.  An alleged conversation that occurred, was

[11]  that something that was provided to you outside

[12]  of any discussions that you had with counsel?

[13]   A.  I'm a little lost. I'm not clear what

[14]  the -- what we're doing here.

[15]   Q.  Sure. You mentioned that -- that you were

[16]  made aware after the accident of alleged

[17]  conver- -- an alleged conversation that occurred

[18]  relating to transportation.

[19]   A.  Right.

[20]   Q.  All right. Was that -- were you made aware

[21]  of that conversation through counsel?

[22]   A.  I may have been made aware of that count --

[23]  that conversation through counsel, I'm not sure,

[24]  but I also know that I heard about it at work.

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 145

[1] After the accident.
[2] Q. All right. Tell me the circumstances
[3] for -- for which you heard about it at work?
[4] Where were you, who was in the room, what was
[5] discussed?
[6] A. Well, I -- I don't know that I know. I
[7] don't even know whether I heard it from count --
[8] I really don't know where I heard it. I'm -- I'm
[9] not sure of the -- of the -- of the origin of it.
[10] Q. Well, tell me -- tell me what was said?
[11] A. I heard that Cheryl told Maly Yan that she
[12] was going to have to work a night shift the
[13] following -- the following week, and that Maly
[14] said something to the effect that she had to take
[15] care of her children, or I'm not sure what she
[16] said, but there was something -- something there
[17] about she had to drive a van, and -- and Cheryl
[18] said, your job is not driving the van, your job
[19] is -- is -- is reporting to the shift for which
[20] you have to report, and I'm telling you, you have
[21] to report for night shift. Something to that
[22] effect.
[23] Q. Okay. Was it discussed, then, as best you
[24] could understand, from what you heard, I guess

Page 146

[1] secondhand from somebody else, was -- was part of
[2] the discussion talking about transportation of
[3] these temporary workers, or did it have to do
[4] just with transporting Maly Yan to work?
[5] A. No, I think it had to talk -- talked about
[6] driving the van with -- with temporary workers,
[7] although I'm not -- I -- I don't know what I was
[8] told at that point. I -- you know, I don't want
[9] to --
[10] Q. That's fine.
[11] A. I don't want to make a statement that --
[12] that is not correct.
[13] Q. Okay.
[14] A. But there was some conversation about
[15] driving a van, and there was some conversation of
[16] that's not your job, your job is quality control
[17] technician, you got to show up for the shift that
[18] I assign you to.
[19] Q. Prior to the accident, were you made aware
[20] of the fact that Yan Thou's driver's license had
[21] been suspended?
[22] A. No.
[23] Q. Did -- did New -- Sterling Newsome ever
[24] convey to you that he learned prior to the

Page 147

[1] accident that Yan Thou's driver's license had
[2] been suspended?
[3] A. No, nor do I know that he knew.
[4] Q. Okay. Has that -- has that ever been a
[5] topic of discussion between yourself and any of
[6] your employees --
[7] A. No.
[8] Q. -- relating to the fact that Yan Thou
[9] driver's license had been suspended?
[10] A. No.
[11] Q. Did you ever receive a telephone call from
[12] David Thach, or were you ever approached by David
[13] Thach relating to Yan Thou and him having had a
[14] suspended license?
[15] A. No.
[16] Q. Tell me how you first learned about the
[17] accident in -- on June 18th of 2001?
[18] A. I'm not positive, but my best recollection
[19] is that Sterling Newsome called me up.
[20] Q. And what -- what did he tell you?
[21] A. He said there had been a -- a serious
[22] accident, and they were down at Christiana. And
[23] he was pretty upset, and suggest -- suggested
[24] that I might want to come down there.

Page 148

[1] Q. And do you know if this was the same day as
[2] the accident?
[3] A. It's the -- it was -- it was the evening of
[4] the accident.
[5] Q. And did you go down to the hospital?
[6] A. Yes, I did.
[7] Q. All right. And what did you learn when you
[8] got to the hospital?
[9] A. Excuse me. I'm not sure what I learned.
[10] It was massive confusion. Nobody really knew too
[11] much of what was going on. There was a
[12] tremendous, tremendous language barrier.
[13] Obviously, for very good reasons, some people
[14] were very upset about loss, and people getting
[15] hurt, and -- and it was just -- it was just, you
[16] know, just a horrible, horrible, sad scene.
[17] And -- and I don't know that we had too many
[18] facts. There were just -- there were just
[19] questions all over the place, what happened, and
[20] I don't know that they were getting any answers.
[21] Q. Did you have any con--- direct contact
[22] with any of the occupants of the 15 passenger van
[23] that was involved in the accident?
[24] MR. DEASEY: That -- you mean that

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 149

[1]     day?
[2]     BY MR. VAN NAARDEN:
[3]   Q.   That day when you were at the hospital.
[4]   A.   When you -- when you say con- -- did you
[5]   say contact?
[6]   Q.   Yes.
[7]   A.   Did I speak to any?
[8]   Q.   Speak to anybody, sure.
[9]   A.   I'm not sure. Most of them were not
[10]  available to be seen. I think I saw one or two
[11]  people being wheeled someplace, and I think I
[12]  spoke to some relatives, but to tell you the
[13]  truth, it was chaos. I mean, I -- I can't convey
[14]  what was going on there.
[15]  Q.   How long did you spend at the hospital?
[16]  A.   I really -- I -- I would guess three or
[17]  four hours.
[18]  Q.   And...
[19]  A.   I mean, they couldn't even get -- they
[20]  couldn't even get names for who -- who was in
[21]  a -- in a -- in a bed. It was -- it was a
[22]  horrible situation.
[23]  Q.   Did anybody, whether it be medical
[24]  personnel or police, ask to speak with you when

Page 150

[1]   you were there at the scene on that day?
[2]   A.   I don't think so.
[3]   Q.   All right. At some later date did anybody,
[4]   any official seek you out to ask you questions
[5]   relating to this accident?
[6]   A.   I don't think so. I -- I -- I'm not
[7]   positive, but I don't think so. Wait a -- wait a
[8]   second. Yeah. Delaware Division of Labor came a
[9]   knocking on my door.
[10]  Q.   And -- and when was that in relation to the
[11]  date of the accident?
[12]  A.   A couple of days later.
[13]  Q.   And what did they say to you when they --
[14]  they -- they knocked on your door at home?
[15]  A.   No. I'm sorry.
[16]  Q.   Okay.
[17]  A.   At the -- at the plant.
[18]  Q.   Okay. And what did they -- what did they
[19]  say to you when -- when they came in?
[20]  A.   Well, there -- there needs to be a little
[21]  explanation first.
[22]  Q.   Please.
[23]  A.   At the time of the accident there was
[24]  between ten and $20,000 flying around loose on

Page 151

[1]   the -- on the highway, and there were some
[2]   newspaper stories right away about questioning
[3]   what was all this money back -- what was all this
[4]   money about, and there was the, I think, there
[5]   were some allegations that maybe we were paying
[6]   cash and -- and that this was an under-the-table
[7]   kind of operation. I -- I know there was one --
[8]   one newspaper guy who was giving us a very bad
[9]   time about the whole thing.
[10]  And in that -- in that situation,
[11]  you know, when -- when -- when there was some
[12]  question, you know, how were these people being
[13]  paid, who they are working at, why didn't we know
[14]  their names, why didn't we know -- all these
[15]  questions the -- the department of labor came a
[16]  knocking, as I said.
[17]  And they asked to see our records.
[18]  Q.   Okay. And -- and did -- did you comply?
[19]  A.   Yes. First, I explained the situation that
[20]  the people in -- in this account for the most
[21]  part were not my employees, they were members of
[22]  a temporary agency. That the driver of the van
[23]  and her sister were employees, but the rest were
[24]  not employees.

Page 152

[1]   And they asked to see our records,
[2]   and they checked our records for a couple of days
[3]   and -- and, you know, at the end of -- of the
[4]   investigation we had an excellent interview, and
[5]   I was told that everything is perfectly fine.
[6]   Q.   Do you know the name of the department of
[7]   labor individuals who came knocking at your door?
[8]   A.   I -- I knew it, and I -- but I don't
[9]   remember it at this point.
[10]  Q.   Okay. Did you ever get a letter in the
[11]  mail from the department of labor indicating that
[12]  you -- you had been cleared of any wrongdoing?
[13]  A.   No.
[14]  Q.   In addition to the department of labor,
[15]  were you contacted by any other -- any other
[16]  official entity in relation to the June 18th
[17]  accident?
[18]  A.   We were contacted by a fellow with the --
[19]  with the name Peter Gunn. And he was out of
[20]  Philadelphia, and I -- I forget what agency he
[21]  worked for, but it was something with the
[22]  implication of racketeering.
[23]  Q.   Was it the IRS?
[24]  A.   No.

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

---

**Page 153**

[1] **Q.** Okay. And what did he tell you?

[2] **A.** He said that he was doing an investigation

[3] of temporary agencies and wanted some

[4] information. And I -- I talked with him. And

[5] then he said he was going to subpoena, you know,

[6] the records of -- of -- of the people that we

[7] were using and then how we paid them, so forth

[8] and so on. And he did, and we gave him our

[9] records.

[10] **Q.** Did you ever hear from him again?

[11] **A.** I had to track him down to see if we could

[12] get our records back, and my understanding -- I

[13] forget what I was told, that he is no longer

[14] on -- on it, and, basically, they weren't

[15] focusing on -- on Suasaday, but some other guys,

[16] and that was the end of it.

[17] **Q.** The records that you gave over to whatever

[18] this entity was, had you made copies to retain?

[19] **A.** No. They were massive. There were massive

[20] amount of records. I mean, you see what happens

[21] from this pile was, what, eight, ten weeks, and

[22] we had, you know, they were asking for three,

[23] four, five years. We didn't -- and we didn't

[24] have the ability to start making copies of

---

**Page 154**

[1] that -- of that.

[2] **Q.** Do you believe that there were documents

[3] that you gave to whatever the entity this is,

[4] that relates to Lam Staffing and Maly Yan that --

[5] **A.** I don't think so.

[6] **MR. DEASEY:** Let him finish.

[7] **BY MR. VAN NAARDEN:**

[8] **Q.** That you -- that you just don't have

[9] anymore?

[10] **A.** I don't know. I think it was mostly

[11] earlier stuff.

[12] **Q.** Earl- -- earlier before Maly Yan was an --

[13] **A.** Yes.

[14] **Q.** -- employee?

[15] **A.** No. Earlier before the accident situation.

[16] **Q.** Okay. But relating to Lam Staffing?

[17] **A.** Well, it was really before I -- I believe

[18] it was before Lam Staffing, but I'm not -- I'm

[19] not really sure. I think we may have gotten --

[20] made a copy of those records because we knew we

[21] would need those, but I -- I think whatever it

[22] was -- it -- it really is a massive amount of

[23] records, but they're all the same thing. They're

[24] all the same -- same as -- as -- as this

---

**Page 155**

[1] calculation.

[2] **Q.** Other than the entities that we've just

[3] discussed, any other official entity that -- that

[4] contacted you relating to the June 18th, 2001

[5] accident?

[6] **A.** Not -- none that I recall. It could have

[7] been somebody else, but not that I recall.

[8] **Q.** Do you recall ever being contacted by the

[9] IRS relating to the accident?

[10] **A.** I don't believe so, no.

[11] **Q.** How about INS?

[12] **A.** I don't believe so either.

[13] **Q.** Okay.

[14] **A.** There wasn't a problem with INS. I mean,

[15] it's -- it's -- I think in that whole car I think

[16] there was one person who was -- who was not a

[17] legitimate person in the United States. And we

[18] had -- we had been checking their records

[19] periodically to make sure that they were doing

[20] their homework on making sure that people are

[21] properly set up to work in the States.

[22] **Q.** This is -- this is Lam -- you were actually

[23] going and looking at Lam Staffing's documents?

[24] **A.** We were asking them to bring them in. We

---

**Page 156**

[1] never went to their offices.

[2] **Q.** Are you aware of any -- any Pack & Process

[3] employee ever going into Lam Staffing's business?

[4] **A.** No.

[5] **Q.** Who would have been the individual who --

[6] in at Pack & Process would have been reviewing

[7] that stuff?

[8] **A.** Either Steve Eslinger or Mina Dobson.

[9] **Q.** Okay. You talked about the fact that there

[10] was an issue of this flying cash after the

[11] accident. As you sit here today, do you have an

[12] understanding as to how that cash came to be -- I

[13] mean, I understand it was part of the accident

[14] and it -- and it was -- was strewn around, but do

[15] you have an understanding as to why there was

[16] that amount of cash in that van?

[17] **A.** Yes.

[18] **Q.** And -- and what is your understanding of

[19] it?

[20] **A.** That some of the -- some of the individuals

[21] didn't trust banks and would carry their savings

[22] around in a money belt. And when they were

[23] thrown from the van -- van, the money belts came

[24] off and -- and there was cash on the road.

---

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 157

[1] Q. Other than the explanation that you just
[2] gave us, you've never been given an alternative
[3] explanation as to why that amount of -- of money
[4] was on the bus, or the van?
[5] A. No.
[6] Q. Did you ever observe David Thach paying
[7] these workers, these -- these temporary workers
[8] in cash --
[9] A. No.
[10] Q. -- on -- on the premises?
[11] A. No.
[12] Q. Do you know if Newsome Sterling or anybody
[13] from your corp -- corporation in addition to the
[14] checks that made were paid to Lam Staffing, paid
[15] him cash on the side?
[16] A. No. What -- what are you saying?
[17] Q. I'm saying, you -- you agree with me that
[18] you gave checks --
[19] A. Yes.
[20] Q. -- to Lam Staffing, correct?
[21] A. Right.
[22] Q. And my question was, in addition to the
[23] checks that you gave to Lam Staffing, did you
[24] also give them any cash on the side?

Page 158

[1] A. Never.
[2] Q. Okay. You -- you currently have -- have
[3] an -- an insurance -- well, you did at the time,
[4] had an insurance policy through Saint Paul,
[5] correct?
[6] A. Correct.
[7]      MR. DEASEY: Saint Paul Mercury.
[8] BY MR. VAN NAARDEN:
[9] Q. Saint Paul Mercury. And there are actually
[10] two policies. There is an auto policy and there
[11] is a general liability commercial policy,
[12] correct?
[13] A. Well, actually in that year I think they
[14] combined. Which -- which year are you talking
[15] about?
[16] Q. I'm talking the -- the date covering this
[17] accident.
[18] A. I -- I sensed that they were combining the
[19] package in that -- in that one year.
[20] Q. So there -- there were both policies
[21] contained in one?
[22] A. That's my recollection. It could be wrong.
[23]      MR. DEASEY: I think what he said
[24] was both coverages were contained in the

Page 159

[1] primary policy, and then there was an excess
[2] policy above that. I think that's the way it
[3] worked.
[4] BY MR. VAN NAARDEN:
[5] Q. Is that your understanding of it?
[6] A. Yes.
[7] Q. Was there a particular agent that you had
[8] contact with relating to the insurance contracts
[9] through Saint Paul Mercury?
[10] A. Yes.
[11] Q. Is the name Jeff Frock, does that sound
[12] familiar?
[13] A. No.
[14] Q. Who -- who is the individual that you
[15] normally contacted with from Saint Paul Mercury?
[16] A. Oh, from Saint Paul. I thought you were
[17] talking about my insurance agent.
[18] Q. Oh. Well, first of all, who is your
[19] insurance agent?
[20] A. Ted Zutz.
[21] Q. And where -- where is he through?
[22] A. The Zutz Agency.
[23] Q. Z-U?
[24] A. T-Z.

Page 160

[1] Q. Okay. Now, the follow-up question. Is
[2] there someone from Saint Paul Mercury that you've
[3] had contact with relating to this accident?
[4] A. Yes, but I -- I don't recall that Frock
[5] name, although it sits -- it sits in the back --
[6] sits in the back of my mind somewhere. That may
[7] have been one of the first guys that I talked
[8] with down in Baltimore, but I -- I -- it's -- I
[9] don't really remember that name too well.
[10] Q. Okay.
[11]      Prior to the June accident, did you
[12] have any direct contact with any Saint Paul
[13] Mercury employee?
[14] A. I believe that they came around for a
[15] normal... what did we call it? Review. You
[16] know, what can you do, what can you do better.
[17] You know, how can we reduce risk, etcetera,
[18] etcetera, etcetera.
[19] Q. Other than that initial walk-through, was
[20] there any contact with any Saint Paul Mercury
[21] employee prior to the June accident?
[22] A. That's -- that's all I recall was those --
[23] those -- then somebody coming in on an audit
[24] basis and checked that. And I may say hello to

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

---

**Page 161**

[1] them, but I was not directly involved with that.
[2]          COURT REPORTER: Coming in?
[3]          THE WITNESS: In on a -- for an
[4] audit.
[5]          MR. DEASEY: Audit.
[6]          THE WITNESS: An annual audit. But I
[7] was not directly involved with that.
[8] BY MR. VAN NAARDEN:
[9]     Q.   Were you contacted by Ted Zutz after this
[10] June accident relating to your insurance
[11] policies?
[12]    A.   I'm not sure what you're asking.
[13]    Q.   Sure. My question was, did Ted -- did Ted
[14] Zutz contact you and/or did you contact Ted Zutz
[15] after you learned of this accident?
[16]    A.   I contacted Ted Zutz, I'm pretty sure.
[17]    Q.   And -- and when -- when did you contact Ted
[18] Zutz?
[19]    A.   If not that day, then the next.
[20]    Q.   Well, what was your intention in -- in
[21] notifying Ted or calling Ted?
[22]    A.   Well, I'm pretty clear I have an obligation
[23] to let the insurance company know that -- that an
[24] accident occurred. So I would call Ted to give

---

**Page 162**

[1] that -- to give that notice.
[2]    Q.   What did you tell Ted?
[3]    A.   I don't recall that conversation. I'm sure
[4] I informed him there was an accident, a serious
[5] one. With certain -- with several people were
[6] killed, in which it was not my van, but one, the
[7] driver was -- was my employee and somebody else
[8] on the -- somebody else in the van was my
[9] employee as well.
[10]    Q.   And do you recall what, if anything, he
[11] said to you? Generalities. I understand you
[12] can't remember exact conversations.
[13]    A.   He was kind of amazed at the whole
[14] situation. You know, he's a fairly -- fairly
[15] experienced fellow, and he said this is, you
[16] know, just a -- just a -- it's a bizarre case in
[17] where if they're telling the truth there is no
[18] coverage; if they lie there is coverage. It's
[19] kind of a strange situation.
[20]    Q.   What did -- what did you take that to mean,
[21] if they lie there is coverage; if they don't lie
[22] there is coverage?
[23]    A.   To tell you the truth, the explanation was
[24] a little technical for me.

---

**Page 163**

[1]    Q.   Okay.
[2]    A.   I knew what he was talking about, but it
[3] had something to do -- but I knew what he was
[4] saying in -- in the implication, but I really
[5] didn't understand the technical aspect of it.
[6] But, obviously, we're not covered if somebody is
[7] punched out and driving a van.
[8]    Q.   Okay.
[9]    A.   But if they say that they are working with-
[10] in the scope of their employment, then they would
[11] be covered. So it was -- it was really an ass-
[12] backwards kind of a situation.
[13]    Q.   And the explanation that you just gave,
[14] that -- that was your understanding of -- of what
[15] Ted meant?
[16]    A.   That's my explanation. By the way, I
[17] wouldn't -- you know, that could be wrong,
[18] because it's not my field.
[19]    Q.   And I understand that. I'm just asking for
[20] what you understood.
[21]          Did Ted tell you what he was going
[22] to do with the information that you gave him
[23] about the accident?
[24]    A.   He was going to notify Saint Paul.

---

**Page 164**

[1]    Q.   Did he tell you who exactly he would be
[2] contacting at Saint Paul?
[3]    A.   I -- I don't remember if he told me or not,
[4] no.
[5]    Q.   I'm sorry.
[6]          After that initial conversation,
[7] did you have any follow-up conversations with Ted
[8] about this accident?
[9]    A.   Well, I think -- I think the next thing
[10] that happened is that Saint Paul denied the claim
[11] because it wasn't our employee. You know, she
[12] wasn't acting in the scope of employment.
[13]    Q.   Did they send you like a letter saying
[14] that, or was that --
[15]    A.   I think there was a form letter that came
[16] in, yes, that denied coverage.
[17]    Q.   And was it your understanding that they
[18] denied coverage because they said she wasn't
[19] working as one of your employees at the time she
[20] was injured, we're not covering it?
[21]          MR. DEASEY: Objection to form.
[22] You can answer.
[23]          THE WITNESS: Something along those
[24] lines. Once, again, it's -- it's -- it gets

---

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 165

[1] a little technical.
[2] BY MR. VAN NAARDEN:
[3] Q. Okay. Did you -- when -- when you received
[4] that type of notification that they were denying
[5] the claim, did you do anything to follow up on
[6] it, or did you just accept what they told you,
[7] and -- and we're to move on, or something
[8] different?
[9] A. I -- I believe that Ted said that -- that
[10] he would talk with them and make sure they
[11] understood what the circumstance was, and then --
[12] and then I knew -- I knew at one point that
[13] Saint -- Saint Paul was involved in -- in -- in
[14] the claim.
[15] Q. When you say they were involved in the
[16] claim, what was your understanding of their
[17] involvement?
[18] A. Well, they were going to -- they were going
[19] to defend Pack & Process in the situation.
[20] Q. At this point in time were you made
[21] aware -- when you had these conversations with
[22] Ted and you were notified that they were denying
[23] the claim, were you made aware of any lawsuit or
[24] any litigation that had been initiated as a

Page 166

[1] result of the accident?
[2] A. This was within the first weeks. I don't
[3] think the lawsuit showed up until two years
[4] later.
[5] Q. Okay. At some point, were you contacted
[6] directly by an individual from Saint Paul Mercury
[7] after the accident?
[8] A. I -- I may have been. I don't recall.
[9] Q. Was there any type of internal
[10] investigation that was done either on your
[11] behalf, or on -- on behalf of Saint Paul Mercury
[12] relating to this accident?
[13] A. Not that I know of.
[14] Q. Did -- was there ever a representative from
[15] Saint Paul Mercury that came to the plant to
[16] interview any of your employees?
[17] A. I don't recall that ever happening.
[18] Q. Is Ted Zutz part of Harry David Zutz
[19] Insurance, Incorporated?
[20] A. Yes.
[21] Q. Was -- was Maly -- I'm sorry, was Yan Thou
[22] ever authorized by Pack & Process to use any of
[23] the forklift...
[24] A. Yes.

Page 167

[1] Q. ... equipment?
[2] Now, was Maly Yan ever authorized
[3] to do such?
[4] A. Not that I know of.
[5] Q. Since the filing of the -- the initial
[6] lawsuit, did you have any further discussions
[7] with any -- anybody at Saint Paul Merculy --
[8] Merc -- Mercury relating to initiation of a
[9] litigation?
[10] MR. DEASEY: Can you answer that
[11] other than when counsel was present?
[12] BY MR. VAN NAARDEN:
[13] Q. Yeah. I don't -- I don't want to know what
[14] counsel said.
[15] MR. DEASEY: Yeah.
[16] THE WITNESS: Not that I recall.
[17] (Whereupon Exhibit Ames-9 was
[18] marked for identification.)
[19] BY MR. VAN NAARDEN:
[20] Q. I think we're up to 9. I'm going to show
[21] you a letter, or it's really a memo, I think, to
[22] Maly Yan from yourself. Is that accurate?
[23] A. Yes. It's to Maly Yan from me.
[24] Q. And when is it dated?

Page 168

[1] A. July 27th, 2001.
[2] Q. It's approximate -- a little over a month
[3] after the accident, correct?
[4] A. That's correct.
[5] Q. All right. Can I have that back for a
[6] second?
[7] A. Sure.
[8] Q. This -- this memorandum, is that something
[9] that you produced?
[10] A. When you say produced, do you type it --
[11] type it --
[12] Q. Did you -- did you type it up?
[13] A. I may have. I don't know the answer to
[14] that. I -- I think I did.
[15] Let me -- let me just see it.
[16] Q. Sure. Absolutely.
[17] A. I'm not -- I think so. Just looking at
[18] this I think so. Because that's -- I think
[19] that's my -- my memo head.
[20] Q. So you believe you typed it?
[21] A. I believe so.
[22] Q. Okay. Um...
[23] A. I'm not positive, though.
[24] Q. Okay. Now was there something that

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

**Page 169**

[1] prompted you to -- to type up this document? Is
[2] there some reason behind it?
[3] **A.** Yes.
[4] **Q.** What was the reason behind it?
[5] **A.** Well, when I found out that Maly Yan had
[6] driven the van, was driving -- had driven, or was
[7] driving the van, whatever the circumstance was, I
[8] was not real happy, and -- you know, because it
[9] put Pack & Process at a risk that -- that I
[10] didn't want to be close to.
[11]     Now, she had gotten hurt and she
[12] absolutely suffered a horrible, horrendous
[13] tragedy. Apparently she was looking for work,
[14] and I wanted -- you know, wanted to encourage her
[15] to come back, but part of her coming back I
[16] wanted her to understand that Pack & Process
[17] didn't want her having any part of driving people
[18] around. She had a right to do it, but Pack &
[19] Process simply did not want to have any part of
[20] that. And this memo was -- was an effort to make
[21] that clear.
[22] **Q.** Did you get any -- any guidance from
[23] anybody at Pack & Process, or from any other
[24] source in coming up with the language for that

**Page 170**

[1] let- -- memo?
[2]     **MR. DEASEY:** Other than counsel?
[3]     **MR. VAN NAARDEN:** Other than counsel.
[4]     **THE WITNESS:** No, not from anybody
[5]     else at Pack & Process.
[6] **BY MR. VAN NAARDEN:**
[7] **Q.** Had you been -- without giving me the
[8] contents of any conversations with counsel, prior
[9] to drafting this letter, did you meet with
[10] counsel?
[11] **A.** You mean specifically for this letter?
[12] **Q.** Sure.
[13] **A.** I don't know. I don't think so, but I
[14] don't know.
[15] **Q.** The language that is contained in -- in
[16] this memo, it's yours? That's your wordage?
[17] **A.** I have no reason to believe it's not.
[18] **Q.** And -- and you came up with these five
[19] different numbers and the corresponding
[20] statements?
[21] **A.** I believe so. I may have -- I may have
[22] talked with counsel, but I don't know. But it
[23] doesn't look -- it doesn't look like it wreaks of
[24] legalese to me.

**Page 171**

[1] **Q.** Okay. It says to Maly Yan, correct?
[2] **A.** Right.
[3] **Q.** Initially it was spelled, M-A-L-I, correct?
[4] Then it was corrected?
[5] **A.** Yep.
[6] **Q.** All right. Did you make that correction?
[7] **A.** I don't know.
[8] **Q.** Does it look like your Y?
[9] **A.** No, it doesn't really.
[10] **Q.** If you actually had typed out that
[11] document, is -- is that a mistake that you think
[12] you would have made?
[13] **A.** It could be.
[14] **Q.** Okay.
[15] **A.** For the first two years I thought it was,
[16] M-O-L-L-Y.
[17] **Q.** Okay. Maly Yan signed that, correct?
[18] **A.** Yes.
[19] **Q.** Did she sign it in your presence?
[20] **A.** Yes.
[21] **Q.** Was anybody else present when she signed it
[22] in front of you?
[23] **A.** Yes.
[24] **Q.** Who else was there?

**Page 172**

[1] **A.** Steve Eslinger.
[2] **Q.** Was that document signed on Pack & Process
[3] property?
[4] **A.** Yes.
[5] **Q.** How is it that Maly Yan ended up back at
[6] the factory so soon after the accident?
[7] **A.** That I can't tell you.
[8] **Q.** Did you actually call her and ask her to
[9] come in specifically to have her review --
[10] **A.** I don't believe so.
[11] **Q.** -- this?
[12] **A.** I don't believe so, no.
[13] **Q.** Do you know if she was back working that
[14] day?
[15] **A.** That day, no, but I know she worked either
[16] that day and/or the next day. She worked for a
[17] couple of days and then didn't come back, she was
[18] too saddened by the whole thing.
[19] **Q.** In your letter it says, and you will agree
[20] with me it says, as we discussed yesterday, we
[21] are glad to have you returned after that most
[22] unfortunate accident, correct?
[23] **A.** Yes.
[24] **Q.** Did you have a conversation with her the

B&R Services for Professionals, Inc.

Min-U-Script®

(43) Page 169 - Page 172

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 173

[1] day before?
[2] A.   I must have, yes.
[3] Q.   Do you remember that conversation?
[4] A.   Not really.
[5] Q.   Would that have been a conversation over
[6] the phone, or a conversation in person?
[7] A.   I don't know.
[8] Q.   Had you act -- actually conversed with Maly
[9] Yan?  You actually talked to her before?
[10] A.   You're talking about before this accident?
[11] Q.   Well, let's -- at any time, do you recall
[12] ever having a conversation?
[13] A.   Oh, sure.  Sure.
[14] Q.   All right.
[15] A.   A conversation, hi, how are you,
[16] Q.   Okay.  Okay.  Have you ever -- other than
[17] the --
[18] A.   And -- and -- and there were some times
[19] when -- when there was some quality issues that I
[20] remember discussing.
[21] Q.   And did you believe that she was able to
[22] adequately understand English?
[23] A.   Oh, absolutely.
[24] Q.   You -- you didn't feel there were any

Page 174

[1] problems in -- in her understanding what you were
[2] saying?
[3] A.   No.  She spoke English well and she
[4] understood it well.  As a matter of fact, her
[5] application said that.
[6] Q.   Was -- was she able to adequately express
[7] to you in English so that you could understand
[8] her?
[9] A.   How did -- it was -- she spoke English very
[10] well.  I mean, sometimes I had problems with --
[11] with -- sometimes, I always had problems with --
[12] with Suasaday or David Thach, but Maly spoke very
[13] nicely.
[14] Q.   This -- this type of memorandum, was
[15] this -- at least the contents of it, telling her
[16] what she is not to be doing, was -- was this the
[17] first time you had ever generated this -- this
[18] type of document?
[19]        What I'm asking is, had you ever
[20] asked any of your other employees to sign a
[21] memorandum like this?
[22] A.   Yes.
[23] Q.   You did?
[24] A.   Yeah.

Page 175

[1] Q.   Is that before the June accident you had
[2] had other employees sign documents like this?
[3] A.   No, but if you go back to those
[4] applications, almost every application has about
[5] four or five different lists of things that they
[6] have to do to -- to work at Pack & Process, and
[7] it's very similar for that sort of thing.
[8] Q.   Okay.  I'm -- I'm -- I'm confused.  And --
[9] and --
[10] A.   Just, for instance, I am making things up
[11] now, these are true things, but you may not bring
[12] glass bottles into the plant.  You may not wear
[13] open-toed shoes.  You may not do such and such.
[14] There is a whole list of things that we used to
[15] have, and inside the five or six different
[16] sheets.
[17] Q.   Okay.  Can we have -- can I have that?
[18]        MR. DEASEY:  Do you want it?
[19]        MR. VAN NAARDEN:  Thanks.
[20]        THE WITNESS:  Thank you.
[21] BY MR. VAN NAARDEN:
[22] Q.   In looking at Maly Yan's employment
[23] contract, the second one in February 3rd --
[24]        MR. DEASEY:  Application.

Page 176

[1] BY MR. VAN NAARDEN:
[2] Q.   Application of February 13th of '01, are
[3] there any such limitations explicitly stated in
[4] the application?
[5] A.   No, but I think -- I think there -- if you
[6] look at the first one I think you will find there
[7] is -- there is.
[8]        MR. DEASEY:  Seven.
[9]        THE WITNESS:  Okay.
[10] BY MR. VAN NAARDEN:
[11] Q.   You -- you -- you believe that there is in
[12] the first contract?
[13] A.   Yeah, because I saw it yesterday.
[14]        Is this the first one?  Yeah.  This
[15] is not a complete copy.  Is this the one that you
[16] had yesterday?
[17]        MR. DEASEY:  I don't know.
[18] BY MR. VAN NAARDEN:
[19] Q.   Do you believe that there are pages missing
[20] from that document?
[21] A.   Yes.
[22] Q.   All right.  So what has been identified as
[23] Ames-7, you believe is missing --
[24] A.   Well, put it this way, there are other

St. Paul Mercury Insurance Company, et al v.                                         Steven Ames
Maly Yan, et al                                                                     June 27, 2006

---

Page 177

[1] parts to that -- to that --
[2]          MR. DEASEY: Let him finish his
[3]      question.
[4] BY MR. VAN NAARDEN:
[5] Q.   My question was, that when you look at
[6] Ames-7 my question was, do you believe there is a
[7] company -- accompanying documentation that is not
[8] contained in what I've presented to you as
[9] Ames-7?
[10] A.   Yes.
[11] Q.   And -- and what would that be?
[12]          MR. DEASEY: Can we go off the
[13]     record?
[14]          MR. VAN NAARDEN: Sure.
[15]          VIDEO TECHNICIAN: Off the record.
[16]     2:35.
[17]          (Whereupon a discussion was held off
[18]     the record.)
[19]          VIDEO TECHNICIAN: On the record.
[20]     2:38.
[21] BY MR. VAN NAARDEN:
[22] Q.   Mr. Ames, I was asking you if you believe
[23] that there is additional documentation that
[24] should be attached to Ames-7, and the application

---

Page 178

[1] for employment dated July of '98 that is not
[2] here.
[3] A.   Yes.
[4] Q.   And what -- what is missing?
[5] A.   There is a series of about four or five
[6] pages with lists that were formulated back in the
[7] '60s, '70s and '80s of things, rules -- plant
[8] rules.
[9]          MR. DEASEY: Well, he's asking you
[10]     as part of the application, or in her
[11]     employment file.
[12]          THE WITNESS: Yeah, right. Yeah, it
[13]     would have been there. And I think I saw it
[14]     yesterday, so...
[15]          MR. DEASEY: Yeah, but I think having
[16]     produced the entire employment file, and I
[17]     think it's in the employment file. Whether
[18]     or not it was attached to the affidavit or
[19]     not --
[20]          THE WITNESS: That horribly written,
[21]     negatively stated rules. If you come across
[22]     it you will know it.
[23] BY MR. VAN NAARDEN:
[24] Q.   Okay. And -- and contained in -- in

---

Page 179

[1] those -- whatever -- whatever it is that you want
[2] to term them, are there -- do you believe that
[3] there was something corresponding to telling Maly
[4] Yan that she was not to be driving a vehicle?
[5] A.   No.
[6] Q.   Okay.
[7] A.   That's not the question you asked.
[8] Q.   I know. I understand it wasn't, but that
[9] is my follow-up question. So -- so you don't
[10] believe that in any of documents relating to Maly
[11] Yan it told her not to drive?
[12] A.   That's correct.
[13] Q.   All right. Have you ever sent a -- a memo
[14] to any of your employees explicitly telling them
[15] that it is not -- other than Maly Yan on this
[16] date, that it is not a condition of your
[17] employment here in -- in talking about her
[18] driving to and from the factory, have you ever
[19] done that other than what -- what you did --
[20] A.   No.
[21] Q.   -- for Maly Yan?
[22]          All right. When you drafted this
[23] document -- well, just tell me -- tell me the
[24] reason -- tell me why you felt it necessary to

---

Page 180

[1] have Maly Yan sign this?
[2] A.   Well, it was to stop her for driving a van
[3] the next day under -- under the same
[4] circumstances. I didn't want any responsibility
[5] for that.
[6] Q.   Okay.
[7] A.   And shouldn't have any responsibility for
[8] it. And when I say I, I am talking about Pack &
[9] Process.
[10] Q.   I understand.
[11]          Was part of the reason why you
[12] drafted this document is that you anticipated
[13] that there might be future litigation arising out
[14] of Maly's driving the van?
[15] A.   I can't tell you what I was thinking, but
[16] that's certainly a possibility.
[17]          (Whereupon Exhibit Ames-12 was
[18]     marked for identification.)
[19] BY MR. VAN NAARDEN:
[20] Q.   I think I asked you before, but I used the
[21] name Jeff W. Frock from Saint Paul Mercury
[22] Insurance Company. Do you ever remember having
[23] any conversations with him?
[24] A.   Is he from Baltimore?

---

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 181

[1] Q. He is a claims specialist, and he is from
[2] Baltimore in that Saint Paul Mercury Insurance
[3] Company.
[4] A. I -- I may have had a conversation with
[5] him.
[6] Q. Okay. I am going to, as Exhibit-12, show
[7] you a letter dated March 13th of 2003. It's to
[8] you and it's from Jeff Frock. Do you remember
[9] getting that letter?
[10]    Take your time.
[11] A. Yes, I recall this.
[12] Q. Okay. Do you recall having any
[13] conversations with anybody from Saint Paul
[14] Mercury prior to getting that letter?
[15] A. I -- I really can't -- can't remember.
[16] Generally speaking, I didn't speak directly
[17] with -- with Saint Paul, I would speak with Ted
[18] Zutz.
[19] Q. Do you recall having any conversation with
[20] Ted Zutz relating to the insurance coverage
[21] issue?
[22] Q. Was he copied this?
[23] Q. He is.
[24] A. I'm sure I let him know.

Page 182

[1] Q. He is. He is copied on it.
[2] A. Yeah.
[3] Q. But I'm talking about prior to getting the
[4] letter, did you remember talking to Ted relating
[5] to the coverage issues?
[6] A. I remember, yes. Generally speaking, I
[7] remember discussing coverage issues.
[8] Q. You will agree with me that -- that in that
[9] letter from Saint Paul Mercury it's basically a
[10] denial of coverage?
[11]    MR. DEASEY: Objection. It's
[12]    actually not, but...
[13]    COURT REPORTER: I'm sorry?
[14]    MR. DEASEY: It's a reservation of
[15]    rights letter is what it is.
[16]    I don't mean to testify for the
[17]    witness, but I think it asks for a legal
[18]    conclusion, but I think the first page of the
[19]    letter says what it is.
[20] BY MR. VAN NAARDEN:
[21] Q. All right. At the time that you got this
[22] letter, had Saint Paul Mercury, or anybody on
[23] their behalf, conducted -- conducted any
[24] investigation that you were aware of into the

Page 183

[1] issues surrounding the accident?
[2] A. When you say investigation, what does that
[3] mean?
[4] Q. Had they interviewed any of your employees?
[5] A. I don't recall that happening.
[6] Q. Did they talk to you specifically?
[7] A. There was conversations as to what
[8] happened, yes. I don't remember when or where,
[9] but there were.
[10] Q. Were there questions regarding agency,
[11] whether Maly Yan was working for you at the time
[12] of the accident?
[13] A. I -- I really -- I really don't remember
[14] those conversations very well.
[15] Q. At any -- at any time after you received
[16] that letter, was there any investigation done on
[17] behalf of Saint Paul Mercury?
[18] A. By investigation, you mean -- you mean,
[19] once again, talking to my employees?
[20] Q. Talking to your employees or --
[21] A. I don't recall them ever doing that. I
[22] could be wrong, but that, I don't recall it.
[23] Q. At some point you signed an -- an affidavit
[24] relating to this matter, correct? Do you recall

Page 184

[1] signing -- signing an affidavit?
[2] A. I don't recall, but I'm not saying that I
[3] don't -- I don't...
[4] Q. That's okay.
[5]    That's Ames-15. I am going to have
[6] you look at an affidavit that purports to be an
[7] affidavit.
[8]    MR. DEASEY: Are you skipping numbers?
[9]    MR. VAN NAARDEN: I'm -- I'm just
[10] going by this. You know, what I think, I
[11] should have 10, right? We will get there any
[12] way.
[13]    MR. DEASEY: We will get to them.
[14]    MR. VAN NAARDEN: We will get to them.
[15]    THE WITNESS: I was just wondering,
[16] because I went down my list and I had 9, and
[17] then I put 10 and then it says 12.
[18]    MR. VAN NAARDEN: All right. I --
[19] I did -- I did skip one.
[20]    MR. DEASEY: This is an affidavit.
[21]    THE WITNESS: Yeah. I remember this
[22] now, yes.
[23] BY MR. VAN NAARDEN:
[24] Q. And is it your signature at the back?

Page 185

[1] A. Yes, it is.
[2] Q. Okay. Where were you when you signed the
[3] affidavit?
[4] A. I really don't know.
[5] Q. Other than any discussions that you may
[6] have had with counsel, did you have any
[7] discussions with anybody else, outside of
[8] discussions with counsel, relating to the
[9] contents of that affidavit?
[10] A. No. No.
[11] Q. Can I have that back?
[12] A. (Indicating).
[13] Q. On the beginning line it says, on this 18th
[14] day of March, 2003, Steven A. Ames deposes and
[15] says, and then is a list, correct? Do -- do you
[16] believe you signed this affidavit on March 18th
[17] of 2003; if you know?
[18] A. I don't recall.
[19] Q. Okay. Was this document sent to you for
[20] your signature at your office at Pack & Process?
[21] A. I don't recall.
[22] Q. Were you made aware of any of your
[23] employees being contacted to also sign
[24] affidavits?

Page 186

[1] A. I don't -- I don't -- I don't recall that.
[2] Q. We talked about Robert McManus, correct?
[3] A. No.
[4] Q. I think you had mentioned him.
[5] A. You have the name wrong. Magnus.
[6] Q. Magnus. Sorry, I'm pronouncing it wrong.
[7] Thanks.
[8] Were -- were you aware that he also
[9] signed an affidavit?
[10] A. I -- I -- I -- I either was not aware or do
[11] not remember.
[12] Q. Did you have any discussions with Robert
[13] Magnus relating to an affidavit that he signed?
[14] A. No, I did not.
[15] Q. Did Robert Magnus ever ask for a day off
[16] from work to travel to Philadelphia to sign an
[17] affidavit?
[18] A. Robert was not working for me at the time
[19] of the accident.
[20] Q. Okay. Did you ever have any conversations
[21] with Bob over the phone that, hey, you might be
[22] contacted in relation to this accident?
[23] A. Yes. That was the extent of the
[24] conversation. I would not say more.

Page 187

[1] Q. And you didn't say anything about Maly Yan
[2] in that conversation?
[3] A. Nope.
[4] Q. Sterling Newsome, we talked about him
[5] before, too. Were you aware that he was also
[6] asked to sign an affidavit?
[7] A. I was not aware.
[8] Q. Did you have any -- well, first of all, in
[9] September of 2003, was Sterling Newsome still an
[10] employee of Pack & Process?
[11] A. I don't believe so, no.
[12] Q. Okay. Did you have any contact with
[13] Sterling Newsome and -- and -- whereby you said
[14] something like, hey, you might be contacted to
[15] sign an affidavit?
[16] A. I -- I -- I was never -- this signing of an
[17] affidavit was not something that I was
[18] particularly aware of. I knew that somebody may
[19] be deposed, and I might have said something to
[20] Bob about that. I don't know if I ever spoke
[21] with Sterling.
[22] Q. Did you ever talk with Sterling about the
[23] accident after the accident happened?
[24] A. Except for the day of the accident, no.

Page 188

[1] Q. Cheryl Staniszewski.
[2] A. We all have trouble.
[3] Q. Ever made aware that she was also asked to
[4] sign an affidavit?
[5] A. Well, once again, I didn't know anything
[6] about the affidavit. I did know about a
[7] deposition.
[8] Q. When was the last time you spoke to Cheryl?
[9] A. Three years ago, two years ago. I'm not
[10] sure.
[11] Q. Did you know that she was deposed earlier
[12] this week?
[13] A. Yes.
[14] Q. Did you have any contact with her after her
[15] deposition?
[16] A. No.
[17] Q. Do you know who Susi Hadi is?
[18] A. Yes.
[19] Q. Who is Susi Hadi?
[20] A. She was one of the occupants of the van.
[21] She was the only person was not legal, and she
[22] was the girlfriend of Sterling Newsome.
[23] Q. Oh, okay. So Sterling Newsome -- do you
[24] know if they're still dating?

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 189

[1]  A.  I was told, but I really don't know.

[2]  Q.  Told that they were, but you don't know?

[3]  A.  Yeah.

[4]  Q.  Okay.  Does -- Sterling Newsome, at the

[5]  time, you know, back in 2003, do you know if he

[6]  lived in Philadelphia?

[7]  A.  I think I heard that he did, but, once

[8]  again, I'm not real sure.  I didn't follow a list

[9]  of things.

[10]  Q.  I will give you an address.  1609 South 8th

[11]  Street in Philadelphia.  Does that mean anything

[12]  to you?

[13]  A.  Zero.

[14]  Q.  All right.

[15]  A.  You're better off with the first question.

[16]  Q.  That's fine.

[17]        Had -- had you ever had any

[18]  conversations with Susi Hadi relating to the

[19]  accident?

[20]  A.  No.

[21]  Q.  Do you know if Susi Hadi was fluent in

[22]  English?

[23]  A.  I only knew the name.  I don't know her --

[24]  Q.  Oh, okay.

Page 190

[1]  A.  I didn't even know her.

[2]  Q.  Do you know her to see her?

[3]  A.  No.  I mean, I might, but I -- but -- if

[4]  you showed me three pictures I wouldn't be able

[5]  to pick her right now.

[6]  Q.  Understood.

[7]        Did you have any conversations,

[8]  prior to the accident, with your adjustor or with

[9]  anybody from Saint Paul Mercury whereby you

[10]  explained to them the relationship between Pack &

[11]  Process and Lam Staffing?

[12]  A.  I don't think so.

[13]        (Whereupon Exhibit Ames-10 was

[14]  marked for identification.)

[15]  BY MR. VAN NAARDEN:

[16]  Q.  This is Ames-10.  I am going to show you --

[17]  it's a memorandum.  I just want to know if this

[18]  was the document that you referred to before

[19]  as -- as being attached to the actual employment

[20]  contract?

[21]        MR. DEASEY: Go ahead.

[22]        THE WITNESS: Yes.

[23]  BY MR. VAN NAARDEN:

[24]  Q.  Okay.  And when -- if you look through it,

Page 191

[1]  are those all the documents that you were

[2]  referring to before, or --

[3]  A.  I don't know absolutely what they all were,

[4]  but I knew there were several pages.

[5]  Q.  Okay.

[6]        MR. DEASEY: Do you want this back?

[7]        MR. VAN NAARDEN:  Please.

[8]        MR. DEASEY:  (Indicating).

[9]  BY MR. VAN NAARDEN:

[10]  Q.  As -- as you sit here today, do you have

[11]  any idea, approximately, how much money Pack &

[12]  Process paid out to Lam Staffing for their

[13]  services?

[14]  A.  I don't -- no, I don't know that.

[15]        (Whereupon Exhibit Ames-11 was

[16]  marked for identification.)

[17]  BY MR. VAN NAARDEN:

[18]  Q.  Ames-11.  And just -- I'm going to show you

[19]  collectively a bunch of signed checks.  Tell me

[20]  if you recognize them.?

[21]        As you flip through them, I am

[22]  going to ask you if they are Pack & Process

[23]  checks made payable to Lam Staffing?

[24]  A.  Yes, they are.

Page 192

[1]  Q.  And whose signature is on the checks?

[2]  A.  In all cases, mine.  Yes, in all cases they

[3]  were my signature.  In all cases they are Pack &

[4]  Process checks.

[5]  Q.  And the -- like, if we take the check that

[6]  is on the first page, is -- is that, I guess,

[7]  typically, the -- the check that you would give

[8]  to Lam Staffing on a weekly basis?

[9]        MR. DEASEY:  You mean the amount?

[10]        MR. VAN NAARDEN:  The amount.

[11]        THE WITNESS:  Yes.

[12]  BY MR. VAN NAARDEN:

[13]  Q.  Okay.  And -- and what is the amount?

[14]  A.  24,945 on the first one.

[15]  Q.  And that -- and that would represent, give

[16]  or take, a little bit, the amount paid to Lam

[17]  Staffing on any given weekly period, or for the

[18]  time that they were providing services to you?

[19]  A.  It would vary, but, yes.

[20]  Q.  I understand that.

[21]        MR. DEASEY:  Let me just object,

[22]  because the checks speak for themselves.  I

[23]        MR. VAN NAARDEN:  That's fine.  I

[24]  understand.

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 193

[1]  THE WITNESS: Maybe it's a little on
[2]  the lower side.
[3]  MR. DEASEY: I've seen them going from
[4]  40,000 down to 19,000.
[5]  THE WITNESS: It's on the -- it's on
[6]  the low side. Maybe middle.
[7]  BY MR. VAN NAARDEN:
[8]  Q.  When was the last time you had any contact
[9]  with anybody relating to Lam Staffing?
[10]  Anybody -- either David, David Suasaday Thach,
[11]  or -- or anybody who worked for Lam Staffing?
[12]  A.  A little -- around the time of the
[13]  accident.
[14]  Q.  Was there any discussion with Lam Staffing
[15]  relating to your relationship with them at or
[16]  around the time of the accident that you were
[17]  aware of?
[18]  A.  There -- there may have been perfunctory
[19]  kinds of conversations. You know, it was a sad
[20]  time. I -- I -- I really can't remember too much
[21]  dialogue at that point.
[22]  Q.  Did you ever, or any of your -- are you
[23]  aware of any of your employees approaching
[24]  somebody from Lam Staffing and -- well -- and --

Page 194

[1]  and, again, and discussing the employment
[2]  relationship between yourself and Maly Yan, and
[3]  Lam Staffing and Maly Yan, if there was one?
[4]  A.  There really wasn't much to discuss.
[5]  Q.  And why -- why wasn't there much to
[6]  discuss?
[7]  A.  Maly Yan was our -- was our employee,
[8]  and -- and that was pretty clear.
[9]  Q.  Did you have any discussions with anybody
[10]  from Lam Staffing whereby they said, well, you
[11]  have to know that we were paying Maly Yan to
[12]  transport workers to and from the factory?
[13]  A.  There is no conversation about that.
[14]  Q.  Were you ever, through a conversation or
[15]  otherwise, made aware of that fact?
[16]  A.  At a deposition Maly Yan said that --
[17]  that -- I think she said that Pack & Process was
[18]  paying her cash, but it was not true.
[19]  Q.  Were you aware of a policy, if there was a
[20]  policy, at Pack & Process, whereby at the end of
[21]  a given day, cash was paid to the driver,
[22]  wherever the leader was, of the van for each
[23]  individual that was on the van?
[24]  MR. DEASEY: Paid by whom? .

Page 195

[1]  BY MR. VAN NAARDEN:
[2]  Q.  Paid by Lam Staffing or by Pack & Process.
[3]  Were you ever made aware of that?
[4]  MR. DEASEY: Why don't we break it
[5]  down.
[6]  BY MR. VAN NAARDEN:
[7]  Q.  Sure. Are you -- are you aware of any --
[8]  were you aware of any policy on behalf of Pack &
[9]  Process whereby cash was paid to the leader per
[10]  head for each individual who they could get into
[11]  that bus?
[12]  A.  There was no such policy.
[13]  Q.  All right. Were you aware of any policy,
[14]  same type of policy, relating to Lam Staffing?
[15]  A.  I was not aware of any, but I would presume
[16]  that somebody was paying for the transportation.
[17]  Q.  You said that you were aware of something
[18]  contained in Maly Yan's deposition. Did you
[19]  review Maly Yan's deposition?
[20]  A.  I was there.
[21]  Q.  You were present. Were you present for any
[22]  of the other depositions taken related to -- to
[23]  these actions?
[24]  A.  No.

Page 196

[1]  Q.  All right. Have you read any of the
[2]  previous deposition transcripts?
[3]  A.  No.
[4]  Q.  As you sit here today, do you have any idea
[5]  where David Thach is?
[6]  A.  No.
[7]  Q.  You said that he -- he, at some point,
[8]  owned a liquor distributor?
[9]  A.  That was my understanding, yes.
[10]  MR. DEASEY: Beer distributor.
[11]  THE WITNESS: Beer distributor.
[12]  MR. VAN NAARDEN: Liquor.
[13]  THE WITNESS: Beer.
[14]  MR. DEASEY: Beer.
[15]  BY MR. VAN NAARDEN:
[16]  Q.  Okay. Beer distributor. In Frankford?
[17]  A.  Yes.
[18]  Q.  Do you know the name of it?
[19]  A.  No.
[20]  Q.  Do you know where in Frankford it was?
[21]  A.  No.
[22]  Q.  Approximately, how long ago were you --
[23]  A.  It's real difficult to date this, but he
[24]  wasn't around for -- for a couple of years. I

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 197

[1] would say -- if I had to guess, I would say '99,
[2] 2000, 2001. During this -- during the time of
[3] the accident he wasn't around.
[4] **Q.** So who was picking up the checks?
[5] **A.** Mataday. Whatever his name is.
[6] **Q.** When is the last time you saw Mataday.
[7] **A.** I don't know.
[8] **Q.** Do you know where Mataday lived?
[9] **A.** No.
[10] **Q.** Any idea where he is now?
[11] **A.** I have no idea.
[12] **Q.** Other than the Mataday, you don't know any
[13] other names that this guy went by?
[14] **A.** Mataday himself?
[15] **Q.** Yes.
[16] **A.** No, I don't know.
[17] **Q.** Can you describe him for me? Build?
[18] **A.** No. I mean, I can say he is about five,
[19] two, very thin, but that's -- that's about it.
[20] **Q.** What kind of -- what nationality was he?
[21] **A.** Even that, you know, it's real tough. I
[22] mean, there were -- there were Vietnamese of
[23] Cambodian descent. There were Cambodians of
[24] Vietnamese descent. There were Cambodians from

Page 198

[1] Cambodia. There were Vietnamese from Vietnam.
[2] It was really a very difficult subject. You
[3] know, I didn't -- it's a lot more complicated
[4] than it would seem.
[5] There were different vans,
[6] different groups of people. When I say different
[7] groups of people, different ethnic groups of
[8] people. And they all would be Cambodian, but
[9] dramatically they were different from a -- from
[10] an ethnic point of view.
[11] **Q.** You have no idea what Mataday was?
[12] **A.** None.
[13] **Q.** At any time, were you made aware of Lam
[14] Staffing paying their employees under the table?
[15] **A.** Was I aware? No.
[16] **Q.** As you sit here today, are you -- are you
[17] aware that that is the way they conducted
[18] business?
[19] **MR. DEASEY:** Other than whatever
[20] you --
[21] **THE WITNESS:** I -- I don't really know
[22] what under-the-table means at this point. I
[23] mean, if they were reimbursing for driving,
[24] is that under-the-table, I don't know. Did

Page 199

[1] they have receipts, I don't know. It's --
[2] it's -- I didn't follow their business. I
[3] had enough problems following my own
[4] business.
[5] **BY MR. VAN NAARDEN:**
[6] **Q.** Do you know if the gas card that we talked
[7] about before, if that was ever given to Maly Yan
[8] or Yan Thou, or any of the leaders --
[9] **A.** It better not have been.
[10] **MR. DEASEY:** Let him finish.
[11] **BY MR. VAN NAARDEN:**
[12] **Q.** For their -- for their leader or the
[13] leaders for reimbursement for gas expenses?
[14] **A.** There -- there is no chance of that. And
[15] if it did, they would have to circumvent --
[16] circumvent a couple of different procedures
[17] which -- which I would be amazed if that ever
[18] happened.
[19] In other words, one of the things
[20] that I reviewed every month was the credit cards,
[21] you know, who -- who -- who is using gas, you
[22] know, and -- and where is that mechanic, should
[23] that mechanic really have been making 18 trips to
[24] Plant 5. Yeah, that's -- that's part of what my

Page 200

[1] management responsibilities were.
[2] **Q.** In addition to the actual credit card
[3] receipts that would itemize the date of any
[4] purchase, was there additional documentation as
[5] to who in particular used the card?
[6] **A.** Yes. There was a recap.
[7] **Q.** All right.
[8] **A.** And I saw that recap on a monthly basis.
[9] **Q.** And -- and it was something that was
[10] generated on a monthly basis?
[11] **A.** I think so, yeah.
[12] **Q.** Have you retained copies of those recaps --
[13] **A.** I don't -- I really --
[14] **Q.** -- from back in June, May, or -- or March
[15] of 2001?
[16] **A.** I really don't know.
[17] **Q.** If we asked you to go back and look, could
[18] you do that for us?
[19] **A.** I can look, sure.
[20] **Q.** All right. And if we asked you to, you
[21] would turn that over to your counsel?
[22] **A.** Yes.
[23] **VIDEO TECHNICIAN:** Off the record.
[24] 3:03.

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 201

[1]         This concludes DV-2 at 3:03 p.m.
[2]         (Whereupon a discussion was held off
[3]     the record.)
[4]         VIDEO TECHNICIAN:  Beginning DV-3.
[5]     3:05 p.m.
[6]  BY MR. VAN NAARDEN:
[7]  Q.  Prior to the accident, were you aware of
[8]  how Maly Yan was getting to work every day?
[9]  A.  No.
[10] Q.  Other than your duties and responsibilities
[11] as president of Pack & Process, were you ever the
[12] owner of any entity whereby you had to manage
[13] workers?
[14]        Other than Pack & Process, did --
[15] were you -- did you have ownership or any type of
[16] ownership interest in any other corporation that
[17] managed workers?
[18] A.  Yes.
[19] Q.  Okay.  And -- and what would the name of
[20] those entities be?
[21] A.  Ames Engineering Corp.
[22] Q.  And what is that?
[23] A.  Well, it's no longer in existence, but it
[24] was an engineering company building packaging

Page 202

[1]  machinery.
[2]         COURT REPORTER:  I'm sorry?
[3]         MR. DEASEY:  Building --
[4]         THE WITNESS:  It was an engineering
[5]     company that built packaging equipment.
[6]  BY MR. VAN NAARDEN:
[7]  Q.  And when did that cease to exist?
[8]  A.  About four years ago.
[9]  Q.  Anything else?
[10] A.  The question was, did I own?
[11] Q.  Or have -- or have an ownership interest
[12] in?
[13] A.  No.
[14] Q.  What is Dell Pack?
[15] A.  Dell Pack was an LLC that was set up back
[16] in the mid '90s to do some work with a -- with
[17] another company that we worked with importing
[18] certain Japanese equipment and managing certain
[19] contract packaging with -- with those machines.
[20] Q.  Is that still in existence?
[21] A.  No.
[22] Q.  How about Stack Packs?
[23] A.  I have no idea.
[24] Q.  Stick Packs?

Page 203

[1]  A.  Well, the Stick Packs was the type of
[2]  package for the...
[3]  Q.  Okay.  For the Dell Pack?
[4]  A.  For Dell Pack.  Yeah.
[5]  Q.  Got it.
[6]         You talked a little bit before
[7]  about -- way before, about the fact that you're
[8]  selling off some of the machinery at Pack &
[9]  Process, correct?
[10] A.  Yes.
[11] Q.  Does that in any way have to do with the
[12] fact that there is pending litigation relating to
[13] what we're here for today?
[14] A.  Not unrelated, but it's not related.  I
[15] mean, I don't know how you answer that question.
[16] But for that accident, it might have taken a
[17] different direction, possibly, but it's not a
[18] direct result.  It's, you know, it's people make
[19] decisions, and then there are a lot of things
[20] that affect decisions that are made.
[21]        MR. VAN NAARDEN:  And let me just
[22] look over my notes real quick, and then we
[23] will see where we are.
[24]        VIDEO TECHNICIAN:  Off the record.

Page 204

[1]  3:09.
[2]         (Whereupon a discussion was held off
[3]     the record.)
[4]         VIDEO TECHNICIAN:  On the record.
[5]     3:11.
[6]  BY MR. VAN NAARDEN:
[7]  Q.  Mr. Ames, you -- you knew when you hired
[8]  Maly Yan that she didn't live in Delaware,
[9]  correct?
[10] A.  Yes.
[11] Q.  Because that was on her employment
[12] application, correct?
[13] A.  Well, when you say you, are you talking
[14] about Pack & Process --
[15] Q.  Sure.
[16] A.  -- because I wasn't -- right.
[17] Q.  And you knew that she lived in
[18] Philadelphia.  You had documentation to confirm
[19] such, right?
[20] A.  Yes.
[21] Q.  All right.  So -- so you knew when Pack &
[22] Process hired her that she was going to have to
[23] get from where she lived to the Delaware factory,
[24] correct?

B&R Services for Professionals, Inc.        Min-U-Script®        (51) Page 201 - Page 204

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 205

[1]  A.  Yes.

[2]  Q.  All right.  Would you agree that getting

[3]  from your home to -- to your place of business is

[4]  related to the work that you're going to do

[5]  during the day?

[6]       MR. DEASEY:  Objection to the form.

[7]  It calls for a legal conclusion.  You can

[8]  answer.

[9]       THE WITNESS:  I don't agree with that

[10]  at all.

[11]  BY MR. VAN NAARDEN:

[12]  Q.  Okay.  Is it possible to do the work that

[13]  you're suppose to do if you can't get to where

[14]  you're suppose to work?

[15]  A.  That's not my issue.  My issue is when you

[16]  come to my door you're my employee.  How you get

[17]  to my door is your business.

[18]  Q.  Did you ever have that discussion with Maly

[19]  Yan?

[20]  A.  I don't believe so, no.

[21]  Q.  Do you know if -- if anybody in your employ

[22]  had that discussion with Maly Yan?

[23]  A.  I don't know.

[24]  Q.  Did you ever direct anybody to have that

Page 206

[1]  discussion with Maly Yan?

[2]  A.  No.

[3]  Q.  Do you know if -- if Maly Yan was ever

[4]  authorized to use any of the vehicles that were

[5]  used for Pack & Process purposes?

[6]  A.  I know she was not authorized to use them.

[7]  Q.  Well, when individuals work at night, and

[8]  we talked a little before about sometimes workers

[9]  would come at night, did you provide

[10]  transportation for those individuals?

[11]  A.  Generally speaking, no.

[12]  Q.  Were there certain situations where you

[13]  would?

[14]  A.  There -- there was an odd-ball situation

[15]  where we had to help an employee, yeah.

[16]  Q.  And -- and was that situation Maly Yan?

[17]  A.  No.

[18]  Q.  Okay.  The -- the situation where you would

[19]  have provided transportation, how would you have

[20]  done it?

[21]  A.  I'm -- I'm not really sure I remember what

[22]  happened, but there was a particularly good,

[23]  long-time employee who had to work a second

[24]  shift, and she had moved out from the city of

Page 207

[1]  Wilmington out to just below Wilmington.  And

[2]  there was no bus transportation there, and she

[3]  had no way of getting home after she worked the

[4]  night shift.  I mean, there is just no way of

[5]  getting home.

[6]       And I think we made some

[7]  arrangement where she would just -- she would

[8]  work a clean-up crew or something for a little

[9]  while, and then when the first guy coming in was

[10]  our -- was our general run-about-town guy, he

[11]  would -- he would take her home and then pick up

[12]  the mail on the way, and so forth and so on, and

[13]  that kind of stuff.  And that was the arrangement

[14]  that was made for that particular employee.

[15]  Q.  For that particular employee, the vehicle

[16]  that was used, was that a Pack & Process vehicle?

[17]  A.  Yes, it was.

[18]  Q.  Okay.

[19]  A.  By the way, not insignificant, I think on

[20]  the point that you were making before, I think

[21]  Maly Yan, when she first worked for us drove --

[22]  drove with her husband.  So she worked -- she --

[23]  you know, I don't know how she got to work later

[24]  on.

Page 208

[1]  Q.  What leads you to believe that -- that Maly

[2]  Yan when she first worked for you was driven by

[3]  her -- with -- with her husband?

[4]  A.  I -- I -- I kind of recall, and -- and I

[5]  could be wrong, I kind of recall that her husband

[6]  worked for us also.  I could be wrong, and that

[7]  it was a very good guy that we hired as a -- as

[8]  a -- as a production line supervisor.  And I --

[9]  and I think they used to come in together.

[10]  Q.  And that would have been before February

[11]  when she signed the February contract with you?

[12]  A.  Yeah.

[13]  Q.  Or the agreement?

[14]  A.  Before, I think, she left to go up to

[15]  Massachusetts.

[16]  Q.  When she came back, did her husband come

[17]  back to work for Pack & Process?

[18]  A.  No.

[19]  Q.  Do you know why?

[20]  A.  No.

[21]  Q.  Back when Maly Yan originally worked for

[22]  you, for the first period of time, did her father

[23]  work for you, too, or was the father coming and

[24]  working at your factory?

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 209

[1]  A.  Yes.
[2]  Q.  And at that point in time was he a leader?
[3]  A.  Yes.
[4]  Q.  Okay.  So you believe that even though Yan
[5]  Thou was driving a van full of workers to your
[6]  factory, that his daughter was not traveling with
[7]  him?
[8]  A.  That's my recollection.  Now, I could be
[9]  wrong.
[10]  Q.  I understand.
[11]  A.  But that's my recollection.
[12]  Q.  Okay.  Where -- where would you have gotten
[13]  that information from?
[14]  A.  It could have been chitchat.
[15]  Q.  Okay.
[16]      Were you ever asked questions by
[17]  the -- the state police relating to this
[18]  accident?
[19]  A.  I may have, but to tell you the truth, I
[20]  don't remember.
[21]  Q.  Did you review the state police report that
[22]  was generated as a result of the accident?
[23]  A.  The so-called Fair report?
[24]  Q.  The -- well, first of all I'm -- I'm

Page 210

[1]  referring to the State of Delaware Uniformed
[2]  Traffic Collision Report and the accompanying
[3]  documents?
[4]  A.  I read that a long time ago, yes.
[5]  Q.  You called it the supposed Fair report?
[6]  A.  Yeah.  I think -- I think, yeah.
[7]  Q.  Well, why do you -- why do you --
[8]  I think that's the title of it.
[9]  Q.  Oh, okay.  I thought you meant something
[10]  else by it.
[11]      MR. DEASEY:  Do you mean like the
[12]  fellow's name or something?
[13]      THE WITNESS:  No.  I don't know why.
[14]  I -- I -- I know it as the Fair report.
[15]  BY MR. VAN NAARDEN:
[16]  Q.  When you say Fair, spell it for me?
[17]  A.  I don't know how to spell it.  F-A-I-R.
[18]  Q.  Oh, okay.  It was not a comment on whether
[19]  or not --
[20]  A.  No.  No.
[21]  Q.  -- the actual report was fair?
[22]  A.  No.  No.
[23]  Q.  Okay.
[24]      MR. DEASEY:  Let him finish his

Page 211

[1]  question.
[2]  BY MR. VAN NAARDEN:
[3]  Q.  Okay.  When you are in West Palm, who is
[4]  doing the day-to-day stuff relating to Pack &
[5]  Process business, or are you doing it?
[6]  A.  Right now?
[7]  Q.  Yes.
[8]  A.  Well, generally speaking, I am available by
[9]  telephone and by E-mail, and in contact with
[10]  my -- any time of the day, if necessary.
[11]  Q.  With who?
[12]  A.  I am plan -- in contact with the plant a
[13]  couple of times a day, if necessary.
[14]  Q.  What is currently going on with the plant
[15]  if there is no -- if there no -- nothing being
[16]  produced on a daily basis?
[17]  A.  Well, I receive some telephone calls.
[18]  Sometimes I can, not very often, I can broker a
[19]  deal someplace.  Talk about, you know, some --
[20]  some machinery.  There is always issues around
[21]  insurance.  There is always issues around the
[22]  plants themselves.  You know, there is always
[23]  something to occupy me.
[24]      I don't work a 40 hour week, but I

Page 212

[1]  have it staffed and have them answer some
[2]  questions.
[3]  Q.  Have you ever been involved in litigation
[4]  relating to your position at Pack & Process about
[5]  an employee being injured using one of your
[6]  vehicles, one of the Pack & Process vehicles?
[7]  A.  No.  Not that I recall.
[8]      My father got rear-ended.  Is
[9]  that -- that was...
[10]  Q.  Your father got rear-ended in one of the
[11]  Pack & Process vehicles?
[12]  A.  Yeah.  Yeah.  And I think -- and I think he
[13]  also had a -- slipped on the ice on a -- in a
[14]  vehicle, you know, sped -- spun out on the ice.
[15]  That's -- that's about it that I recall, anyway.
[16]  Q.  Mike Platt.  Was that the name of a
[17]  production manager?
[18]  A.  Yes.
[19]  Q.  And was he prior to Newsome Sterling?
[20]  A.  Subsequent.
[21]  Q.  After?
[22]  A.  Yes.
[23]  Q.  Okay.  How about George Aaronson?
[24]  A.  George Arrington was a production

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Page 213

[1]  supervisor who would either work for Michael or
[2]  worked for Sterling.
[3]  Q.    At the time this accident occurred, the --
[4]  the parking lot was not owned by yourself,
[5]  correct?
[6]  A.    That's correct.
[7]  Q.    Was it owned by Reef? Is that what it's
[8]  called?
[9]  A.    I would believe, yes.
[10]  Q.    Okay. Has it been owned by that company
[11]  for the duration of the time that you've been
[12]  there?
[13]  A.    No.
[14]  Q.    But at the time of the accident it was
[15]  owned by them?
[16]  A.    Yes.
[17]  Q.    Okay. Did you lease the parking lot from
[18]  them?
[19]  A.    Well, I don't know how to answer that.
[20]  That's -- we rented the building and it's a --
[21]  you know, it's an industrial park, so it's like a
[22]  condominium.
[23]  Q.    Okay. Did you pay some sort of fee for the
[24]  use of the parking lot?

Page 215

[1]  was it part of Maly Yan's job description to
[2]  drive a van to and from Pack & Process for the
[3]  temporary laborers that were supplied by Lam
[4]  Staffing?
[5]  A.    Absolutely not.
[6]  Q.    Was it, at any point in time when she was
[7]  an employee of Pack & Process, part of her job
[8]  description -- description or within the course
[9]  and scope of her employment to drive that -- the
[10]  van containing temporary laborers from
[11]  Lam Staffing?
[12]  A.    Absolutely not.
[13]  Q.    Was she ever, to your knowledge, paid by
[14]  Pack & Process to transport laborers, temporary
[15]  laborers, to and from Pack & Process?
[16]  A.    Absolutely not.
[17]  Q.    Do you -- do you know how her -- was she
[18]  paid a salary or an hourly rate, to your
[19]  knowledge, as of June 18th, 2001?
[20]  A.    She was paid an hourly rate.
[21]  Q.    Do you know how her -- her pay was
[22]  calculated then?
[23]  A.    I believe, and I'm not positive, I believe
[24]  it was seven and a half dollars an hour.

Page 214

[1]  A.    No. It was part -- part of the condominium
[2]  fee.
[3]  Q.    Okay. It was part of the fee for the
[4]  building?
[5]  A.    Right. Until it came to snow plowing.
[6]  Q.    Okay. Prior to the accident happening
[7]  in -- in June of '01, did you ever -- were you
[8]  ever made aware of any discussions with Maly Yan
[9]  whereby she was asked to change ownership of the
[10]  van into her name?
[11]  A.    No.
[12]      MR. VAN NAARDEN:    That's all I
[13]  have.
[14]  BY MR. DEASEY:
[15]  Q.    I just have a few questions, Mr. Ames.
[16]  A.    Okay.
[17]      VIDEO TECHNICIAN:    Off the record.
[18]  3:22.
[19]      (Whereupon a discussion was held off
[20]  the record.)
[21]      VIDEO TECHNICIAN:    On the record.
[22]  3:22.
[23]  BY MR. DEASEY:
[24]  Q.    Mr. Ames, as of June 18th, 19- -- or 2001,

Page 216

[1]  Q.    I'm sorry. Do you know how they calculated
[2]  how many hours she worked? How Pack & Process
[3]  calculated --
[4]  A.    Oh, yes.
[5]  Q.    -- how many hours she would --
[6]  A.    There was a time card and they -- and they
[7]  would ver -- they would verify against the time
[8]  card how many hours she actually worked.
[9]  Q.    Have you had an opportunity to review the
[10]  time card?
[11]  A.    Yes.
[12]  Q.    Had she clocked out as of the time of the
[13]  accident?
[14]  A.    Yes, she had.
[15]  Q.    Was she on Pack & Process' time clock at
[16]  the time of the accident?
[17]  A.    No.
[18]  Q.    In other words, was she still on -- within
[19]  her time, or she had already clocked out for --
[20]  on the day --
[21]  A.    No. The shift was already over.
[22]  Q.    On June 18th, 2001, as of the date -- as of
[23]  the time of the accident, had she already clocked
[24]  out?

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

---

Page 217

[1] A. Yes, she had.
[2] Q. Okay. Are you aware of any employee of
[3] Pack & Process paying Maly Yan either by check or
[4] by cash for transporting temporary laborers to
[5] and from Pack & Process?
[6] A. No, I'm not.
[7] Q. You talked briefly about the petty cash
[8] situation. Who controlled the petty cash?
[9] A. Dorothy Stanley.
[10] Q. And is that something that you would
[11] review?
[12] A. Yes.
[13] Q. Have you ever, in your review of those
[14] documents, seen any indication of petty cash ever
[15] being paid to Maly Yan?
[16] A. No.
[17]         MR. DEASEY: I don't have anything
[18] further. Thank you.
[19] BY MR. VAN NAARDEN:
[20] Q. A quick follow-up.
[21]         VIDEO TECHNICIAN: Off the record.
[22] 3:24.
[23]         (Whereupon a discussion was held off
[24] the record.)

---

Page 218

[1]         VIDEO TECHNICIAN: On the record.
[2] 3:25.
[3] BY MR. VAN NAARDEN:
[4] Q. On the issue of petty cash, was there a --
[5] traditionally an amount of petty cash that was
[6] always kept on hand?
[7] A. There was a general amount, yes.
[8] Q. And what was the general amount?
[9] A. About $300.
[10] Q. Okay. And -- and who actually had custody
[11] of the petty cash traditionally?
[12] A. Dorothy Stanley.
[13] Q. Was that in a lock box?
[14] A. Yes.
[15] Q. All right. And was Dorothy Stanley given
[16] discretion to hand out the petty cash as she saw
[17] fit as long as she accounted for -- for it?
[18] A. Well, there was -- there was -- she had the
[19] ability to -- to reimburse people and give money
[20] to people, but if it was above a certain amount
[21] she would have to come to me. And if it was
[22] unusual, she would check with me.
[23] Q. Approximately, how often in -- in June of
[24] 2001, would you need to replenish the petty cash

---

Page 219

[1] to keep it up to the $300 level?
[2] A. Oh, possibly once every three or four
[3] weeks.
[4] Q. And you kept records --
[5] A. Yes.
[6] Q. -- of -- of that?
[7] A. Yes.
[8] Q. Okay. And, again, if we were asked -- do
[9] you retain those records?
[10] A. Yes.
[11] Q. Okay. Did you at -- at the time that you
[12] were doing business with Lam Staffing, was there
[13] ever a period of time that you had concerns
[14] that -- that Lam Staffing was not paying taxes,
[15] and in some way you could be implicated as a
[16] joint employer with Lam Staffing and be
[17] responsible for the fact that they weren't paying
[18] taxes?
[19] A. I always worried about that.
[20] Q. But was that -- was that issue something
[21] that you -- particular to your dealings with Lam
[22] Staffing?
[23] A. No.
[24] Q. It was something that you had a concern

---

Page 220

[1] about with all of the temporary employment
[2] agencies that you work with?
[3] A. Yes.
[4] Q. What, if anything, did you do proactively
[5] to -- to prevent that from happening?
[6] A. We would ask to see how they were paying
[7] certain -- certain things, like paying Delaware
[8] insurance -- Delaware workmen's comp fees. There
[9] was -- there were certain things that we checked
[10] on -- on an audit basis periodically. But I
[11] always worried about that.
[12] Q. Okay. What was it about these temporary
[13] agencies that you were contracting with that they
[14] gave you that -- that type of concern?
[15] A. Articles that I would read about
[16] restaurants going out of business, and -- and
[17] the -- the restaurateur not paying his staff,
[18] and -- and the IRS coming directly after the --
[19] the owner of the restaurant. I -- you know,
[20] it's -- as a small businessman you read and you
[21] worry.
[22] Q. And so you -- you took steps to insure that
[23] wasn't happening because you thought that it --
[24] it might be a foreseeable event?

---

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

---

Page 221

[1]  A.  I didn't necessarily --
[2]          MR. DEASEY:  Objection to the form,
[3]  but you can answer.
[4]          THE WITNESS:  I didn't necessarily
[5]  think it was forsee -- was -- was going to
[6]  happen, but it was an ounce of prevention.
[7]  You know, it's -- it's something I knew that
[8]  if these guys absconded, it could be a risk
[9]  to me, so I had people audited.
[10] BY MR. VAN NAARDEN:
[11] Q.  As you sit here today, is it your
[12] understand that Lam -- Lam Staffing has
[13] absconded?
[14] A.  No.  I don't know that.
[15] Q.  Have you had -- do you have any information
[16] relating to Lam Staffing's whereabouts?
[17] A.  None.
[18]          MR. DEASEY:  You mean the company's
[19] whereabouts?
[20]          MR. VAN NAARDEN:  The company's
[21] whereabouts.
[22]          MR. DEASEY:  Do you know anything
[23] about it?
[24]          THE WITNESS:  Just the old address.

---

Page 222

[1]          It's...
[2]  BY MR. VAN NAARDEN:
[3]  Q.  Have you ever been to that old address?
[4]  A.  I haven't, no.
[5]  Q.  Do you know if there was ever like a
[6]  storefront or anything at that address that they
[7]  provided to you that would indicate that there a
[8]  a -- a company called Lam Staffing at that
[9]  property?
[10] A.  I -- I have -- I've been asked the same
[11] question before and I -- I don't know anything
[12] about them.  We -- you know, they -- we did
[13] business in Delaware, we didn't go to
[14] Philadelphia.
[15]          MR. VAN NAARDEN:  That's it.  Do
[16] you have anything else?
[17]          MR. DEASEY:  No.  No, I don't.  I have
[18] no more questions.
[19]          VIDEO TECHNICIAN:  This then concludes
[20] the deposition today, Tuesday, June 27th, at
[21] 3:29 p.m.
[22]          - - -
[23]          (Witness excused.)
[24]          (Deposition concluded.)

---

Page 223

[1]          C E R T I F I C A T I O N
[2]
[3]          I, COLLEEN A. YOUNG, hereby
[4]  certify that the testimony and the proceedings in
[5]  the foregoing matter taken on June 27, 2006, are
[6]  contained fully and accurately in the
[7]  stenographic notes taken by me, and that pages 1
[8]  to 222, inclusive, of this testimony are a true
[9]  and correct transcript of the same.
[10]
[11]
[12]          COLLEEN A. YOUNG, #255
[13]              R.P.R., C.S.R.
[14]              Notary Public
[15]
[16]          The foregoing certification of
[17] this transcript does not apply to any
[18] reproduction of the same by any means unless
[19] under the direct control and/or direction of the
[20] certifying shorthand reporter.
[21]          - - -

---

Page 224

[1]          CERTIFICATE OF DEPONENT
[2]
[3]          I, STEVEN AMES, have read the
[4]  foregoing transcript of my testimony taken on
[5]  June 27, 2006, contained within pages 1 to 223
[6]  and it is true, correct and complete to the best
[7]  of my knowledge, recollection and belief, except
[8]  for the list of corrections, if any, attached on
[9]  a separate sheet herewith.
[10]
[11]
[12] DATE              STEVEN AMES
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

---

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

**$**

$20,000 150:24
$20,528.38 115:15
$300 218:9;219:1

**0**

00353 115:12
01 57:15;58:3;133:10;
134:12,13;140:9,13;176:2;
214:7
03 33:19
04 111:7
05-0022 6:2
05-0513 6:8

**1**

1 37:10,11,19
1:00 122:7
1:42 122:9
1:45 126:5
1:47 127:3
1:51 129:23
1:53 130:3
10 184:11,17
10/6 75:11
10:00 6:24
10:51 7:2
10:52 6:17
1000 28:19
1001 22:14;28:19
11:06 20:9
11:08 21:8
11:10 23:11
11:17 28:11
110 57:8
12 44:14;184:17
12:21 80:11
12:43 105:14
12:45 105:16
120 57:8
13 44:14
13th 176:2;181:7
14 44:14
1400 17:24;18:23;22:13,
22;28:13;29:1
15 34:8;35:2;37:13;62:8;
148:22
1525 5:17
1609 189:10
16th 101:17
17th 5:18
18 199:23
18th 8:5;83:5;134:12;
147:17;152:16;155:4;
185:13,16;214:24;215:19;
216:22
19– 214:24
19,000 193:4
1986 10:4,6;11:7;29:17;

32:20;49:20
1991 43:11

**2**

2 97:8
2:30 97:8
2:35 177:16
2:38 177:20
20 37:12;40:1;42:11,13,
17;43:20;62:8;130:16
2000 18:8;63:24;64:6;
71:4;73:23;75:11;82:20,23;
101:17;119:21;120:14,18;
121:5,7,10;197:2
2001 35:22;36:5,11,13,18;
38:20;39:12,16;40:2,8;
41:1;42:6,9;43:7;45:5,9;
46:7;56:6,18;58:16,17,18;
83:5;85:21;86:20;89:3;
118:1;120:16,18;147:17;
155:4;168:1;197:2;200:15;
214:24;215:19;216:22;
218:24
2003 8:5;9:15;10:21;
12:10,16;17:3,10;18:20,21;
29:12;53:5,17;181:7;
185:14,17;187:9;189:5
2004 31:21;53:17
2006 6:16
227 5:13
23rd 111:6
24 42:11,13
24,945 192:14
25 21:14;39:17;40:1
27th 6:16;168:1;222:20
28 130:16
290 57:7
29th 117:2
2nd 116:24;118:1

**3**

3 18:3;25:18
3,121 113:11
3:03 200:24;201:1
3:05 201:5
3:09 204:1
3:11 204:3
3:22 214:18,22
3:24 217:22
3:25 218:2
3:29 222:21
30 35:7;37:13;65:7;117:6;
119:9,21
350 43:11
353 115:10
356 116:15,17,24
392 119:13,15;121:17
3rd 175:23

**4**

4 43:17;90:1,2
40 65:7;211:24
40,000 193:4
400 43:16,16
410 43:16
4201 5:13
430 43:17
45 57:5,7,16;59:6
49 117:7,8,8,10

**5**

5 199:24
5/24/01 112:13
5:00 117:3
5:50 89:23
50 21:15;38:22;56:7,11;
57:17;59:6
502 23:4,5

**6**

6 89:22,24;117:7,7
6/5/04 111:9
6:00 117:3
60s 178:7
6th 71:4;73:23;121:2,4,10

**7**

7 130:16
70s 178:7
725 84:7,11,17,23
7621 34:2
7th 22:14;28:19

**8**

80s 14:10;178:7
86 11:2;49:14;50:8;51:2,
20
87 51:14,16,21,24;52:3
8th 189:10

**9**

9 167:20;184:16
90s 14:10;52:12,14;
202:16
95 7:1
98 130:17;131:20;178:1
99 197:1

**A**

Aaronson 212:23
ABC 61:5,5
ability 13:18;153:24;
218:19
able 14:7;55:9;67:15;88:2,
19,22;96:8;173:21;174:6;
190:4
above 135:6,8;159:2;

218:20
absconded 221:8,13
absence 134:1
absent 78:5
absolute 135:21
absolutely 52:5;169:12;
173:23;191:3
Absolutely 80:6;96:3;
126:5;168:16;215:5,12,16
accept 39:10;165:6
accident 6:24;35:20;36:4;
53:14;83:4;133:4;134:12,
15;138:2,18;141:6,9;
143:11;144:16;145:1;
146:19;147:1,17,22;148:2,
4,23;150:5,11,23;151:20;
152:17;154:15;155:5,9;
156:11,13;158:17;160:3,
11,21;161:10,15,24;162:4;
163:23;164:8;166:1,7,12;
168:3;172:6,22;173:10;
175:1;183:1,12;186:19,22;
187:23,23,24;189:19;
190:8;193:13,16;197:3;
201:7;203:16;209:18,22;
213:3,14;214:6;216:13,16,
23
accompanying 177:7;
210:2
according 84:7;102:23
accounted 218:17
accounting 87:4
accurate 10:14,15;12:13;
49:5;64:22;72:17,18;91:16;
98:20;99:11,12;167:22
accurately 88:3
across 178:21
act 173:8
acting 164:12
action 7:7
Action 6:2,8
actions 195:23
activities 27:10
activity 47:5,5
actual 24:15;44:10;46:13;
80:15,23;85:3;93:17;94:6,
15;98:19;99:10;106:22;
107:18;110:11,19;114:17;
118:22;129:9;190:19;
200:2;210:21
actually 29:18;49:21;
50:6;63:18;76:1;80:4;85:3,
22;87:18;88:23;89:16;
95:15;107:17,21;109:2;
117:1;155:22;158:9,13;
171:10;172:8;173:8,9;
182:12;216:8;218:10
Actually 25:2
ad 50:4,14;68:3
addendum 69:6;72:6,13;
73:22;75:1;76:23;77:17;
80:13;81:1,5,10;82:11;
92:2,6,7,8;95:13

Addendum 71:19
adding 126:15,16
addition 7:1;44:7;56:11;
67:21;80:1,13;96:23;103:6;
106:19;107:17;152:14;
157:13,22;200:2
additional 73:2;177:23;
200:4
Additionally 7:3
address 34:1;8;38:7,17;
106:9;189:10;221:24;
222:3,6
addresses 33:18,22
adequately 173:22;174:6
adjustor 190:8
administrative 38:9,13,
24;39:4;86:7,16;87:7,10
Administrative 39:19
Administrator 6:4
admissibility 20:14
ads 50:10
advantageous 15:17
advertise 50:5
advertisements 14:16
affairs 30:11;36:10
affect 22:1;203:20
affidavit 21:4;178:18;
183:23;184:1,6,7,20;185:3,
9,16;186:9,13,17;187:6,15,
17;188:4,6
affidavits 185:24
afterwards 144:5
again 52:8;56:23;73:18,
24;75:5;89:14;98:21;
113:3;114:13;132:24;
138:20;153:10;164:24;
183:19;188:5;189:8;194:1;
219:8
Again 23:14;139:24
against 8:24;216:7
agencies 45:14;51:9,15;
52:9,22;53:2,7,19;55:20;
58:9;60:16;61:2;64:21;
68:4;106:17;107:12;153:3;
220:2,13
agency 45:21;51:3;53:12;
58:23;59:10;60:1;71:14;
76:22;93:20;107:21;108:4;
137:17;138:11;151:22;
152:20;183:10
Agency 159:22
agent 159:7,17,19
ago 9:3;49:13;188:9,9;
196:22;202:8;210:4
agree 12:9;26:12;51:7;
71:3;82:18;106:1;108:3;
109:21;126:21;127:9;
157:17;172:19;182:8;
205:2,9
agreed 5:1;117:9;142:4
agreement 60:10;68:20;
72:7,12,15;73:2,3,20;76:3,
6,19;78:6,13,16,19;79:8,8;

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

81:7,14,24;82:8,14,24;
83:6;91:3,14;92:22;95:8;
97:19;98:3,5,6,17,20;99:8,
11;103:23;110:15,18;
124:18,19;142:7,15,16,18;
143:1,6;208:13
agreements 142:3,18
agrees 92:20
ahead 107:6;190:21
al 6:6
allegations 151:5
alleged 141:7;144:7,10,
16,17
allow 45:5
almost 16:5;175:4
alone 57:6
along 11:21;71:17;164:23
alternative 157:2
although 61:14;146:7;
160:5
always 10:16;19:15;22:9;
30:1;32:20;55:8,9,16;
63:21;93:19;96:9;125:12;
136:5;137:20;139:10;
174:11;211:20,21,22;
218:6;219:19;220:11
amazed 162:13;199:17
Ames 6:15;7:20;10:7,9;
24:22;26:21;27:6;75:16,16;
117:17;127:5;177:22;
185:14;201:21;204:7;
214:15,24
AMES 6:19
Ames-1 69:5,9;108:13
Ames-10 190:13,16
Ames-11 191:15,18
Ames-12 180:17
Ames-15 184:5
Ames-2 105:11,19
Ames-3 108:22,23;109:3,
5,14
Ames-4 109:14,17;113:3;
115:16
Ames-5 118:14
Ames-6 125:22;127:8
Ames-7 130:4,8;176:23;
177:6,9,24
Ames-8 133:6,9
Ames-9 167:17
among 138:21
amount 14:19,20;19:10;
39:17;47:4;54:6,9,12;
72:21;89:5;90:23;113:5;
153:20;154:22;156:16;
157:3;192:9,10,13,16;
218:5,7,8,20
amounts 126:16
and/or 36:17;87:15;
161:14;172:16
annual 161:6
answered 68:13
anticipated 180:12
anymore 31:1;35:18;

154:9
ap- 130:11
Apparently 169:13
appear 94:22;126:21;
127:22
appearances 6:12
appears 126:13;130:16
applicant 130:19
application 129:17;
130:11,15,23;131:23;
132:1,6;133:9,15,21,23;
134:13;137:6;174:5;175:4;
176:4;177:24;178:10;
204:12
Application 130:9;
175:24;176:2
applications 175:4
applied 131:6,10
apply 55:1
appointed 49:15
appreciate 58:4;97:12
approached 147:12
approaching 193:23
appropriate 46:24
approved 82:11;111:13;
112:6,21,24
Approved 111:15
approximate 6:17;168:2
approximately 12:11;
21:11;52:11;56:18;62:6;
134:14;191:11
Approximately 31:22;
44:13;65:5;196:22;218:23
approximating 63:24
approximation 58:19
area 121:23;140:12
areas 25:4,24;56:8
arising 180:13
around 15:16;31:21;40:1;
47:9;57:4;64:3,6;97:8;
136:8;150:24;156:14,22;
160:14;169:18;193:12,16;
196:24;197:3;211:20,21
arrangement 207:7,13
Arrington 212:24
arrive 139:4,8
arrived 88:5;140:20
Articles 220:15
aside 108:11;121:20
aspect 14:6;163:5
aspects 80:21
ass- 163:11
assess 88:3
asset 26:23
Asset 26:24
assets 26:15
assign 146:18
assistant 86:8;87:7
associated 16:10
assume 27:2;36:12
assumption 45:19;95:5
attached 81:6;82:11;
110:14;177:24;178:18;

190:19
Attempt 68:11
attorney 7:24;77:3,4;
92:2;127:6
attracting 54:22
audit 160:23;161:4,6;
220:10
Audit 161:5
audited 221:9
authority 76:18
authorization 48:8
authorize 70:22
authorized 45:2;70:6;
166:22;167:2;206:4,6
auto 158:10
available 131:3;149:10;
211:8.
aware 36:4;67:24;136:15,
21;137:14,23;138:7;
139:10;141:2,6,10,15,20,
21;142:1,2,6,7,14;143:5,
11;144:16,20,22;146:19;
156:2;165:21,23;182:24;
185:22;186:8,10;187:5,7,
18;188:3;193:17,23;
194:15,19;195:3,7,8,13,15,
17;198:13,15,17;201:7;
214:8;217:2
away 14:10;151:2

**B**

back 9:15;10:20;15:13;
17:3;26:21;35:22;39:12;
40:24;42:5,9;56:6;74:24;
86:19;89:3;90:17;96:15;
97:8;99:2,5;109:23;110:6;
117:15;122:11;125:9,10,
17;132:23;133:3,13,14;
134:1,8;136:6;151:3;
153:12;160:5,6;168:5;
169:15,15;172:5,13,17;
175:3;178:6;184:24;
185:11;189:5;191:6;
200:14,17;202:15;208:16,
17
Back 29:12;40:2,8;45:5;
56:18;58:18;208:21
background 63:21
backwards 163:12
bad 151:8
Baltimore 160:8;180:24;
181:2
banks 156:21
barrier 148:12
based 130:21;132:6
Based 10:24;123:3
basically 42:12;88:8;
95:10;153:14;182:9
basis 14:12;38:14;86:3,6;
87:9,14;123:11;126:24;
135:1;160:24;192:8;200:8,
10;211:16;220:10

Bates 115:12;116:17;
119:15;121:16;126:10
Beach 34:2,17
became 11:1;13:13;
14:13;15:10;49:14,20,21;
50:2;52:22;63:11;64:6;
67:24
become 26:16;55:14
becoming 11:12,15
bed 149:21
beer 63:23;64:1
Beer 196:10,11,13,14,16
began 7:23;64:7
begin 6:21;51:12;82:9
beginning 7:2;56:24;
57:2,11,12;59:2;185:13
Beginning 105:15;201:4
behalf 5:15;7:15;76:18;
166:11,11;182:23;183:17;
195:8
behind 169:2,4
bell 105:2
below 81:22;207:1
belt 156:22
belts 156:23
beneficial 52:20
benefits 40:5;52:21;
53:18,20
besides 43:19;63:9;76:7
best 67:19;120:8;145:23;
147:18
better 14:24;142:12;
160:16;189:15;199:9
beyond 20:15;23:17;
25:22;26:1;115:18;119:4
Beyond 99:16;101:15
big 57:2;122:21
bigger 52:22
biggest 20:3
billing 100:2
bit 16:18;141:9;192:16;
203:6
bizarre 162:16
blank 110:16
blender 11:18
blouse 78:24
blouses 78:21
Bob 35:13;96:14,15,17,
17,19,20,21;97:1;186:21;
187:20
both 42:24;51:7;72:13;
81:15;158:20,24
bottles 175:12
bottom 19:20;70:5;113:4,
6,6
bought 10:7;11:7;19:5
Boulden 18:3;25:18;
37:17,18,20;38:6,16;44:15;
117:1
box 218:13
break 35:8;36:19;39:3,13;
62:10,13;80:5;88:12;117:6;
119:9;122:14;127:5;195:4

breakdown 56:8
breaks 80:17;90:7
brevity 5:22
brick 95:2
brief 127:5
briefly 7:22;126:12;217:7
bring 58:8;26:21;155:24;
175:11
bringing 13:2
broke 90:20;122:12,13,14
broker 211:18
brother 138:1
budget 14:1
Build 197:17
building 14:17;17:19;
89:16;95:2;201:24;213:20;
214:4
Building 203:3
built 202:5
bunch 114:16;191:19
burden 27:21
bus 157:4;195:11;207:2
bus- 29:9
business 12:24;13:2,5,7;
16:16,24;17:6,17;19:1,11;
21:12,17;24:21;27:18;
29:10,14,19;30:6;9;33:20;
35:10;38:4;42:7,8,19,22;
51:22;52:23;53:21;63:23;
69:3;108:2,7;120:19,21;
135:18;156:3;198:18;
199:2,4;205:3,17;211:5;
219:12;220:16;222:13
businesslike 19:23
businessman 220:20
busy 53:23,24

**C**

calculate 113:20
calculated 88:8;124:12;
215:22;216:1,3
calculation 85:12;87:2;
155:1
calculator 126:15
call 106:21;107:21,21;
147:11;160:15;161:24;
172:8
called 64:15;91:3;120:19,
21;147:19;210:5;213:8;
222:8
calling 161:21
calls 205:7;211:17
Cambodia 198:1
Cambodian 197:23;
198:8
Cambodians 197:23,24
came 13:24;19:4,7,8,9;
50:20;59:22;62:7;66:8;
87:17;91:17;100:14;
132:23;133:3,13,14;134:1,
8;150:8,19;151:15;152:7;
156:12,23;160:14;164:15;

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

166:15;170:18;208:16;
214:5
**can** 16:19,19;19:18;20:14;
22:11;23:16;26:17;27:20;
35:24;39:12;46:5;47:13,24;
51:7;58:18;62:4;66:12;
69:20;94:11;95:20;99:2;
107:6;108:11;109:23;
110:5;121:20,24;122:5,20,
24;124:23;126:1,3;129:21;
139:17;140:1;142:22;
143:16;160:16,16,17;
164:22;175:17;197:18;
200:19;205:7;211:18,18;
221:3
**Can** 25:1;62:2;66:15;
77:11;80:4;117:15;127:15;
167:10;168:5;175:17;
177:12;185:11;197:17
**candidly** 20:18
**candies** 31:10,11
**candy** 108:4
**capacity** 135:11
**caption** 5:20
**captions** 5:19
**car** 155:15
**card** 46:5;47:19;48:1;
199:6;200:2,5;216:6,8,10
**cards** 46:3,7,15;47:8,11,
17,17;48:9,20;199:20
**care** 40:2,5,14,17;118:4;
120:1;145:15
**carry** 156:21
**case** 5:16,20,23;6:3;
20:13,17;23:18;32:21;
73:14,15,17;162:16
**cases** 192:2,2,3
**cash** 65:12;151:6;156:10,
12,16,24;157:8,15,24;
194:18,21;195:9;217:4,7,8,
14;218:4,5,11,16,24
**categories** 27:19
**caveat** 9:19
**cease** 202:7
**center** 15:15;38:4
**certain** 14:19,20;41:16,
16;45:2;47:4,20;48:2,7;
60:20;72:21;88:20,21;
134:24,24;135:2;162:5;
202:18,18;206:12;218:20;
220:7,7,9
**certainly** 180:16
**certificate** 101:16;104:2;
107:23;109:3,5
**certification** 5:3;103:6;
108:23
**Chan** 136:23;137:2,13
**chance** 127:6;199:14
**change** 15:5;108:13;
132:11,18,21;214:9
**changed** 33:18;60:21;
132:20
**chaos** 149:13

**charge** 57:19;79:22;
120:9,11
**Charlotte** 135:22
**charts** 135:2
**check** 65:11,11,19,21;
66:5,9,13;110:3;136:7;
192:5,7;217:3;218:22
**checked** 107:24;131:4;
152:2;160:24;220:9
**checking** 155:18
**checks** 90:19;157:14,18,
23;191:19,23;192:1,4,22;
197:4
**checkup** 87:13
**Cheryl** 135:3,6,8,23,24;
145:11,17;188:1,8
**Chicago** 15:16
**children** 16:15;145:15
**chitchat** 209:14
**chose** 12:22
**Christiana** 147:22
**Church** 5:13
**Cinacin** 61:8
**Circle** 18:3;25:18;37:17,
19,20;38:6,17;44:15
**circulating** 47:9
**circumstance** 165:11;
169:7
**circumstances** 135:16;
145:2;180:4
**circumvent** 199:15,16
**citizen** 54:11
**city** 206:24
**Civil** 6:2,8
**claim** 164:10;165:5,14,16,
23
**claims** 54:24;181:1
**clarification** 45:11;65:14
**clarified** 79:24;90:10
**clarify** 90:12
**class** 56:14
**clean** 80:18
**clean-up** 207:8
**clear** 50:9;125:1;138:12;
144:13;161:22;169:21;
194:8
**cleared** 152:12
**clearly** 55:23
**clerk** 33:11;87:5
**client** 14:16;19:3,3;20:3,
4,23;21:5,10,13,17;22:6;
26:18;53:24
**clients** 13:9,15,15;15:17
**client's** 16:1
**clock** 57:4;87:20;216:15
**clocked** 216:12,19,23
**close** 13:3;31:15,17;34:7;
169:10
**closed** 79:3
**closing** 30:17,20
**clothing** 78:22
**collectively** 81:6;191:19
**college** 11:20

**Collision** 210:2
**combined** 158:14
**combining** 158:18
**coming** 15:12;61:19;
78:22,23;115:2,3,6;116:20;
160:23;169:15,24;207:9;
208:23;220:18
**Coming** 161:2
**comment** 210:18
**commercial** 158:11
**common** 59:4
**communicate** 67:11,16;
96:8
**comp** 16:1,2;102:20,22;
103:7;108:24;220:8
**companies** 16:4;23:20,
20;25:16;27:9,11,18;28:1;
46:9;52:15;60:6,11;129:2
**company** 10:7,12;11:8;
13:21;16:6;19:8;22:2;23:5;
53:6;61:13;63:13,16;68:15,
16;70:23;104:16;106:6,22;
107:22;119:22;120:4;
161:23;177:7;201:24;
202:5,17;213:10;222:8
**Company** 5:24;6:7,12;
7:16;102:24;105:1;106:3;
107:3;108:2;180:22;181:3
**company's** 221:18,20
**compensated** 83:8;
124:7
**compensation** 103:24;
107:16;124:20
**Compensation's** 104:5
**competitors** 14:18
**compile** 86:8
**complaint** 24:12;25:12;
26:3
**complete** 5:20;6:12;
176:15
**complicated** 16:9,11;
198:3
**comply** 151:18
**computer** 40:24;41:2,7;
116:13
**computer-generated**
41:12
**computers** 41:2,3
**con-** 148:21;149:4
**concept** 13:8;14:9
**concern** 219:24;220:14
**concerned** 42:5
**concerns** 219:13
**concluded** 222:24
**concludes** 105:13;201:1;
222:19
**conclusion** 182:18;205:7
**condition** 179:16
**conditions** 46:24;70:24;
78:9
**condominium** 213:22;
214:1

**conducted** 182:23,23;
198:17
**conducting** 135:18
**confidential** 20:12
**confirm** 10:21;204:18
**confirmation** 107:18
**confused** 175:8
**confusion** 148:10
**connected** 43:1
**connection** 8:21
**consider** 37:23;38:1
**considered** 46:23
**consistent** 53:22
**consolidated** 26:6
**construction** 44:9
**contact** 62:21;63:2,16;
64:14;68:4,11;139:1;
148:21;149:5;159:8;160:3,
12,20;161:14,14,17;
187:12;188:14;193:8;
211:9,12
**contacted** 152:15,18;
155:4,8;159:15;161:9,16;
166:5;185:23;186:22;
187:14
**contacting** 164:2
**contain** 83:21
**contained** 24:18;78:19;
79:7;80:14;158:21,24;
170:15;177:8;178:24;
195:18
**containing** 215:10
**contents** 92:4;95:12;
98:19;99:10;170:8;174:15;
185:9
**continue** 82:12;97:7,10
**contract** 13:22;19:4,12,
13,15,21;53:22;60:17;
68:20;71:24;72:3;74:9,11;
80:3;93:11;95:7;103:3,12,
16;120:24;121:1;131:18;
175:23;176:12;190:20;
202:19;208:11
**contracted** 60:3,6
**contracting** 220:13
**Contractions** 54:3,4
**contractor** 73:10
**contracts** 60:19;159:8
**control** 11:18;25:10;39:8,
23;71:24;128:19;133:2;
134:19,22,23;135:12,18;
137:9;146:16
**controlled** 217:8
**convenient** 121:22
**conver** 144:8
**conver-** 141:15;144:17
**conversation** 67:14;
92:4,5,15;141:7;142:1;
143:10;144:5,10,17,21,23;
146:14,15;162:3;164:6;
172:24;173:3,5,6,12,15;
181:4,19;186:24;187:2;
194:13,14

**conversations** 67:2;
92:1;96:4,23;97:2;141:3,
10,16,21;143:24;162:12;
164:7;165:21;170:8;
180:23;181:13;183:7,14;
186:20;189:18;190:7;
193:19
**conversed** 173:8
**convey** 146:24;149:13
**convince** 45:9
**co-packers** 15:14
**copied** 181:22;182:1
**copies** 116:14;153:18,24;
200:12
**copy** 69:5;100:9;106:19;
154:20;176:15
**corollary** 55:17
**corp** 157:13
**Corp** 201:21
**corporate** 7:4,9,11;20:16;
23:17;19:24;10:25;3;26:1;
27:13,15;28:6
**corporation** 157:13;
201:16
**corporations** 23:23
**corrected** 117:2;171:4
**correction** 171:6
**correctly** 81:11;98:10;
104:6
**correspond** 90:21;
111:10
**corresponding** 92:23;
123:15,21;128:7;170:19;
179:3
**corresponds** 113:14
**cost** 16:12
**Costigan** 97:14
**COSTIGAN** 97:6,11
**costs** 13:16
**counsel** 5:2;6:9,10,11;
7:5;143:14,24;144:12,21,
23;167:11,14;170:2,3,8,10,
22;185:6,8;200:21
**counsel's** 7:17
**count** 144:22;145:7
**counting** 33:1
**country** 15:13,16,22
**couple** 35:3,8;49:13;
90:18;116:13;118:19;
150:12;152:2;172:17;
196:24;199:16;211:13
**coupon** 101:8
**course** 135:23;215:8
**court** 6:14,17;99:4
**Court** 5:10,12
**COURT** 17:12;161:2;
182:13;202:2
**cover** 26:11;78:21,22
**coverage** 26:14;104:3,4,
5;162:18,18,21,22;164:16,
18;181:20;182:5,7,10
**coverages** 158:24
**covered** 163:6,11

B&R Services for Professionals, Inc.

Min-U-Script®

(3) can - covered

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

covering 103:24;158:16;
164:20
credit 47:16;48:20;
199:20;200:2
crew 55:9,10,15;207:8
criteria 85:5
current 34:1
currently 12:7;30:5,12,
22;31:2;32:11;35:10;49:2;
158:2;211:14
custody 25:9;218:10

**D**

dad 49:22
daily 35:12;86:3,5;87:9,
13;126:18;211:16
date 6:16;7:11,12,12;
41:18;71:4;75:11;82:9,10,
12;83:4;110:3;111:3,9,10;
112:10,12;119:20;120:24;
121:1;130:14,15;134:11;
150:3,11;158:16;179:16;
196:23;200:3;216:22
dated 73:22;101:16;
133:10;167:24;178:1;181:7
dating 188:24
daughter 209:6
David 62:23;63:3,16,21,
22;64:6,15;65:3,8,14;66:2,
8;67:10,11;76:14;95:24;
96:6,7,10,14,24;118:17;
147:12,12;157:6;166:18;
174:12;193:10,10;196:5
day 16:20;26:22;37:2;
42:3;80:18,18;111:11;
117:1,4;125:6,6,7,9,10;
139:13;148:1;149:1,3;
150:1;161:19;172:14,15,
16,16;173:1;180:3;185:14;
186:15;187:24;194:21;
201:8;205:5;211:10,13;
216:20
days 139:20;150:12;
152:2;172:17
day-to-day 211:4
deal 211:19
dealings 219:21
dealt 19:10;107:13
Deasey 7:15
DEASEY 7:14;18:15;
20:6,12,19;21:1;23:8,14;
24:5;25:1;26:12,23;29:20;
31:9,12;32:5,6;33:20;
35:23;36:19;43:22;45:10,
17,24;47:12;54:3;56:20;
57:10;60:17;62:16,18;
65:13,17;66:22;68:10;
69:15;70:1,19;73:6;74:8;
77:20;79:1;84:12,15;89:10;
90:6;93:22;94:10,20;95:19;
97:9,12,20,22;98:23;99:1;
100:20;101:18;102:5,14,

18;103:15;104:17;106:24;
107:4;108:12,19;109:2,9;
110:1;111:15,22;114:7;
115:7,9,11,20;116:1,15,17;
119:12,15;121:2,5,8,16,21;
123:16;124:22;126:3,9;
127:1,15,18;128:2;131:22;
139:15,17,24;142:21;
143:12,19;144:7;148:24;
154:6;158:7,23;161:5;
164:21;167:10,15;170:2;
175:18,24;176:8,17;177:2,
12;178:9,15;182:11,14;
184:8,13,20;190:21;191:6,
8;192:9,21;193:3;194:24;
195:4;196:10,14;198:19;
199:10;202:3;205:6;
210:11,24;214:14,23;
217:17;221:2,18,22;222:17
dec 107:19
deceased 6:5,6
December 119:21;
120:14,18
decided 18:4
deciding 8:22
decision 13:1;16:22;17:5;
47:19
decisions 203:19,20
deduct 88:16
D-E-E 66:22
defend 165:19
defendant 5:16;6:2,10;
26:7
defendants' 7:6
defilled 8:4
define 30:19;59:8,10,15,
20,20;74:5
defining 58:22,23
definitely 139:7
Delaware 5:11;10:14,17;
15:24;26:6;34:11;18;40:13;
94:5;100:10,15;104:4;
125:18,19;150:8;204:8,23;
210:1;220:7,8;222:13
delivered 56:1;83:13;
98:21
delivering 31:13
Dell 202:14,15;203:3,4
DeLong 33:5,6;34:19
denial 182:10
denied 164:10,16,18
Dennis 33:5,6;34:19
denying 165:4,22
department 39:5;151:15;
152:6,11,14
departments 39:9
depending 22:16
Depending 58:24
depends 73:9
deponent 6:15;25:8
deposed 8:4,11,17;9:4,
10;17:4,4,10:53:5;61:20;
187:19;188:11

deposes 185:14
deposit 101:8
deposition 5:3;6:23;7:4;
8:8;9:12,19,22;10:20,24;
12:10;23:18;24:6,9;27:14,
15;74:18;97:15;188:7,15;
194:16;195:18,19;196:2;
222:20
Deposition 222:24
depositions 195:22
descent 197:23,24
describe 69:13,20;197:17
described 24:12;25:11;
27:17;44:8;86:15;117:24
description 108:3,7;
132:10,12;215:1,8,8
designate 48:14
designee 7:5,9,11;20:16;
24:10;25:4;26:1;28:6
desire 21:23;82:14,23
details 16:8;60:20
determinate 82:24
determine 88:22
determined 26:13;34:16
determining 88:15
dialogue 193:21
dictate 9:18;72:15
different 9:1;12:23;19:8;
22:19;29:4,4;38:23,24;
47:18;53:20;56:8;54;60:5;
61:14,17;69:1;73:5;86:11;
126:16,17;143:5;165:8;
170:19;175:5,15;198:5,6,6,
7,9;199:16;203:17
difficult 13:8;15:20,24;
19:14;22:9;54:19;55:19;
57:3;67:9;196:23;198:2
difficulties 7:2
difficulty 55:6
direct 21:22;50:23;137:2;
139:1;148:21;160:12;
203:18;205:24
directing 19:5
direction 136:5;203:17
directly 57:19;134:9;
136:18;143:7;161:1,7;
166:6;181:16;220:18
dis- 64:7
disclose 20:5
disclosing 21:10
discovery 7:12;24:14,14;
25:2,13,17;26:23,24;27:1
discretion 47:10;218:16
discuss 24:11;194:4,6
discussed 89:15;118:12;
124:14;145:5,23;155:3;
172:20
discussing 62:1;173:20;
182:7;194:1
discussion 20:10;23:12;
126:7;129:24;146:2;147:5;
177:17;193:14;201:2;
204:2;205:18,22;206:1;

214:19;217:23
discussions 95:23;
105:3;144:12;167:6;185:5,
7,8;186:12;194:9;214:8
distribute 15:13
distribution 64:8
distributor 63:23;196:8,
10,11,16
distributorship 64:1
District 5:10,10;26:4
division 39:1,1
Division 100:10;150:8
divisions 38:24;39:2
divulge 143:15
Dobson 86:21,22;87:1;
88:2;112:9;114:19,21;
156:8
doc- 70:18
document 59:19;62:2;
69:21;70:18;77:10;78:6,11;
80:23;93:23;94:10;95:14;
98:13;99:21;100:14;
101:12;102:7,23;104:9,15;
105:19;106:2,11;108:2,13;
110:5;114:22;116:5;
117:24;130:22;135:1;
142:18;169:1;171:11;
172:2;174:18;176:20;
179:23;180:12;185:19;
190:18
documentation 18:10;
41:17,17,23;54:10;59:15;
107:14;177:7,23;200:4;
204:18
documents 24:13;25:12;
35:16,17;41:12;61:21;19,21,
24;62:6;72:7;74:19;
116:13;120:17;122:23;
126:14;127:10;128:5;
154:2;155:23;175:2;
179:10;191:1;210:3;217:14
dollars 215:24
done 13:12;14:19;48:19;
83:2;84:2;114:19,24;
127:12;166:10;179:19;
183:16;206:20
door 89:6;90:13;150:9,14;
152:7;205:16,17
Dorothy 87:11;88:1;
106:18,19;114:24;217:9;
218:12,15
Dorothy's 107:13
doubt 74:13,14,14
dowhat 29:9
down 12:23;13:2;16:17,
24;17:6,17;19:1;30:17;
36:20;39:3,13;51:23;57:16;
72:12,19;76:2;89:1,17;
90:1,20;117:4,18;147:22,
24;148:5;153:11;160:8;
184:16;193:4;195:5
drafted 76:24;92:2,6,7;
179:22;180:12

Drafted 92:12
drafting 170:9
dramatic 51:22;54:9
dramatically 198:9
dressed 78:23;79:19
drive 55:14;95:4;145:17;
179:11;215:2,9
driven 169:6,6;208:2
driver 95:4;151:22;162:7;
194:21
drivers 39:11
driver's 146:20;147:1,9
driving 138:23;145:18;
146:6,15;163:7;169:6,7,17;
179:4,18;180:2,14;198:23;
209:5
drove 22:3;58:24;207:21,
22
due 53:3
Due 6:24
duly 6:19
dump 42:15
duration 213:11
during 11:19;39:16;
64:24;90:7;103:23;134:18;
197:2;205:5
During 197:2
dusty 37:5
duties 78:10;82:3;92:18;
134:21;201:10
DV 105:13,15
DV-2 201:1
DV-3 201:4

**E**

Earl- 154:12
earlier 56:6;118:12;
154:11,12;188:11
Earlier 154:15
early 14:10;80:20;139:8
East 22:14;28:19
Eastern 5:10;26:4
effect 47:22;83:6;103:23;
145:14,22
effectively 67:17
efficiency 14:15;55:16,17
efficient 55:14
effort 169:20
eight 39:24;153:21
either 21:19;22:10;28:5;
126:14;130:16;155:12;
166:10;172:15;186:10;
193:10;213:1;217:3
Either 156:8
eligible 55:2
else 14:17;18:24;32:17;
44:4;48:13;63:14;76:6,12;
86:17;93:9,10;96:10;
137:14;146:1;155:7;162:7,
8;170:5;171:21,24;185:7;
202:9;210:10;222:16
else's 56:15

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

E-mail 211:9
employ 38:20;50:16,18,
19,21;205:21
employed 129:11
employee 11:22;33:3;
34:19;41:23;46:4,13,14;
47:20;48:2;109:19;128:16,
24;129:1,9;132:13,15;
137:2;141:12,17,22,23;
154:14;156:3;160:13,21;
162:7,9;164:11;187:10;
194:7;205:16;206:15,23;
207:14,15;212:5;215:7;
217:2
employees 32:23;33:1,2,
4;35:21;36:6;38:19;39:14;
40:6;41:22;45:2;48:7,9;
50:7,23;56:7,9,11,12,13,
15,17,19;57:20;58:13;
85:17;87:17;89:6;90:22;
103:4;129:14;139:11,11,
21;147:6;151:21,23,24;
164:19;166:16;174:20;
175:2;179:14;183:4,19,20;
185:23;193:23;198:14
employer 219:16
employment 25:14;26:9;
45:14;51:3;53:1,6,12,19;
60:1,15;64:21;68:4;71:14;
107:12;129:18;130:11,24;
131:18,23;132:1;133:10;
164:12;175:22;178:1,11,
16,17;179:17;190:19;
194:1;204:11;215:9;220:1
Employment 130:10
en- 61:6
encourage 169:14
end 67:13;80:18;84:2,2;
125:9;152:3;153:16;194:20
ended 51:21;72:24;172:5
ending 118:1;119:20;
120:14,16
engineering 201:24;
202:4
Engineering 201:21
England 134:5
English 67:5,7,21;173:22;
174:3,7,9;189:22
enough 199:3
enter 76:18
entered 71:7;73:20;76:5;
82:19;95:7
entering 76:3
entire 98:5;178:16
entities 155:2;201:20
entitled 25:24
entity 24:23;61:6;69:1,2;
79:18;120:19,21;152:16;
153:18;154:3;155:3;201:12
enumerated 93:4;113:16
equipment 32:6,8;167:1;
202:5,18

Eslinger 33:16;35:5,6;
48:12;70:10;76:9;156:8;
172:1
Estate 6:5
estimate 39:14;51:13
Estimate 39:15,17
estimating 44:14
et 6:6
etcetera 25:21;160:17,18,
18
ethnic 198:7,10
even 7:11;59:16;72:19;
145:7;149:19,20;190:1;
209:4
Even 197:21
evening 148:3
event 136:3;220:24
events 135:24
everybody 50:20
evidence 20:15
evolved 60:21;77:14
exact 92:4;162:12
exactly 18:7;115:23;
116:19,22;123:19;164:1
examined 6:20
excellent 152:4
except 5:4;12:20;110:16
Except 187:24
excess 159:1
exclusively 42:22
excuse 28:2
Excuse 58:4;116:20;
148:9
excused 222:23
Exhibit 69:9;98:4;105:11;
118:14;130:4;133:6;
167:17;180:17;190:13;
191:15
Exhibit-4 69:13
Exhibit-12 181:6
Exhibit-2 105:9
Exhibit-5 118:10
Exhibits 109:14
exist 202:7
existence 68:1;201:23;
202:20
exists 95:15
expansions 54:1
expectation 106:20;
107:20
expected 107:7
expenses 199:13
experience 52:19,20
experienced 162:15
expire 18:6,20
explain 17:2;110:7
Explain 142:11
explained 151:19;190:10
explanation 150:21;
157:1,3;162:23;163:13,16
explicitly 94:7;176:3;
179:14
express 174:6

extent 20:17;126:12;
143:13;186:23
extra 108:18
extremely 26:16

F

fact 27:19;48:3,5;54:14;
59:16;93:15;95:16;96:1;
103:9;107:15;125:13;
128:16;146:20;147:8;
156:9;174:4;194:15;203:7,
12;219:17
factor 14:13
factories 44:11
factory 11:16;49:17,24;
56:10,19;58:20;70:13;
85:15;87:18;88:4;89:7;
90:24;91:2;93:7,17;94:9;
95:9,18;108:8;132:13,15;
133:1;136:17,22;138:8,15;
139:5,12;140:14;172:6;
179:18;194:12;204:23;
208:24;209:6
Factory 82:6
facts 148:18
factually 52:17
faded 53:16
failed 21:16
fair 45:1;210:21
Fair 209:23;210:5,14,16
F-A-I-R 210:17
fairly 139:8;162:14,14
familiar 106:5;137:21;
159:12
family 136:16,21;137:14
far 12:16;16:11,12;18:10;
26:8;31:24;38:2;39:13;
40:14;41:7,8,11;42:5;
130:14;131:6;135:10
father 10:7,9;11:8;12:4;
13:21;138:3;208:22,23;
212:8,10
February 133:10;134:13;
175:23;176:2;208:10,11
federal 85:5;101:7
fee 91:4,11,16,19;213:23;
214:2,3
feel 53:18;173:24
feeling 115:5
fees 220:8
fellow 152:18;162:15
fellow's 210:12
felt 179:24
female 66:19
few 10:21;214:18
field 163:18
file 129:13,17;178:11,16,
17
filed 8:23,24;9:2;26:4
files 106:12
filing 5:2;167:5
fill 100:5;133:14,20

filled 100:6,8;110:11;
126:19;132:5;133:24
filling 50:3;135:2;137:6
final 30:17
Financial 105:1;106:2;
107:2;108:1
find 13:16;48:2,4;74:8,10;
176:6
fine 26:20;45:24;108:17;
109:11;122:1;128:2,12;
146:10;152:5;189:16;
192:23
finish 154:6;177:2;
199:10;210:24
finished 32:3
firm 8:1;61:11;126:11
first 41:7;42:21;63:11;
69:22;70:19,20;71:7,11;
77:8;81:3,8;110:24;113:4,
8;115:5,15;125:17;128:23;
130:23;131:9,9;147:16;
150:21;159:18;160:7;
166:2;171:15;174:17;
176:6,12,14;182:18;187:8;
189:15;192:6,14;207:9,21;
208:2,22;209:24
First 6:23;24:8;93:18;
104:24;105:1;106:2;107:2;
108:1;151:19
fit 37:16;218:17
five 12:11;19:24;39:23;
54:14,17;55:12;90:3;
123:17,17;134:14;153:23;
170:18;175:5,15;178:5;
197:18
Five 112:13
fixed 17:20
fixing 18:23
flip 71:18;99:15;105:24;
114:5,12,15;115:18,18;
119:4;191:21
Flip 119:8
floor 5:18
Florida 34:3
fluent 189:21
flying 150:24;156:10
focusing 13:23;153:15
follow 78:8;106:21;
107:20;136:9;165:5;189:8;
199:2
followed 118:22
following 92:21;144:3;
145:13,13;199:3
Following 116:12
follows 6:20;99:5;116:3
follow-up 160:1;164:7;
179:9;217:20
food 13:10;15:11;16:10
foot 42:11,13,17;43:20
force 103:22
foreseeable 220:24
forget 48:21;152:20;
153:13

forklift 166:23
forklifts 44:8,12,13,15,18,
23;45:3,6
form 5:5;35:23;47:12;
60:10,22;95:19;99:17;
100:1,4,7;106:24;110:14,
16,19;113:18;114:17,18;
118:12,23;119:1,23;
124:22;133:24;139:15;
140:1;142:22;164:15,21;
205:6;221:2
formally 7:23
format 13:20
forms 110:9;114:10;
125:23
formulated 178:6
forsee 221:5
forth 7:13;58:11;153:7;
207:12
Fortune 119:24;120:3,9,
20;129:3
found 169:5
founder 10:10
four 19:24;25:4;27:19,23;
39:13,23;55:12;59:2,3;
92:18;113:7;134:16,18;
149:17;153:23;175:5;
178:5;202:8;219:2
Francis 7:15
frank 23:24
Frankford 196:16,20
Frock 159:11;160:4;
180:21;181:8
front 24:15;80:24;118:11,
17;127:10;131:3;171:22
full 103:22;131:4;209:5
full-time 11:22
furnish 103:22;104:2
further 106:22;107:22,24;
167:6;217:18
fussy 142:11
future 32:1;180:13

G

garbage 42:15
gas 46:5,5,7;47:17;199:6,
13,21
gasoline 46:3,9;47:11;
48:1,9
gather 87:8
gathered 35:15
gathering 90:4
gathers 35:14
gave 46:23;47:8;85:6;
154:3;144:4;153:8,17;
154:3;157:2,18,23;163:13,
22;220:14
general 13:7;14:12;97:18,
24;104:3;122:23;158:11;
207:10;218:7,8
General 104:17,19
Generalities 162:11

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

generalization 89:21
generally 48:4;132:2;
211:8
Generally 181:16;182:6;
206:11
generate 114:22
generated 70:12;77:10;
116:5,11;174:17;200:10;
209:22
generically 44:2
George 212:23,24
gets 164:24
girlfriend 188:22
given 9:11,14;22:17;
46:15;47:9;48:1,8;56:22;
70:24;76:16;83:23;139:13;
157:2;192:17;194:21;
199:7;218:15
gives 111:11
giving 151:8;170:7
glad 172:21
glance 127:7
glanced 126:12
glass 175:12
goes 82:8;92:17;113:1
golly 40:21
good 49:13;55:15;56:3;
66:16;148:13;206:22;208:7
Good 7:20,21
gradual 17:1
Gray 101:3
great 15:7
Great 127:1
Green 34:8
Greenville 34:9
Grossman 77:3;92:11,12
group 68:17
grouping 39:11
groups 39:13;198:6,7,7
guess 17:11,14;38:21;
44:9;53:16;59:9;74:10;
75:13;117:14;121:11;
132:14;145:24;149:16;
192:6;197:1
guessing 18:9;34:21
guidance 169:22
Gunn 152:19
guy 35:11;62:16,18;64:4;
66:16;120:12;151:8;
197:13;207:9,10;208:7
guys 21:2;153:15;160:7;
221:8

**H**

Hadi 188:17,19;189:18,21
half 31:18;117:3;215:24
hand 19:12;75:17;218:6,
16
handed 65:11,20;86:5
handled 92:16
hands-on 50:6
handwriting 15:23;75:14

happen 221:6
happened 12:16;48:6;
65:24;148:19;164:10;
183:8;187:23;199:18;
206:22
happening 166:17;183:5;
214:6;220:5,23
happens 117:19;153:20
happy 62:12;169:8
hard 40:14
Harry 166:18
Hassey 33:9,10;34:24;
35:1;96:18
head 168:19;195:10
heading 82:6
headquarters 38:2
health 16:2,5,15;40:2,5,
14,17
hear 48:17;153:10
heard 61:11,15;104:24;
134:9;143:13,15;144:24;
145:3,7,8,11,24;189:7
held 9:12;10:4;11:9;
20:10;23:12;46:14;80:9;
122:8;126:7;129:24;137:8;
177:17;201:2;204:2;
214:19;217:23
hello 67:12;139:3;160:24
help 55:7;98:21;206:15
Herbert 10:7,9
herein 98:4
hereinafter 81:6
Here's 21:2
Hessey 34:23
hey 16:17;78:12;80:2;
186:21;187:14
hi 173:15
higher 16:12
highway 151:1
himself 197:14
hire 54:14,17
hired 132:6,24;204:7,22;
208:7
hiring 54:7,8
historically 142:24
hold 31:20;41:9;117:23
Hold 20:19;69:15
holding 122:21
home 95:17;125:10;
150:14;205:3;207:3,5,11
homes 93:7,16;141:5
homework 155:20
hope 97:7
horrendous 169:12
horrible 148:16,16;
149:22;169:12
horribly 178:20
hospital 148:5,8;149:3,15
hour 84:7,11,17,23;90:20,
21;117:4;211:24;215:24
hourly 83:14;85:14;88:17;
113:15;123:5,8,11;215:18,
20

hours 83:15,22;85:16;
86:9;109:19;113:15,23;
117:2;126:16;149:17;
216:2,5,8
house 8:19,21;17:21;
18:23;53:22
huge 124;125:21
hurt 148:15;169:11
husband 134:6;207:22;
208:3,5,16
hypothetical 73:8

**I**

ice 212:13,14
idea 191:1;196:4;197:10,
11;198:11;202:23
identification 69:10;
105:12;109:15;118:15;
127:8;130:5;133:7;167:18;
180:18;190:14;191:16
identified 126:18;130:7;
176:22
Identified 109:17
imagine 52:4
immediate 21:19;135:4
immediately 122:12
implicated 219:15
implication 152:22;163:4
important 14:3
importing 202:17
impossible 16:5
inappropriately 78:23
Inc 6:7;7:17;27:9,14;28:2;
70:3,3;72:4,4,8;75:19;94:4
inception 10:16
incident 24:12;25:11
included 124:1
includes 41:19
including 6:10;24:13;
25:12;39:24;41:17
incorporated 10:13,17;
98:4
Incorporated 5:13;6:1;
10:2,10;30:9;75:3;99:18;
118:4;119:2,6;120:3,10,20,
22;166:19
indemnification 26:8
independent 86:10,10
Indiana 15:16
indicate 112:22;222:7
indicates 24:10
indicating 152:11
Indicating 88:9;117:16;
185:12;191:8
indication 217:14
indirectly 76:21;134:9
individual 28:5;57:18;
58:15;62:20;63:1;68:12;
75:2;76:2,7,17;95:24;
120:8;137:23;138:10;
156:5;159:14;166:6;
194:23;195:10

individually 65:15
Individually 6:4
individuals 47:8;66:11;
81:21;85:22;87:24;113:16;
138:22;152:7;156:20;
206:7,10
industrial 213:21
industry 14:11;16:9
inform 136:13
information 20:13;24:18;
42:1;54:12;76:16;87:8;
114:20;116:20;140:5;
153:4;163:22;209:13;
221:15
informed 152:4
initial 110:9;112:7;
160:19;164:6;167:5
initialed 112:22
initially 110:15
Initially 171:3
initiated 165:24
initiation 167:8
injured 164:20;212:5
inquire 25:24
inquiries 27:23
inquiry 25:5
INS 155:11,14
inside 44:10;135:19;
140:22;175:15
insignificant 207:19
instance 37:3;175:10
institution 105:1
instruct 26:18;27:6;28:3;
58:9
instruction 136:9
instructions 9:11,15,18
insurance 16:2,3,5;
26:15;40:18;101:16;
102:11,15;103:8,9,24;
104:2,4,5,15,16,18;105:4,
5;106:6,16,20,22;107:15,
18,21,23;109:3,6;158:3,4;
159:8,17,19;160:23;
181:20;211:21;220:8
Insurance 5:24;6:7,11;
7:16;102:24;105:1;106:2;
107:3;108:1;166:19;
180:22;181:2
insure 220:22
insured 106:8
insuring 85:23
intend 32:9
intention 31:23;161:20
interest 23:6;24;24:24;
32:18;201:16;202:11
interesting 101:21
interface 136:10
internal 59:19;166:9
internally 44:10
inter-plant 47:5
interpreted 47:22
interpreting 16:4
interrelationship 25:16

intervening 73:10
interview 55:22;152:4;
166:16
interviewed 183:4
into 15:6;16:16;19:16;
25:24;37:17;47:22;54:7;
56:10;61:18;71:8;73:20;
76:3,5,19;82:19;84:19;
95:4,4,5,7;121:22;132:24;
133:2,2;156:3;175:12;
182:24;195:10;214:10
introduced 7:22
introductions 13:23,24
inventory 41:4
investigation 152:4;
153:2;166:10;182:24;
183:2,16,18
invoice 83:15,17,18,21;
86:11,23;87:1;100:3;
110:11,23;111:1,3,8,9,10;
115:2,14;118:10,12
Invoice 111:6
invoice-related 127:11
invoices 90:19,21;
109:18;112:15;122:15;
123:3,13;125:24;126:14,15
invoicing 126:24
involved 49:23;63:11;
64:8;69:24;148:23;161:1,7;
165:13,15;212:3
involvement 27:16;
165:17
involving 36:5
IRS 152:23;155:9;220:18
Islinger 35:4
isolate 187:8
issue 15:8,9;156:10;
181:21;205:15,15;218:4;
219:20
issues 173:19;182:5,7;
183:1;211:20,21
item 123:15,21;124:2,4;
128:6
itemize 200:3
items 19:24

**J**

jagged 31:16
Japanese 202:18
Jeff 159:11;180:21;181:8
Jeffrey 5:11
Jerry 77:3,7;92:11,12
Jersey 5:14
job 31:16;132:10,12;
145:18,18;146:16,16;
215:1,7
job/functions 81:22
jobs 50:3
joint 219:16
Jordan 7:13
Josh 7:24;20:20;23:15;
94:22;121:21

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

judge 21:3
Judge 7:13
judgment 27:2
July 168:1;178:1
June 6:16;35:22;36:5,11,
13,18;38:20;57:15,16;58:3,
16,18;65:1;83:5;85:21;
86:19,20;116:23;118:1;
120:16,18;134:12;140:9,
13;147:17;152:16;155:4;
160:11,21;161:10;175:1;
200:14;214:7,24;215:19;
216:22;218:23;222:20
justified 86:12
justify 47:4

**K**

keep 41:16;103:22;
108:14;219:1
Keep 115:20,22
Kenney 60:23;61:2
kept 35:16;42:2;218:6;
219:4
Kept 42:3
key 14:6;17:19,22;120:12
killed 162:6
kind 13:22;14:14;21:24;
40:14;53:16;56:4;59:14;
80:16;96:16;151:7;162:13,
19;163:12;197:20;207:13;
208:4,5
Kind 33:13
kinds 193:19
Kline 5:17;8:1
knew 63:7,8;88:5,7;104:8;
132:2,3;147:3;148:10;
152:8;154:20;163:2,3;
165:12,12;187:18;189:23;
191:4;204:7,17,21;221:7
knocked 150:14
knocking 150:9;151:16;
152:7
knowing 134:11
knowledge 67:19;85:6;
120:9;215:13,19
known 140:5

**L**

labor 49:16;51:9,14,15;
52:9;59:10;60:1,5;68:12;
70:23;72:21;100:2;106:16;
127:23;151:15;152:7,11,14
Labor 150:8
laborer 71:13;84:24
laborers 45:12;49:24;
51:18;56:9;70:4;72:21;
215:3,10,14,15;217:4
laid 15:4
Lam 61:10,15,16;62:20;
63:2,12;64:8;65:16;66:3,
11;68:1,19;70:2;71:8,10;

72:4,8;73:6,7,20;74:12;
75:19;76:2,8,12,18;78:7;
79:14;81:18;82:3;83:9;
84:14,16,18,23;85:4,17;
89:5;91:10;93:15,21;94:4;
95:8,16;98:18;99:9,17;
100:16;105:5;106:9;
107:11;109:8,20,20;
110:11;111:11;113:21;
115:3;116:7,9,10;117:9;
118:3,17;119:1,5;120:5,21;
122:15;123:9;124:7,15;
126:20;127:12,21,24;
128:8,24;136:17;138:14;
140:17;143:1;154:4,16,18;
155:22,23;156:3;157:14,
20,23;190:11;191:12,23;
192:8,16;193:9,11,14,24;
194:3,10;195:2,14;198:13;
215:3,11;219:12,14,16,21;
221:12,12,16;222:8
Lane 34:2
language 67:20;91:23;
93:14;148:12;169:24;
170:15
languages 67:21
large 14:21;15:1
larger 13:11
last 49:9;53:11,13;81:3,9,
9;118:20;188:8;193:8;
197:6
late 14:10
later 7:3,9,11;31:16;
40:13;52:10;80:19;132:23;
150:3,12;166:4;207:23
Laurel 5:14
law 8:1
laws 10:13,17;16:2
lawsuit 8:20;165:23;
166:3;167:6
lead 5:16,23;7:6;15:6;
20:14
leader 59:16,17;138:18;
194:22;195:9;199:12;209:2
leaders 58:8,10,14,16,19,
23;99:4,7,13;125:12;
138:21;199:8,13
Leaders 58:21
leads 208:1
learn 131:15;148:7
learned 44:5;146:24;
147:16;148:9;161:15
lease 17:18;18:4,6,11,20,
22;23:3;29:1;213:17
leased 17:19;18:1;23:1;
25:20;28:17,22,24,24;
36:17;38:3,12;43:4;44:19
leases 24:22
leasing 24:1;30:2,5
least 64:24;66:4,7;92:13;
102:22;103:12;108:7;
112:21;115:23;174:15
leave 80:20;134:1;139:9

leaves 97:14
leaving 90:5
left 30:24;68:6;88:7;89:7;
132:22;133:3,14;134:3;
139:9;208:14
legal 182:17;188:21;205:7
legalese 170:24
legitimate 155:17
less 16:13;34:18;53:15,15
let- 170:1
letter 7:7;40:22;152:10;
164:13,15;167:21;170:9,
11;172:19;181:7,9,14;
182:4,9,15,19,22;183:16
level 219:1
Lexus 43:13,19
liability 101:16;102:11;
103:8,9;104:3,17,19;
107:15;158:11
Liability 102:15
license 45:7;100:16,17,
18,21,23;146:20;147:1,9,
14
License 100:11
lie 162:18,21,21
lieu 122:21
life 41:15
likely 38:15;87:15;139:6
limitations 176:3
line 14:5;19:20;55:15;
57:5,6;72:19;86:2,4,16;
87:3,8,12;88:20,24;89:22,
24;90:1;103:19;123:14,20;
128:6;131:9;185:13;208:8
lines 11:21;71:17;134:24;
164:24
liquor 64:7;196:8
Liquor 196:12
list 6:12;175:14;184:16;
185:15;189:8
listed 5:20;6:13;27:20;
81:22;130:8
listen 143:19
Listen 98:23;99:1;143:19
lists 26:6;175:5;178:6
litigation 9:7;165:24;
167:9;180:13;203:12;212:3
little 16:8,8;21:24;34:17,
17;122:14;132:23;141:9;
142:11,12;143:4;144:13;
150:20;162:24;165:1;
168:2;192:16;193:1,12;
203:6;206:8;207:8
live 134:6;204:8
lived 34:6;189:6;197:8;
204:17,23
LLC 23:4,5;202:15
local 50:4;51:14
located 15:15;18:2;24:20
location 38:4
locations 22:19,21
lock 218:13
Locust 5:17

logo 127:21
long 9:3;20:1;34:6,19;
42:1;52:14;74:2;88:3;97:7;
149:15;196:22;210:4;
218:17
longer 72:23;131:16;
153:13;201:23
long-time 206:23
look 19:14,16;62:7;69:7;
80:23;92:15;93:4;102:16;
103:14,15;105:9;126:1,2;
127:20;170:23,23;171:8;
176:6;177:5;184:6;190:24;
200:17,19;203:22
looked 74:20;90:18,19;
120:15
looking 16:16;93:24;
113:13;116:4;120:16;
155:23;168:17;169:13;
175:22
looks 75:10,12,12;101:7;
111:24
loose 150:24
loosely 79:24
loss 148:14
lost 20:2;144:13
lot 13:11,11;54:22,22;
55:3,5,5,6;80:20;198:3;
203:19;213:4,17,24
low 193:6
lower 193:2
LS 82:3
LSI 81:18,21;82:12,23;
83:9,12,18;85:17;89:5;
90:19,22;92:18,20,23;93:5,
5;95:24;98:9;102:10;103:3,
8,24;104:2,16
lunch 88:12;90:7;117:6,8,
9;119:9,9
lunchtime 88:16

**M**

machine 11:17;15:3
machinery 15:2;30:13,
14,15,22,22;42:16;202:1;
203:8;211:20
Machinery 30:24
machines 14:23;202:19
Magnus 96:19,20,21;
97:1;186:5,6,13,15
mail 152:11;207:12
mailed 65:10
mailing 106:9
major 19:3;57:2
makes 35:15
making 153:24;155:20;
175:10;199:23;207:20
male 66:19,20
M-A-L-I 171:3
Maly 5:15;6:1,10;8:2;
25:14;26:10;128:14;
130:20,22;131:16;132:18;

136:16,21;137:11,13;
138:3;141:16,22,23;142:3;
145:11,13;146:4;154:4,12;
166:21;167:2,22,23;169:5;
171:1,17;172:5;173:8;
174:12;175:22;179:3,10,
15,21;180:1;183:11;187:1;
194:2,3,7,11,16;195:18,19;
199:7;201:8;204:8;205:18,
22;206:1,3,16;207:21;
208:1,21;214:8;215:1;
217:3,15
Maly's 136:24;180:14
Mam 6:5;137:21
MAMSI 40:10,18,21
manage 58:12,13;201:12
managed 201:17
management 200:1
manager 47:23;58:8;
64:18,19,20;96:21;136:4;
212:17
manages 35:12
managing 55:6;58:16;
202:18
manufacturers 13:10
manufacturing 31:2
many 12:6;22:7;32:23,23;
36:16;38:19,23;39:14;
44:13;46:7;55:24;56:18;
58:19;62:6;65:5;67:18;
139:21;148:17;216:2,5,8
March 181:7;185:14,16;
200:14
margins 13:18
mark 27:20;69:5;105:8;
108:22,23;125:21
marked 28:8;69:10;
105:12,18;108:15,17;
109:15;118:15;127:7;
130:4;133:7;167:18;
180:18;190:14;191:16
market 14:4;15:5
marketing 14:9
Massachusetts 134:5;
208:15
massive 148:10;153:19,
19;154:22
Mata- 75:20
Mataday 66:17,19,21;
67:2,11,16;75:20,21;197:5,
6,8,12,14;198:11
material 31:3;127:11
materials 15:11;18:24;
41:9
M-A-T-T-A 66:22
matter 8:5,12;9:4,10;25:7;
28:2;84:10;98:8;174:4;
183:24
matters 27:19;28:6
may 18:19,19;25:20;
37:12,12;38:14;40:11;53:3;
56:15;59:1,1;60:20,21;
67:3;76:20;77:6;83:1;90:3;

B&R Services for Professionals, Inc.

Min-U-Script®

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

97:4;98:17,17;99:8,8;
101:14;114:1;139:9;
144:22;154:19;160:6,24;
166:8;168:13;170:21,21;
175:11,12,13;181:4;185:5;
187:18;193:18;209:19
**May** 117:2;200:14
**maybe** 53:17;65:7;
121:23;151:5
**Maybe** 31:17;193:1,6
**McManus** 186:2
**mean** 16:1,7;20:19;25:3;
26:17;29:20;30:14;31:9;
32:6;37:1;46:22;60:24;
65:10;78:1;83:9;94:6,13;
100:20;102:10;105:5;
108:17;111:5;113:19;
131:22;148:24;149:13,19;
153:20;155:14;156:13;
162:20;170:11;174:10;
182:16;183:3,18,18;
189:11;190:3;192:9;
197:18,22;198:23;203:15;
207:4;210:11;221:18
**Meaning** 121:16
**means** 198:22
**meant** 163:15;210:9
**mechanic** 33:7;199:22,23
**mechanical** 39:1
**Mechanical** 39:8,23
**mechanics** 47:4
**Media** 5:12
**medical** 149:23
**meet** 65:3,5;170:9
**members** 136:16,21;
151:21
**memo** 48:16;167:21;
168:19;169:20;170:1,16;
179:13
**memorandum** 168:8;
174:14,21;190:17
**memorializing** 72:7
**memos** 48:19
**mention** 26:3
**mentioned** 56:11;144:15;
186:4
**Merc** 167:8
**Mercedes** 43:11,20
**Merculy** 167:7
**Mercury** 5:23;6:7,11;
7:16;158:7,9;159:9,15;
160:2,13,20;166:6,11,15;
167:8;180:21;181:2,14;
182:9,22;183:17;190:9
**met** 85:5,7
**mete** 47:10;48:8
**meted** 46:18,20,21;47:18
**mic** 117:18
**Michael** 213:1
**mid** 202:16
**middle** 15:21;35:8;193:6
**midwest** 15:12
**might** 37:15;39:6;113:24;

136:4;147:24;180:13;
186:21;187:14,19;190:3;
203:16;220:24
**Mike** 212:16
**million** 16:8
**Mina** 86:21,21;87:1;88:2;
112:9;114:19,21;156:8
**mind** 160:6
**mine** 75:8;192:2
**minute** 23:9;80:17;117:6;
119:9
**minutes** 90:3,18
**missing** 176:19,23;178:4
**mistake** 19:6;171:11
**model** 43:14
**M-O-L-L-Y** 171:16
**mom** 43:12
**moment** 25:1
**Monday** 54:15
**money** 126:17;151:3,4;
156:22,23;157:3;191:11;
218:19
**Monteverde** 34:2
**month** 126:21;47:2,3;
168:2;199:20
**monthly** 200:8,10
**months** 134:14,16,18
**more** 8:13;13:8,11,13;
14:11;15:19,19;16:9,11;
34:17;114:1;186:24;198:3;
222:18
**morning** 7:20,21
**most** 15:11;35:12;41:15;
67:12;151:20;172:21
**Most** 38:15;87:15;139:6;
149:9
**mostly** 154:10
**Mostly** 41:4
**mother** 43:9;137:16
**Mount** 5:13
**move** 14:23;42:16;165:7
**moved** 34:4;206:24
**movement** 47:5
**much** 13:8;16:9;21:11;
34:14;60:14;85:3;148:11;
191:11;193:20;194:4,5
**must** 173:2
**myself** 7:22;16:17

## N

**Naarden** 7:24
**NAARDEN** 6:21;7:19;
17:15;18:17;20:22;21:6,9;
23:22;24:8;26:2,13;28:7,
12;29:22;31:11,13,19;32:7;
33:22,24;36:3;37:22;43:23;
44:3;45:15,22;46:2;47:15;
56:5,21;57:14;60:18;62:17,
19;65:16,22;66:24;68:11,
18;69:12,19;70:4,20;71:2;
73:7,12;74:15;77:22;79:5;
80:6,12;84:13,20;89:13;

90:9;94:2,14,23;95:22;
97:16,21,23;99:2,13;
100:22;101:1,20,24;102:6,
21;103:17;104:19,22;
105:17;107:2,9;108:16,20;
109:4,11,16;110:2;111:16,
23;114:8;115:17,21;116:2,
16,18;117:21;118:16;
119:14,16;121:3,6,9,14,19,
24;122:5,10;123:18,23;
125:3;127:4,17;128:1,3;
129:20;130:6;131:24;
133:8;139:19;140:3;143:3,
21;144:9;149:2;154:7;
158:8;159:4;161:8;165:2;
167:12,19;170:3,6;175:19,
21;176:1,10,18;177:4,14,
21;178:23;180:19;182:20;
184:9,14,18,23;190:15,23;
191:7,9,17;192:10,12,23;
193:7;195:1,6;196:12,15;
199:5,11;201:6;202:6;
203:21;204:6;205:11;
210:15;211:2;214:12;
217:19;218:3;221:10,20;
222:2,15
**name** 7:23;20:4;21:10;
46:13,13;60:23;63:11;
92:10;106:8;116:7;119:22;
120:3;130:18;137:24;
152:6,19;159:11;160:5,9;
180:21;186:5;189:23;
196:18;197:5;201:19;
210:12;212:16;214:10
**named** 63:15;77:3
**names** 33:4;61:14,17;
63:4,8;66:15;86:19;149:20;
151:14;197:13
**nationality** 197:20
**nature** 53:1
**Navy** 6:5;137:24
**near** 37:7
**necessarily** 11:22;221:1,
4
**necessary** 20:20;179:24;
211:10,13
**need** 14:4;35:18;46:12;
53:24;62:10;67:1;72:23;
126:2;154:21;218:24
**needed** 35:17;55:24;
67:18;70:12
**needs** 150:20
**negative** 15:9
**negatively** 178:21
**negotiate** 20:1;21:23
**negotiating** 20:24;21:1,
12
**negotiation** 19:2
**negotiations** 21:16
**neighborhood** 38:21
**new** 13:23;14:7;19:7;
76:21;121:22;133:15
**New** 5:14;13:23;134:4;

141:10;146:23
**Newsome** 58:17;65:1;
67:15,20;68:7;88:1;97:3;
117:12;135:6,11;140:11,
19;141:3,11;146:23;
147:19;157:12;187:4,9,13;
188:22,23;189:4;212:19
**newspaper** 50:4;151:2,8
**next** 36:11;90:3;100:9;
101:7;161:19;164:9;
172:16;180:3
**nice** 62:14,16,17,18
**nicely** 174:13
**night** 87:16;145:12,21;
206:7,9;207:4
**nine** 39:24;131:17
**nobody** 14:17
**Nobody** 148:10
**none** 25:5;27:23;142:6;
155:6
**None** 12:8;135:14;198:12;
221:17
**Nope** 187:3
**nor** 147:3
**normal** 41:11;135:23;
160:15
**normally** 159:15
**Normally** 19:8
**note** 82:13
**notes** 203:22
**notice** 23:17;24:6;9;25:3,
15;27:13,15,20,21,22;
162:1
**noticed** 6:24;7:3
**notification** 165:4
**notified** 7:6,7;165:22
**notifies** 82:13
**notify** 82:23;163:24
**notifying** 161:21
**Nowhere** 25:15;27:14
**number** 35:11;59:4;
83:14,22;85:16;86:4,9,9;
90:22;91:8;103:19;105:14;
110:23;111:1,6;128:9;
139:10,11
**Number** 6:2,8;27:12;
92:18;97:24;116:17;
119:15;121:17
**numbers** 86:13,14;92:22;
126:10;170:19;184:8
**numerical** 128:9

## O

**object** 23:14;26:18;27:6;
28:3;84:15;94:10;107:4;
142:21;192:21
**objection** 139:24
**Objection** 35:23;47:12;
70:1;95:19;106:24;124:22;
139:15;164:21;182:11;
205:6;221:2
**objections** 5:4

**obligated** 26:11
**obligation** 136:12;161:22
**obligations** 41:16
**observations** 13:4
**observe** 157:6
**obtain** 107:14
**obtained** 45:13;107:5
**obtaining** 106:19
**obviously** 24:11;26:7;
163:6
**Obviously** 50:19;148:13
**occupants** 148:22;
188:20
**occupied** 25:20
**occupy** 211:23
**occurred** 80:22;83:4;
144:6,10,17;161:24;213:3
**o'clock** 89:22,24;90:1,3;
97:8;117:7
**October** 71:4;73:23;
82:20,22;101:17;121:1,2,4,
10
**odd-ball** 206:14
**Oeurn** 6:5;137:21
**off** 15:1;20:7,10;23:9,12;
30:15;32:3,8;54:8;80:7;
86:3;117:11,13;126:3,6,7;
129:21,24;131:4;156:24;
177:12,17;186:15;189:15;
201:2;203:8;204:2;214:19;
217:23
**Off** 20:8;23:8,10;122:6;
129:22;177:15;200:23;
203:24;214:17;217:21
**offer** 14:16
**offhand** 184:21
**office** 38:16;46:18,19;
47:9,17,23;185:20
**officer** 101:2
**offices** 5:17;38:10,13;
156:1
**official** 150:4;152:16;
155:3
**often** 65:23;211:18;
218:23
**oil** 8:19,21
**old** 117:20;121:12;221:24;
222:3
**older** 17:20
**once** 27:1;30:18;47:2,3;
56:23;66:4;183:19;188:5;
189:7;219:2
**Once** 164:24
**one** 8:13,14,16;9:19;
12:20;13:21;14:23;17:20;
22:10,11,16,17;27:12;
31:15;33:2,8,20;37:14;
38:2,2;41:13;46:4,17,17,
19;53:13;54:16;57:5;60:10,
15;61:2;66:16;70:11;71:8;
72:12;74:16,17,19;81:23;
82:13;93:24;105:14;
108:14,16,17;109:23;

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

111:21;114:1,9,13;115:3,
22;116:9;117:20,22;118:7;
120:15;122:22;129:1;
149:10;151:7,8;155:16;
158:19,21;160:7;162:5,6;
164:19;165:12;175:23;
176:6,14,15;184:19;
188:20;192:14;194:3;
199:19;212:5,6,10
One 8:15;22:13;55:21;
115:2
ones 40:20;123:18,19,20
only 25:17;26:2;54:16;
112:23;113:22;188:21;
189:23
onto 41:9;54:13;79:12;
82:8
open 15:21;131:11
Open 131:12
open-end 92:14
open-toed 175:13
operate 12:7
operated 12:12;36:17;
37:12
operating 22:8;37:20
operation 15:21;22:16,
18,20;35:12;37:5,14,15,17;
151:7
Operation 36:20
operational 36:21;80:16
operator 11:17;131:13
opportunity 216:9
oral 98:7,17;99:8
orally 142:17
order 30:5;60:11,12;69:6,
7,22,23,24;71:4,15;72:5,6,
13;73:22;76:23;77:8,17;
80:14;81:1,5,10;82:10,10;
84:7;92:3,8;94:1;95:13,14;
114:21;122:3
Order 71:19
orders 21:3;70:11;71:8
organization 11:3,10;
106:14;133:20;140:4
origin 145:9
originally 26:4;208:21
otherwise 23:16;194:15
ounce 221:6
out 13:17,24;14:4,11;15:4;
19:18,18;21:24;29:10,14;
46:18,20,21;47:10,18,20;
48:1,2,4,8;49:16;51:3,8;
53:16;54:24;74:9,10;77:6;
89:11;93:13;95:15;97:6;
100:5,6,8;110:11;116:8;
125:7;126:19;133:14,20,
24;134:8;135:2;136:12;
137:6;150:4;152:19;163:7;
169:5;171:10;180:13;
191:12;206:24;207:1;
212:14;216:12,19,24;
218:16;220:16
outline 81:24

outside 144:11;185:7
over 10:20;30:24;49:15;
60:6,21;71:18;77:14;97:19;
105:24;113:13;114:5,12;
119:8;122:14;124:3;
138:13;148:19;153:17;
168:2;173:5;186:21;
200:21;203:22;216:21
own 15:6;22:18,21,22;
103:4;199:3;202:10
owned 12:12;25:20;
28:14,20;29:13,18,21,23;
196:8;213:4,7,10,15
owner 32:14;76:21;
201:12;220:19
ownership 12:17,19;
23:6,20,24;24:17,19,24;
25:6;27:8,8;32:17;201:15,
16;202:11;214:9
owns 24:3;29:8

P

P/P 126:11
Pack 5:24;6:6;7:16;10:2,
10,12;11:3,10;12:7,17,20;
21:11,17;22:7,18,21;24:2,
17,20;25:19;26:6,10,15;
27:9,14;28:1,14,20;29:8,9,
13,19,20,23;30:6;32:1,18;
31:5,24;32:14,18,24;34:20;
35:22;36:6,10,17;38:1,19;
42:5,7,8,18,22;43:1;46:3;
49:2,16,22;50:3,7,17,24;
51:6,8,10;66:4;68:22;70:3;
72:4,8;73:21;74:11;75:2;
77:5;79:17;81:20;88:23;
92:21,24;98:8;104:1;
109:18;110:12;112:4,14;
115:3,6,13;116:5;117:6;
126:19;128:16,23;129:10,
11;130:11,24;131:16;
133:19;135:19;136:18;
137:3,15,16;141:5,11,17,
20;143:2,3;143:7;156:2,
6;165:19;166:22;169:9,16,
18,23;170:5;172:2;175:6;
180:8;185:20;187:10;
190:10;191:11,22;192:3;
194:17,20;195:2,8;201:11,
14;202:14,15;203:3,4,8;
204:14,21;206:5;207:16;
208:17;211:4;212:4,6,11;
215:2,7,14,15;216:2,15;
217:3,5
package 122:20;158:19;
203:2
packager 13:22
packaging 31:9;37:4;
108:4;201:24;202:5,19
Packaging 31:11
packer 132:9,11,13,16
Packers 60:23;61:2

packet 101:19;110:7;
118:20;125:22
packing 31:2
Packs 202:22,24;203:1
page 39:6;69:22;70:5,19,
20;71:18;74:24;77:9;
81:15;90:11;93:24;97:17;
99:16;100:9;101:7;103:18;
105:24;108:2;109:1;
110:24;113:4,6,8;114:1,6,
7,13;115:15,19,19;116:3;
118:11;125:18;128:5,5;
131:3,8,9;140:14;182:18;
192:6
Page 97:20;115:10
pages 176:19;178:6;
191:4
paid 11:23;65:9,9,12;
84:16;90:2,19;113:5;
151:13;153:7;157:14,14;
191:12;192:16;194:21;
195:9;215:13,18,20;217:15
Paid 194:24;195:2
Palm 34:2,4,6,15,17;211:3
paper 50:11;68:3;121:12;
122:21
papers 114:16
paragraph 81:3,8
park 213:21
parking 213:4,17,24
part 14:8;52:22;68:16;
78:6;110:18;146:1;151:21;
156:13;166:18;169:15,17,
19;178:10;180:11;199:24;
214:1,1,3;215:1,7
Part 80:17
parted 22:7
particular 14:4;19:3;
24:19,22;28:8;37:5;57:5;
58:24;62:2;72:2,22;93:11;
107:11;116:24;159:7;
200:5;207:14,15;219:21
particularly 13:1,6;14:2;
22:5;187:18;206:22
parties 69:24;70:2;72:2,
14,16;98:5
parts 19:17;177:1
part-time 33:2
party 82:13
passed 16:3
passenger 148:22
passing 13:19
past 107:13
Pat's 75:2
Paul 5:23;6:7,11;7:5,8,15;
26:11,14;158:4,7,9;159:9,
15,16;160:2,12,20;163:24;
164:2,10;165:13;166:6,11,
15;167:7;180:21;181:2,13,
17;182:9,22;183:17;190:9
pay 54:13;83:16;91:10,22;
213:23;215:21
payable 191:23

paying 83:11,13;84:6,23;
89:4,17;91:16;123:5,9;
151:5;157:6;194:11,18;
195:16;198:14;217:3;
219:14,17;220:6,7,17
payment 109:19
pending 9:7;203:12
Pennsylvania 5:19;26:5
people 16:6;19:8,9;47:18;
50:6,13;54:8,14,15,22,23;
55:3,24,24;57:6,8;58:10,
11,23;59:6;67:18;85:20;
86:4,9,15;117:7,8,8,10;
125:7,8,9,10;148:13,14;
149:11;151:12,20;153:6;
155:20;162:5;169:17;
198:6,7,8;203:18;218:19,
20;221:9
People 39:20
per 59:3;90:20;130:23;
195:9
percent 21:15;37:12,13,
13;39:17
perfectly 152:5
perform 81:21
performing 83:12
perfunctory 193:18
period 3:23;52:7,10,14,
24;64:24;72:22;74:2,2,4,5,
6;83:23;132:22;134:18;
138:17;192:17;208:22;
219:13
periodically 159:19;
220:10
periods 89:15
permanent 35:21;36:6;
130:24
permissible 26:24;27:1,4
permission 89:12
person 11:18;54:16;
62:21;63:17;64:14;86:12,
23;128:20;134:22;135:18;
155:16,17;175:6;188:21
personal 27:18;33:21;
43:5,9
Personal 33:22
personally 49:11
personnel 81:21;104:1;
135:12;149:24
Personnel 61:10,16
perspective 143:18
pertain 25:10
Peter 152:19
petered 21:24
petty 217:7,8,14;218:4,5,
11,16,24
ph 61:8
phase 116:3
Philadelphia 5:18;
152:20;186:16;189:6,11;
204:18;222:14
phone 41:5;173:6;186:21
phones 33:14

phrase 57:21,22
physical 134:24
Physically 65:9
pick 65:20;66:5,8;190:5;
207:11
picked 19:24;121:12
picking 197:4
pickup 44:1
picture 53:16;106:16
pictures 190:4
piece 121:12
pieces 54:12
pile 122:21;153:21
pin- 62:5
pinpoint 16:19;62:2,4
place 8:19;53:13;58:10,
10;121:22;148:19;205:3
placed 127:10
plaintiffs 6:1
plaintiff's 24:12;25:11
Plaintiff's 7:5
plan 32:10;211:12
plant 14:23;15:1;22:19;
24:2;37:9,12;56:1,16;57:9,
18;95:5;128:24;136:4;
140:22;150:17;166:15;
175:12;178:7;211:12,14
Plant 37:10,11,19;199:24
plants 12:6,11;14:15;
24:24;27:2,15;25:6;36:16,
24;37:1,2,42:16;211:22
Platt 212:16
played 89:23
please 97:7
Please 150:22;191:7
plowing 214:5
plus 39:17;57:7
Plus 15:8,23
pm 105:14,16;117:3;
122:7;126:6;201:1,5;
222:21
point 11:22;12:24;15:10;
16:2,20;17:4,7;21:2;23:15;
27:4;36:22,24;40:12;43:15;
51:8,17;52:3;55:19;62:4;
72:24;77:4;80:5;82:22;
93:13;111:19;120:13,17;
122:13;129:8;131:15;
132:10,17,18;134:10;
146:8;152:9;165:12,20;
166:5;183:23;193:21;
196:7;198:10,22;207:20;
209:2;215:6
Point 119:24;120:3,9,19
points 11:17
police 149:24;209:17,21
policies 158:10,20;
161:11
policy 26:15;41:8,10;
47:21,21;106:20,23;107:1,
3,6,19;158:4,10,11;159:1,
2;194:19,20;195:8,12,13,
14

ed 73:1
on 28:9
ion 10:4;11:9;15:17;
;49:15;131:6,10;
;137:8;212:4
ions 11:2,9
ive 56:4;115:1;
8;150:7;168:23;
3
ession 25:9
ibility 180:16
ible 205:12
ibly 203:17;219:2
erful 13:13
ical 80:21
ice 41:11;112:14
accident 141:21
ecessor 129:2
ice 143:22
ises 66:4;140:24;
0
aration 61:19;74:18
ared 24:11
75:17
ence 97:1,2;171:19
ent 6:9;76:6;140:24;
1;171:21;195:21,21
ent 5:15
ented 177:8
ently 44:21
dent 10:2;11:1,12,
;12:2,4,4;19:7;29:17;
;49:14,20,22,22;50:2;
1
ident 75:18
s 21:3
sures 13:14
ume 52:17;133:22;
;140:21;142:24;
5
y 24:16;55:23;60:14;
;76:15;147:23;
6,22;194:8
nt 220:5
ention 221:6
ous 11:20;13:18;
68:15;98:6;120:15;
;196:2
ously 63:15;69:2
13:11,14,16;14:13,
arily 42:15
ary 159:1
eton 102:23
9:9;11:15;49:14,21;
51:11;120:4;134:14;
8;141:9;146:24;
1;170:8;181:14;
;190:8;212:19
11:7,12;51:2;
9;160:11;201:7;214:6
cy 14:20
eged 144:1

proactively 220:4
probably 20:3;34:16;
41:14
problem 15:8;136:6;
155:14
problems 16:10,15;
19:17;55:21;174:1,10,11;
199:3
procedures 199:16
process 7:23;54:20;
55:23;137:5
Process 5:24;6:6;7:17;
10:2,10,12;11:4,10;12:7,
18,20;21:18;22:7,18,21;
24:2,18,20;25:20;26:7,10,
16;27:9,14;28:2,15,20;
29:8,13,19,21,23;30:6,9,
12,18;31:5,24;32:15,18,24;
34:20;35:22;36:7,10,18;
38:1,19;42:5,7,8,18,22;
43:1;46:3;49:2,16,23;50:3,
8,17,24;51:8,10;66:4;
68:22;70:3;72:4,9;73:21;
74:12;75:2;77:5;79:17;
81:20;88:23;92:21,24;98:8;
104:1;109:19;110:12;
112:4,14;115:3,6,13;116:6;
117:7;126:19;128:17,24;
129:10,12;130:12,24;
131:16;133:19;135:19;
136:18;137:3,15,17;141:5,
11,17,22,23;142:3,8;143:7;
156:2,6;165:19;166:22;
169:9,16,19,23;170:5;
172:2;175:6;180:9;185:20;
187:10;190:11;191:12,22;
192:4;194:17,20;195:2,9;
201:11,14;203:9;204:14,
22;206:5;207:16;208:17;
211:5;212:4,6,11;215:2,7,
14,15;216:2;217:3,5
Process' 21:11;216:15
Process-related 29:9
produce 7:8,10
produced 27:12;114:18;
126:11;168:9,10;178:16;
211:16
producing 31:7
product 11:17,24;14:8;
37:6;64:18
production 12:22;13:23;
14:16,22;15:7;16:11;17:21;
37:9,11;39:8,24;41:18;
55:14;58:7,8;64:19,20;
88:24;89:17,22,24;90:1,13,
23;96:21;116:21;136:13;
140:8;208:8;212:17,24
products 31:8;37:7
professional 5:12
profitable 22:4,5
program 47:2;57:3;96:16
programs 57:7
project 16:12;37:3;41:14;

44:21;51:21;72:1;24;73:1
projects 41:15
prompted 169:1
pronounced 137:22
pronouncing 186:6
proof 102:11,20;103:7,9
proper 26:20
properly 155:21
properties 12:17,19;
22:12;23:21;25:6,19;29:8,
12,18;30:5;38:3,12;44:19,
22
property 12:21;17:23;
18:1,2,11,23;23:1;24:17,
19,23;28:14,20;29:2,4;
32:4;34:12;44:16;172:3;
222:9
provide 51:4,9,15;60:12;
68:12;72:8,21;73:21;81:20;
92:20;95:8,16;96:1;100:2,
6;103:3,8;142:4;206:9
provided 40:5;61:3,6;
79:14,15;83:22;84:24;
85:10;90:22;93:5;100:4;
104:16;122:15;127:23;
128:8;138:14;139:12;
140:17;144:11;206:19;
222:7
providing 92:24;93:15;
94:5;108:8;123:10;124:8,
21;139:12;142:9;192:18
Providing 125:19
provisions 97:18,24
pull 125:6
punched 163:7
punching 87:18
purchase 69:6,6,22,23,
24;70:11;71:8,15;72:5,6,
13;73:22;76:23;77:8,17;
80:14;81:1,5,10;82:9,10,
10;84:7;92:3,8;94:1;95:13,
13;200:4
Purchase 71:19
purchases 81:24
purchasing 13:9
purports 184:6
purpose 128:12
purposes 100:2;206:5
pursue 30:6
push 14:11,21
put 6:22;26:19;27:5;
47:22;50:4,10;55:9;91:23;
95:2;108:11;121:13,20;
169:9;176:24;184:17
Put 67:9
putting 13:14

Q

QC 39:24;41:17
qual- 137:9
quality 11:18;39:8;55:18;
128:19;133:2;134:19,22,

23;135:12,17;137:9;
146:16;173:19
Quality 39:23
quibble 134:17
quick 203:22;217:20
quickly 55:21;78:3
quite 23:24;89:19
quote 81:7;91:11,19

R

racketeering 152:22
radio 50:5
range 13:11
rapid 54:1,2
Rapid 54:2
rate 70:24;83:14;85:14;
88:17;123:6,8;215:18,20
raw 15:11
read 10:20;74:22;77:23;
78:2,3;81:11;82:15,15;
94:13,18,22;98:10,12;99:2,
4;103:22;104:6;196:1;
210:4;220:15,20
reading 10:24;81:4;117:4
real 13:18;66:16;169:8;
189:8;196:23;197:21;
203:22
really 14:6,10,12,14;
33:13;41:10;55:4;58:7,12;
64:3;77:12;100:24;106:13;
145:8;148:10;149:16;
154:17,19,22;160:9;163:4,
11;167:21;171:9;173:4;
181:15;183:13,13;185:4;
189:1;193:20;194:4;198:2,
21;199:23;200:13,16;
206:21
rear-ended 212:8,10
reason 17:11,13;37:8;
134:7;169:2,4;170:17;
179:24;180:11
reasons 27:11;28:3;
42:24;148:13
recall 17:40:11;66:12;
67:6,7;72:10;76:1;83:1,3;
97:4,5;101:14;155:6,8;
160:4,22;162:3,10;166:8,
17;167:16;173:11;181:11,
12,19;183:5,21,22,24;
184:2;185:18,21;186:1;
208:4,5;212:7,15
recap 48:5,16,19;200:6,8
recaps 200:12
receipt 112:19
Receipt 100:11
receipts 199:1;200:3
receive 147:1;211:17
received 112:23;113:2;
165:3;183:15
receiving 85:4
recently 74:17
recess 80:9;122:8

recognize 69:8;70:6;
71:21;75:1;105:19,20,23;
130:10;191:20
recollect 57:1
recollection 46:8;52:6;
134:4;147:18;158:22;
209:8,11
reconciled 115:4
record 5:9,21;6:13,22;
20:7,8,11;21:7;23:8,9,10,
13;26:19;27:6,22;28:10;
80:8,10;122:6,9,11;126:4,
6,8;127:2,19;129:2,22;
130:1,2;177:13,15,18,19;
200:23;201:3;203:24;
204:3,4;214:17,20,21;
217:21,24;218:1
records 25:9;35:14;
151:17;152:1,2;153:6,9,12,
17,20;154:20,23;155:18;
219:4,9
reduce 160:17
Reed 5:11
Reef 213:7
refer 24:16;25:10;27:16;
81:13;103:18
reference 98:4
referred 81:6;190:18
referring 115:11;191:2;
210:1
reflected 83:16
refused 21:17
regarding 25:13;27:16;
183:10
Regina 101:2
reimburse 218:19
reimbursement 199:13
reimbursing 198:23
relate 12:20;25:10;26:9;
41:14;126:23
related 8:4;23:20;24:24;
27:8,10,17;126:14;127:23;
195:22;203:14;205:4
relates 12:17;109:8;154:4
relating 105:4;127:11;
141:4,12,17,24;142:19;
144:18;147:8,13;150:5;
154:16;155:4,9;159:8;
163:1;161:10;166:12;
167:8;179:10;181:20;
182:4;183:24;185:8;
186:13;189:18;193:9,15;
195:14;203:12;209:17;
211:4;212:4;221:16
relation 24:17;48:20;
563:83:11;150:10;152:16;
186:22
relationship 26:9;28:1;
72:16;135:10;190:10;
193:15;194:2
relationships 64:15
relative 67:12
relatives 149:12

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

relevant 20:14;26:16
remember 8:7;18:7,8,8;
46:11;48:1;62:3;63:14;
152:9;160:9;162:12;164:3;
173:3,20;180:22;181:8,15;
182:4,6,7;183:8,13;184:21;
186:11;193:20;206:21;
209:20
remeun- 16:13
remuneration 16:13
renew 17:18;18:4,22
rented 213:20
repeat 11:5;47:14;94:17;
96:15;135:1;141:19
rephrase 49:18
replenish 218:24
report 145:20,21;209:21,
23;210:5,14,21
Report 210:2
reporter 6:14,18;99:4
REPORTER 17:12;161:2;
182:13;202:2
reporting 145:19
represent 8:1;109:18;
192:15
representation 7:17;
98:7
representative 166:14
represented 7:10;77:5
representing 127:22
request 102:11;103:7;
104:1
requested 24:13;25:13;
102:10;104:9
Requested 24:14
requesting 68:3
requests 24:15
required 143:14
requirement 80:1
research 14:1
reservation 182:14
reserved 5:5
respect 25:19;27:7;98:7
respectfully 25:3
respond 27:7
responding 24:6
response 27:13
responsibilities 78:10;
82:1;134:22;200:1;201:10
responsibility 35:9;
107:14;132:15;180:4,7
responsible 19:22,23;
85:22;89:4;91:15,22;93:6;
94:4;106:15;219:17
rest 15:13;151:23
restaurant 220:19
restaurants 220:16
restaurateur 220:17
result 20:2;21:16;166:1;
203:18;209:22
retain 18:13;41:22;42:1;
153:18;219:9
retained 48:24;106:12;

relevant 20:14;26:16
129:13;200:12
retaining 41:12
retention 41:8,19
returned 172:21
Revenue 100:10
review 61:20,23;112:16;
172:9;195:19;209:21;
216:9;217:11,13
Review 160:15
reviewed 77:17;112:24;
199:20
reviewing 62:3;130:21;
156:6
rid 35:17;41:20
right 12:15;21:6;22:22;
24:3;36:16;39:6;40:17,23;
48:17;49:8;50:16;51:2;
54:2;60:9;61:8;71:21;
72:23;74:22;76:5;77:21;
81:4,11,17,23;82:5,16,16,
18,22;84:1;93:2;95:12;
97:22;98:15;99:6,21;101:2;
102:9;103:6;104:8,12,23;
106:5,8;108:6;110:4,18,20,
22;111:14;112:3,6;114:12,
15;116:4;118:9,24;119:4;
120:7;121:8;122:19;128:4,
22;129:8,20;130:14,21;
131:2;133:13,23;136:14;
140:14,16;141:8;144:2,20;
145:2;148:7;150:3;151:2;
168:5;169:18;171:6;
173:14;176:22;178:12;
179:13,22;182:21;184:11,
18;189:14;190:5;195:13;
196:1;200:7,20;204:16,19,
21;205:2;218:15
Right 39:7;50:12,15;
71:20;79:13;93:1;95:11;
101:9;118:5;125:20;143:4;
144:19;157:21;171:2;
211:6;214:5
right-hand 111:14
rights 92:18;182:15
ring 105:2
risk 160:17;169:9;221:8
road 156:24
Road 5:13;34:9
Robert 33:9,10;34:23;
186:2,12,15,18
role 59:16
room 76:6;145:4
rules 178:7,8,21
run 54:24
run-about-town 207:10
running 37:2;57:3,4;
114:3
runs 126:15

**S**

sad 148:16;193:19
saddened 172:18

safe 66:2;74:16;128:22
Saint 5:23;6:11;7:5,8,15;
26:11,14;158:4,7,9;159:9,
15,16;160:2,12,20;163:24;
164:2,10;165:13,13;166:6,
11,15;167:7;180:21;181:2,
13,17;182:9,22;183:17;
190:9
sake 5:21
salary 215:18
same 13:18;15:1,2;16:14;
28:24;29:1;39:6;42:20;
54:18,21;60:14,19,22;
68:16,16;81:15;86:13;
90:11;108:16;109:1;
114:10;118:7,11;119:8;
125:23;137:5;140:14;
148:1;154:23,24,24;180:3;
195:14;222:10
Same 137:11
sample 41:19
savings 156:21
saw 12:23;15:7;52:20;
65:7;105:21;149:10;
176:13;178:13;197:6;
200:8;218:16
saying 16:17;86:13;
89:19;92:15;105:22;
157:16,17;163:4;164:13;
174:2;184:2
scan 77:23;78:10
scanned 74:23;77:20,24
scanning 78:1,5
scene 148:16;150:1
scope 96:20;15:23:17;
25:22;26:1;163:10;164:12;
215:9
SDL 43:11
sealing 5:2
second 6:3;37:15;46:19;
53:24;69:15;71:18;78:12;
80:2;105:24;108:2;109:24;
114:6,7;117:15;126:4;
129:21;150:8;168:6;
175:23;206:23
Second 93:20
secondhand 146:1
secrecy 14:19
secret 20:21,22
secretary 33:12,13;86:7,
17;87:7,10
seek 49:16;51:3;71:24;
150:4
seem 198:4
seems 106:1
sees 35:13
selling 30:14,15,21,23;
31:3,8;32:3;203:8
Selling 30:13;32:8
send 19:16,16;164:13
sensed 158:18
sent 179:13;185:19
sentence 81:3,9

sep- 69:1
separate 68:19
separately 108:22,23
September 8:5;9:15;
17:3;33:18;187:9
series 178:5
serious 147:21;162:4
serve 93:15
served 12:3
service 91:4,11,16,19;
124:16
services 72:8;73:21;
81:17;83:9;92:21,23;93:5;
96:2;123:10,15;124:8;
128:7;142:5,10,20;191:13;
192:18
set 7:12;14:14;47:21;
114:1;155:21;202:15
sets 95:15
settle 16:17
setup 14:24
seven 39:19;215:24
Seven 176:8
several 6:9;14:15;27:11;
43:4;53:20;55:20;64:5;
85:20;162:5;191:4
shall 82:9,12;104:2
sheet 44:6;87:22;107:19;
108:18;115:8;116:24,24;
118:24;119:5
sheets 85:23;86:5;
119:10;126:17,19;175:16
shift 54:1;59:3;87:16;
117:1;145:12,19,21;
146:17;206:24;207:4;
216:21
shifts 59:3
shoes 79:3;175:13
short 20:1;80:9;122:8
show 54:15,16;55:1;85:9;
111:20;130:7;146:17;
167:20;181:6;190:16;
191:18
showed 48:5;123:14;
166:3;190:4
showing 55:3;66:12;
104:14;116:23;139:22
shown 71:1;105:18;
115:15;123:20
sic 89:23
side 111:14;115:6,13;
142:2,7,14,16;157:15,24;
193:2,6
sides 115:2
sifting 15:5
sign 21:4;60:11;68:19;
70:17;73:1;171:19;174:20;
175:2;180:1;185:23;
186:16;187:6,15;188:4
signature 70:6,7,9;74:24;
75:1,5,7;99:16;184:24;
185:20;192:1,3
signed 72:14;86:3;98:12;

104:8;117:7,11;171:17,21;
172:2;183:23;185:2,16;
186:9,13;191:19;208:11
sign-in 87:22
signing 76:7,17;117:13;
184:1,1;187:16
sim 121:11
similar 115:23;175:7
simply 19:22,23;21:4;
121:11;169:19
single 60:15
sister 136:24;137:1;
151:23
sit 10:1;12:6;15:3;29:7;
30:4,8;49:6;51:7;76:1;
104:14;128:13;132:4;
136:15,20;156:11;191:10;
196:4;198:16;221:11
sites 24:19
sits 160:5,5,6
sitting 8:7;76:2
situation 12:23;22:3;
30:1;40:15;47:24;56:4;
149:22;151:10,19;154:15;
162:14,19;163:12;165:19;
206:14,16,18;217:8
situations 206:12
six 12:11;39:19;97:17,24;
175:15
skip 184:19
skipping 184:8
slew 36:11
sliding 117:18
slipped 212:13
slow 17:17;19:1;51:22;
53:23
slowdown 53:14
slowdowns 53:3
slowing 12:23;13:2;
16:24;17:5
small 14:15;42:11,12;
220:20
smock 79:2,2
Smock 79:1
smocks 79:12,21
snow 214:5
so-called 209:23
sole 32:14
solely 42:6
Solely 42:8
solved 55:20
somebody 48:15;56:15;
86:17;96:10;121:11;146:1;
155:7;160:23;162:7,8;
163:6;181:18;193:24;
195:16
Somebody 48:21
somehow 64:1
someone 59:20;66:3;
133:19;140:4;160:2
Someone 65:20
someplace 35:8;93:9;
149:11;211:19

sometimes 22:4;47:3;
50:5;54:1;61:15;174:10,11;
206:8
Sometimes 42:16;80:19,
20;211:18
somewhere 31:21;38:21;
40:1;64:6;93:10;160:6
soon 21:20;172:6
sorry 17:12;19:6;46:1;
65:17;69:17;87:21;93:21;
113:6;123:9,16;124:11;
135:23;139:16;150:15;
164:5;166:21;182:13;
202:2;216:1
Sorry 75:13;186:6
sort 15:2;175:7;213:23
sought 51:9
sound 61:8;137:21;
159:11
source 143:16;169:24
sourcing 14:12
South 189:10
span 41:15
speak 67:5,20;149:7,24;
181:16,17;192:22
Speak 149:8
speaking 181:16;182:6;
206:11;211:8
specialist 181:1
specialty 13:22
specific 14:8;25:4;123:14
specifically 124:19;
127:20;170:11;172:9;183:6
specification 136:12
specificity 95:15
Specter 5:17;8:1
sped 212:14
spell 66:17;210:16,17
spelled 171:3
spend 34:14;149:15
spent 11:23
spices 37:7,16,18
spill 8:19,21
spoke 67:7;77:7;149:12;
174:3,9,12;187:20;188:8
spoken 63:3
spun 212:14
St 6:7
stabs 51:13
Stack 202:22
staff 57:6;220:17
Staff 61:16,16;70:3;72:4,
8;74:12;75:19;94:4;
100:16;106:9;109:20;
115:3;116:9,10;117:9;
126:20;143:1
staffed 77:6;212:1
Staffing 61:11;62:20;
63:2,12;64:9;65:16;66:3,
12;68:1,19;71:9,10;73:6,7,
20;76:3,8,12,18;78:7;
79:15;82:3;84:14,17,18,23;
85:4;89:5;91:10;93:15,21;

95:8,16;98:18;99:9,17;
105:5;107:11;109:8,20;
110:11;111:11;113:22;
118:3,17;119:2,5;120:5,21;
122:16;123:10;124:7,15;
127:12,21,24;128:8,24;
136:18;138:14;140:17;
154:4,16,18;157:14,20,23;
190:11;191:12,23;192:8,
17;193:9,11,14,24;194:3,
10;195:2,14;198:14;215:4,
11;219:12,14,16,22;
221:12;222:8
Staffing's 155:23;156:3;
221:16
Staff's 116:7
stages 30:17,20
stamp 111:24;112:1,3;
113:1
stamped 112:15;115:12
standard 24:16;60:9,22
standing 117:20
Staniszewski 188:1
Stanley 87:11;88:2;
106:18;114:24;217:9;
218:12,15
start 12:22;13:1;17:5;
51:6;52:8;88:21;105:7;
124:16;153:24
started 13:7,14,21;52:13,
18,18,19;53:14;73:24;
89:24;120:23;128:23
starting 16:12;17:16
starts 89:22;90:14
state 30:11;36:10;62:9;
135:21,22;209:17,21
State 10:13;15:23;40:13;
100:9,15;210:1
stated 124:19;176:3;
178:21
statement 27:5;96:13;
146:11
statements 170:20
states 93:5
States 5:10;155:17,21
stay 80:19;129:9
stenographic 5:21;6:13
step 17:20,22;97:6
steps 220:22
Sterling 58:17;65:1;
67:15,20;68:7;87:15;88:1;
96:22;97:2;117:12;135:6,
11;136:3;140:11,19;141:3,
11;146:23;147:19;157:12;
187:4,9,13,21,22;188:22,
23;189:4;212:19;213:2
Steve 33:16;35:4,9,11;
48:12,13,21;70:10,17;76:9;
156:8;172:1
Steven 6:15;75:16,16;
185:14
STEVEN 6:19
Steve's 75:5

Stick 202:24;203:1
still 9:7;18:18;22:18;30:9;
34:10,12;44:22;49:4,5;
53:6;63:16;64:8;80:24;
83:6;187:9;188:24;202:20;
216:18
stipulate 94:21;126:9
stipulated 5:1;95:3
stocks 15:11
stop 31:7;88:20;121:23,
24;180:2
stopped 51:18;52:2,6,17,
18;53:1;73:24;90:2;120:18,
23
storefront 222:6
stories 151:2
story 20:1
strange 162:19
street 54:9
Street 5:17;17:24;18:23;
22:13,14,23;28:13,19;29:2;
189:11
strewn 156:14
strong 37:16
structure 12:16;23:19
stuff 154:11;156:7;
207:13;211:4
Suasaday 63:6,7;118:4;
120:2,7;153:15;174:12;
193:10
Sub 118:24
subject 98:8;121:23;
198:2
submitted 44:6;109:19;
110:12;130:23;131:17
submitting 113:22
subpoena 153:5
subsequent 74:9,11
Subsequent 212:20
substantial 67:4
subtotal 113:12;114:3
success 14:3
successful 15:6
succession 54:18
successor 63:13;68:15
suffered 55:17,18;169:12
suffering 55:18
suggest 147:23
suggested 100:7;147:23
suit 8:23,24;9:2
sum 114:2;138:21
summarized 114:2
superseded 98:19;99:10
supersedes 98:6
supervising 57:19;
135:11
supervisor 58:7;86:16;
87:3,13,16;116:21;117:9;
135:4,22;136:1,7,8;140:8;
208:8;213:1
supervisors 43:5;47:3;
86:2;87:9;126:20,20
Supervisors 43:22,23

supplied 215:3
supply 70:23;79:21
supports 93:14
suppose 35:14;78:12;
79:19;205:13,14
supposed 210:5
sure 9:5;11:11;35:16;
36:1,23;43:15,18;52:5;
54:11;61:15;74:17;76:15;
77:12;78:8;86:13;96:14;
113:24;114:23,24;117:13;
120:23;129:14;131:13;
144:23;145:9,15;148:9;
149:8,9;154:19;155:19,20;
161:12,16;162:3;165:10;
173:13;181:24;188:10;
189:8;200:19;206:21
Sure 11:6;23:22;40:5;
47:16;49:19;50:10;73:19;
78:9;84:21;110:1;114:9;
127:17;141:20;142:13;
144:15;161:13;168:7,16;
170:12;173:13;177:14;
195:7;204:15
surmising 52:16
surrounding 183:1
Susi 188:17,19;189:18,21
suspended 146:21;
147:2,9,14
swear 6:18
sworn 6:19
system 40:24;41:2,5,8;
54:13;58:5

<br>

# T

table 198:14
talk 22:15;25:15;56:12;
64:20;92:17;141:8;146:5;
165:10;183:6;187:22
Talk 211:19
talked 56:6;96:7;110:10,
15;138:20;143:6;146:5;
153:4;156:9;160:7;170:22;
173:9;186:2;187:4;199:6;
203:6;206:8;217:7
talking 24:5;28:13;36:13;
43:6;45:12,20;57:7;58:7;
65:14;79:6;81:1,8;85:15;
90:6;96:17;98:21,22;99:19;
102:1;107:1,10,11,12;
119:12;122:16;123:17;
138:13;140:16;143:17;
146:2;158:14,16;159:17;
163:2;173:10;179:17;
180:8;182:3,4;183:19;
204:13
Talking 183:20
talks 81:17;82:5;125:18
tasks 134:24;135:1
tax 101:7
taxes 219:14,18
tea 37:4,6

technical 7:1;162:24;
163:5;165:1
technician 134:23;
137:10;146:17
Technician 128:21
TECHNICIAN 5:8;20:8;
21:7;23:10;28:10;80:7,10;
105:13,15;117:17;122:6,9;
126:5;127:2;129:22;130:2;
177:15,19;200:23;201:4;
203:24;204:4;214:17,21;
217:21;218:1;222:19
Ted 159:20;161:9,13,13,
14,16,17,21,21,24;162:2;
163:15,21;164:7;165:9,22;
166:18;181:17,20;182:4
telephone 147:11;211:9,
17
telling 83:19;143:23;
145:20;162:17;174:15;
179:3,14
temp 58:9;61:2;108:3
temporaries 54:8
Temporaries 56:13
temporary 33:15;35:21;
36:6;38:14;45:5,11,13,20;
49:16,23;51:3,9,14,18;
52:9,21;53:1,6,12,19;
55:20;56:9,19;57:9,20;
58:13;59:10,24;64:21;68:4,
12;71:14;83:13;87:17;
93:20;100:16,17,18,21,23;
106:16;127:23;129:6;
137:17;138:11;139:11,21;
146:3,6;151:22;153:3;
157:7;215:3,10,14;217:4;
220:1,12
Temporary 100:10
temps 57:17
ten 34:21;80:17;92:22;
93:3,4;103:19;117:3;
150:24;153:21
Ten 103:20
term 79:24;103:23;
124:20;179:2
terminate 82:14
terms 70:24;78:9;91:3;
98:19;99:10;103:3,12
test 14:4,9;15:5
testified 6:20;107:5
testify 28:5;182:16
Thach 62:23;63:6,7,16,
21;64:6,15;65:3,8,15;66:8;
76:14;95:24;96:6,7,10,24;
118:4,7;120:2,7;147:12,13;
157:6;174:12;193:10;196:5
Thanks 62:15;175:19;
186:7
thereafter 21:20
thick 122:21
thin 197:19
thinking 180:15
third 114:12

Thou 6:3;25:14;138:5,14,
18;139:2;141:4,12;142:8,
20;143:1,8;147:8,13;
166:21;199:8;209:5
though 14:3;57:11;
168:23;209:4
thought 80:2;134:5,6;
142:23;159:16;171:15;
210:9;220:23
Thou's 146:20;147:1
three 36:24;37:1,2;46:8;
54:12,15;55:11;59:1,3,7,7;
91:8;97:17,20;113:11;
117:10;149:16;153:22;
190:4;219:2
Three 46:9;188:9
threshold 85:8
thrown 156:23
thumbnail 8:17
Thursday 54:17
tie 72:12
tight 14:2
times 21:14;57:7;65:5,7;
67:12;83:14;117:10;
128:18,19;173:18;211:13
title 210:8
today 5:15;7:3,9;8:10;
9:19;10:1;12:6;29:7;30:4,
8;32:20,23;35:19;49:8;
51:7;61:20;62:1,7;74:19;
76:2;104:14;128:13;132:4;
136:15,20;156:11;191:10;
196:4;198:16;203:13;
221:11;222:20
Today 53:9
today's 6:23
Today's 6:15
together 55:10;208:9
told 76:20;145:11;146:8;
152:5;153:13;164:3;165:6;
179:11;189:1
Told 189:2
took 8:19;51:13;80:17;
127:5;220:22
top 99:18;110:3,22;118:3;
119:1,6;130:9
Top 111:14
topic 147:5
total 86:9,9;113:5,10,12;
115:14,16
totally 24:24;53:1
tough 197:21
towards 14:11
track 153:11
tracking 41:4
trade 20:21,22
traditionally 66:8;71:13,
15;218:5,11
Traditionally 140:12,19
Traffic 210:2
tragedy 169:13
trained 45:7
training 55:11

transcript 28:8
transcripts 196:2
transferred 26:5;133:1
transport 194:12;215:14
transportation 15:9;
94:16,21;95:17;96:1;108:8;
123:15,21;124:8,20,21;
128:7;141:4,13,18,24;
142:5,10,20;144:18;146:2;
195:16;206:10,19;207:2
transporting 93:6,16;
94:8;146:4;217:4
travel 186:16
traveling 209:6
treats 20:21
tremendous 13:14;
148:12,12
trial 5:6
tried 20:1
trips 199:23
trouble 96:11;188:2
truck 42:11,13,17;43:20;
44:1
true 10:18;11:4,11;
175:11;194:18
trust 156:21
truth 149:13;162:17,23;
209:19
try 62:17
trying 72:11;74:8,10
Tuesday 6:16;54:15;
117:2;222:20
turn 200:21
two 5:19;6:22;22:10,11,
16,18;31:15,17;33:1,2;
34:22;35:11;41:18;59:3;
63:9;80:17;84:3;86:12;
103:18;105:15;115:2;
120:17;149:10;158:10;
166:3;171:15;188:9;197:19
Two 55:23
type 8:20;44:8,9;52:15;
60:9;64:7;79:8,17;85:7;
98:17;99:7;100:20,22;
118:11;119:8;123:14;
125:23;135:10;143:6;
165:4;166:9;168:10,11,12;
169:1;174:14,18;195:14;
201:15;203:1;220:14
typed 168:20;171:10
typed-up 114:17
typewritten 118:23
typical 51:22
typically 13:10,24;14:22;
22:10;58:21;192:7
Typically 65:19
T-Z 159:24

### U

Uh 80:4
Um 112:18;168:22
unable 7:8

under 9:20,23;10:13,17;
13:20;26:14;46:23;61:14;
70:24;75:2,9,19;79:10;
91:2,2,3;92:21;98:3;103:2,
11;108:2,7;135:16;180:3,3;
198:14
Under 91:8;97:17;101:2;
108:1
underneath 75:9
understandings 79:4,6
understood 68:24;78:15,
18;79:10;80:3;93:18;
96:14;98:16;99:7;124:2,4;
125:2;142:9;163:20;
165:11;174:4
Understood 190:6
under-the-table 151:6;
198:22,24
unemployment 54:24;
55:2
unfortunate 172:22
uniform 79:23
Uniformed 210:1
uniforms 78:20;79:11
United 5:9;155:17
unless 23:15;125:17
Unless 125:17
unquote 81:7;91:11,19
unrelated 27:18;203:14
unusual 218:22
up 14:5,14;17:20;18:23;
19:24;21:13;51:16;52:8;
54:15,16;55:1,3;65:20;
66:5,9,12;73:1;80:19;86:8;
88:24;91:17,19;95:2;
106:21;107:20;114:1;
121:12;122:3;125:6;
126:16,16;138:12,21;
139:22;144:4;146:17;
147:19;155:21;165:5;
166:3;167:20;168:12;
169:1,24;170:18;172:5;
175:10;197:4;202:15;
207:11;208:14;219:1
upon 104:1;112:15;142:4
Upon 112:19
upset 147:23;148:14
use 42:12;45:2;46:5;54:7;
55:19;70:23;71:13,16;
110:20;166:22;206:4,6;
213:24
used 13:10;31:1;41:3;
42:6,10,14,18,24;44:2,10;
51:14;53:12,13,15;70:18,
21;91:24;114:21;175:14;
180:20;200:5;206:5;
207:16;208:9
uses 130:12
using 43:24;51:18;52:2,8,
8,13,21;53:1,9,19;79:23;
153:7;199:21;212:5
usually 48:5;84:1
utilize 45:6;52:14

utilizing 46:4;53:6

### V

vacations 11:20
van 139:5;140:13,16;
145:17,18;146:6,15;
148:22;151:22;156:16,23,
23;157:4;162:6,8;163:7;
169:6,7;180:2,14;188:20;
194:22,23;209:5;214:10;
215:2,10
Van 7:24
VAN 6:21;7:19;17:15;
18:17;20:22;21:6,9;23:22;
24:8;26:2,13;28:7,12;
29:22;31:11,13,19;32:7;
33:22,24;36:3;37:22;43:23;
44:3;45:15,22;46:2;47:15;
56:5,21;57:14;60:18;62:17,
19;65:16,22;66:24;68:11,
18;69:12,19;70:2;70:1,2;
73:7,12;74:15;77:22;79:5;
80:6,12;84:13;20;89:13;
90:9;94:2,14,23;95:22;
97:16,21,23;99:2,2,13;
100:22;101:1,20,24;102:6,
21;103:17;104:19,22;
105:17;107:2,9;108:16,20;
109:4,11,16;110:2;111:16,
23;114:8;115:17,21;116:2,
16,18;117:21;118:16;
119:24;122:5,10;123:18,23;
125:3;127:4,17;128:1,3;
129:20;130:6;131:24;
133:8;139:19;140:3;143:3,
21;144:9;149:2;154:7;
158:8;159:4;161:8;165:2;
167:12,19;170:3,6;175:19,
21;176:1,10,18;177:4,14,
21;178:23;180:19;182:20;
184:9,14,18,23;190:15,23;
191:7,9,17;192:10,12,23;
193:7;195:1,6;196:12,15;
199:5,11;201:6;202:6;
203:21;204:6;205:11;
210:15;211:2;214:12;
217:19;218:3;221:10,20;
222:2,15
vans 58:24;59:2,3,7;
125:6,7,9,12;138:23;
140:16;198:5
various 11:2,19;45:13;
60:5;78:14;79:4
Various 61:24
vary 192:19
vehicle 43:5,9,10;179:4;
207:15,16;212:14
vehicles 42:6,9,18,23;
43:3,4,19;44:7,10;46:5;
206:4;212:6,6,11
ver 216:7

verbally 59:21;79:10
verdict 27:2
verification 119:9
verified 85:16
verify 106:22;107:22;
216:7
verifying 104:3;106:15
versa 100:5
versus 6:1,6
via 7:7
vice 11:12,15;12:2,3;
100:5
video 9:20,23;20:11;
23:13;126:8
VIDEO 5:8;20:8;21:7;
23:10;28:10;80:7,10;
105:13,15;117:17;122:6,9;
126:5;127:2;129:22;130:2;
177:15,19;200:23;201:4;
203:24;204:4;214:17,21;
217:21;218:1;222:19
videographer 5:12
videotape 5:9
Vietnam 198:1
Vietnamese 197:22,24;
198:1
view 12:24;15:10;16:2;
36:22;198:10

### W

wait 78:12;80:2;150:7
Wait 150:7
waived 5:4
walk 90:13
walked 89:6,11
walk-through 160:19
wall 15:23;95:2
Walmart 13:9,13
Walnut 34:8
way 9:11,18;16:3;39:3;
43:1;51:17;57:22;58:2,5;
59:9;64:16;67:9;70:14;
79:19;88:15;93:19;94:17;
107:18;122:4,24;135:17,
21;159:2;163:16;176:24;
184:12;198:17;203:7,11;
207:3,4,12,19;219:15
ways 13:16;22:7
wear 78:20;79:3;175:12
Wear 79:2
wearing 54:19
website 49:3,5,10,11
Wednesday 54:16
week 66:4;74:5,6;84:2,4,
5;111:6;118:1;119:19;
120:14,15;145:13;188:12;
211:24
weekly 126:24;192:8,17
Weekly 66:1
weeks 55:12;84:3;153:21;
166:2;219:3
weren't 14:14;22:20;

Steven Ames
June 27, 2006

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

44:21;89:17;153:14;219:17
**West** 34:2,4,6,15,17;211:3
**what's** 75:16,17
**wheeled** 149:11
**whenever** 121:21
**whereabouts** 221:16,19,
21
**whereby** 46:4;59:15;
142:4,8;187:13;190:9;
194:10,20;195:9;201:12;
214:9
**Whereupon** 20:10;23:12;
69:9;80:9;97:14;99:4;
105:11;109:14;118:14;
122:8;126:7;129:24;130:4;
133:6;167:17;177:17;
180:17;190:13;191:15;
201:2;204:2;214:19;217:23
**wherever** 194:22
**whoa** 102:14,14
**Whoa** 102:14
**whole** 14:21;55:22;56:14;
110:5;122:20;151:9;
155:15;162:13;172:18;
175:14
**whose** 70:6,9;192:1
**Whose** 75:7
**willing** 15:20;56:2
**Wilmington** 207:1,1
**wisdom** 15:24
**with-** 163:9
**within** 5:3;9:5;11:3,9;
13:12,12;19:9;93:4;166:2;
215:8;216:18
**without** 54:7;104:14;
170:7
**Without** 142:23
**witness** 6:18;126:18;
182:17
**Witness** 222:23
**WITNESS** 17:13;20:18;
31:14;33:23;36:1,21;44:1;
45:19;47:14;54:4;57:12;
65:19;68:13;69:11,17;70:2,
22;73:8;74:13;79:2;89:12;
93:24;94:12;95:21;98:24;
99:12;100:24;101:23;
102:17,19;104:20;107:7;
109:10,13;115:8,10,13;
117:19;121:10,18;122:2;
123:22;124:24;126:23;
139:16,18;140:2;142:23;
143:17;161:3,6;164:23;
167:16;170:4;175:20;
176:9;178:12,20;184:15,
21;190:22;192:11;193:1,5;
196:11,13;198:21;202:4;
205:9;210:13;221:4,24
**wondering** 184:15
**word** 39:5;54:2;78:2,2,24;
94:15,21
**wordage** 170:16
**words** 199:19;216:18

**work** 11:16,20;13:12,12;
15:2,18;21:15;49:24;50:7,
17;51:10;53:4;54:6,13,23;
55:1,4;58:8;60:2,12;83:12;
88:24;95:9;106:12;125:8;
127:11;131:3;134:8;
138:15;144:24;145:3,12;
146:4;155:21;169:13;
175:6;186:16;201:8;
202:16;205:4,12,14;206:7,
23;207:8,23;208:17,23;
211:24;213:1;220:2
**worked** 14:3;48:21;58:2,
3,5;60:1;64:16;83:15,23;
89:8,10,12;136:17;137:15,
16;152:21;159:3;172:15,
16;193:11;202:17;207:3,
21,22;208:2,6,21;213:2;
216:2,8
**worker** 84:10,17,18;85:3;
129:6;132:15
**workers** 45:6,12,20;51:4;
56:2,16;57:9;61:3,6;83:14;
88:3,23;91:2;93:6,16;94:5,
8;95:9,17;96:2;113:23;
123:5,11;124:9;125:18,19;
141:4,13,18,24;146:3,6;
157:7,7;194:12;201:13,17;
206:8;209:5
**Workers** 82:6;104:4
**workers'** 102:22;103:7,
24;108:24
**working** 11:24;15:3;
36:22,23;37:1;39:14;56:2,
9;84:24;85:17;88:4;113:18,
23;128:23;131:16;136:11,
21;138:7;151:13;163:9;
164:19;172:13;183:11;
186:18;208:24
**workmen's** 16:1,1;
102:20;107:16;220:8
**worried** 219:19;220:11
**worry** 220:21
**worse** 15:10,10
**worst** 19:24
**wreaks** 170:23
**writing** 83:2
**written** 25:17;59:15;
75:10,17;78:13;79:8;98:7;
104:1;107:17;125:14,15;
142:17;178:20
**wrong** 37:24;64:18;86:6,
24;116:9;158:22;163:17;
183:22;186:5,6;208:5,6;
209:9
**wrongdoing** 152:12

## X

**xerox** 116:13

## Y

**Yan** 5:16;6:1,3,6,10;8:2;
25:14,14;26:10;117:14;
128:14;130:20,22;131:16;
132:18;136:21,23;137:2,
11,13,13,24;138:5,14,18;
139:2;141:3,12,16,22,24;
142:3,8,20;143:1,7;145:11;
146:4,20;147:1,8,13;154:4,
12;166:21;167:2,22,23;
169:5;171:1,17;172:5;
173:9;179:4,11,15,21;
180:1;183:11;187:1;194:2,
3,7,11,16;199:7,8;201:8;
204:8;205:19,22;206:1,3,
16;207:21;208:2,21;209:4;
214:8;217:3,15
**Yan's** 136:16;138:3;
175:22;195:18,19;215:1
**year** 9:6;15:8,17;16:21;
31:17;34:7,14;43:6;56:24;
57:1,13;59:2;63:24;158:13,
14,19
**years** 31:15,17;34:21,22;
35:2,7;41:18;49:13;60:7;
125:5;153:23;166:3;
171:15;188:9,9;196:24;
202:8
**Yep** 171:5
**yesterday** 7:7;40:22;
172:20;176:13,16;178:14
**younger** 137:24

## Z

**Zero** 189:13
**Z-U** 159:23
**Zutz** 159:20,22;161:9,14,
14,16,18;166:18,18;
181:18,20

---

West - Zutz (14)                    Min-U-Script®                    B&R Services for Professionals, Inc.