# EXHIBIT E
# PART 2

1     Q.    Can you give me a number?

2     A.    That would vary depending on the number of

3     employees.   There -- the majority of them were

4     Asian, of Asian decent.

5     Q.    Were they from Philadelphia?

6     A.    Most of them were from Philadelphia.   I

7     think that sometimes there were crews that came

8     in from New Jersey.

9     Q.    Did you have anything to do with dictating

10    how these workers would get to the factory?

11    A.    No.

12    Q.    As far as you know, they just showed up,

13    and it wasn't your concern how they got there or

14    got back?

15    A.    Exactly.

16    Q.    You would have worked inside the factory,

17    you do quality control, and workers being

18    procured and transported was somebody else's job?

19    A.    Yes.

20    Q.    Okay.   Did you ever have any knowledge of

21    what arrangements Mr. Newsome and Mr. Ames may

22    have had regarding who was or was not to drive

23    the workers back and forth from their point of

24    origin to the factory?

1             MR. MARCEL:  Objection.  You can

2        answer.

3    BY MR. COHEN:

4    Q.    You can answer.

5    A.    I can answer?

6    Q.    Yes.

7             MR. MARCEL:  Yes.

8             THE WITNESS:  That was the temp

9        agency's responsibility to get the workers to

10        the facilities.

11    BY MR. COHEN:

12    Q.    Okay.  My question is different.

13    A.    Okay.

14    Q.    My question is, did you have any knowledge

15    of what arrangements Mr. Newsome and Mr. Ames

16    had, with anyone, to get workers back and forth?

17    A.    No.

18    Q.    Okay.  And when you said a second ago that

19    it was the temp agency's job, is that just an

20    assumption on your part?

21    A.    The temp agency brought the people down.  I

22    don't think that, as far as my knowledge goes,

23    Steven Ames or Sterling Newsome did not tell them

24    how to get the people to the facility.

B&R Services for Professionals, Inc.

CHERYL STANISZEWSKI ADKINS

39

1    Q.    Okay.  Well, as far as your knowledge goes,

2    but as you told me, you weren't involved in that

3    process, correct?

4    A.    I was not involved in that process, but it

5    was a small company.

6    Q.    Okay.  You can't tell me for sure that

7    either Mr. Ames or Mr. Newsome never said

8    anything to the temp agency about how to get the

9    workers there, can you?

10    A.    No.

11    Q.    Or that they never said anything to anyone

12    about how to get the workers there or who should

13    take them?

14    A.    No.  Correct.

15    Q.    Okay.  And that goes for any of the

16    workers, correct?

17    A.    Correct.

18    Q.    Do you know how your line inspectors got

19    back and forth from their homes to the factory?

20    A.    My permanent line inspectors?

21    Q.    Yes.

22    A.    They were responsible for their own

23    transportation, so no.

24    Q.    Okay.  So pretty much like a lot of people

1    at work, you just assume they would get there and

2    get go home, and --

3    A.    Yes.

4    Q.    -- it is up to them?

5    A.    Exactly.

6    Q.    And Maly Yan was one of those people?

7    A.    Yes.

8    Q.    Were you ever present when somebody from

9    Pack & Process said something to Maly Yan about

10    driving workers back and forth?

11    A.    I don't know that I was present where --

12    oh, I wasn't present where Maly Yan -- somebody

13    from Pack & Process said something about -- to

14    Maly Yan about getting the workers back.    Maly

15    Yan said something to me about driving.

16    Q.    Let me just stay on the first part of that.

17    A.    Okay.

18    Q.    As to what anyone else may have said to

19    Maly Yan at the company about driving workers

20    back and forth, and what she should do, and what

21    she shouldn't do, you don't know?

22    A.    No.

23    Q.    You only know what she may have said to

24    you?

B&R Services for Professionals, Inc.

CHERYL STANISZEWSKI ADKINS                    41

1    A.    Yes.

2    Q.    Okay.  When did she say something to you?

3    A.    A week before the accident I was going

4    on -- getting ready to go on vacation.  I was

5    actually on vacation when this accident occurred.

6            I had spoken to Maly Yan on

7    Thursday, I think it was, because it was the end

8    of the week, and I expressed to her that I needed

9    her to go to night shift once I got back from

10   vacation, meaning that she was on day shift, and

11   I needed her to switch over to night shift

12   because she had to rotate, and take a couple

13   weeks of night shift.  I think it was like every

14   two weeks they would switch who was doing days to

15   nights.

16            And she told me that she was unable

17   to do so because she was driving for her father,

18   Yan.  That her father had lost his license, and

19   he was one of the drivers, and she was helping

20   him out in driving the van.  And I told Maly that

21   that was not my concern, that her

22   responsibilities at Pack & Process was not to

23   drive, it was to do the quality control

24   inspection, and I didn't think it was a good idea

CHERYL STANISZEWSKI ADKINS                    42

1    for her to be driving the van anyway.  And I told

2    her I'd expected her to be on night shift the

3    week I got back.

4    Q.    Okay.  So your point to her was, you know,

5    I'm your boss, you have a job for me, and I need

6    you here?

7    A.    Yes.

8    Q.    Okay.  In terms of whether somebody else at

9    the company had asked her to do driving, you

10   don't know?

11   A.    I do not know that.

12   Q.    Okay.  And sort of the same idea in terms

13   of whether somebody else at the company said

14   something to her father, Yan Thou, about driving

15   workers to Pack & Process, you don't know?

16   A.    I don't know.

17   Q.    Did you ever talk to David Thach about

18   whether or not workers were being paid to drive

19   other workers --

20   A.    No.

21   Q.    -- back and forth?

22            No?  So, as you sit here today, you

23   don't know what his thoughts were on that issue?

24   A.    No, I do not.

1    Q.    And you don't know whatever he may have

2    said to anybody about that?

3.   A.    No, I do not.

4    Q.    How did you come to learn of the accident

5    involving the -- the van full of the workers that

6    we're here to talk about?

7    A.    Tammy Casper called me the night of the

8    accident when I was on vacation at the beach, and

9    told me what had happened.

10   Q.    So you were on vacation with your -- your

11   family, I guess?

12   A.    Yes.

13   Q.    Rehoboth?

14   A.    I think we may have been in Ocean City.

15   Q.    All right.

16   A.    That evening.

17   Q.    Did she call you on a cell phone?

18   A.    Yes, she did.

19   Q.    What did she say?

20   A.    She said, I wanted to tell you there was a

21   horrible accident, several people got hurt, and

22   they're in the hospital.  I just wanted to let

23   you know.  I can't remember any other details.

24   Q.    And, obviously, it was clear to you that

B&R Services for Professionals, Inc.

1    she was talking about workers at Pack & Process?

2    A.    Well, she had told me that one of the vans

3    had gotten into an accident and several people

4    had been very badly hurt.

5    Q.    Do you remember if she told you who was

6    driving, or who was in it, or anything like that?

7    A.    I don't recall.

8    Q.    She may have, she may not have; you just

9    don't remember today?

10    A.    I don't remember.

11    Q.    Do you remember what your reaction was?

12    A.    I was in disbelief and shock, and it put a

13    real damper on my night.

14    Q.    You had mentioned a few moments ago that

15    you didn't think it was a good idea for Maly to

16    be driving the van.  Why was that?

17    A.    Well, it was her father's responsibility.

18    I thought that, you know, driving a van with all

19    those people was too much.  It wasn't her

20    responsibility.  She didn't work for the temp

21    agency, she was a Pack & Process full-time

22    employee, and she needed to be doing quality

23    control line inspections.

24    Q.    Did you know if she had the skills to drive

1       a van with that many people in it?

2       A.    I did not know, no.

3       Q.    All right.  Tell me what happened next with

4       regard to your connection to the accident and its

5       aftermath?

6       A.    I think my boyfriend and I, we cut our

7       vacation short, and I came back, and went up to

8       find out some more details of what had happened.

9       And I went to actually visit, I think I saw Maly

10      in the hospital, and a couple of other people.

11      And I ended up going to the funerals of Maly's

12      mom and brother.

13      Q.    Did you talk to anyone in connection with

14      those funerals, about what had happened?

15      A.    No.  Just, you know...

16      Q.    Just a sad time?

17      A.    Just a very sad time.

18      Q.    What happened next?

19      A.    Maly Yan never returned to Pack & Process,

20      and I got new inspectors.  I -- I don't know --

21      life went on.

22      Q.    Do you know if her father returned?

23      A.    I -- no.  I heard that he was never right

24      afterwards.

CHERYL STANISZEWSKI ADKINS                46

1    Q.    Who did you hear that from?

2    A.    Several people said -- some of the workers

3    that had worked there had said that he just

4    wasn't right, in the right frame of mind.  Very

5    depressed.

6    Q.    Not surprising?

7    A.    Not surprising.

8    Q.    Were you ever aware of any communications

9    between Mr. Ames and Mr. Yan -- excuse me, and

10   Maly Yan, after the accident?

11   A.    No.

12   Q.    If Maly Yan had returned to her job --

13   well, you were her supervisor, so you would have

14   known it, right?

15   A.    Yes.  I don't recall that she ever showed

16   back up for work.

17   Q.    Let me show you something that I have

18   marked as Adkins-1.  I will just put a sticker at

19   the bottom.

20   A.    Okay.

21              (Whereupon Exhibit Adkins-1 was

22         marked for identification.)

23   BY MR. COHEN:

24   Q.    Take a look at that.  Do you recognize that

B&R Services for Professionals, Inc.

CHERYL STANISZEWSKI ADKINS                    47

1        as Pack & Process letterhead?

2        A.    Yes, it is.

3        Q.    Okay.  And that's from Mr. Ames to --

4        A.    Okay.

5        Q.     -- Maly Yan?

6                    Do you see that at the top?

7        A.    I do.

8        Q.    What is the date?

9        A.    July 27th, 2001.

10       Q.    Okay.  Take a look -- read it to yourself,

11       and then look up at me when you are done.

12       A.    Okay.

13       Q.    In summary, it appears to be a memo to Maly

14       Yan from Mr. Ames saying a few things.  Welcome

15       back to work, and as we discussed you're not a

16       van driver.  Right?

17       A.    Exactly.

18       Q.    And it is signed by Maly Yan dated in July.

19       A.    Yes.

20       Q.    Did you ever have any awareness that that

21       document was ever produced?

22       A.    I don't recall the document.  I may have

23       seen it before, but it's not something that I

24       recall.

B&R Services for Professionals, Inc.

1    Q.    Do you have any idea how Mr. Ames was

2    discussing Maly Yan's return to work if she never

3    returned to work?

4    A.    She must have returned to work.  I must

5    have been mistaken.  She wasn't there long after

6    that, though.

7    Q.    Okay.  Do you have any idea why, after the

8    accident, Mr. Ames is going over precise points

9    of Maly Yan's job duties, specifically excluding

10   driving the van as opposed to before?

11   A.    It wasn't an issue before.  You know, I

12   don't know.  Probably to make sure to cover his

13   rear end at this point, but it was not an issue

14   before.  He was probably not aware that Maly Yan

15   was driving.

16   Q.    Is that a guess?

17   A.    That is a guess.

18   Q.    Okay.  Now, at some point, were you

19   approached by attorneys from Pack & Process who

20   actually work in Philadelphia?

21   A.    Yes.

22   Q.    Do you remember who they were?

23   A.    No.

24   Q.    Were you approached in person or through

                B&R Services for Professionals, Inc.

1    some other communication?

2    A.    In person, and on the phone.

3    Q.    Did you ever talk to a big guy named

4    Raphael Villalobos?

5    A.    No.

6    Q.    Okay.  How about a middle-aged gentleman,

7    Jim Young?

8    A.    There was a gentleman that came down and

9    took my deposition at home.

10    Q.    He took your deposition at home, or --

11    A.    Well, he took my -- I don't know what it's

12    called.  Lawyer terms.

13    Q.    Okay.

14    A.    He came to my house --

15    Q.    Statement?

16    A.    -- and took my statement.  There you go.

17    Q.    Was he representing you at that time?

18    A.    No.

19    Q.    Okay.  If he -- if he was your counsel, I

20    would not seek to ask you about what he said and

21    what you said, so as not to break any privileges,

22    and if you're sure he was not your counsel, then

23    I will ask.

24    A.    He was not my counsel.

B&R Services for Professionals, Inc.

CHERYL STANISZEWSKI ADKINS                    50

1      Q.     Okay.  What did you talk about?

2      A.     We went over the same things that we're

3      going over today.  He asked me what I did for

4      Pack & Process, and then we went over Maly Yan's

5      employment, and the conversation that I did have

6      with Maly Yan about not driving the van.

7      Q.     Let me show you, here is a copy for

8      counsel, what I will ask to have marked as

9      Adkins-2.  I have an extra one.  I will put the

10     sticker up higher so I don't block anything.  I

11     will show you that.

12                 (Whereupon Exhibit Ames-2 was

13            marked for identification.)

14     BY MR. COHEN:

15     Q.     That was an affidavit that was on the

16     letterhead from those lawyers in Philadelphia.

17     A.     Yes.

18     Q.     Did they type that up?

19     A.     Yes, they did.

20     Q.     Did they put it in front of you and ask you

21     to sign it?

22     A.     Yes, they did.

23     Q.     Did you read it first before you signed it?

24     A.     Yes, I did.

B&R Services for Professionals, Inc.

CHERYL STANISZEWSKI ADKINS                51

1    Q.    I would like to have you look down at the

2    last paragraph with the number that talks about

3    the conversation that you had with Maly.

4    A.    Okay.

5    Q.    In it, it alleges that you said that

6    driving the van was not her responsibility or in

7    any way related to her employment.

8    A.    Yes.

9    Q.    Sounds like lawyer language, right?

10   A.    Yes.

11   Q.    Okay.  That wasn't your language, right?

12   A.    No.  That was a summary of my statement.

13   Q.    Okay.  In fact, what you told me earlier

14   today is that you had told her, you work for me,

15   I need you here in the night shifts.

16   A.    Uh-huh.

17   Q.    I don't want you doing that.  But you

18   didn't know about whether anyone else asked her

19   to do that driving?

20   A.    No.  I told her that was not part of her

21   responsibility, to drive the van, and that it was

22   not a good idea.  She told me that she was

23   driving to help her family out.

24   Q.    Okay.  Now, when you said it wasn't part of

B&R Services for Professionals, Inc.

CHERYL STANISZEWSKI ADKINS                              52

1    her responsibility, you meant her responsibility

2    to you?

3    A.    And to Pack & Process. Her responsibility

4    was the quality control line inspector, and I

5    needed her to go to second shift.

6    Q.    Okay. And if either Mr. Ames, or Mr.

7    Newsome, or somebody else at high rank wanted

8    that responsibility, or at least your

9    understanding of it altered, to allow her to

10   drive, you wouldn't have been aware of that?

11   A.    I wouldn't have been aware of it, but I

12   doubt very much so that either one of them said

13   something to Maly Yan that she needed to drive.

14   Q.    Okay. You're not aware of the testimony in

15   this case that contradicts your doubt?

16   A.    Okay.

17   Q.    Are you?

18   A.    No, I'm not.

19   Q.    Okay. When you say that you doubted it,

20   though, why would you have doubted it?

21   A.    Because I don't think that -- I definitely

22   would know that Steven Ames would not tell Maly

23   Yan to drive a van for Pack & Process. That just

24   not would happen. He --

1   Q.    Because that's not his function to tell

2   people those little things?

3   A.    That's not his function, and he would not

4   take an employee of Pack & Process and tell them

5   to drive a van.  It's just not something that

6   Steve Ames would do.

7   Q.    You mean, it's just like not part of his

8   character?

9   A.    That's not part of his character, that was

10  not part of her responsibility.  I don't think he

11  would want her anywhere near the van driving

12  situation.

13  Q.    Why not?

14  A.    It wasn't her responsibility.  I mean, her

15  responsibility was quality control line

16  inspector.  She was, you know, what, early 20s,

17  female.  If 20.  You know, she should not have

18  that responsibility to drive a bunch of people

19  down to the plant.

20  Q.    What is -- what is being female and early

21  20s have to do with that responsibility?

22  A.    I don't think that that would be something

23  that I would even be able to handle, driving a

24  van that size.

<u>CHERYL STANISZEWSKI ADKINS</u>                                    54

1    Q.    Why?  Is there a physical aspect to

2    controlling it that you're talking about?

3    A.    I'm not sure, but, um, you know.

4    Q.    Just an intimidating thing to do?

5    A.    Just an intimidating thing to do, yes.

6    Q.    Even, you, yourself --

7    A.    Oh, yeah.

8    Q.    -- would be nervous handling a vehicle that

9    size on the highways with -- full of people?

10   A.    I wouldn't want to be responsible for that.

11   Q.    It could be dangerous?

12   A.    Exactly.

13   Q.    Okay.  How about Sterling Newsome, if he

14   needed to get that van driven down there and Mr.

15   Thou, Yan Thou, couldn't do it for some reason,

16   you have no reason to dispute that he set up some

17   arrangements with Maly Yan would drive the van,

18   do you?

19   A.    I am not aware of any arrangement that

20   Sterling Newsome had with Maly to drive the van.

21   She did not speak of that to me and neither did

22   he.

23   Q.    And he never told you that there was never

24   such an arrangement?

B&R Services for Professionals, Inc.

<u>CHERYL STANISZEWSKI ADKINS</u>                    55

1    A.    No, he did not.

2    Q.    Have you ever spoken to any of the other

3    managers, or owners, and workers at Pack & 

4    Process about this accident and what happened?

5    A.    I've probably talked to the other managers

6    about the accident.  That would have happened,

7    yes, and what a trag- -- tragedy it was.

8    Q.    Did you ever see the van before the

9    accident?

10   A.    Yes.

11   Q.    Do you remember what it looked like?

12   A.    I think I recall that Yan's van was a --

13   I'm not sure.  Purple, maybe.  Brownish color.

14   Q.    Not sure?

15   A.    What was it?

16   Q.    Not sure?

17   A.    Not sure.  Not sure.

18   Q.    Okay.  That's all right.

19            Did you ever see anyone providing

20   checks or cash to the workers?

21   A.    No.

22   Q.    The -- the payment of the workers was not

23   something that you were involved in?

24   A.    Exactly.

B&R Services for Professionals, Inc.

CHERYL STANISZEWSKI ADKINS                    56

1    Q.    Okay.  Nor were you involved in the payment

2    of even the people that worked in your

3    department, that was through payroll?

4    A.    Exactly.

5    Q.    All right.

6    A.    I handed their checks out to them.

7    Q.    Okay.  So you would get a check from

8    payroll and --

9    A.    Yes.

10   Q.    -- then you would hand it to people like

11   Maly Yan?

12   A.    Exactly.

13   Q.    And whether she received any extra money

14   from anybody else for driving is not something

15   that you would have been aware of?

16   A.    Exactly.

17   Q.    Okay.

18            MR. COHEN:  That's all the

19            questions I have for you.  Counsel may hav

20            some, too.

21   BY MR. COSTIGAN:

22   Q.    Hello, Miss Adkins.  My name is Richard

23   Costigan.  I represent Khan Gul, Zair Shah, and

24   the Estate of Mohammed Azim.  I just have a few

B&R Services for Professionals, Inc.

1          questions?

2                              VIDEO TECHNICIAN:  Mr. Costigan, we

3                  are going to go off the record a moment to

4                  make arrangements so that you are picked up

5                  by the videotape.

6                              MR. COSTIGAN:  Okay.

7                              VIDEO TECHNICIAN:  Off the record.

8                  11:56.

9                              (Whereupon a discussion was held off

10                 the record.)

11                             VIDEO TECHNICIAN:  On the record.

12                 11:57.

13                             THE WITNESS: Hello.

14         BY MR. COSTIGAN:

15         Q.    My name is Richard Costigan.  I represent

16         Khan Gul, Zair Shah, and the Estate of Mohammed

17         Azim.  I just have a few questions.

18                             You referred to Suasaday.  Was he

19         supplying workers to Pack & Process at the time

20         you started in 1995?

21         A.    Yes, he was.

22         Q.    Do you know for how long he had been

23         supplying workers up to that time?

24         A.    No, I do not.  No.

1    Q.    Do you know the name of the company that he

2    worked for in supplying workers to -- to Pack &

3    Process?

4    A.    I think the other counsel said that it was

5    Lam Staff, and that sounds correct.

6    Q.    Are you familiar with the name of Point &

7    Fortune, Inc.?

8    A.    I've heard of that name as well.

9    Q.    Is that a name that you associate with

10    Suasaday?

11    A.    I'm not sure.  It's been a long time.

12    Q.    Did -- you testified that Suasaday was also

13    known as David Thach?

14    A.    Yes.

15    Q.    Do you know of any other names that he was

16    known by?

17    A.    No.  David Thach, Suasaday.

18    Q.    Do you recognize the name of Loi Thach?

19    A.    Lloyd (sic) Thach I think is Sausaday's

20    brother.

21    Q.    Did you have any contact with him in

22    connection with your work?

23    A.    Not within connection within my work.  I

24    think I may have met him once or twice within

<u>CHERYL STANISZEWSKI ADKINS</u>                              59

1       passing.

2       Q.     When -- when did you meet him?

3       A.     I don't recall.  He may have came down

4       there with Suasaday and said hello to him one

5       time or twice.

6       Q.     Did you know if Loi Thach performs any work

7       in supplying workers to Pack & Process?

8       A.     I do not know that.

9       Q.     Do you know of any other members of

10      Suasaday or David Thach's family that you may

11      have met in the course of your work with Pack &

12      Process?

13      A.     No, I do not.

14      Q.     Do you recognize the name of Ban Thach?

15      A.     Can you repeat that?

16      Q.     Ban, that's B-A-N, Thach.

17      A.     No, I do not.

18      Q.     T-H-A-C-H.

19      A.     No, I do not recognize that name.

20      Q.     Earlier you testified that there was a

21      production line.  Can you estimate how many

22      workers would be on the production line?

23      A.     That would vary, depending on how many, or

24      what line it was running.  How complicated the

B&R Services for Professionals, Inc.

1    different number -- the different pieces of

2    equipment that would be needed for that line, so

3    that number would vary.

4         Q.    And earlier, I believe, you referred to --

5    you testified that Sterling Newsome would advise

6    the day before how many workers would be needed

7    for the next day?

8         A.    Correct.

9         Q.    And it's your understanding that he would

10    advise David Thach of that?

11         A.    No.  I don't think that he would do that on

12    a daily basis with David Thach, I think he would

13    tell the leaders.  There were different leaders

14    that normally were the drivers for Pack & --

15    for -- for Lam Staff that would come down, and he

16    woulde advise the leaders of how many people were

17    needed.

18         Q.    Do you know how many leaders there were,

19    generally?

20         A.    I don't recall.  It depends on how many

21    lines there were.

22         Q.    Other than advising the drivers how many

23    individuals they needed, did they advise -- did

24    Sterling Newsome advise the drive -- the drivers

B&R Services for Professionals, Inc.

1    of anything else?

2    A.    Not that I'm aware of.

3    Q.    Was there an understanding of whether

4    Ster -- Sterling Newsome could advise the driver

5    not to bring a -- a certain individual back the

6    following day?

7    A.    Yes.  He was able to do that if he had a

8    problem with a person, yes.

9    Q.    Was anyone else at Pack & Process, other

10   than Sterling Newsome, able to do that?

11   A.    I think Sterling Newsome, or the production

12   manager would be the one in charge.  A production

13   supervisor may be if Sterling Newsome wasn't

14   available, like say on a night shift or

15   something.  If the supervisor had trouble with an

16   individual, he could tell the leader not to bring

17   that person back the following shift.

18              MR. COSTIGAN:  Thank you.  I have

19         no further questions.

20              THE WITNESS:  Thank you.

21              VIDEO TECHNICIAN:  Off the record.

22         12:02.

23              (Whereupon a short recess was held.)

24              VIDEO TECHNICIAN:  On the record.

B&R Services for Professionals, Inc.

1            12:06.

2       BY MR. MARCEL:

3       Q.    Good afternoon, Miss Adkins.

4       A.    Hello.

5       Q.    My name is Henri Marcel, and I represent

6       Pack & Process, Incorporated, and Saint Paul

7       Mercury Insurance Company.  I have a few

8       questions for you.

9             Did you interview Maly Yan when she

10      first started to work at Pack & Process as a

11      temporary line worker?

12      A.    Probably not initially.

13      Q.    Did you ever interview Maly Yan for any job

14      that she had --

15      A.    Yes.

16      Q.    -- at Pack & Process?

17      A.    Yes.

18      Q.    What job did you interview Maly Yan for?

19      A.    For the quality control line inspector I

20      must have spoken to her.

21      Q.    All right.  What was your assessment of

22      Maly Yan's skills in spoken English?

23      A.    Fluent in English.

24      Q.    Was that one of the qualities that you were

B&R Services for Professionals, Inc.

1     looking for, for that position?

2     A.     Yes.

3     Q.     During the time that Maly Yan worked for

4     you at Pack & Process, did you ever have any

5     trouble communicating with her?

6     A.     No.

7     Q.     Did she ever have any trouble communicating

8     with you?

9     A.     No.

10    Q.     Was all that communication done in English?

11    A.     Yes.

12    Q.     Miss Adkins, you were familiar, weren't

13    you, with the responsibilities of a quality

14    control line inspector?

15    A.     Yes.

16    Q.     And that was the position that Maly Yan

17    held?

18    A.     Yes.

19    Q.     Did you hire Maly Yan as a quality control

20    line inspector?

21    A.     I don't recall if it was directly me, or

22    maybe it was me and the production manager at the

23    time.

24    Q.     Okay.

B&R Services for Professionals, Inc.

1    A.    Probably did it in conjunction with each

2    other.

3    Q.    Okay.  As a quality control line inspector,

4    was Maly Yan hired by Pack & Process to drive a

5    vehicle?

6    A.    No.

7    Q.    Did the production manager at Pack &

8    Process ever inform you that Maly Yan was ever

9    hired by Pack & Process to drive a vehicle?

10   A.    No.

11   Q.    Did anyone at Pack & Process ever inform

12   that you Maly Yan was hired by Pack & Process to

13   drive a vehicle?

14   A.    No.

15   Q.    Did you ever pay Maly Yan to drive a

16   vehicle on behalf of Pack & Process?

17   A.    No.

18   Q.    Do you know if anyone from Pack & Process

19   paid Maly Yan to drive a vehicle on behalf of

20   Pack & Process?

21   A.    No.

22   Q.    Did anyone from Pack & Process ever tell

23   you that they paid Maly Yan to drive a vehicle on

24   Pack & Process' behalf?

B&R Services for Professionals, Inc.

CHERYL STANISZEWSKI ADKINS                    65

1      A.    No.

2      Q.    Did you ever expect Maly Yan to drive a

3      vehicle as part of her employment as a quality

4      control line inspector?

5      A.    No.

6      Q.    Did any production control manager ever

7      inform you that Maly Yan was expected to drive a

8      vehicle as part of her employment with Pack &

9      Process?

10     A.    No.

11     Q.    Regardless of expectation, did you ever

12     request that Maly Yan drive a vehicle on behalf

13     of Pack & Process?

14     A.    No.

15     Q.    Did anyone from Pack & Process ever tell

16     you that they requested Maly Yan to drive a

17     vehicle on behalf of Pack & Process?

18     A.    No.

19     Q.    You testified earlier about a conversation

20     that you had with Maly Yan in which you informed

21     her that when you were going to return from

22     vacation that you wanted Maly Yan to work night

23     shift?

24     A.    Yes.

<u>CHERYL STANISZEWSKI ADKINS</u>                          66

1    Q.    And I believe you testified that Maly Yan

2    told you she could not drive because she was

3    driving for her father who had lost her license?

4    A.    Lost his license, yes.

5    Q.    I'm sorry.  Lost his license.

6    A.    Yes.

7    Q.    At that point, did you tell Maly Yan that

8    driving a van was not her responsibility?

9    A.    I did tell her that.

10   Q.    Did Maly Yan tell you that someone for Pack

11   & Process had indeed told her that driving a van

12   was her responsibility?

13   A.    No, she did not.

14   Q.    Did Maly Yan tell you that, during this

15   conversation, that anyone from Pack & Process had

16   asked her to drive the van as a result of her

17   father having lost his license?

18   A.    No.

19   Q.    Was it your understanding at the end of

20   that conversation that Maly Yan was going to work

21   the night shift as you had told her she would

22   when you returned from vacation?

23   A.    I expected her to be there.

24   Q.    Did she lead you to believe that she would

1      not be there?

2      A.    I did not know if she would show up or not.

3                  MR. MARCEL:  Those are all the

4            questions I have.  Thank you, ma'am.

5                  VIDEO TECHNICIAN:  Off the record.

6            12:12.

7                  (Whereupon a discussion was held off

8            the record.)

9                  VIDEO TECHNICIAN:  On the record.

10           12:13.

11     BY MR. COHEN:

12     Q.    Did Maly Yan work on that night shift as

13     you expected; --

14     A.    No.

15     Q.    -- do you know?

16                  She did not?

17     A.    No.

18     Q.    She drove the van?

19     A.    She was in the hospital.

20     Q.    When you left, how long was it before the

21     accident occurred?

22     A.    When I left on vacation?

23     Q.    Yes.

24     A.    I think the accident happened on either a

CHERYL STANISZEWSKI ADKINS                68

1      Thursday or a Wednesday.  I'm not sure.  Only a

2      couple of days.

3         Q.    Okay.  So for that couple of days between

4      the time that you spoke to her and the time that

5      the accident occurred, what did she do?

6         A.    I do not know.

7         Q.    Well, that's what I'm talking about.  Did

8      she start working on the night shift then?

9         A.    Night shift when -- she was not expected to

10     be on night shift until the week I returned.  She

11     had one more week of day shift, then she was

12     expected to be night shift the following week.

13        Q.    Okay.  So when you told her that you

14     expected her to work the night shift, you told me

15     before you did that, because you wanted her to

16     work that and not drive the van, right?

17        A.    I needed her to go to night shift.

18        Q.    And if she drove the van she couldn't do

19     that?

20        A.    I guess.

21        Q.    But until she needed to be on the night

22     shift, your concern about the conflicting duties

23     between driving and being on night shift wouldn't

24     come into play?

B&R Services for Professionals, Inc.

<u>CHERYL STANISZEWSKI ADKINS</u>                    69

1              MR. MARCEL:  Objection.  You can

2          answer.

3              THE WITNESS:  I don't understand what

4          you're --

5    BY MR. COHEN:

6    Q.    Okay.

7              THE WITNESS:  -- saying.

8    BY MR. COHEN:

9    Q.    Before you told me that you expected her to

10   work on the night shift.

11   A.    Uh-huh.

12   Q.    Right?

13   A.    Uh-huh.

14   Q.    That's what you wanted?

15   A.    Yes.

16   Q.    Okay.  And when she told you about this

17   driving of the van, among other reasons, you

18   thought that driving would conflict and be too

19   much in addition to working the night shift?

20   A.    She would un -- be unable to be there for

21   the night shift if she was driving a van because

22   the schedules would conflict.

23   Q.    Exactly.  That's what I'm talking about.

24   A.    Yes.

CHERYL STANISZEWSKI ADKINS                    70

1     Q.    Okay.  But that conflict wouldn't come up

2     until a week or so later after you had that

3     conversation, correct?  It's just that she didn't

4     get that far because she had the accident in a

5     couple of days?

6     A.    Correct.

7     Q.    Okay.  So between the time you talked to

8     her and the time she had the accident, she didn't

9     have that conflict that you were worried about

10    because she wasn't even expected to work the

11    night shift yet, correct?

12    A.    Correct.

13              MR. COHEN:  That's all I have.

14        Thank you.  We're done.

15              MR. MARCEL:  I don't have any

16        questions.

17              VIDEO TECHNICIAN:  Any more questions?

18    BY MR. COSTIGAN:

19    Q.    I just have a question or two.

20              Miss Adkins, you testified earlier

21    that the production supervisor would communicate

22    with the leaders or drivers concerning how many

23    workers were needed for the next day; is that

24    correct?

B&R Services for Professionals, Inc.

CHERYL STANISZEWSKI ADKINS                    71

1    A.    Correct.

2    Q.    And would it be fair to say that the

3    production supervisor would be aware of who the

4    drivers of the vehicles were?

5    A.    They should have been, yes.

6    Q.    And is it your understanding that at the

7    time of the accident Sterling Newsome was the

8    production supervisor?

9    A.    He was the production manager.

10    Q.    And who -- who -- who would have been the

11    super -- production supervisor?

12    A.    I'm not sure who was working at the time.

13    There may have been a couple of them.

14    Q.    Do you know the names of individuals who

15    may have been doing that job at that time?

16    A.    Yes.  Michael Platt and George Arrington.

17    Q.    Their titles were both production

18    supervisors?

19    A.    At that time, yes.

20              MR. COSTIGAN:  Thank you.  I have

21         no further questions.

22              VIDEO TECHNICIAN:  This then concludes

23         the deposition at this time, June 26th, at

24         12:17 p.m.  We're off the record.

B&R Services for Professionals, Inc.

1                         — — —

2              (Witness excused.)

3              (Deposition concluded.)

4                         — — —

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHERYL STANISZEWSKI ADKINS                    73

1                    C E R T I F I C A T I O N

2

3                    I, COLLEEN A. YOUNG, hereby

4       certify that the testimony and the proceedings in

5       the foregoing matter taken on June 26, 2006, are

6       contained fully and accurately in the

7       stenographic notes taken by me, and that pages 1

8       to 72, inclusive, of this testimony are a true

9       and correct transcript of the same.

10

11                    COLLEEN A. YOUNG, #255
                      R.P.R., C.S.R.
12                    Notary Public

13

14                    The foregoing certification of

15      this transcript does not apply to any

16      reproduction of the same by any means unless

17      under the direct control and/or direction of the

18      certifying shorthand reporter.

19                              — — —

20

21

22

23

24

B&R Services for Professionals, Inc.

## LAWYERS NOTES

| Page | Line | |
|------|------|---|
| | | |