## NATURE AND STAGE OF PROCEEDINGS

This case involves a fatal auto accident that occurred on June 18, 2001. Yan Thou, individually and as the administrator of the estates of Oeurn Mam and Navy Yan and Chan Yan, Thuha Son, Chieu Thi Huynh filed a lawsuit for damages for personal injuries against Maly Yan in the Court of Common Pleas of Philadelphia County on June 11, 2003 captioned as Thou et al. v. Yan Docket No. 030601508. See Plaintiffs' Complaint Attached as Exhibit "A."[1]

In addition to the above action filed against Maly Yan, the fatal June 18, 2001 accident gave rise to several other lawsuits filed against Maly Yan and other Defendants by both Maly Yan and other Plaintiffs. Originally, there were five (5) other cases which have been filed on behalf of persons injured in this accident, all filed in the Court of Common Pleas of Philadelphia County. All of these cases contain allegations that Maly Yan was working in the course and scope of her employment with Pack and Process at the time of the accident. These cases were consolidated for all purposes with the Yan Thou case by Order of court[2] dated February 21, 2003. That entire consolidated action was eventually dismissed from the Court of Common Pleas of Philadelphia County with leave to re-file the actions in Delaware (the Superior Court of Pennsylvania affirmed the trial court's decision to grant Defendants' *forum non conveniens* motion).

One action filed against Maly Yan was never consolidated and proceeded to trial on January 14, 2005, against only defendant Maly Yan before the Honorable Sandra J. Moss, sitting

---

[1]The June 18, 2001 accident gave rise to several other lawsuits filed against Maly Yan and other Defendants by both Maly Yan and other Plaintiffs.

[2]Unchalee Vong, Et al v. Maly Yan ,et al., Kusti Leman, et al. v. Maly Yan, et al., Bay Thi Nguyun v. First Fleet Corp, et al., Zair Shah, et al. v. Maly Yan, et al.

1

without a jury[3].  The trial was concluded on January 20, 2005, and a verdict in favor of all

Plaintiffs and against Maly Yan was entered in the total amount of $10,228,467.00.  The

disposition of that one action (which does not include all Plaintiffs-who have a right to a jury

trial on all issues, including Maly Yan's agency-or all Defendants) gave rise to the instant

declaratory judgment actions that were consolidated on August 24, 2005, to determine whether

Maly Yan was an agent of Pack and Process and was acting in the course and scope of her

employment with Pack and Process or performing a duty related to the conduct of Pack and

Process business[4] while transporting employees to and from the Pack and Process factory on the

date of the fatal accident.  The Defendants' declaratory judgment action requests that this Court

make five (5) declarations:

> 1.      On June 18, 2001, Maly Yan was an agent/employee of Pack and Process
> and was acting in the course and scope of her employment with Pack and Process while
> transporting employees to and from the Pack and Process factory.

> 2.      On June 18, 2001, Maly Yan was performing a duty related to the conduct
> of Pack and Process's business while transporting employees to and from the Pack and
> Process factory.

> 3.      Pack and Process is responsible to pay the entire judgment imposed upon
> Maly Yan in the matter of Yan Thou et.al. v. Maly Yan, June Term 2003 No.1503 (less
> payment from St. Paul, as the insurance carrier for Pack and process).

> 4.      St. Paul, as the insurance carrier for Pack and Process is responsible to pay
> for Maly Yan's actions in the matter of Yan Thou et.al. v. Maly Yan, June Term, 2003
> No.1503, in the amount of the verdict imposed upon Maly Yan, on January 20, 2005, up
> to and including their policy limits, for negligent acts performed by her while working as

---

[3]Counsel for Pack and Process was given notice of this trial in Pennsylvania, but declined to intervene or participate choosing instead to sit in the public gallery during the proceedings.

[4]St. Paul's insurance contract with Pack and Process provides coverage for employees and volunteer workers for "work done within the scope of their employment by (Pack and Process); or their performance of duties related to the conduct of (Pack and Process) business."  See copy of St. Paul's General Liability Policy Pg. 6; Umbrella Excess Liability Policy Pg. 7, covering Pack and process attached as Exhibit "B."

an agent/employee of Pack and Process on June 18, 2001.

     5.    For such other and further relief as to this court may seem just and proper.

<u>See</u> Defendants' Declaratory Judgment Action attached hereto as Exhibit "C." D.I. 05-00513,

No. 17.

Defendants filed a Motion for Summary Judgment on August 4, 2006, outlining that no

issues of material fact exist and the Defendants are entitled to judgment as a matter of law as to

all of the declarations requested in the Defendants' Declaratory Judgment Action and Summary

Judgment should be granted.  <u>See</u> Defendants' Motion for Summary Judgment attached hereto as

Exhibit "D."  D. I. No. 105.    Defendants Motion for Summary Judgment is currently pending

before this Court.  On August 8, 2006, Plaintiffs St. Paul Mercury Insurance Company and Pack

and Process, Inc. (hereinafter referred to as "Plaintiffs") filed the present Motion for Summary

Judgment.  D.I. No. 106  Both pending motions overlap on the issue of agency.

## SUMMARY OF ARGUMENT

Defendant Maly Yan was given "actual authority" to act on behalf of Pack and Process and to transport employees to and from the Pack and Process Factory. Maly Yan was acting on behalf of Pack and Process in transporting employees to and from the factory, working within the course and scope of her employment and performing duty related to the conduct of Pack and Process's business.  The testimonial evidence also demonstrates that the restrictions contained in the Umbrella insurance policy have been satisfied and Maly Yan is a "protected person" under the Umbrella policy.   No issue of material fact exist and the Defendants are entitled to judgment as a matter of law as to all of the declarations requested in the Defendants' Declaratory Judgment Action.[5]  Summary Judgment should be granted on behalf of the Defendants and Plaintiffs' present Motion for Summary Judgment should be denied.

---

[5]Declaration number four (4) of Defendants' Declaratory Judgment Action states, "St. Paul, as the insurance carrier for Pack and Process is responsibile to pay for Maly Yan's actions in the matter of Yan Thou et.al. v. Maly Yan, June Term, 2003 No.1503, in the amount of the verdict imposed upon Maly Yan, on January 20, 2005, up to and including their policy limits, for negligent acts performed by her while working as an agent/employee of Pack and Process on June 18, 2001.  See  Defendants' Declaratory Judgment Action attached hereto as Exhibit "C." D.I. 05-00513, No. 17.

## COUNTER STATEMENT OF FACTS

On or about June 18, 2001, Yan Thou, Oeurn Mam, Navy Yan, Chan Yan, Thuha Son, Chieu Thi Huynh, Bay Thi Nguyen, Uchalee Vong, Donkeo Phravichit, Kusti Leman, Lani Chandra, Zair Shah, Khan Gul, Mohammed Azim, Lang Khem and Lam Khem were returning from work at Pack and Process and were passengers in a 1992 Dodge Ram Van, bearing Pennsylvania license plate No. DZK8292, traveling northbound on I-495 toward Philadelphia. The 1992 Dodge Ram van was owned and operated by Maly Yan, who, twice under oath, admitted to acting as the agent of Defendant Pack and Process in transporting nineteen passengers in the van back and forth to the Pack and Process factory in New Castle, Delaware. Eighteen of the passengers were contract workers supplied by Lam to work at Pack and Process, and were transported by Maly Yan, acting as the agent of Pack and Process, from their neighborhood in Philadelphia to work at the Pack and Process facility in New Castle, Delaware, and back again to Philadelphia at the end of the work day.

At around 4:50 p.m. on June 18, 2001, Maly Yan attempted to drive the 1992 Dodge van past a Motiva tractor-trailer driven on northbound I-495. At this time, the 15 passenger van was carrying nineteen passengers[6]. At about 3.4 miles north of Wilmington, the operator of the tractor trailer steered the tractor-trailer close to the van so as to make it unsafe for Maly Yan to operate the van and thereby created a dangerous roadway condition. Maly Yan also negligently lost control of the van and swerved into the tractor-trailer. The van careened off of the left edge of the road and over a median strip and rolled over several times, causing severe injuries to all of

---

[6]The van was dangerously overloaded because of the acts and omissions of Pack and Process. Plaintiffs' Complaint ¶ 39(h). This is the basis for direct (non-vicarious) claims of Pack and Process's liability for damages that were brought by the injured Plaintiffs' and decedents' estates. Plaintiffs' Complaint Count III.

the occupants of the van, and killing Navy Yan, Oeurn Mam, Mohammed Azim, Lang Khem and Lam Khem.

## ARGUMENT

### I.    THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact, and the evidence is so one-sided that a party is entitled to judgment as a matter of law. Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991) (quoting Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 251-52 (1986)). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court will consider the pleadings, admissions on file and affidavits in making its determination. FED. R. CIV. P. 56(c).

To be sure, the moving party initially bears the burden of showing that no genuine issues of material fact exist. Celotex Corp. v. Catrett, 477 U.S. at 423 (1986); Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp., 812 F.2d 141, 144 (3d Cir. 1987). If a properly supported motion shows no genuine issues of material fact, however, the burden shifts to the nonmoving party to prove the existence of genuine issues of material fact. Anderson v. Liberty Lobby. Inc., 477 U.S. at 248 (1986). Further, the nonmoving party cannot create a genuine issue for trial with bare assertions, conclusory allegations, vague statements or general denials. See Celotex, 477 U.S. at 324. See also Marcangelo v. Boardwalk Regency Corp., 847 F. Supp. 1222, 1226 (D.N.J. 1994).

II.    **DEFENDANT MALY YAN WAS ACTING ON BEHALF OF PACK AND PROCESS IN TRANSPORTING EMPLOYEES TO AND FROM THE FACTORY, WORKING WITHIN THE COURSE AND SCOPE OF HER EMPLOYMENT AND PERFORMING A DUTY RELATED TO THE CONDUCT OF PACK AND PROCESS'S BUSINESS**

Plaintiffs' Motion for Summary Judgment alleges that Defendant Maly Yan was not within the course and scope of her employment with Pack and Process at the time of the accident on June 18, 2001. The Plaintiffs are wrong. Defendants incorporate by reference their Motion for Summary Judgment as to Agency, which was filed first and outlines that no issues of material fact exist and the Defendants are entitled to judgment as a matter of law as to all of the declarations requested in the Defendants' Declaratory Judgment Action and Summary Judgment should be granted on behalf of the Defendants. Defendant Maly Yan was given "actual authority" to act on behalf of Pack and Process and to transport employees to and from the Pack and Process Factory, as outlined in detail below. Maly Yan's actions on the June 18, 2001, in transporting these employees from the Pack and Process factory at the time of the accident were within the course and scope of her employment and constituted a duty related to the conduct of Pack and Process's business. Accordingly, the principal, Pack and Process, is liable for her actions. As more fully explained in footnote 4, <u>supra</u>, the usage of the language "a duty related to the conduct of Pack and Process's business" is taken out of the subject insurance contract and imposes a separate and distinct obligation for St. Paul to pay the policy limits.

A.    **Agency Law**

The law of agency is clear and unambiguous. A principal is liable for the actions of its agents that are within the scope of the agent's actual or apparent authority. <u>See</u> Restatement (Second) of Agency § 140. Actual authority is created by words or conduct of the principal,

which reasonably cause the agent to determine that the principal's wishes the agent to act on the principal's behalf. Jurimex Kommerz Transit G.M.B.H. v. Case Corporation, 2006 WL 1995128 (D.Del.) (quoting) Edwards v. Born, Inc.,792 F.2d 387, 389-90 (3d Cir.1986). See Slip Copy attached hereto as Exhibit "E." Apparent authority, on the other hand, can be created by words or conduct of the principal, which reasonably cause a third party to believe that the agent is acting on the principal's behalf. Id. at 390[7]. Maly Yan's actual authority to act on behalf of Pack and Process establishes that she was acting in course and scope of employment on June 18, 2006.

Maly Yan's conduct in transporting workers to and from the Pack and process factory was requested of her by Pack and Process production manager Sterling Newsome. Maly Yan's actions were clearly within the scope of her employment. Delaware follows the analysis provided by the Second Restatement on Agency in determining if *respondeat superior* liability is present. As such, the appropriate test is:

> "(1)  Conduct of a servant is within the scope of employment if, but only if:
>
> > (a) It is of a kind he is employed to perform;
> > (b) it occurs substantially within the authorized time and space limits;
> > (c) it is actuated, at least in part, by a purpose to serve the master, and
>
> (2)  Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."

---

[7] As a general rule, the existence of a agency relationship is decided in a trial on the merits. However, where the parties have been given an opportunity to conduct discovery on the agency relation, and where a party is able to put fort sufficient evidence of such a relationship, the policy of judicial economy is served by a decision on summary judgment. Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc., 456 F.Supp. 831, 838 (D.Del. 1978).

See Restatement (Second) of Agency § 228; Coates v. Murphy, 270 A.2d 527, 528

(Del.Super.1970). As stated in Draper v. Olivere Paving & Construction Co., 181 A.2d 565

(Del.Super.1962), "scope of employment :[i]s at best indefinite. It is nothing more than a

convenient means of defining those tortious acts of the servant not ordered by the master for

which the policy of law imposes liability upon the master." Id.

The phrase, itself, contains no guide for its application. However, it certainly includes

acts of the servant so closely connected with what she is employed to do, so fairly incidental to it,

that they are to be regarded as methods elected by the servant, even though improper, of carrying

out the master's business. See Prosser on Torts (2nd E.), § 63, p. 352. The Restatement imposes

liability upon the master for his servant's intended tortious harm "if his act was not unexpectable

in view of the duties of the servant." See Restatement (Second) of Agency § 245.

The determination of whether a particular tortious act was one performed within the

scope of the servant's employment for which the master consequently is liable can be answered

only in the light of the particular circumstances of the case under consideration. Sherlyn &

Dimos Konstantopoulios v. Westavco Corporation, 1992 WL 16297 (D.Del).  See Slip Copy

attached hereto as Exhibit "F." It is clear from the testimonial evidence elicited during discovery

that Maly Yan was acting within the scope of her employment.  However, as further outlined in

footnote 4 supra, the subject St. Paul insurance contract attaches responsibility to Pack and

Process for employee's actions that are related to the conduct of Pack and Process's business.

Maly Yan's actions on the June 18, 2001, in transporting these employees from the Pack and

Process factory at the time of the accident were within the course and scope of her employment

and constituted a duty related to the conduct of Pack and Process's business.

10

**B.  No Genuine Issues of Material Fact Exist and Defendants are Entitled to Judgment as a Matter of Law as to Maly Yan's "Actual Authority" to Act on Behalf of Pack and Process in Transporting Employees on June 18, 2001**

The testimony elicited from all parties in this case during the discovery process of the present Declaratory Judgment action and the other related actions demonstrate that no genuine issues of material fact exist and Defendants are entitled to judgment as a matter of law as to Maly Yan's "actual authority" to act on behalf of Pack and Process in transporting employees on June 18, 2001.  Outlined below are the relevant portions of trial and deposition testimony from Defendant Maly Yan, Pack and Process Owner Steven Ames, and Pack and Process Production Manager Sterling Newsome, in which all agree that Mr. Newsome was in a managerial position within the Pack and Process organization and that Maly Yan was asked to drive employees to and from the factory by Mr. Newsome on behalf of Pack and Process.

**1.  Maly Yan**

Maly Yan testified on January 20, 2005, before the Honorable Sandra Mazer Moss and stated as follows:

> Q.    Ms. Yan, I know you understand some English, but we're going to go through the interpreter, okay?
>
> A.    Okay.
>
> Q.    State your full name and your present home address.
>
> A.    My name is Yan, Maly. My residence is 2007 South 9th Street, 19148.

NT. pg.6,  L12-18.

> Q.    And what is your country of origin?

11

> A.    Cambodia.
>
> Q.    Okay. Were you the operator of one of the vehicles involved in the accident that we're here about from back on June 18th of 2001?
>
> A.    Yes.
>
> Q.    And what kind of vehicle -- what kind of vehicle were you driving at the time of the accident?
>
> A.    Van,1992.
>
> Q.    Where were you coming from and where were you going?
>
> A.    From work and heading home.
>
> Q.    And home was Philadelphia?
>
> A.    Correct.

NT. pg. 7, L 4-5 and L10-22.

> Q.    On the date of the accident, on June 18th of 2001, you were working for Pack and Process located in Delaware, right?
>
> A.    Correct.
>
> Q.    And you were working as a quality control employee at the factory?
>
> A.    Yes.
>
> Q.    And as part of your duties, you would transport workers from their homes in Philadelphia to the factory and back home to Philadelphia, right?
>
> A.     Correct.

NT. pg.9, L7-17.

<u>See</u> the transcript from the January 20, 2005, trial attached hereto as Exhibit "G."

Maly Yan was deposed on September 24, 2003 and stated as follows:

Q.    Did anyone at Pack & Process ever instruct you to drive a vehicle?

A.    My supervisor told me.

Q.    Your supervisor told you to drive a vehicle?

A.    Yes, transferring people to work and also working as an employee there.

Q.    What supervisor was it that told you to transport people to and from work?

A.    Sterling.

Q.    Sterling Newsome?

A.    Yes.

Q.    And when was it that Sterling Newsome told you to drive a van to transport workers?

A.    After my father got his license suspended.

Q.    Under what circumstances was it that Sterling Newsome first came to you and spoke to you about driving a vehicle?

A.    Because he does not want my father to leave the place and he does not want to lose us from the company.

Q.    So what did Sterling Newsome say to you?

A.    Told me to bring people to work into that company and also work at that company as employee.

Q.    And did Sterling Newsome provide you with a vehicle to drive or would you just drive your van?

A.    Drive my own vehicle.

Q.    Did Sterling Newsome or Pack & Process pay you to drive the van in May and June of 200l?

13

MR. URBAN: You mean directly or indirectly?

MR. VILLALOBOS: Directly.

THE WITNESS: Yes, Pack & Process paid me.

P.69, L1-70 and L16.

During the September 24, 2003, deposition of Maly Yan, she was questioned about a form that she was asked to sign by Pack and Process owner Steven Ames upon her return to work at Pack and Process after the June 18, 2001, accident. The form indicated, among other things, that it is not a condition of her employment to drive employees to and from the accident. See the July 27, 2001, Pack and Process Memorandum attached hereto as Exhibit "H." Maly Yan stated as follows:

Q.    When you received this form, did you have a belief that the conditions that were set forth on this form represented a change in your work relationship with Pack & Process?

A.    Yes, in a way.

Q.    Well, let me see what we mean by in a way. Before you signed this form did you believe that as a condition of your employment with Pack & Process you were to assist the transport of labor to Pack & Process?

A.    My supervisors told me that starting from this date that I sign, which is July 24, I can no longer transport people to work there.

P.92, L18 - P.93, L23.

Q.    Did you believe, prior to signing this, when you were transporting workers to Pack & Process, that you were transporting people to Pack & Process to assist Pack & Process?

A.    Well, yes, but at the time when I was transporting people to work there, I never received this kind of document. This is the first time

14

I received this document, which is under date that I signed. (Indicating).

Q.    You received this document after the accident?

A.    Yes

P.94, L9-22.

<u>See</u> Maly Yan's September 24, 2003, Deposition Transcript attached hereto as Exhibit "I."

Maly Yan was deposed again on June 5, 2006 and stated as follows:

Q.    Now, did any employee of Pack & Process ever tell you that it was part of your job to transport workers to and from Pack & Process?

A.    David and Steve who told me to do that.

Q.    Well, David who?

A.    David, Sdey.

Q.    David Thatch?

A.    Yes.

Q.    And Steve who?

A.    The boss in the company.

P.98, L9-20.

It is clear from Maly Yan's testimony that the words of her Production Manager, Sterling Newsome reasonably caused her to determine that Pack and Process wished her to transport employees to and from the factory. This is a subjective test and the inquiry need not go further, however it is important to also note that the Production Manager, Sterling Newsome, agreed that he did have such a conversation with Maly Yan regarding her responsibility for transporting

15

workers on behalf of Pack and Process.

<u>See</u> Maly Yan's June 5, 2006, Deposition Transcript attached hereto as Exhibit "J."


### 2. Sterling Newsome

Sterling Newsome was the production manager for Pack and Process at the time of

the June 18, 2001, accident and in his June 29, 2006, deposition stated as follows:

> Q.    She [Maly Yan] was also, just like you, sat down for a deposition on
> September 24, 2003. She was sworn under oath and I'll go
> through with you again some stuff. She was asked on page 69,
> line 6, the question was posed to her, this was by Mr. Villalobos,
> who is defense counsel. What supervisor was it that told you to
> transport people to and from work, Her answer was Sterling. The
> question was then posed to her, Sterling Newsome? And her
> answer was yes. Do you disagree with that?

> A.    I think that I said to her one time, but not in a official capacity,
> I said, she asked how are we going to get back and forth to work.
> And said, I guess you'll have to drive. But that was not in an
> official capacity of Pack and Process. That was just as two friends
> talking.

> Q.    That conversation, did that occur at the plant?

> A.    Yes.

> Q.    So it occurred, it occurred during the hours in which she was
> working as a QC operator?

> A.    It was either some time during the day there one time.


> Q.    She was on the clock at the time that you had this conversation,
> correct?

> A.    Correct. But I didn't make it in the official capacity of being plant
> supervisor.

Q.      Did you express that to her, and say listen, we're having this conversation just as two friends and this is in no way, I'm in no way talking to you as your supervisor?

A.      I guess I assumed.

Q.      But you didn't explicitly say that to her.

A.      I didn't say, Maly, you're going to have to do it, no.

Q.      The next question was and when it was, and when was it that Sterling Newsome told you to drive the van to transport workers. And her answer was after my father got his license suspended. As far as the time frame is concerned, do you agree with that?

A.      It was after that, yes.

Q.      Okay. And then the next question was under what circumstances was it that Mr. Sterling Newsome first came to you and spoke to you about driving the vehicle. And the answer was because he did not want my father to leave the place, and he does not want to lose us from the company. Would you agree with that?

A.      Yes, I'll agree with that.

Q.      And then it says, so what did Sterling say to you. Answer, told me to bring people to work into the company and also work at the company as employee. Do you remember having that conversation with her?

A.      I would say that's sort of chopped up there but it's, probably discussed. But, once again, that was as two friends talking, not as me being – I wasn't her supervisor. Cheryl was her supervisor. She worked for Cheryl. I made two separate, even though I was responsible for both of them, I maintained deferitian (ph.) between the two. Cheryl ran her department, I ran mine.

Q.      But like you said, I understand that. But you were responsible for Cheryl and for Maly, correct?

A.       Theoretically, yes.

P.119, L24 - P.122, L17.

17

There is certainly no issue of material fact that Mr. Newsome was a production manager for Pack and Process at the time of his conversation with Maly Yan and that he had supervisory responsibility over her.  He is the principal and Maly Yan is the agent.  Mr. Sterling's words and conduct reasonably caused Maly Yan to determine that Pack and Process wished her to transport employees to and from the factory.  There can be no issue of material fact on this subject as both the agent and the principal agree that this conversation took place and as such the principal is liable to the agent.  However, in the interest of being complete, the testimony of Pack and Process owner Steven Ames was taken and further demonstrated no issue of material fact on this issue.  Mr. Ames confirmed that Sterling Newsome was the production manager at the time of the June 18, 2001, accident and that he had supervisory powers over Maly Yan.

<u>See</u> Sterling Newsome's June 29, 2006, Deposition transcript attached hereto as Exhibit "K."

### 3.  Steven Ames

Steven Ames is the president of Pack & Process and was the president at the time of the June 18, 2001, accident and in his June 27, 2006 deposition, stated as follows:

> Q.    Okay. As you sit here today, are you the president of Pack & Process, Incorporated?
>
> A.    Yes, I am.
>
> Q.    And have you held that position since 1986?
>
> A.    That's correct.
>
> Q.    And my understanding is that in 1986 you bought the company from your father Herbert Ames?
>
> A.    That's correct.

Q.    And your father Herbert M. Ames was the founder of Pack & Process, Incorporated, correct?

A.    Yes.

Q.    And Pack & Process is a company that is incorporated under the laws of the State of Delaware; is that accurate?

A.    That is accurate.

P.10, L1-15.

Q.    There were various different of these labor companies that you had contracted with over the years, correct?

A.    Yes.

Q.    All right. And was there a standard type of agreement form that each one of these companies would have to sign in to in order -- in order to -- to provide you with the work?

A.    Yes.

P.60, L5-12.

Q.    The production manager would talk to these temporary employment agencies. Is that -- is that accurate?

A.    Yes.

Q.    And during this period of time, at least in June, it would have been Sterling Newsome?

A.    Yes, sir.

P.64, L20 -P.65 L1.

Q.    And I will mark as Ames-l a copy of a purchase order and then an addendum to a purchase order. I will ask you if you take a look at it and tell me if you recognize it?

THE WITNESS: Yes, I do.

P.69, L5-8 and L11.

Q.    Okay. And describe for me what Exhibit-1 is?

19

P.69, L13-14.

Q.    I said, can you describe for me what that document is?

A.    The first page is a purchase order.

Q.    And who is the purchase order with? Who are the parties involved in the purchase order?

MR. DEASEY: Objection.

THE WITNESS: The parties are Lam Staff, Inc. and Pack & Process, Inc.

P.69, L20 - P.70 L l3.

Q.    And if you flip over to the second page it says, Addendum to Purchase Order.

A.    Right.

Q.    All right? Do you recognize what that is?

A.    Yes.

Q.    What is it?

A.    That's the contract that we seek to controlthe project with.

Q..    And who are the parties to this particular contract?

A.    Lam Staff, Inc. and Pack & Process, Inc.

Q.    Other than this -- this purchase order and the addendum to the purchase order, are there any other documents memorializing your agreement with Lam Staff, Inc. to provide services to Pack & Process?

A.    Not that I recall.

Q.    So this was like a -- what I'm trying to --to tie down, it was a one time agreement, a purchase order, and an addendum that you -- both parties signed, and that was going to be the agreement that was going to dictate the relationship between the parties; is that accurate?

A.    That's accurate.

P71 L18 - P72 L18.

Q.    On the signature page at the back of the addendum, do you
      recognize the signature of the individual under the Pat's --
      Pack & Process, Incorporated?

A.    Yes.

Q.    And is that again Steve's signature?

A.    No.

Q.    Whose signature is it?

A.    It's mine.

P74, L24 - P75, L8.

Q.    Okay. The addendum to the purchase order, do you know who
      drafted it?

A.    I believe I do.

Q.    Who would that be?

A.    An attorney named Jerry Grossman.

Q.    Is that an attorney that at some point or another represented
      Pack & Process?

A.    Yes.

P.76,L23 - P.77, L6.

Q.    So now I'm just going to refer to this as the -- as the agreement,
      and if I do that, we're both on the same page.

A.    Yes.

Q.    All right. Then it talks about services. LSI, which -- that's
      Lam, correct?

A.      Yes

Q.      Will provide to P & P, Pack & Process, those individuals,
        LSI personnel, to perform the job/functions listed below.
        All right. Is that one of the purposes of this agreement, to
        outline the responsibilities –

A.      Yes.

Q..     -- and duties of LS -- Lam Staffing?

A.      Yes.

P.81, L13 - P.82, L4.

Q.      At the date that this accident occurred, June 18th of 2001,
        do you believe that this agreement was still in effect?

A.      Yes.

P.83, L4-7.

Q.      Okay. Then it goes on to talk about the duties and rights of
        LSI, correct? Number four.

A.      Yes

Q.      It says, LSI agrees to provide the following services to
        Pack & Process under this agreement, and then there are
        ten numbers corresponding to the services that LSI will be

        providing to Pack & Process, correct?

A.      Right.

P.92, L17 - P.93, L1.

Q.      The contract that you entered into, this agreement, was for
        Lam Staffing to provide workers to work in your factory. Isn't
         -- isn't that basically what it is?

A.      Right.

Q.      All right. Other than the contents of this purchase order and the

addendum to purchase order, is there any document that you
believe exists that actually sets out with specificity the fact that
Lam Staffing is to provide transportation for the workers from
their home to the factory?

MR. DEASEY: Objection to form. You can answer.

THE WITNESS: No.

P.95, L7 -18, L21.

Q.    Number six, it says, general provisions, Correct?

A.    Yes.

Q.    And under A it says, this agreement, and Exhibit A incorporated by
reference herein, is the entire agreement between the parties and
supersedes any previous agreement or representation, written or
oral, with respect to the subject matter between Pack & Process
and LSI.

Q.    Did I read that correctly?

A.    Yes.

Q.    And did you read that before you signed document?

A.    Yes, I did.

Q.    All right. So you understood then that any type of oral agreement that you
may or may not have had with Lam Staffing would have been superseded
by the actual contents and terms in this agreement; is that accurate?

P.97, L24 - P.98, L20.

THE WITNESS: Yes. That is accurate

P.99, L12.

Q.    Okay. What type of relationship, as far as a supervising
capacity, did Sterling Newsome have for the quality control
personnel, if any?

23

A.    He didn't.

Q.    None?

A.    No.

Q.    So under no circumstances should -- should he have been directing the way that a quality control person was conducting business with - inside Pack & Process?

A.    I -- I wouldn't -- I wouldn't be so absolute in -- in the way I state that. I would state that her supervisor was Charlotte -- I'm sorry, Cheryl. And then in the normal course of events, Cheryl would tell -- would be her supervisor.

Q.    Okay.

A.    There could be an event in which Sterling who as -- as the plant manager might give her a direction to do something and she would always --you know, if there is a problem she would go back and check with her supervisor. But if her supervisor were not around, I presume he would give her instruction and she would follow it. And she would also interface with him when --when -- when she was working on something, and it was out of specification. It was her obligation to inform production that something was going on that was not right.

See Steve Ames's June 27, 2006, Deposition transcript attached hereto as Exhibit "L."

Pack and Process has claimed that Maly Yan was driving on behalf of the temporary employment agency, Lam Staffing, and that it was part of the agreement between Pack and Process and Lam Staffing for the latter to provide transportation to and from the Pack and Process factory. During the deposition of Pack and Process owner Steven Ames, the written agreement between Pack and Process was present to Mr. Ames and he admitted that no such language existed in the document.

_____The language contained in Mr. Newsome's conversation with Maly Yan is precisely the type of evidence that the Jurimex court deemed sufficient to reasonably cause an agent to act

24

on the principal's behalf giving the agent "actual authority." <u>Jurimex Kommerz Transit</u>

<u>G.M.B.H. v. Case Corporation</u>, 2006 WL 1995128 (D.Del.). <u>See</u> Slip Copy attached hereto as

Exhibit "E." The confirmation of the content of this conversation, without evidence to the

contrary, is sufficient to demonstrate that no issue of material fact exists and that the Defendants

are entitled to judgment as a matter of law. <u>Id.</u> The evidence regarding the conversation between

Maly Yan and Sterling Newsome is clear and unequivocal. This conversation caused Maly Yan

to act on behalf of Pack and Process, this evidence is so one-sided that Defendants are entitled to

judgment as a matter of law. <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 322 (1987).

_____The law is well settled that a principal is liable for the acts within the scope of an

agent's actual authority. <u>Taylor v. Peoples Natural Gas Co.</u>, 49 F.3d 982 (3rd Cir. 1995). As

discussed more fully <u>supra</u>, Maly Yan had "actual authority" to act on behalf of Pack and

Process. The creation of Maly Yan's "actual authority" to transport employees to and from the

Pack and Process factory also creates an obligation for Pack and Process and St. Paul, as its

insurance carrier, to indemnify Maly Yan as a result of her negligence on June 18, 2001. Under

the 2nd Restatement on Agency, the same result is obtained. The testimony establishes that Maly

Yan's actions in transporting workers on June 18, 2001, were so closely connected with her

employment that liability attaches. <u>See</u> Prossser on Torts, (2nd Ed.), § 63, p.352.

III.    **THE ST. PAUL POLICY PROVIDES COVERAGE TO MALY YAN FOR THE JUNE 18, 2001 ACCIDENT**

Plaintiffs' Summary Judgment Motion misapplies the facts to the relevant language contained within the applicable St. Paul insurance policies.[1]  Pack and Process has three (3) insurance policies through St. Paul Mercury.  The Commercial General Liability Policy and the Auto Liability Policy are primary insurance policies.  See St. Paul Mercury Commercial General Liability Policy and the Auto Liability Policy attached hereto as Exhibit "M."  The third insurance policy is an Umbrella Excess Liability.  See Umbrella Excess Liability Policy attached hereto as Exhibit "N."  The Umbrella Excess policy clearly states:

**Coverage When Basic Insurance Doesn't Apply**

We'll pay amounts any protected person is legally required to pay as damages for injury or damage that:

• is covered by this agreement; and
• is not covered by your basic insurance.

See page 4 of Exhibit "N."  The Umbrella policy drops down even if the auto and general liability policy do not apply.

The most basic rule in construing insurance contracts is that policy language should be given its popular and ordinary meaning, unless it is apparent from a reading of the whole instrument that a different or special meaning was intended. XL Specialty Insurance Company v. Envision Peripherals, Inc., 2003 WL 145407 (D.Del.)  See Slip Copy attached hereto as Exhibit "O."  Courts should, however, in general, look to dictionary definitions to establish the ordinary

---

[1]Pack and Process is also responsible to pay the entire judgment imposed upon Maly Yan in the matter of Yan Thou et.al. v. Maly Yan, June Term 2003 No.1503 (less payment from St. Paul, as the insurance carrier for Pack and process).  The present claims are under-insured and when the St. Paul policy is exhausted Pack and Process will be exposed to personal liability.

and popular meaning of an undefined word in the policy. <u>Id</u>.  And unless there is some reason to conclude that a word was used in a technical or legal sense, a non-legal dictionary should be used. In general, a standard non-legal dictionary is a more reliable guide to the construction of an insurance contract than definitions found in legal dictionaries.  All situations, the interpretation favorable to the insured would be adopted. <u>Id</u>.

In regard to the applicability of the Umbrella Policy only one (1) issue needs to be determined - is Maly Yan protected under the insurance agreement.  Plaintiffs' Motion for Summary Judgment outlines who is a protected person under the Umbrella policy.  <u>See</u> Plaintiffs' Motion for Summary Judgment at pg. 27 D.I. 105.  "Under this provision, employees of a corporation are protected persons only for work done within the scope of their employment by the corporation or the employees performance of duties related to the conduct of the corporation."  <u>See</u> Plaintiffs' Motion for Summary Judgment at pg. 27 D.I. 106. (quoting the Umbrella Excess Policy).  The determination of whether Maly Yan is a protected person under the Umbrella policy is a two (2) prong analysis.  The court must determine if Maly Yan's actions on June 18, 2001, constitutes the performance of a **duty related** to the conduct of the Pack and Process business.  The key words in the protected person policy provision are "duty" and "related."

First, "related" is a common word used in liability insurance policies. For example, a policy might provide that all "related" wrongful acts constitute a single claim. The word "related" should be held to mean "in connection with, associated with." <u>Coregis Ins. co. v. American Health Foundation, Inc</u>., 241 F.3d 123, 128-29 (2d Cir. 2001). The actions of Mally Yan in transporting employees to and from the Pack and Process factory, as directed by Pack and

Process production manager Sterling Newsome, clearly is "connected and associated" Pack and Process business.

Second, "duty" is word that is not defined in any of St. Paul's insurance policies and as such it should be given its popular and ordinary meaning.  Dictionary.com states:

"1.  An act or a course of action that is required of one by position, social custom, law, or religion: Do your duty to your country.

2.  (a) Moral obligation: acting out of duty.

(b)The compulsion felt to meet such obligation.

3.  A service, function, or task assigned to one, especially in the armed forces: hazardous duty."

See Dictionary.com attached as Exhibit "P." May Yan was "assigned the task" of transporting employee to and from the factory by Sterling Newsome.  Maly Yan's actions on June 18, 2001, are within the ordinary definition of "duty."  The testimonial evidence listed above demonstrates that the Umbrella insurance policy language of, "the performance of a duty related to the conduct of the corporation" has been satisfied and Maly Yan is a "protected person" under the Umbrella policy.  Accordingly, the insurance policy provides coverage for Maly Yan and the June 18, 2001, accident.  No issue of material fact exists and Plaintiffs' Summary Judgment Motion should be denied and Defendants' Summary Judgment Motion should be granted.

_____    **<u>CONCLUSION</u>**

Defendant Maly Yan was given "actual authority" to act on behalf of Pack and Process and to transport employees to and from the Pack and Process Factory. Maly Yan was acting on behalf of Pack and Process in transporting employees to and from the factory, working within the course and scope of her employment and performing duty related to the conduct of Pack and Process's business.  The testimonial evidence also demonstrates that the restrictions contained in the Umbrella insurance policy have been satisfied and Maly Yan is a "protected person" under the Umbrella policy.   No issue of material fact exist and the Defendants are entitled to judgment as a matter of law as to all of the declarations requested in the Defendants' Declaratory Judgment Action.  Summary Judgment should be granted on behalf of the Defendants and Plaintiffs' present Motion for Summary Judgment should be denied.

Respectfully submitted,

**Weiss & Saville**, **P. A.**

BY:  **<u>S/Yvonne Takvorian  Saville</u>**
Yvonne Takvorian Saville, Esquire
1220 North Market Street, Suite 604
P.O. Box 370
Wilmington DE 19801
(302) 656-0400

DATED:   8/25/06                                            and

**Kline & Specter, P.C.**

BY:  **<u>S/ Joshua Van Naarden</u>**
Jonathan Cohen, Esquire
Joshua Van Naarden, Esquire
1525 Locust Street, 19th Floor
Philadelphia PA 19102
215-772-1000

29