```
 1              IN THE COURT OF COMMON PLEAS

 2           PHILADELPHIA COUNTY, PENNSYLVANIA

 3                        - - -

 4   UNCHALEE VONG et al      :FEBRUARY TERM 03

 5        vs.                 :

 6   MALY YAN et al           :2882

 7                        - - -

 8              Oral deposition of

 9   Maly Yan, taken pursuant to Notice, held

10   at the law offices of Christie, Pabarue,

11   Mortensen & Young Services, 1880 JFK

12   Boulevard, 10th Floor, Philadelphia, PA,

13   on Wednesday, September 24, 2003, at

14   12:45 p.m., before John W. Begley, a

15   Federally Approved Registered

16   Professional Reporter - Notary Public in

17   and for the Commonwealth of Pennsylvania.

18                        - - -

19           ESQUIRE DEPOSITION SERVICES

20                   15th Floor

21          1880 John F. Kennedy Boulevard

22          Philadelphia, Pennsylvania 19103

23                  215 - 988-9191

24
```

**66**

1  Q. Prior to June 18, 2001 on
2  how many occasions had you driven the van
3  to or from Pack & Process?
4  A. Like what do you mean? Can
5  you repeat that?
6  Q. Well, let me ask you this:
7  When did you first begin driving the van?
8  In 2001 when did you first begin driving
9  the van to or from Pack & Process?
10  A. In May.
11  Q. And we are talking about May
12  of 2000, so a month before the accident,
13  roughly?
14  A. Yes.
15  MR. HULLER: I'm sorry,
16  Rafael. That was 2001, I think
17  you meant to say --
18  MR. VILLALOBOS: 2001.
19  THE WITNESS: Yes.
20  BY MR. VILLALOBOS:
21  Q. And why did you start
22  driving the van in May 2001?
23  A. Because my father got his
24  license suspended.

**67**

1  Q. Was your father customarily
2  the person who would drive that van?
3  A. Yes.
4  Q. And was your father paid by
5  someone to drive that van?
6  A. Yes, Lam. Mr. Thatch.
7  Q. And when you began to drive
8  the van in May 2001, a month or so before
9  the accident --
10  A. Yes.
11  Q. -- were you paid by anyone
12  to drive that van?
13  A. I get paid from Pack &
14  Process and I also get paid from Mr. Lam.
15  Q. Now, what were you paid by
16  Pack & Process for; for working as a
17  quality technician or were you paid by
18  Pack & Process to drive the van?
19  MR. URBAN: Objection to the
20  form of the question.
21  Go ahead.
22  THE WITNESS: As a person
23  working as a control.
24  BY MR. VILLALOBOS:

**68**

1  Q. You were not paid by Pack &
2  Process to drive the van in May or June
3  of 2001?
4  MR. URBAN: Objection to the
5  form of the question.
6  THE INTERPRETER: I'm sorry.
7  I wasn't sure she understand the
8  question because the answer --
9  MR. MC NULTY: That's all
10  right. Just translate what she
11  said.
12  THE INTERPRETER: The answer
13  is I get paid from Mr. Thatch as a
14  transporter driving the van,
15  taking people to work there.
16  BY MR. VILLALOBOS:
17  Q. So in May and June of 2001
18  Mr. Thatch was paying you to transport
19  workers between Philadelphia and
20  Wilmington?
21  A. Yes.
22  Q. Did anyone at Pack & Process
23  ever instruct you to drive a vehicle?
24  A. My supervisor told me.

**69**

1  Q. Your supervisor told you to
2  drive a vehicle?
3  A. Yes, transferring people to
4  work and also working as an employee
5  there.
6  Q. What supervisor was it that
7  told you to transport people to and from
8  work?
9  A. Sterling.
10  Q. Sterling Newsome?
11  A. Yes.
12  Q. And when was it that
13  Sterling Newsome told you to drive a van
14  to transport workers?
15  A. After my father got his
16  license suspended.
17  Q. Under what circumstances was
18  it that Sterling Newsome first came to
19  you and spoke to you about driving a
20  vehicle?
21  A. Because he does not want my
22  father to leave the place and he does not
23  want to lose us from the company.
24  Q. So what did Sterling Newsome

70

1  say to you?
2      A.  Told me to bring people to
3  work into that company and also work at
4  that company as employee.
5      Q.  And did Sterling Newsome
6  provide you with a vehicle to drive or
7  would you just drive your van?
8      A.  Drive my own vehicle.
9      Q.  Did Sterling Newsome or Pack
10 & Process pay you to drive the van in May
11 and June of 2001?
12         MR. URBAN:  You mean
13     directly or indirectly?
14         MR. VILLALOBOS:  Directly.
15         THE WITNESS:  Yes, Pack &
16     Process paid me.
17 BY MR. VILLALOBOS:
18     Q.  As opposed to Mr. Thatch.
19     A.  Actually, Mr. Thatch paid me
20 for transporting.
21     Q.  Did you ever receive any
22 monies directly from Pack & Process for
23 transporting workers from Wilmington to
24 Philadelphia or from Philadelphia to

71

1  Wilmington?
2      A.  No.
3      Q.  Who approached you first
4  about driving the van in May and June of
5  2001 after your father's license was
6  suspended?
7          MR. URBAN:  Objection.  She
8      just said Sterling Newsome.
9          MR. VILLALOBOS:  I'm going
10     to ask her a follow-up.  You will
11     understand.  Your father or
12     Sterling Newsome.  This is the
13     balance of the question.  I wasn't
14     done.
15         MR. MC NULTY:  That question
16     has been asked and answered.  You
17     are changing the question to get,
18     to try to get a different answer
19     to the question.
20         MR. VILLALOBOS:  No, I'm
21     trying to complete a question.  I
22     wanted to ask who was the one that
23     approached her first, her father
24     or Sterling Newsome.

72

1          MR. MC NULTY:  I think that
2      question has been asked and
3      answered.
4          MR. URBAN:  She answered
5      that.
6          MR. MC NULTY:  That's been
7      covered.
8          MR. VILLALOBOS:  She
9      answered that Sterling was the
10     person at Pack & Process who
11     approached her.  I want to know at
12     some point in time before that her
13     father said Hey, look.  I can't
14     drive, et cetera.
15         MR. MC NULTY:  Objection to
16     the form of the question.
17     You can answer the question.
18         THE WITNESS:  Mr. Thatch.
19 BY MR. VILLALOBOS:
20     Q.  Mr. Thatch approached you
21 first?
22     A.  Yes.
23         MR. VILLALOBOS:  I want to
24     take a five minute break and we

73

1      will come back.
2          (Deposition recessed)
3  BY MR. VILLALOBOS:
4      Q.  Back on the record.
5      Just so that I have a clear
6  understanding of who and how and when you
7  were approached to drive, I'm going to
8  break it down person by person.  Okay?
9      Q.  When did Mr. Thatch, in May
10 or June of 2001, when did Mr. Thatch
11 first approach you and ask you to drive
12 the van?
13         MR. URBAN:  Objection to the
14     form of the question.
15         THE WITNESS:  It was in May
16     2001.
17 BY MR. VILLALOBOS:
18     Q.  And do you know why he
19 approached you to drive the van?
20     A.  Because he couldn't find
21 other people to drive and it is hard for
22 him to look for anybody else, so --
23     Q.  And this is after your
24 father's license was suspended?

90

1 given to your father or could it be
2 either one of you that would receive
3 gasoline money?
4      A.  If my father is the person
5 driving the van transporting people he
6 would be the one to get the gas money; if
7 I am the one who was the driver I would
8 get the gas money.
9      Q.  And how often would you
10 receive gasoline money from Mr. Thatch?
11     A.  Once a week.
12     Q.  And do you recall how much
13 money you would receive for gasoline each
14 week?
15     A.  20, sometimes $30.
16     Q.  And other than the
17 conversation between Mr. Thatch and your
18 father, do you have any other reason to
19 believe that Pack & Process was giving
20 money to Mr. Thatch in order to
21 compensate drivers for gasoline?
22         MR. MC NULTY:  Objection to
23    the form of the question.
24         You can answer.

91

1         THE INTERPRETER:  I'm sorry.
2    Can you repeat that again?
3 BY MR. VILLALOBOS:
4    Q.  Sure.  Other than the
5 conversation that your father had with
6 Mr. Thatch, do you have any other reason
7 to believe that Pack & Process was giving
8 money to Mr. Thatch to be distributed to
9 drivers to reimburse them for gasoline
10 expenses?
11    A.  Can you repeat the question?
12        Can I repeat the question?
13        MR. VILLALOBOS:  I will just
14    have it read back.
15        (The last question was read
16    back by the Court Reporter).
17        THE WITNESS:  Yes
18 BY MR. VILLALOBOS:
19    Q.  And what other basis for
20 that belief do you have?
21    A.  Mr. Lam told Pack & Process
22 to gave it.
23    Q.  Mr. Lam told whom?
24    A.  To my dad.

92

1    Q.  But other than that does she
2 have any reason to believe that Pack &
3 Process was reimbursing drivers for
4 gasoline?
5    A.  Yes.
6    Q.  And what, then, is the basis
7 for your believing that Pack & Process
8 was paying, in essence, for the gasoline?
9    A.  I say because Mr. Lam told
10 my father that money is coming from Pack
11 & Process.
12    Q.  And that's the only reason?
13    A.  Yes.
14        MR. VILLALOBOS:  I have no
15    further questions for you.
16            ---
17 BY MR. HOFFMAN:
18    Q.  I would just like to ask a
19 couple questions about this form that you
20 were given.  (Indicating).
21        MR. URBAN:  Is that Maly Yan
22    Exhibit 4?
23        MR. HOFFMAN:  The warm
24    wishes of welcome back from Pack &

93

1    Process.
2 BY MR. HOFFMAN:
3    Q.  When you received this form,
4 did you have a belief that the conditions
5 that were set forth on this form
6 represented a change in your work
7 relationship with Pack & Process?
8    A.  Yes, in a way.
9    Q.  Well, let me see what we
10 mean by in a way.  Before you signed this
11 form did you believe that as a condition
12 of your employment with Pack & Process
13 you were to assist the transport of labor
14 to Pack & Process?
15    A.  My supervisors told me that
16 starting from this date that I sign,
17 which is July 24, I can no longer
18 transport people to work there.
19    Q.  But before you signed this
20 did you have a belief that as a condition
21 of your employment of working at Pack &
22 Process that you were to assist in the
23 transport of clients to Pack & Process?
24        MR. MC NULTY:  Wait a

94

1   minute. Didn't she just answer
2   that one? I'm going to object.
3       MR. HOFFMAN: Was her answer
4   yes?
5       MR. MC NULTY: Yes.
6       MR. HOFFMAN: So we have an
7   answer yes.
8   BY MR. HOFFMAN:
9       Q. Did you believe, prior to
10  signing this, when you were transporting
11  workers to Pack & Process, that you were
12  transporting people to Pack & Process to
13  assist Pack & Process?
14      A. Well, yes, but at the time
15  when I was transporting people to work
16  there, I never received this kind of
17  document. This is the first time I
18  received this document, which is under
19  date that I signed. (Indicating).
20      Q. You received this document
21  after the accident?
22      A. Yes.
23      MR. HOFFMAN: No further
24  questions.

95

1       MR. MC NULTY: Does anyone
2   else have any questions?
3       (There were none).
4       MR. VILLALOBOS: Okay. The
5   deposition is over.
6       (Witness excused.)
7       (Deposition concluded at
8   2:45 p.m.)

96

CERTIFICATE
---

5       I hereby certify that the
6   witness was duly sworn by me and that the
7   deposition is a true record of the
8   testimony given by the witness.

_____
14  John W. Begley, RPR
15  Dated: September 25, 2003

17  (The foregoing certification of this
18  transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying shorthand
22  reporter.)

97

INSTRUCTIONS TO WITNESS
2       Please read your deposition
3   over carefully and make any necessary
4   changes. You should assign a reason in
5   the appropriate column on the errata
6   sheet for any change made.
7       After making any change
8   which has been noted on the following
9   errata sheet, along with the reason for
10  any change, sign your name to the errata
11  sheet and date it.
12      You are signing it subject
13  to the changes you have made in the
14  errata sheet, which will be attached to
15  the deposition. You must sign in the
16  space provided.
17      Return the original errata
18  sheet to the deposing attorney within
19  thirty (30) days of receipt of the
20  transcript by you.