# In The Matter Of:

*St. Paul Mercury Insurance Company, et al v.*
*Maly Yan, et al*

*Steven Ames*
*June 27, 2006*

*B&R Services for Professionals, Inc.*
*235 S. 13th Street*
*Philadelphia, PA  19107*
*(215) 546-7400*
*FAX (215) 985-0169*

Original File 062706CY.V1, Pages 1-224

**Word Index included with this Min-U-Script®**

Page 9

[1] different?
[2] A.  I filed suit.
[3] Q.  Okay.  How long ago did you -- were you
[4] deposed in that matter?
[5] A.  I'm not sure, but I would say it's within
[6] the scope of a year.
[7] Q.  And is that a litigation still pending?
[8] A.  Yes, it is.
[9] Q.  Okay.  I'm just going to tell you, prior to
[10] you being deposed in that other matter, were you
[11] given instructions as to the way that the
[12] deposition was going to be held?
[13] A.  Yes, I was.
[14] Q.  Okay.  And you were also given those
[15] instructions back in September of 2003, correct?
[16] A.  I believe I was.
[17] Q.  I am going to tell you that those
[18] instructions are going to dictate the way that we
[19] do the deposition here today, with the one caveat
[20] that we're doing this under video.
[21] A.  Okay.
[22] Q.  Have you ever had your deposition taken
[23] under video before?
[24] A.  I have not.

Page 10

[1] Q.  Okay.  As you sit here today, are you the
[2] president of Pack & Process, Incorporated?
[3] A.  Yes, I am.
[4] Q.  And have you held that position since 1986?
[5] A.  That's correct.
[6] Q.  And my understanding is that in 1986 you
[7] bought the company from your father Herbert Ames?
[8] A.  That's correct.
[9] Q.  And your father Herbert M. Ames was the
[10] founder of Pack & Process, Incorporated, correct?
[11] A.  Yes.
[12] Q.  And Pack & Process is a company that is
[13] incorporated under the laws of the State of
[14] Delaware; is that accurate?
[15] A.  That is accurate.
[16] Q.  And since its inception has always been
[17] incorporated under the laws of Delaware; is that
[18] true?
[19] A.  Yes.
[20] Q.  I've read over your deposition back in
[21] 2003.  I just want to confirm a few things.
[22] Okay?
[23] A.  Okay.
[24] Q.  Based on reading your deposition, my

Page 11

[1] understanding is that before you became president
[2] in '86 you also had various other positions
[3] within the organization, that being Pack &
[4] Process; is that true?
[5] A.  Will you repeat that.
[6] Q.  Sure.
[7]      Prior to 1986 when you bought the
[8] company from your father, you had
[9] other position -- you held other positions within
[10] the Pack & Process organization?
[11] A.  I'm not sure that's true.
[12] Q.  Prior to becoming president, were you vice
[13] president?
[14] A.  Yes.
[15] Q.  Okay.  And prior to becoming vice
[16] president, didn't you work at the factory as a
[17] machine operator at points in time, and a
[18] blender, and a quality control person?
[19] A.  Yes, but not -- I did that during various
[20] vacations from previous work, or from college, or
[21] something along those lines.  I wasn't
[22] necessarily a full-time employee at that point.
[23] Q.  Were you paid for the time that you spent
[24] working?

Page 12

[1] A.  Yes, sir.  Yes, I was.
[2] Q.  Okay.  When you were vice president for
[3] whatever period of time that you served as vice
[4] president, was your father president?
[5] A.  Yes, he was.
[6] Q.  As you sit here today, how many plants does
[7] Pack & Process currently operate?
[8] A.  None.
[9] Q.  You will agree with me that when your
[10] deposition was taken in 2003 that there was
[11] approximately five or six plants that you -- that
[12] you owned, not all of them were being operated at
[13] the time; is that accurate?
[14] A.  That is correct.
[15] Q.  All right.  Well, take me through what has
[16] happened since 2003 as far as the structure and
[17] the ownership of properties as it relates to Pack
[18] & Process?
[19] A.  Well, the ownership of the properties don't
[20] relate to Pack & Process.  The -- except for one
[21] property.
[22]      The production, I chose to start
[23] slowing down.  I saw a different situation from a
[24] business point of view that I did not

St. Paul Mercury Insurance Company, et al v
Maly Yan, et al          Document 112-13     Filed 08/28/2006     Page 3 of 13     Steven Ames
June 27, 2006

Page 57

[1] the year, if I recollect, we were at the
[2] beginning of a very major, a very big, and very
[3] difficult program. And I think we were running,
[4] I think we were running around the clock, and
[5] on -- on one particular line I think there was 45
[6] people to staff that line alone. So you're
[7] talking about 45 times 290, plus other programs,
[8] there could have been a 110, 120 people as
[9] temporary workers in the plant.
[10]            MR. DEASEY: That's at the
[11]       beginning, though.
[12]            THE WITNESS: At the beginning of the
[13]       year.
[14] BY MR. VAN NAARDEN:
[15]    Q.   How about in June of '01?
[16]    A.   In June, I think it was down to about 45,
[17] 50 temps.
[18]    Q.   Okay. Was there an individual at the plant
[19] that was directly in charge of supervising these
[20] temporary employees?
[21]    A.   That's -- that's -- I wouldn't phrase a
[22] question that way, or if you -- if you phrase
[23] that question I can't answer that. I can't
[24] answer that.

Page 58

[1]    Q.   Well, why can't you answer?
[2]    A.   It's not the way it worked.
[3]    Q.   Well, tell me how it worked in June of '01?
[4]    A.   Excuse me. I appreciate it.
[5]            The way the system worked was that
[6] we would -- we would, and when I say we, I'm
[7] really talking about production supervisor,
[8] production manager, would work with the leaders
[9] of the temp agencies, and he would instruct those
[10] leaders as to how to place people, where to place
[11] people, so forth and so on.
[12]            And so we wouldn't really manage
[13] the temporary employees, we would manage the
[14] leaders.
[15]    Q.   Okay. And who was the individual who was
[16] managing the leaders in June of 2001?
[17]    A.   2001? I believe that was Sterling Newsome.
[18]    Q.   Back in June of 2001, can you give me an
[19] approximation of how many leaders there were at
[20] the factory?
[21]    A.   Leaders would typically, and this is not me
[22] defining them, this is -- this is -- this is the
[23] agency defining them, leaders were the people
[24] that drove the vans. Depending on the particular

Page 59

[1] time there may been -- may have been three or
[2] four vans -- in the beginning of the year there
[3] were three or four vans per shift, two shifts, so
[4] you have a common number of leaders.
[5]            At this time if there were -- if
[6] there were 45, 50 people there should have been
[7] about three vans and three leaders.
[8]    Q.   You said that it's not -- you don't define
[9] them that way, but it's the, I guess, the
[10] temporary labor agency that define them as being
[11] the -- the drivers. Is that what you -- what you
[12] said?
[13]    A.   The leaders, yes.
[14]    Q.   Okay. Where -- is there some kind of
[15] written documentation whereby they define what
[16] the role of a leader is, or even the fact that
[17] there is a leader?
[18]    A.   I don't know of any. That would be their
[19] internal document.
[20]    Q.   So when you say define, did someone define
[21] it for you verbally?
[22]    A.   I -- I -- I came to that understanding,
[23] yes.
[24]    Q.   And that's with every -- every temporary

Page 60

[1] labor employment agency that you worked for?
[2]    A.   I didn't work for.
[3]    Q.   That -- that -- that you contracted with?
[4]    A.   I -- I believe so, yes.
[5]    Q.   There were various different of these labor
[6] companies that you had contracted with over the
[7] years, correct?
[8]    A.   Yes.
[9]    Q.   All right. And was there a standard type
[10] of agreement form that each one of these
[11] companies would have to sign in to in order -- in
[12] order to -- to provide you with the work?
[13]    A.   Yes.
[14]    Q.   And was it pretty much the same for
[15] every -- for every single one of the employment
[16] agencies?
[17]            MR. DEASEY: The contract, or --
[18] BY MR. VAN NAARDEN:
[19]    Q.   The contracts. Were they the same?
[20]    A.   There may have been certain details that
[21] were changed and may have evolved over time, but
[22] yes, it was the same standard form.
[23]    Q.   Kenney Packers, does that -- does that name
[24] mean anything to you?

Page 61

[1]    A.   Yes.
[2]    Q.   Is Kenney Packers one of the temp agencies
[3]    that provided workers for you?
[4]    A.   I believe so, yes.
[5]    Q.   Okay.  And how about ABC, is ABC another
[6]    en- -- entity that provided workers to you?
[7]    A.   I believe so, yes.
[8]    Q.   Cinacin (ph), does that sound right?
[9]    A.   No.
[10]   Q.   Okay.  And then there is Lam Personnel
[11]   Staffing.  You've heard of that firm prior --
[12]   A.   Yes.
[13]   Q.   That company before?
[14]   A.   Yes, although under different names.  I'm
[15]   not sure, I think sometimes we heard it as Lam
[16]   Staff, Lam Personnel Staff.  There -- there were
[17]   some different names.
[18]   Q.   Before we get into some -- some of the
[19]   documents in preparation for you coming here
[20]   today and being deposed, did you review any
[21]   documents?
[22]   A.   Yes, I did.
[23]   Q.   And what did you review?
[24]   A.   Various documents that I think we are going

Page 63

[1]    Q.   Was he an individual that you had had
[2]    contact with at Lam Staffing?
[3]    A.   I had spoken to David, yes.
[4]    Q.   Do you know him by any other names?
[5]    A.   Yes.
[6]    Q.   And would that be Suasaday Thach?
[7]    A.   I knew him as Suasaday Thach, yes.
[8]    Q.   Any -- any other names that you knew him by
[9]    besides those two?
[10]   A.   No.
[11]   Q.   How was it that you first became involved
[12]   with Lam Staffing?
[13]   A.   I think they were the successor company to
[14]   something else, and I don't remember the name.
[15]   Q.   And when it was the previously named
[16]   company, was David Thach still the contact
[17]   person?
[18]   A.   I believe he was.  Well, actually not.  You
[19]   know, I can't answer that.  I can't answer that.
[20]   Q.   Well, why can't you?
[21]   A.   David Thach was always in the background.
[22]   By this time -- by this time, David was in
[23]   another business.  He was in a beer distributor
[24]   by the year -- I'm approximating -- 2000, he was

Page 62

[1]    to be discussing today.
[2]    Q.   Can you pinpoint any particular document
[3]    that you remember reviewing?
[4]    A.   If you want to point to it, I can pinpoint
[5]    it, but I can't pin- --
[6]    Q.   Well, approximately, how many documents did
[7]    you look at before you came in today?
[8]    A.   I would say 15, 20.
[9]    Q.   Let me just also state that at any time you
[10]   need a break, you let me know.
[11]   A.   Okay.
[12]   Q.   And I will be happy to let you have that
[13]   break.
[14]   A.   That's pretty nice of you.
[15]   Q.   Thanks.
[16]         MR. DEASEY:  He's a nice guy.
[17]         MR. VAN NAARDEN:  I try to be nice.
[18]         MR. DEASEY:  He's a nice guy.
[19]   BY MR. VAN NAARDEN:
[20]   Q.   Was there an individual at Lam Staffing
[21]   that was your contact person?
[22]   A.   No.
[23]   Q.   Do you know who David Thach is?
[24]   A.   Yes.

Page 64

[1]    in a beer distributorship.
[2]    Q.   Okay.
[3]    A.   And he wasn't really around, but he somehow
[4]    was the guy who had this thing going.
[5]    Q.   Was there several -- when -- when -- and
[6]    somewhere around 2000 when David Thach became --
[7]    began doing some type of liquor dis- --
[8]    distribution, was he still involved in Lam
[9]    Staffing?
[10]   A.   I believe he was, but, you know, I don't
[11]   know.
[12]   Q.   Okay.
[13]   A.   I -- I wasn't -- when you say is he your
[14]   contact person, I -- I didn't -- I didn't have
[15]   relationships where I called David Thach.  That
[16]   was not the way it worked.
[17]   Q.   My -- my understanding, correct me if I'm
[18]   wrong, that the product manager would --
[19]   A.   The production manager.
[20]   Q.   The production manager would talk to these
[21]   temporary employment agencies.  Is that -- is
[22]   that accurate?
[23]   A.   Yes.
[24]   Q.   And during this period of time, at least in

Page 65

[1]    June, it would have been Sterling Newsome?
[2]    A.    Yes, sir.
[3]    Q.    Did you ever meet David Thach?
[4]    A.    Yes, sir.
[5]    Q.    Approximately, how many times did you meet
[6]    him?
[7]    A.    I saw him maybe 30, 40 times.
[8]    Q.    Did you know how it was that David Thach
[9]    was paid? Physically, how he was paid? What I
[10]   mean by that is, do you know if you mailed him a
[11]   check, do you know if you handed him a check, do
[12]   you know if you paid him cash?
[13]          MR. DEASEY: Let me just get a
[14]   clarification. Are you talking about David
[15]   Thach individually now, or --
[16]          MR. VAN NAARDEN: Lam Staffing.
[17]          MR. DEASEY: Okay. I'm sorry. Thank
[18]   you.
[19]          THE WITNESS: Typically, a -- a check
[20]   was handed to them. Someone would pick up a
[21]   check.
[22]   BY MR. VAN NAARDEN:
[23]   Q.    Do you know how often that would have
[24]   happened?

Page 66

[1]    A.    Weekly.
[2]    Q.    So, would it be safe to say that David --
[3]    someone from Lam Staffing would have been on the
[4]    Pack & Process premises at least once a week to
[5]    pick up a check?
[6]    A.    Yes.
[7]    Q.    Did you have an understanding that at least
[8]    traditionally it was David Thach who came to pick
[9]    up the check?
[10]   A.    No. No.
[11]   Q.    Were there any other individuals from Lam
[12]   Staffing that you can recall showing up and
[13]   asking for the check?
[14]   A.    Yes.
[15]   Q.    Can you give me their names?
[16]   A.    I -- I'm not real good at this, but one guy
[17]   I think was Mataday, and don't ask me to spell
[18]   it.
[19]   Q.    Is Mataday male or female?
[20]   A.    A male.
[21]   Q.    Mataday?
[22]          MR. DEASEY: It's M-A-T-T-A, D-E-E,
[23]   I think.
[24]   BY MR. VAN NAARDEN:

Page 67

[1]    Q.    Did you ever need -- have -- ever have any
[2]    conversations with Mataday?
[3]    A.    I may have. Nothing -- nothing
[4]    substantial.
[5]    Q.    Did he speak English?
[6]    A.    I don't recall.
[7]    Q.    Okay. You don't recall if he spoke English
[8]    at all?
[9]    A.    Put it this way, I had very, very difficult
[10]   time understanding David. I -- I couldn't
[11]   communicate with David. Mataday, I think was a
[12]   relative of his, and most times it was hello.
[13]   That's it. That was -- that was the end of my
[14]   conversation.
[15]   Q.    Do you know if Sterling Newsome was able to
[16]   communicate with Mataday?
[17]   A.    I think he could effectively tell him how
[18]   many people he needed.
[19]   Q.    Okay. Does -- to best of your knowledge,
[20]   does Sterling Newsome speak any language --
[21]   languages in addition to English?
[22]   A.    At that time, I don't think he did, but I
[23]   don't know.
[24]   Q.    Okay. Do you know how you became aware of

Page 68

[1]    Lam Staffing, of their existence?
[2]    A.    No.
[3]    Q.    Did you have an ad in the paper requesting
[4]    for temporary employment agencies to contact you?
[5]    A.    No.
[6]    Q.    Was that something that you left to
[7]    Sterling Newsome to do?
[8]    A.    No.
[9]    Q.    Is that something that you did?
[10]          MR. DEASEY: To do what?
[11]          MR. VAN NAARDEN: Attempt to contact
[12]   an individual to provide temporary labor.
[13]          THE WITNESS: I think I answered the
[14]   question before. I think -- I think they
[15]   were a successor company to a previous
[16]   company that was part of the same -- same
[17]   group.
[18]   BY MR. VAN NAARDEN:
[19]   Q.    Did you have Lam Staffing sign a separate
[20]   contract or agreement --
[21]   A.    Yes.
[22]   Q.    -- for Pack & Process?
[23]   A.    Yes.
[24]   Q.    Is that because you understood that it was

Page 69

[1] a sep- -- a different entity from the other
[2] entity that you had been previously doing
[3] business with?
[4] A.    Yes.
[5] Q.    And I will mark as Ames-1 a copy of a
[6] purchase order and then an addendum to a purchase
[7] order.  I will ask you if you take a look at it
[8] and tell me if you recognize it?
[9]        (Whereupon Exhibit Ames-1 was
[10]       marked for identification.)
[11]       THE WITNESS:  Yes, I do.
[12] BY MR. VAN NAARDEN:
[13] Q.    Okay.  And describe for me what Exhibit-1
[14] is?
[15]       MR. DEASEY:  Hold on a second.
[16]    Okay.
[17]       THE WITNESS:  I'm sorry.  What did you
[18]    ask?
[19] BY MR. VAN NAARDEN:
[20] Q.    I said, can you describe for me what that
[21] document is?
[22] A.    The first page is a purchase order.
[23] Q.    And who is the purchase order with?  Who
[24] are the parties involved in the purchase order?

Page 70

[1]       MR. DEASEY:  Objection.
[2]       THE WITNESS:  The parties are Lam
[3]    Staff, Inc. and Pack & Process, Inc.
[4] BY MR. VAN NAARDEN:
[5] Q.    Okay.  At the bottom of the page it says
[6] authorized signature.  Do you recognize whose
[7] signature that is?
[8] A.    Yes.
[9] Q.    And whose signature is that?
[10] A.    Steve Eslinger.
[11] Q.    Okay.  Would one of these purchase orders
[12] be generated for each time you needed laborers at
[13] the factory?
[14] A.    I -- I can't answer that question the way
[15] you're asking.
[16] Q.    Well, why would you -- why would -- why
[17] would Steve sign this?  What -- what is this
[18] doc- -- document used for?
[19]       MR. DEASEY:  The first page?
[20]       MR. VAN NAARDEN:  The first page.
[21]    What is it used for?
[22]       THE WITNESS:  This was to authorize
[23]    the use of this company to supply labor at a
[24]    given rate under the terms and conditions

Page 71

[1]    shown.
[2] BY MR. VAN NAARDEN:
[3] Q.    And it says -- you will agree with me that
[4] it says the date of order, October 6th of 2000,
[5] correct?
[6] A.    Correct.
[7] Q.    Is that the first time that you had entered
[8] into one of these purchase orders with Lam
[9] Staffing?
[10] A.    I would believe with Lam Staffing, yes.
[11] Q.    So that was the first time?
[12] A.    I believe so, yes.
[13] Q.    When you traditionally would use a laborer,
[14] a -- a temporary employment agency, is this
[15] the -- the purchase order that you traditionally
[16] use?
[17] A.    Something along those lines, yes.
[18] Q.    And if you flip over to the second page it
[19] says, Addendum to Purchase Order.
[20] A.    Right.
[21] Q.    All right?  Do you recognize what that is?
[22] A.    Yes.
[23] Q.    What is it?
[24] A.    That's the contract that we seek to control

Page 72

[1]    the project with.
[2] Q.    And who are the parties to this particular
[3] contract?
[4] A.    Lam Staff, Inc. and Pack & Process, Inc.
[5] Q.    Other than this -- this purchase order and
[6] the addendum to the purchase order, are there any
[7] other documents memorializing your agreement with
[8] Lam Staff, Inc. to provide services to Pack &
[9] Process?
[10] A.    Not that I recall.
[11] Q.    So this was like a -- what I'm trying to --
[12] to tie down, it was a one time agreement, a
[13] purchase order, and an addendum that you -- both
[14] parties signed, and that was going to be the
[15] agreement that was going to dictate the
[16] relationship between the parties; is that
[17] accurate?
[18] A.    That's accurate.
[19] Q.    Okay.  So even if down the line -- well,
[20] let me ask you this.  If they were going to
[21] provide a certain amount of labor, laborers for a
[22] particular period of time, and then you said no,
[23] I no -- no longer need any right now because a
[24] project ended, and then at some point in time

St. Paul Mercury Insurance Company, et al v.
Maly Yan, et al

Steven Ames
June 27, 2006

Page 73

[1] another project popped up, would you sign an
[2] additional agreement, or would you just go by
[3] this agreement --
[4] A.    With --
[5] Q.    -- or something different?
[6]        MR. DEASEY: With Lam Staffing?
[7]        MR. VAN NAARDEN: With Lam Staffing.
[8]        THE WITNESS: That's hypothetical. It
[9] depends on time and -- and whether to get an
[10] intervening contractor. I -- I can't answer
[11] that question.
[12] BY MR. VAN NAARDEN:
[13] Q.    Well, do you know if that was ever the
[14] case?
[15] A.    I don't know if that was ever the case.
[16] Q.    Okay. Do you know that it was not ever the
[17] case?
[18] A.    Yeah -- say that again.
[19] Q.    Sure. Do you believe at any time you
[20] entered into an agreement with Lam Staffing to
[21] provide services to Pack & Process other than
[22] this purchase order and addendum that is dated
[23] October 6th of 2000?
[24] A.    And then stopped and then started again?

Page 74

[1] Q.    Correct.
[2] A.    Oh, after a period -- a long period of
[3] time?
[4] Q.    Any period of time.
[5] A.    Would you define period of time as a week?
[6] Q.    If it's -- if it's a week. Any period of
[7] time?
[8]        MR. DEASEY: He's trying to find
[9] out is -- is there a subsequent contract, I
[10] guess, is what he is trying to find out. Is
[11] there a subsequent contract between Pack &
[12] Process and Lam Staff?
[13]        THE WITNESS: No. I doubt it. I
[14] doubt -- I don't know, but I doubt it.
[15] BY MR. VAN NAARDEN:
[16] Q.    Is it safe to say you haven't seen one?
[17] A.    I haven't seen one recently for sure.
[18] Q.    Okay. In preparation for your deposition
[19] today, is this one of the documents that you
[20] looked at?
[21] A.    Yes.
[22] Q.    All right. And you read it?
[23] A.    I scanned it, yes.
[24] Q.    On the signature page at the back of the

Page 75

[1] addendum, do you recognize the signature of the
[2] individual under the Pat's -- Pack & Process,
[3] Incorporated?
[4] A.    Yes.
[5] Q.    And is that again Steve's signature?
[6] A.    No.
[7] Q.    Whose signature is it?
[8] A.    It's mine.
[9] Q.    Okay. And then under -- underneath it
[10] there is something written and it looks like a
[11] date. It says 10/6 of 2000?
[12] A.    That looks -- it looks like that. Is that
[13] what it is? Yeah, I guess so. Sorry about that.
[14] Q.    Is that your handwriting?
[15] A.    Yeah. I got to believe it is, yes.
[16] Q.    After Steven Ames -- Steven Ames, what's --
[17] what's written in hand, does it say pres.?
[18] A.    President, yes.
[19] Q.    Okay. And under Lam Staff, Inc. it says
[20] Mata- -- Mataday?
[21] A.    I think Mataday.
[22] Q.    That's who -- that's you believe it to be,
[23] correct?
[24] A.    Yes.

Page 76

[1] Q.    Do you actually recall, as you sit here
[2] today, sitting down with an individual from Lam
[3] Staffing and entering into this agreement?
[4] A.    Yes.
[5] Q.    All right. And when you entered into the
[6] agreement, who else was present in the room
[7] besides yourself and the individual signing for
[8] Lam Staffing, if anybody?
[9] A.    Steve Eslinger.
[10] Q.    He was there?
[11] A.    Yes.
[12] Q.    Anybody else from Lam Staffing?
[13] A.    I don't believe so.
[14] Q.    Do you know if David Thach was there?
[15] A.    I'm pretty sure he was not.
[16] Q.    Did you -- were you given any information
[17] that the individual that was signing on -- on
[18] behalf of Lam Staffing had the authority to enter
[19] into this agreement?
[20] A.    I think -- I think I may have been told
[21] indirectly that he was the new owner of the
[22] agency.
[23] Q.    Okay. The addendum to the purchase order,
[24] do you know who drafted it?

Page 77

[1] A. I believe I do.

[2] Q. Who would that be?

[3] A. An attorney named Jerry Grossman.

[4] Q. Is that an attorney that at some point or

[5] another represented Pack & Process?

[6] A. Yes. Now he may have staffed it out, but

[7] I -- you know, I spoke to Jerry.

[8] Q. How about the purchase order on the first

[9] page, is that something -- who -- who would have

[10] generated that document?

[11] A. Can I see that?

[12] I'm not sure. I'm not -- I really

[13] don't know. That could -- that could have

[14] evolved over time. It could have been -- I don't

[15] know the answer to that.

[16] Q. Okay. Other than the -- and you said you

[17] reviewed the addendum to the purchase order,

[18] correct?

[19] A. Yes.

[20] MR. DEASEY: He said he scanned it.

[21] That's all right.

[22] BY MR. VAN NAARDEN:

[23] Q. Did you read it, or did you scan it?

[24] A. I scanned it.

Page 78

[1] Q. Okay. What -- what does scanning mean,

[2] you didn't read it word for word?

[3] A. I read it very quickly.

[4] Q. Okay. Is there anything when you were

[5] scanning it that you believed to be absent from

[6] this document that was part of the agreement with

[7] Lam Staffing?

[8] A. I'm not sure I follow your question.

[9] Q. Sure. Are there any terms and conditions,

[10] or duties and responsibilities as -- as you scan

[11] through this document that you said to yourself,

[12] hey, wait a second, they were suppose to do X,

[13] and it's not written in this agreement?

[14] A. Well, there were various things that were

[15] understood that -- that are not in this

[16] agreement.

[17] Q. And -- and what are those things that --

[18] that you believe were understood but not

[19] contained in this agreement?

[20] A. That they would wear uniforms or -- or

[21] blouses, you know, to -- to -- to cover -- to

[22] cover clothing that wouldn't be coming -- that

[23] would be coming in inappropriately dressed. I

[24] can't think of the word. Not blouse, but...

Page 79

[1] MR. DEASEY: Smock?

[2] THE WITNESS: A smock. Wear a smock.

[3] They would wear closed shoes. There -- there

[4] were various other understandings.

[5] BY MR. VAN NAARDEN:

[6] Q. Those understandings that you're talking

[7] about, are they contained in -- in some other

[8] type of agreement, written agreement?

[9] A. I don't know where they are. I think this

[10] was under -- understood verbally.

[11] Q. When you say uniforms, and then I think

[12] you -- you went onto say that smocks?

[13] A. Right.

[14] Q. Is that something that was provided by Lam

[15] Staffing or provided by --

[16] A. They would --

[17] Q. -- Pack & Process, or some other type of

[18] entity?

[19] A. They were suppose to be dressed that way.

[20] And from time to time they were not, and from

[21] time to time we would supply them with smocks and

[22] charge them for it.

[23] Q. Other than the uniform, and I'm using that

[24] term loosely because you've clarified it, other

Page 80

[1] than that requirement, anything in addition that

[2] you thought, hey, wait a second, it's not in this

[3] contract, but it was understood?

[4] A. Uh, actually, there are things. Can we

[5] take a break at this point?

[6] MR. VAN NAARDEN: Absolutely.

[7] VIDEO TECHNICIAN: We're off the

[8] record.

[9] (Whereupon a short recess was held.)

[10] VIDEO TECHNICIAN: On the record.

[11] 12:21.

[12] BY MR. VAN NAARDEN:

[13] Q. What, in addition, to the addendum and the

[14] purchase order do you believe to be not contained

[15] in -- in -- in the actual --

[16] A. There were all kind of operational things.

[17] You know, we took two ten minute breaks. Part of

[18] the day -- at the end of the day we had to clean

[19] up. Sometimes we would have to stay later.

[20] Sometimes we would leave early. There were a lot

[21] of practical aspects to it that -- that -- that

[22] occurred.

[23] Q. Okay. If you look at the actual document,

[24] do you have it in front of you still? We're

Page 81

[1]    talking about the addendum to the purchase order.
[2]    A.   Uh-huh.
[3]    Q.   The first paragraph, the last sentence, I'm
[4]    just asking if I am reading this right, this
[5]    addendum and the purchase order to which it is
[6]    attached are hereinafter collectively referred to
[7]    as quote, unquote agreement.
[8]    A.   You're talking about the first paragraph?
[9]    Q.   Yeah.  The last -- last sentence.
[10]   A.   This addendum and purchase order... yes.
[11]   Q.   Okay.  I read it correctly, right?
[12]   A.   Yes.
[13]   Q.   So now I'm just going to refer to this as
[14]   the -- as the agreement, and if I do that, we're
[15]   both on the same page.
[16]   A.   Yes.
[17]   Q.   All right.  Then it talks about services.
[18]   LSI, which -- that's Lam, correct?
[19]   A.   Yes.
[20]   Q.   Will provide to P & P, Pack & Process,
[21]   those individuals, LSI personnel, to perform the
[22]   job/functions listed below.
[23]        All right.  Is that one of the
[24]   ~~purchas~~es of this agreement, to outline the
          ↑
       prrposeS

Page 82

[1]    responsibilities --
[2]    A.   Yes.
[3]    Q.   -- and duties of LS -- Lam Staffing?
[4]    A.   Yes.
[5]    Q.   All right.  And it talks -- there is a
[6]    heading, Factory Workers, correct?
[7]    A.   Yes.
[8]    Q.   Then it goes onto say, that this agreement
[9]    shall begin on the date the purchase -- the
[10]   purchase order -- on the date the purchase order
[11]   to which this addendum is attached is approved by
[12]   LSI, and shall continue until the date on which
[13]   one party note -- notifies the other of its
[14]   desire to terminate this agreement.
[15]        Correct?  I read -- I read it
[16]   right, right?
[17]   A.   Correct.
[18]   Q.   All right.  Now this -- you will agree with
[19]   me that this was entered into on -- on -- in
[20]   October of 2000, correct?
[21]   A.   Correct.
[22]   Q.   All right.  So at some point after October
[23]   of 2000, did you ever notify LSI of the desire to
[24]   determinate this agreement?

Page 83

[1]    A.   I don't recall.  I may have.
[2]    Q.   Would you have done that in writing?
[3]    A.   I don't recall.
[4]    Q.   At the date that this accident occurred,
[5]    June 18th of 2001, do you believe that this
[6]    agreement was still in effect?
[7]    A.   Yes.
[8]    Q.   Okay.  How is it that you compensated
[9]    Lam -- LSI for their services?  What I mean by
[10]   that is, what was your understanding as to what
[11]   you were paying for in relation to -- to -- to
[12]   the work that LSI was to be performing for you?
[13]   A.   We were paying for delivered temporary
[14]   workers at an hourly rate times the number of
[15]   hours they worked, and we would get an invoice
[16]   which reflected that, and we would pay the
[17]   invoice.
[18]   Q.   You would get an invoice from LSI; is that
[19]   what you're telling me?
[20]   A.   Yes.
[21]   Q.   And that would contain -- that invoice
[22]   would be the number of hours that they provided
[23]   to you had worked on any given period of time?
[24]   A.   Correct.

Page 84

[1]    Q.   All right.  And -- and that was usually
[2]    done at the end of each week, or -- or at the end
[3]    of every two weeks?
[4]    A.   Each week.
[5]    Q.   Each week.
[6]         Okay.  And you were paying,
[7]    according to the purchase order, 725 an hour,
[8]    correct?
[9]    A.   That's correct.
[10]   Q.   It didn't matter who the worker was, they
[11]   were getting 725 an hour?
[12]        MR. DEASEY: Well --
[13]   BY MR. VAN NAARDEN:
[14]   Q.   Through Lam Staffing?
[15]        MR. DEASEY: I object to the
[16]        question.  I think he said he paid Lam
[17]        Staffing 725 an hour for every worker.  What
[18]        the worker was getting from Lam Staffing he
[19]        didn't get into that.
[20]   BY MR. VAN NAARDEN:
[21]   Q.   Sure.
[22]        Was it your understanding that you
[23]   were paying Lam Staffing 725 for each hour that
[24]   the -- the laborer provided by them was working?

Page 89

[1]   it was down?
[2]   A.   Correct.
[3]   Q.   So was it your understanding, back in 2001,
[4]   that you were going to be responsible for paying
[5]   Lam Staffing for the amount of time that the LSI
[6]   employees walked in the door to the time they
[7]   left the factory?  Is that your understanding?
[8]   A.   The time they worked, yes.
[9]   Q.   Okay.
[10]        MR. DEASEY:  The time they worked
[11]   or the time they walked out?
[12]        THE WITNESS:  The time they worked.
[13]  BY MR. VAN NAARDEN:
[14]   Q.   Okay.  And, again, that's what we
[15]   discussed, because there were periods of time
[16]   when they were actually in the building when
[17]   production was down and you weren't paying them
[18]   for that?
[19]   A.   No.  That's not quite what I was saying.
[20]   Q.   Well, then, correct me.
[21]   A.   Well, as a generalization, if the
[22]   production line starts at 6 o'clock and they get
[23]   there at 5:50 they would played (sic) when the
[24]   production line started at 6 o'clock.  And if the

Page 90

[1]   production line went down at 4 o'clock they
[2]   were -- they -- they were stopped being paid at 4
[3]   o'clock.  The next five minutes they may have
[4]   been gathering their things and -- and --
[5]   leaving.
[6]        MR. DEASEY:  I think he was talking
[7]   about during lunch and breaks.  Is that what
[8]   you wanted to know?
[9]   BY MR. VAN NAARDEN:
[10]   Q.   Well, no, I think you clarified it.  I think
[11]   we're all on the same page.  I understand.
[12]        So just to clarify, it's not when
[13]   they walk in the door, it's when production
[14]   starts?
[15]   A.   Correct.
[16]   Q.   Got it.
[17]        And if we went back, and we will in
[18]   a couple of minutes, but we looked at the
[19]   invoices and we looked at the checks paid to LSI,
[20]   do you believe that if we broke it down hour per
[21]   hour, it would correspond with the invoices for
[22]   the number of employees provided by LSI, and the
[23]   amount of time that production was going on in
[24]   the factory?

Page 91

[1]   A.   It should -- it should be, yes.
[2]   Q.   Okay.  Now under factory workers under --
[3]   under terms of agreement it has something called
[4]   service fee.
[5]   A.   Yes.
[6]   Q.   Do you see where that says -- it says that?
[7]   A.   Yes.
[8]   Q.   Under number three?
[9]   A.   Yes.
[10]   Q.   Okay.  Did you ever pay Lam Staffing a
[11]   quote, unquote service fee?
[12]   A.   I don't believe so.
[13]   Q.   So that is something that is in this
[14]   agreement, but was -- there was -- there was an
[15]   understanding that you would not be responsible
[16]   for paying a service fee; is that accurate?
[17]   A.   Well, I don't think it ever came up.
[18]   Q.   Okay.  What was your understanding as to
[19]   when the quote, unquote service fee would come up
[20]   and you would be --
[21]   A.   I --
[22]   Q.   -- responsible to pay?
[23]   A.   I think there was some language put in
[24]   there that just -- just never was used.

Page 92

[1]   Q.   Did you have any conversations with the
[2]   attorney that drafted this addendum to the
[3]   purchase order, and you don't have to tell me the
[4]   exact contents of the -- of the conversation, but
[5]   did you have a conversation with him before this
[6]   addendum was drafted?
[7]   A.   Before which addendum was drafted?
[8]   Q.   The addendum to the purchase order that
[9]   we're going through.  You said that -- I think
[10]   his name was...
[11]   A.   Jerry Grossman.
[12]   Q.   Jerry Grossman.  Drafted for you, or at
[13]   least gave to you?
[14]   A.   Yeah.  I think we had an open-end
[15]   conversation saying, look, this is what I'm
[16]   doing, how should this be handled.
[17]   Q.   Okay.  Then it goes on to talk about the
[18]   duties and rights of LSI, correct?  Number four.
[19]   A.   Yes.
[20]   Q.   It says, LSI agrees to provide the
[21]   following services to Pack & Process under this
[22]   agreement, and then there are ten numbers
[23]   corresponding to the services that LSI will be
[24]   providing to Pack & Process, correct?

Page 93

[1] A. Right.
[2] Q. All right. Is there any -- anything in
[3] those ten, and I want you to take your time and
[4] look at it, anything within those ten enumerated
[5] services provided by LSI that states that LSI
[6] will be responsible for transporting workers from
[7] their homes to the factory?
[8] A. Oh, it's -- it's not in there, but it's
[9] someplace else.
[10] Q. Okay. It's somewhere else in this
[11] particular contract?
[12] A. Yeah.
[13] Q. Okay. Why don't you point out to me where
[14] you believe the language is that supports the
[15] fact that Lam Staffing will be providing serve --
[16] transporting workers from their homes to the
[17] actual factory?
[18] A. First of all, it was understood because
[19] that's the way it had always been and -- and
[20] every other temporary agency does that. Second
[21] of all, Lam Staffing will be -- I'm sorry.
[22]     MR. DEASEY: Tell him what
[23]   document.
[24]     THE WITNESS: I'm looking at page one,

Page 94

[1]   the purchase order.
[2] BY MR. VAN NAARDEN:
[3] Q. Okay.
[4] A. Lam Staff, Inc. is also responsible for
[5] providing Delaware workers.
[6] Q. Now, that was actual -- I mean, this
[7] doesn't say that they -- explicitly say that they
[8] are going to be transporting the workers to the
[9] factory, does it?
[10]     MR. DEASEY: I object. The document
[11]   says what it says, but you can answer.
[12]     THE WITNESS: That's what I -- what I
[13]   read it to -- to mean.
[14] BY MR. VAN NAARDEN:
[15] Q. Well, there -- there is no actual word
[16] there transportation, is there?
[17] A. I will repeat my answer. That's the way I
[18] read it to be.
[19] Q. So you --
[20]     MR. DEASEY: Is there -- well, I
[21]   will stipulate that the word transportation
[22]   didn't appear in what he read to you, Josh.
[23] BY MR. VAN NAARDEN:
[24] Q. Okay.

Page 95

[1] A. I'll -- I'll also answer that -- that if I
[2] was going to put up a brick wall in the building
[3] it wouldn't be stipulated that -- that -- that
[4] the driver is going to drive to -- into -- into,
[5] you know, into my plant. There is an assumption
[6] there.
[7] Q. The contract that you entered into, this
[8] agreement, was for Lam Staffing to provide
[9] workers to work in your factory. Isn't -- isn't
[10] that basically what it is?
[11] A. Right.
[12] Q. All right. Other than the contents of this
[13] purchase order and the addendum to purchase
[14] order, is there any document that you believe
[15] exists that actually sets out with specificity
[16] the fact that Lam Staffing is to provide
[17] transportation for the workers from their home to
[18] the factory?
[19]     MR. DEASEY: Objection to form.
[20]   You can answer.
[21]     THE WITNESS: No.
[22] BY MR. VAN NAARDEN:
[23] Q. Did you ever have any discussions with
[24] David Thach or any individual at LSI about the

Page 96

[1]   fact that they were to provide transportation
[2]   services for these workers?
[3] A. Absolutely.
[4] Q. And who did you have those conversations
[5] with?
[6] A. With David Thach.
[7] Q. And when you talked with David Thach, you
[8] were able to communicate with him?
[9] A. No, but I -- I would always be with
[10] somebody else when I was with David Thach,
[11] because I had trouble understanding him.
[12] Q. So --
[13] A. But I would -- I would make a statement,
[14] Bob would make sure that David understood, David
[15] would repeat it back to -- to Bob, and that was
[16] kind of the program.
[17] Q. You're talking about Bob -- Bob Has --
[18] Hassey?
[19] A. No, Bob Magnus.
[20] Q. Who is Bob Magnus?
[21] A. Bob Magnus was the production manager
[22] before Sterling.
[23] Q. Did you -- in addition to conversations
[24] that you would have had with David Thach in the



Page 97

[1] presence of Bob Magnus, did you have
[2] conversations in the presence of Sterling
[3] Newsome?
[4] A.    I don't recall that. I may have, but I
[5] don't recall.
[6]        MR. COSTIGAN:  I will step out, but
[7]    please continue as long as you like. I hope
[8]    to be back around 2 o'clock or 2:30.
[9]        MR. DEASEY:  We have permission to
[10]   continue?
[11]        MR. COSTIGAN:  Yes.
[12]        MR. DEASEY:  Thank you. I appreciate
[13]   that.
[14]        (Whereupon Mr. Costigan leaves the
[15]   deposition.)
[16] BY MR. VAN NAARDEN:
[17] Q.    Under six, and -- and we're on page three,
[18] there are some general provisions of this
[19] agreement, and I want to go over them with you.
[20]        MR. DEASEY:  Page three?
[21]        MR. VAN NAARDEN:  Yes.
[22]        MR. DEASEY:  All right.
[23] BY MR. VAN NAARDEN:
[24] Q.    Number six, it says, general provisions,

Page 98

[1] correct?
[2] A.    Yes.
[3] Q.    And under A it says, this agreement, and
[4] Exhibit A incorporated by reference herein, is
[5] the entire agreement between the parties and
[6] supersedes any previous agreement or
[7] representation, written or oral, with respect to
[8] the subject matter between Pack & Process and
[9] LSI.
[10]        Did I read that correctly?
[11] A.    Yes.
[12] Q.    And did you read that before you signed
[13] this document?
[14] A.    Yes, I did.
[15] Q.    All right.
[16]        So you understood then that any
[17] type of oral agreement that you may or may not
[18] have had with Lam Staffing would have been
[19] superseded by the actual contents and terms in
[20] this agreement; is that accurate?
[21] A.    Are you talking about delivered help again?
[22] Q.    I'm talking --
[23]        MR. DEASEY:  Listen --
[24]        THE WITNESS:  Okay.

Page 99

[1]        MR. DEASEY:  Listen to the question.
[2]        MR. VAN NAARDEN:  You can read back
[3]    the question.
[4]        (Whereupon the court reporter read
[5]    back as follows:
[6]        Question: All right.
[7]        So you understood then that any type
[8]    of oral agreement that you may or may not
[9]    have had with Lam Staffing would have been
[10]   superseded by the actual contents and terms
[11]   in this agreement; is that accurate?)
[12]        THE WITNESS:  Yes. That is accurate.
[13] BY MR. VAN NAARDEN:
[14] Q.    Okay.
[15]        Now if we flip -- we've already
[16] been through the signature page. Beyond that
[17] there is a form that has Lam Staffing,
[18] Incorporated on the top. Do you see where I'm
[19] talking?
[20] A.    Yes.
[21] Q.    All right. Have you seen this document
[22] before?
[23] A.    Yes.
[24] Q.    And what is it?

Page 100

[1] A.    This is the form on which they would
[2] provide their labor for billing purposes, their
[3] invoice.
[4] Q.    And is this a form that you provided to
[5] them to fill out, or vice versa, did -- did they
[6] provide it already filled out to you?
[7] A.    I think we suggested the form and they
[8] filled it out.
[9] Q.    Okay. The next page is a copy of the State
[10] of Delaware, Division of Revenue, Temporary
[11] License Receipt. Do you know what this is?
[12] A.    I believe I -- I know what it is.
[13] Q.    Well, what do you believe it is?
[14] A.    I believe this is a document that came from
[15] the State of Delaware that says that they have
[16] this temporary license. Lam Staff has this
[17] temporary license.
[18] Q.    Do you know what a temporary license is
[19] for?
[20]        MR. DEASEY:  You mean this type of
[21]    temporary license?
[22]        MR. VAN NAARDEN:  Yes. This type of
[23]    temporary license.
[24]        THE WITNESS:  Not really, no.

Page 133

[1]  the factory, and then I think she transferred
[2]  into -- into quality control.
[3]  Q.   And when she left and came back, was that
[4]  all before the -- the accident?
[5]  A.   Yes.
[6]        (Whereupon Exhibit Ames-8 was
[7]        marked for identification.)
[8]  BY MR. VAN NAARDEN:
[9]  Q.   I have Ames-8 is another application for
[10] employment that is dated February of '01,
[11] correct?
[12] A.   Yes.
[13] Q.   All right.  When she came back, when she
[14] left and she came back, did you make her fill out
[15] a -- a new application?
[16] A.   Did I make her do that, no.
[17] Q.   Did you ask her to?
[18] A.   No.
[19] Q.   Did someone in -- in the Pack & Process
[20] organization have her fill out another
[21] application?
[22] A.   I presume, yes.
[23] Q.   All right.  And is that the application
[24] form that you believe she filled out when she

Page 134

[1]  came back after a leave of absence?
[2]  A.   Yes.
[3]  Q.   Do you know why she left?
[4]  A.   My recollection is that she went to New
[5]  England or Massachusetts, I thought with her
[6]  husband, and I thought they were going to live
[7]  there, and then for whatever reason it didn't
[8]  work out she came back.  That's -- I don't know
[9]  if I heard that directly, indirectly, I -- but
[10] that's what I believe at this point.
[11] Q.   Okay.  And -- and knowing the date of
[12] accident was June 18th, '01, and that employment
[13] application was February of '01, it's
[14] approximately five months, give or take, prior to
[15] the accident, correct?
[16] A.   I would say four months, but I don't
[17] quibble.
[18] Q.   Okay.  And during that four months period
[19] of time, you said that she was quality control?
[20] A.   Yes.
[21] Q.   And what were her -- what were her duties
[22] and responsibilities as a quality control person?
[23] A.   As a quality control technician she would
[24] do certain physical tasks on -- on certain lines,

Page 135

[1]  on a repeat basis, and document those tasks by
[2]  filling out certain charts.
[3]  Q.   And who was her -- and I believe Cheryl was
[4]  her immediate supervisor?
[5]  A.   That's correct.
[6]  Q.   And above Cheryl would be Sterling Newsome?
[7]  A.   No.
[8]  Q.   Who would be above Cheryl?
[9]  A.   I would be.
[10] Q.   Okay.  What type of relationship, as far as
[11] a supervising capacity, did Sterling Newsome have
[12] for the quality control personnel, if any?
[13] A.   He didn't.
[14] Q.   None?
[15] A.   No.
[16] Q.   So under no circumstances should -- should
[17] he have been directing the way that a quality
[18] control person was conducting business with --
[19] inside Pack & Process?
[20] A.   I -- I wouldn't -- I wouldn't be so
[21] absolute in -- in the way I state that.  I would
[22] state that her supervisor was Charlotte -- I'm
[23] sorry, Cheryl.  And then in the normal course of
[24] events, Cheryl would tell -- would be her

Page 136

[1]  supervisor.
[2]  Q.   Okay.
[3]  A.   There could be an event in which Sterling
[4]  who as -- as the plant manager might give her a
[5]  direction to do something and she would always --
[6]  you know, if there is a problem she would go back
[7]  and check with her supervisor.  But if her
[8]  supervisor were not around, I presume he would
[9]  give her instruction and she would follow it.
[10] And she would also interface with him when --
[11] when -- when she was working on something, and it
[12] was out of specification.  It was her obligation
[13] to inform production that something was going on
[14] that was not right.
[15] Q.   Are you aware, as you sit here today, of
[16] any other of Maly Yan's family members that
[17] worked at the factory, whether it be through Lam
[18] Staffing or directly through Pack & Process?
[19] A.   Yes.
[20] Q.   And -- and as you sit here today, who are
[21] you aware of family members of Maly Yan working
[22] at the factory?
[23] A.   Chan Yan.
[24] Q.   And that is Maly's sister, correct?