**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ST. PAUL MERCURY INSURANCE            :
COMPANY and PACK AND                  :
PROCESS, INC.                         :    Case No. 05-0022 (MPT)
                                      :
            v.                        :
                                      :
MALY YAN                              :
........................................................    :
                                      :
YAN THOU, et al.                      :
                                      :
            v.                        :    Case No. 05-00513 (MPT)
                                      :
PACK & PROCESS, INC., et al.          :    CONSOLIDATED CASES
                                      :
                                      :

**PLAINTIFFS' MEMORANDUM OF LAW REGARDING**
**DEFENDANTS/COUNTERPLAINTIFFS' PROPOSED**
**COUNTER-DESIGNATIONS OF DEPOSITIONS**

Plaintiffs submit that there is no legal basis to permit Defendants/Counterplaintiffs to read into evidence those portions of their counter-designations of depositions to which plaintiffs have objected. Plaintiffs' objections to said counter-designations include first and second level hearsay, as well as an objection to any testimony regarding the deponent's subjective belief. In addition, plaintiffs submit that there is no legal basis for Defendants/Counterplaintiffs to submit any live trial testimony that would constitute either first or second level hearsay or testimony regarding the witness' subjective belief.

Attached hereto are Defendants/Counterplaintiffs' deposition counter-designations, as well as plaintiffs' objections to same.[1] The counter-designations to which plaintiffs object are in

---

[1]    For the Court's convenience, the deposition transcripts have been highlighted as follows:  Yellow for Defendants' Counter-Designations; Green for Plaintiffs' Objections; and, Blue for Plaintiffs' Redirect Designations.

large part first level and second level hearsay statements allegedly made by David Thatch. Mr. Thatch is not a party to this action, and thus any deposition testimony that includes his first level and second level hearsay statements are clearly inadmissible. There are no applicable exceptions to the federal hearsay rules that permit the introduction of statements attributable to Mr. Thatch. Furthermore, Mr. Thatch's hearsay statements cannot be used to establish an agency relationship between Lam Staffing and Pack & Process, as the use of such statements would violate the well-known rule that "the use of the alleged agent's hearsay assertions that he is agent would for that purpose be inadmissible, as merely begging the very question." Lockhart v. Hoenstine, 411 F.2d 455, fn. 9 (3d. Cir., 1969).

With regard to plaintiff's objections to the counter-designations regarding the deponent's subjective belief, whether by deposition counter-designations or live testimony, plaintiffs submit that any such testimony is also inadmissible. The subject counter-designations clearly reveal that the basis for the deponent's subjective belief is once again the hearsay statements of Mr. Thatch. Any testimony regarding a deponent or witness' subjective belief in this matter is also inadmissible as irrelevant to the contested issue in this matter.

Dated: April 22, 2008

BIFFERATO GENTILOTTI LLC

By:_____

Chad J. Toms (#4155)
800 King Street, Plaza Level
Wilmington, DE 19801
(302) 429-1900
and
Francis J. Deasey, Esq.
Henri Marcel, Esq.
Deasey, Mahoney & Bender, Ltd.
1601 Market St., Suite 3400
Philadelphia, Pennsylvania 19103
(215) 587-9400

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ST. PAUL MERCURY INSURANCE          :
COMPANY and PACK AND                :
PROCESS, INC.                       :          Case No. 05-0022 (KAJ)
                                    :
      v.                      :
                                    :
MALY YAN                            :

YAN THOU, et al.                    :
                                    :
      v.                      :          Case No. 05-00513 (KAJ)
                                    :
PACK & PROCESS, INC., et al.        :          CONSOLIDATED CASES
                                    :

## PLAINTIFFS' OBJECTIONS TO DEFENDANTS' COUNTER DEISGNATIONS OF MALY YAN DEPOSITION TAKEN 9-24-03

| From Page/Line | | to Page/Line | | |
|---|---|---|---|---|
| 70 | 9 | 70 | 16 | Objection – misstates testimony then actually corrected herself stating Mr. Thatch paid her for transporting, not Pack and Process |
| 84 | 21 | 85 | 5 | Objection – relevancy |
| 87 | 5 | 88 | 9 | Objection – hearsay.  See page 88, lines 17-24 |
| 93 | 3 | 94 | 22 | Objection – relevancy |

| | | | |
|---|---|---|---|
| 87 | 5 | 88 | 9 |
| 89 | 1 | 89 | 13 |
| 89 | 23 | 92 | 13 |
| 93 | 3 | 94 | 22 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ST. PAUL MERCURY INSURANCE
COMPANY and PACK AND
PROCESS, INC.                                          :         Case No. 05-0022 (KAJ)

                              v.

MALY YAN
••••••••••••••••••••••••••••••••

YAN THOU, et al.

                              v.

                                                                Case No. 05-005 13 (KAJ)
PACK & PROCESS, INC., et al.                     :         **CONSOLIDATED CASES**

$D$EFENDANTS' **DEPOSITION DESIGNATIONS- MALY YAN DEPOSITION TAKEN 9-24-03**

| From Page /Line | | to Page /Line | |
|---|---|---|---|
| 22 | 24 | 23 | 15 |
| 37 | 12 | 38 | 13 |
| 38 | 23 | 40 | 8 |
| 42 | 4 | 43 | 6 |
| 49 | 2 | 50 | 2 |
| 52 | 8 | 53 | 24 |
| 66 | 21 | 70 | 16 |
| 73 | 9 | 75 | 10 |
| 76 | 2 | 76 | 13 |
| 82 | 16 | 83 | 6 |
| 84 | 21 | 85 | 5 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ST. PAUL MERCURY INSURANCE
COMPANY and PACK AND
PROCESS, INC.

v.

MALY YAN

........................................................

YAN THOU, et al.

v.

PACK & PROCESS, INC., et al.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 05-0022 (KAJ)

Case No. 05-00513 (KAJ)

CONSOLIDATED CASES

## REDIRECT DEPOSITION DESIGNATIONS – MALY YAN
## DEPOSITION TAKEN 9/24/03

| From Page/Line | | to Page/Line | |
|---|---|---|---|
| 70 | 9 | 70 | 20 |
| 84 | 21 | 85 | 21 |

Dated:  April 21, 2008

BIFFERATO GENTILOTTI LLC

Ian Connor Bifferato (#3273)
Chad J. Toms (#4155)
800 N. King Street, Plaza Level
Wilmington, DE  19801
(302) 429-1900

DKT. NO. 180
DT. FILED 4·21·08

1          IN THE COURT OF COMMON PLEAS

2      PHILADELPHIA COUNTY, PENNSYLVANIA

3                  - - -

4    UNCHALEE VONG et al      :FEBRUARY TERM 03

5          vs.                :

6    MALY YAN et al           :2882

7                  - - -

8              Oral deposition of

9    Maly Yan, taken pursuant to Notice, held

10   at the law offices of Christie, Pabarue,

11   Mortensen & Young Services, 1880 JFK

12   Boulevard, 10th Floor, Philadelphia, PA,

13   on Wednesday, September 24, 2003, at

14   12:45 p.m., before John W. Begley, a

15   Federally Approved Registered

16   Professional Reporter - Notary Public in

17   and for the Commonwealth of Pennsylvania.

18                  - - -

19          ESQUIRE DEPOSITION SERVICES

20               15th Floor

21        1880 John F. Kennedy Boulevard

22        Philadelphia, Pennsylvania 19103

23            215 - 988-9191

24

22

1    THE WITNESS: No, not at
2    all.
3    BY MR. VILLALOBOS:
4        Q.    And do you recall how much
5    the vehicle cost when it was purchased?
6        A.    It was about 11,000.
7        Q.    And when was it that you
8    purchased it?
9            MR. MC NULTY: Can we just
10   clear up, was it her who purchased
11   it, her father, or both?
12           THE WITNESS: At first it
13   was under my father name when it
14   was bought, and then later on,
15   after I was driving back, it was
16   transferred to my name.
17   BY MR. VILLALOBOS:
18       Q.    And the monies that were
19   spent on the vehicle, were they your
20   father's monies, the ten or 11,000? Were
21   they his monies that were used to
22   purchase the vehicle or were they yours?
23       A.    It was my dad money.
24       Q.    Okay. Now, why is it that

23

1    your father purchased a 15-passenger van,
2    to the extent that you know?
3            MR. URBAN: Objection to the
4    form of the question.
5            You can answer.
6            THE WITNESS: We need it for
7    our business.
8    BY MR. VILLALOBOS:
9        Q.    For your business?
10       A.    Yes.
11       Q.    And what business is that
12   that you needed that 15-passenger van
13   for?
14       A.    I transport people to work
15   at Pack & Process and Lam.
16       Q.    We are going to talk about
17   that in some great detail, but before I
18   do I want to ask you some more questions
19   about the vehicle.
20           Was the vehicle registered
21   in your father's name or was the vehicle
22   registered in your name?
23           MR. MC NULTY: Objection.
24           MR. HOFFMAN: Objection. At

24

1    what time?
2            MR. URBAN: When?
3            MR. VILLALOBOS: At the time
4    the vehicle was purchased?
5            MR. URBAN: When? The
6    transfer to her name may, in some
7    eyes, may be considered a purchase
8    or repurchase by her as well.
9            MR. VILLALOBOS: When the
10   vehicle first came into the
11   possession of her family, was it
12   registered in her name or her
13   father's name.
14           MR. URBAN: When it first
15   came into the possession of her
16   father or her, in her name?
17           MR. VILLALOBOS: Her father.
18           MR. URBAN: Well, ask that
19   question.
20           THE WITNESS: Yes.
21   BY MR. VILLALOBOS:
22       Q.    And at some point in time
23   was the vehicle then registered in your
24   name rather than in your father's name?

25

1        A.    Yes.
2        Q.    And do you know when that
3    took place, that the registration of the
4    vehicle was transferred from your
5    father's name to your name?
6        A.    Around April 2001.
7        Q.    Is there any particular
8    reason why the vehicle was transferred
9    from your father's name into your name in
10   April of 2001?
11       A.    My father got his license
12   suspended.
13       Q.    So are you telling me that
14   he wasn't able to drive the vehicle, and
15   therefore he transferred it to someone
16   else's name, that being your name?
17           MR. URBAN: Objection to the
18   form of the question.
19           MR. MC NULTY: Objection to
20   the form of the question. She is
21   not going to answer that question.
22   I instruct her not to answer.
23           MR. VILLALOBOS: Excuse me.
24           MR. MC NULTY: She's not

34

1    A.    I don't know.
2    Q.    Do you have any
3    understanding as to who paid this
4    invoice?
5         MR. MC NULTY:  I'm going to
6    object.  If she doesn't know how
7    would she have an understanding?
8         MR. VILLALOBOS:  She doesn't
9    know if there's documentation.
10   I'm asking if she has an
11   understanding as to who would have
12   paid.
13        MR. MC NULTY:  I'm going to
14   object to the form and I'm not
15   going to let her answer.
16   BY MR. VILLALOBOS:
17   Q.    Do you have any reason to
18   believe that Pack & Process paid this
19   $603.22 for the maintenance of this
20   vehicle?
21   A.    No.
22   Q.    I would like to flip into, I
23   believe it is, the seventh page.  It is
24   another invoice dated June 14, 2001.  It

1    A.    No.
2    Q.    As of June, I'm done with
3    this document for the time being, as of
4    June 2001 could you please tell me who
5    purchased the gasoline that would go in
6    that vehicle?
7         MR. URBAN:  Is your question
8    whether or not she would be
9    reimbursed for gasoline?
10        MR. VILLALOBOS:  No, I
11   haven't gotten there yet.
12        MR. URBAN:  Okay.
13        MR. VILLALOBOS:  That's the
14   next question.
15        MR. URBAN:  That's fine.
16        MR. VILLALOBOS:  Who bought
17   the gas, and the next question is,
18   if someone else other than her
19   did, did someone reimburse her.
20        THE WITNESS:  Myself.
21   BY MR. VILLALOBOS:
22   Q.    Were you reimbursed for the
23   monies that you had spent to put gas in
24   that van in June 2001?

35

1    looks just like the first page.
2         MR. URBAN:  What's the Bates
3    number?
4         MR. VILLALOBOS:  The Bates
5    number is eight, 008.
6    BY MR. VILLALOBOS:
7    Q.    Same question with respect
8    to the total invoice amount, which is
9    $783.93.  Do you have any idea who paid
10   for this service on this van?
11   A.    It is probably my dad.
12   Q.    Would you have any
13   documentation or receipts regarding who
14   would have paid this amount for the
15   repair of this van?
16        MR. MC NULTY:  Objection to
17   the form of the question.
18        You can answer.
19        THE WITNESS:  I really don't
20   know.
21   BY MR. VILLALOBOS:
22   Q.    Do you have any reason to
23   believe that Pack & Process would have
24   paid for the repairs on that van?

1    A.    No.
2    Q.    Are you familiar with a
3    company by the name of Lam Staff?
4    A.    Yes.
5    Q.    And how is it that you are
6    familiar with that company?
7    A.    That person contact me to
8    provide workers.
9    Q.    And when you say "that
10   person", who is that person?
11   A.    The name is Lam.
12   Q.    Okay.  Are you familiar with
13   a gentleman by the name of Thatch.
14   A.    Like what?  What was the
15   name.
16   Q.    Suasaday Thatch.
17   A.    Yes.
18   Q.    And who is that individual,
19   to your knowledge?
20   A.    It is my agency.
21   Q.    It is your agency?
22   A.    Yes, the person who ask me
23   to take people to work.
24   Q.    Okay.  So Mr. Thatch is

38

1 associated in some fashion with Lam
2 Staff?
3    A.   Yes.
4    Q.   And what is your
5 understanding of Mr. Thatch's
6 relationship to Lam Staff?
7    A.   I really don't know.
8    Q.   For instance, do you know if
9 he's the owner or president of Lam Staff,
10 or would he simply be an employee of Lam
11 Staff?
12    A.   I believe it is the owner of
13 that place.
14    Q.   And you said that at some
15 point in time this gentleman approached
16 you to find people or transport people on
17 his behalf or on behalf of his company?
18       MR. URBAN: Objection to the
19 form of the question.
20       MR. MC NULTY: Objection. I
21 don't think that's what she said.
22 BY MR. VILLALOBOS:
23    Q.   You said that he approached
24 you for some reason. Could you tell me

39

1 what he approached you for?
2    A.   He came to ask me to provide
3 or transport people to work at Pack &
4 Process.
5    Q.   Okay. Did you know this
6 gentleman before then?
7    A.   No.
8    Q.   And when was it that he
9 approached you to transport people to
10 Pack & Process?
11    A.   In 1995.
12    Q.   And did you, in fact,
13 transport people to Pack & Process as
14 requested by this gentleman back in 1995?
15       MR. URBAN: Objection to the
16 form of the question.
17       You can answer.
18       THE WITNESS: My father, in
19 1995, my father was the one who
20 transported people to work.
21 BY MR. VILLALOBOS:
22    Q.   Okay. And was that at the
23 request of Mr. Thatch?
24    A.   Yes.

40

1    Q.   And, to her knowledge, was
2 her father paid for transporting people
3 to Pack & Process?
4    A.   Yes.
5    Q.   And to her knowledge, who
6 was it that paid her father to transport
7 these individuals to Pack & Process?
8    A.   Mr. Thatch.
9    Q.   And what I'm going to do is
10 ask you about some other companies and
11 then we are going to get into more detail
12 about transportation issues.
13       Are you familiar with a
14 company called Point & Fortune?
15    A.   No.
16    Q.   How about a company called
17 Asian Plus?
18    A.   I don't know.
19    Q.   Okay. How about a gentleman
20 by the name of Bob Macknis?
21    A.   American?
22    Q.   Yes.
23    A.   Yes.
24    Q.   And how do you know

41

1 Mr. Macknis?
2    A.   He work at Pack & Process.
3    Q.   Okay. Do you know what his
4 job title or his position was at Pack &
5 Process?
6    A.   At the time he was a
7 manager.
8    Q.   And what time was that?
9 What time frame?
10    A.   Since 1995. I believe it
11 was in 1997 or 1998 was when he was
12 retired.
13    Q.   While you were working at
14 Pack & Process, at some point during the
15 1990's did you work with Mr. Robert
16 Macknis?
17    A.   That American man?
18    Q.   Yes.
19    A.   Which part of the years
20 again?
21    Q.   During the 1990's, before he
22 retired, did she work with Mr. Macknis at
23 Pack & Process?
24    A.   Yes.

42

1    Q.    And was he one of her bosses
2  or supervisors?
3    A.    Yes.
4    Q.    Likewise, how about a woman
5  by the name of Cheryl Staniszewski?
6    A.    She's my supervisor on QC.
7    Q.    Is that quality control?
8    A.    Yes.
9    Q.    And during what time frame
10  did you work with Cheryl Staniszewski in
11  quality control at Pack & Process?
12    A.    In 1998.
13    Q.    How about in 2001?
14    A.    Yes.
15    Q.    And she was your supervisor
16  at that time?
17    A.    Yes.
18    Q.    How about a gentleman by the
19  name of Sterling Newsome?
20    A.    Yes.
21    Q.    And did you work with him at
22  Pack & Process as well?
23    A.    Yes.
24    Q.    And was he one of your

1    MR. URBAN: Objection.
2  BY MR. VILLALOBOS:
3    Q.    What I'm going to be doing
4  is asking about your working physically
5  at Pack & Process, but it is my
6  understanding that while working at Pack
7  & Process, depending upon the time frame
8  you worked as both an employee of Pack &
9  Process --
10    MR. MC NULTY:  Wait a
11  minute.  Shouldn't you be asking
12  her questions as opposed to
13  telling her --
14    MR. VILLALOBOS:  I'm giving
15  her my understanding as a
16  backdrop.  If she disagrees,
17  that's fine, but I'm just trying
18  to give her an understanding
19  because I'm going to distinguish
20  between working for versus working
21  at.
22    MR. MC NULTY:  Why don't
23  just ask her that?
24    MR. URBAN:  I think that

43

1  supervisors or bosses at Pack & Process?
2    A.    Yes.
3    Q.    And would he have been your
4  boss or supervisor in 2001 as well as
5  Cheryl Staniszewski was?
6    A.    Yes.
7    Q.    And, lastly, do you know
8  someone by the name of Susi Hadi or Susi
9  Hadi?
10    A.    I don't really recognize the
11  name.
12    Q.    What I would like to do is
13  ask you about your employment history
14  with Pack & Process.
15    A.    All right.
16    Q.    When was it that you first
17  worked at Pack & Process, and I'm
18  distinguishing that between worked for
19  Pack & Process, and I will explain it,
20  but why don't you give her that part of
21  that and then I will explain the balance
22  of it.
23    MR. MC NULTY:  I'm not sure
24  she understands the distinction.

1  would be better.
2    MR. VILLALOBOS:  I tried and
3  then you said she didn't
4  understand, and the interpreter
5  didn't understand.
6    MR. MC NULTY:  No, I think
7  the question is in 1998 who did
8  you work for and have her answer.
9    MR. VILLALOBOS:  Okay.
10    MR. MC NULTY:  Who paid your
11  salary?
12    MR. VILLALOBOS:  That's
13  fine.
14    MR. MC NULTY:  That's what I
15  would prefer you do.
16    MR. VILLALOBOS:  Sure.
17  BY MR. VILLALOBOS:
18    Q.    When was it that you first
19  began to work at Pack & Process?  Was
20  1998?
21    A.    You mean like by paying by?
22    Q.    That's what I'm trying to
23  avoid.  When did you physically go to a
24  Pack & Process facility and work there,

46

1  regardless of who it was that was paying
2  you?
3      MR. URBAN: She didn't
4  understand.
5      Re-ask the question, please.
6  BY MR. VILLALOBOS:
7      Q.  The question is when did you
8  first work at, physically work at, Pack &
9  Process?
10     MR. URBAN: Why don't you
11  say which year?
12  BY MR. VILLALOBOS:
13     Q.  Which year was it that you
14  first worked at Pack & Process?
15     A.  In 1995.
16     Q.  And in 1995 were you paid by
17  Pack & Process or were you paid by some
18  other company?
19     A.  It was another person.
20     Q.  And who was that other
21  person that paid you as opposed to Pack &
22  Process?
23     A.  Mr. Thatch.
24     Q.  And what was your job title?

47

1      A.  It was pretty much packing
2  candies.
3      Q.  In 1995, when you initially
4  worked at Pack & Process, did you drive a
5  vehicle?
6      A.  No.
7      Q.  From 1995 until what year
8  did you initially work at Pack & Process?
9      A.  Starting year 2001 is when I
10  entered into working for Pack & Process.
11     Q.  Okay.  So from 1995 until
12  2001 did you work continuously at Pack &
13  Process?
14     A.  Yes.
15     Q.  Was there any period of time
16  between 1995 and 2001 when you, for
17  whatever reason, stopped working at Pack
18  & Process?
19     A.  When I was pregnant.
20     Q.  Okay.  And during that time
21  period between 1995 and 2001, while you
22  were working at Pack & Process, were you
23  paid by Mr. Thatch as opposed to Pack &
24  Process during that whole time frame?

48

1      A.  Yes.
2      Q.  During that time frame,
3  between 1995 and 2001, while you were
4  working for Mr. Thatch at Pack & Process,
5  how did you get to work every day?
6      MR. URBAN: Objection to the
7  form of the question.
8      Go ahead.  You can answer.
9      THE WITNESS:  I drove my
10  vehicle.
11  BY MR. VILLALOBOS:
12     Q.  Okay.  And what vehicle was
13  that?
14     A.  The 1992 vehicle.
15     Q.  Did you drive it to and from
16  Pack & Process between 1995 and 2001 on a
17  daily basis?
18     A.  At first my father was the
19  one who drove the vehicle, and then
20  several months before the accident
21  happened I was the one who was driving
22  the vehicle.
23     Q.  I'm going to ask you some
24  more questions about that in a few

49

1  moments.
2      At some point in 2001 did
3  your job title change at Pack & Process?
4      A.  Yes.
5      Q.  And what did your job title
6  change to?
7      A.  I was packing candies and
8  putting into boxes.
9      Q.  At some point in time,
10  though, in 2001 did you cease working
11  directly for Mr. Thatch and then become
12  an employee of Pack & Process?
13     MR. URBAN: Objection to the
14  form of the question.
15     THE WITNESS:  Actually, for
16  both.
17  BY MR. VILLALOBOS:
18     Q.  What do you mean by
19  "actually for both"?
20     A.  I got paid from Pack &
21  Process, I got a check from them, and
22  also I get paid being a transporter for
23  people, taking peoples there.
24     Q.  And who would pay you for

50

```
1   being a transporter?
2        A.  Mr. Thatch.
3        Q.  Let me ask you about quality
4   control.  It is my understanding that in
5   2001 you began working in the capacity of
6   a quality control technician rather than
7   a packer.
8        A.  Yes.
9        Q.  And in that capacity were
10  you working for Cheryl Staniszewski?
11       A.  Yes.
12       Q.  And was she your direct
13  supervisor?
14       A.  Yes.
15       Q.  And when did you transition
16  from being a packer to a quality control
17  technician?  What month and year?
18       A.  I think it was in February.
19       Q.  Of 2001?
20       A.  Yes.
21       Q.  And who was it that hired
22  you at Pack & Process to be a quality
23  control technician?
24       A.  Ms. Cheryl.
```

55

```
1   per hour as a quality control technician
2   as of February 2001?
3        A.  7.50 an hour.
4        Q.  And was that an increase in
5   your pay over what you received when you
6   were working for Mr. Thatch?
7        A.  Yes.
8        Q.  And how much was it that you
9   were receiving from Mr. Thatch when you
10  were working for him as opposed to Pack &
11  Process?
12          MR. URBAN:  Objection to the
13      form of the question.
14          You can answer.
15          THE WITNESS:  When I was
16      working for him he paid me three
17      dollars a person.
18  BY MR. VILLALOBOS:
19       Q.  To transport people?
20       A.  Yes.
21       Q.  Three dollars per person per
22  day?
23       A.  Yes.
24          MR. URBAN:  But the question
```

51

```
1        Q.  Ms. Who?
2        A.  The person named Cheryl.
3        Q.  Cheryl?
4        A.  Cheryl.
5        Q.  And were you hired as a
6   full-time employee or a part-time
7   employee?
8        A.  Full-time.
9        Q.  And were you receiving a
10  salary or were you paid at an hourly
11  rate?
12          MR. MC NULTY:  Objection to
13      the form of the question.  It can
14      be the same.
15          MR. VILLALOBOS:  Well, an
16      hourly wage earner making X number
17      of dollars per hour versus someone
18      who receives a salary for a year.
19      I'm trying to differentiate
20      between the two.
21          MR. URBAN:  Okay.
22          THE WITNESS:  By hours.
23  BY MR. VILLALOBOS:
24       Q.  And how much were you paid
```

5

```
1   is in relation to when she was
2   being paid by Mr. Thatch to work
3   at Pack & Process, what did he pay
4   her.
5          THE WITNESS:  Like I say, by
6      person.
7          MR. MC NULTY:  Not in
8      relation to taking people back and
9      forth from work.  When she
10     physically was working in the
11     plant, as opposed to --
12         MR. VILLALOBOS:  As a
13     packer.
14         MR. MILLER:  In 2001.
15         THE WITNESS:  When I was
16     working for cash or after I work
17     with check?
18  BY MR. VILLALOBOS:
19       Q.  Well, let's do it both ways.
20  How much did you get when you were being
21  paid cash?
22       A.  5.50.
23       Q.  And how about by check?
24       A.  7.50.
```

66

1    Q.   Prior to June 18, 2001 on
2  how many occasions had you driven the van
3  to or from Pack & Process?
4    A.   Like what do you mean?  Can
5  you repeat that?
6    Q.   Well, let me ask you this:
7  When did you first begin driving the van?
8  In 2001 when did you first begin driving
9  the van to or from Pack & Process?
10   A.   In May.
11   Q.   And we are talking about May
12 of 2000, so a month before the accident,
13 roughly?
14   A.   Yes.
15      MR. HULLER:  I'm sorry,
16 Rafael.  That was 2001, I think
17 you meant to say --
18      MR. VILLALOBOS:  2001.
19      THE WITNESS:  Yes.
20 BY MR. VILLALOBOS:
21   Q.   And why did you start
22 driving the van in May 2001?
23   A.   Because my father got his
24 license suspended.

1    Q.   You were not paid by Pack
2  Process to drive the van in May or Jun
3  of 2001?
4      MR. URBAN:  Objection to the
5  form of the question.
6      THE INTERPRETER:  I'm sorry.
7  I wasn't sure she understand the
8  question because the answer --
9      MR. MC NULTY:  That's all
10 right.  Just translate what she
11 said.
12      THE INTERPRETER:  The answe
13 is I get paid from Mr. Thatch as a
14 transporter driving the van,
15 taking people to work there.
16 BY MR. VILLALOBOS:
17   Q.   So in May and June of 2001
18 Mr. Thatch was paying you to transport
19 workers between Philadelphia and
20 Wilmington?
21   A.   Yes.
22   Q.   Did anyone at Pack & Process
23 ever instruct you to drive a vehicle?
24   A.   My supervisor told me.

67

1    Q.   Was your father customarily
2  the person who would drive that van?
3    A.   Yes.
4    Q.   And was your father paid by
5  someone to drive that van?
6    A.   Yes, Lam.  Mr. Thatch.
7    Q.   And when you began to drive
8  the van in May 2001, a month or so before
9  the accident --
10   A.   Yes.
11   Q.   -- were you paid by anyone
12 to drive that van?
13   A.   I get paid from Pack &
14 Process and I also get paid from Mr. Lam.
15   Q.   Now, what were you paid by
16 Pack & Process for; for working as a
17 quality technician or were you paid by
18 Pack & Process to drive the van?
19      MR. URBAN:  Objection to the
20 form of the question.
21      Go ahead.
22      THE WITNESS:  As a person
23 working as a control.
24 BY MR. VILLALOBOS:

1    Q.   Your supervisor told you to
2  drive a vehicle?
3    A.   Yes, transferring people to
4  work and also working as an employee
5  there.
6    Q.   What supervisor was it that
7  told you to transport people to and from
8  work?
9    A.   Sterling.
10   Q.   Sterling Newsome?
11   A.   Yes.
12   Q.   And when was it that
13 Sterling Newsome told you to drive a va
14 to transport workers?
15   A.   After my father got his
16 license suspended.
17   Q.   Under what circumstances was
18 it that Sterling Newsome first came to
19 you and spoke to you about driving a
20 vehicle?
21   A.   Because he does not want my
22 father to leave the place and he does not
23 want to lose us from the company.
24   Q.   So what did Sterling Newsome

70

1 say to you?
2    A.   Told me to bring people to
3 work into that company and also work at
4 that company as employee.
5    Q.   And did Sterling Newsome
6 provide you with a vehicle to drive or
7 would you just drive your van?
8    A.   Drive my own vehicle.
9    Q.   Did Sterling Newsome or Pack
10 & Process pay you to drive the van in May
11 and June of 2001?
12    MR. URBAN:  You mean
13 directly or indirectly?
14    MR. VILLALOBOS:  Directly.
15    THE WITNESS:  Yes, Pack &
16 Process paid me.
17 BY MR. VILLALOBOS:
18    Q.   As opposed to Mr. Thatch.
19    A.   Actually, Mr. Thatch paid me
20 for transporting.
21    Q.   Did you ever receive any
22 monies directly from Pack & Process for
23 transporting workers from Wilmington to
24 Philadelphia or from Philadelphia to

72

1    MR. MC NULTY
2 question has been as
3 answered.
4    MR. URBAN:
5 that.
6    MR. MC NUI
7 covered.
8    MR. VILLALOBOS:  Sh
9 answered that Sterling was the
10 person at Pack & Process who
11 approached her.  I want to know at
12 some point in time before that her
13 father said Hey, look.  I can't
14 drive, et cetera.
15    MR. MC NULTY:  Objection to
16 the form of the question.
17    You can answer the question.
18    THE WITNESS:  Mr. Thatch.
19 BY MR. VILLALOBOS:
20    Q.   Mr. Thatch approached you
21 first?
22    A.   Yes.
23    MR. VILLALOBOS:  I want to
24 take a five minute break and we

71

1 Wilmington?
2    A.   No.
3    Q.   Who approached you first
4 about driving the van in May and June of
5 2001 after your father's license was
6 suspended?
7    MR. URBAN:  Objection.  She
8 just said Sterling Newsome.
9    MR. VILLALOBOS:  I'm going
10 to ask her a follow-up.  You will
11 understand.  Your father or
12 Sterling Newsome.  This is the
13 balance of the question.  I wasn't
14 done.
15    MR. MC NULTY:  That question
16 has been asked and answered.  You
17 are changing the question to get,
18 to try to get a different answer
19 to the question.
20    MR. VILLALOBOS:  No, I'm
21 trying to complete a question.  I
22 wanted to ask who was the one that
23 approached her first, her father
24 or Sterling Newsome.

73

1 will come back.
2    (Deposition recessed)
3 BY MR. VILLALOBOS:
4    Q.   Back on the record.
5    Just so that I have a clear
6 understanding of who and how and when you
7 were approached to drive, I'm going to
8 break it down person by person.  Okay?
9    Q.   When did Mr. Thatch, in May
10 or June of 2001, when did Mr. Thatch
11 first approach you and ask you to drive
12 the van?
13    MR. URBAN:  Objection to the
14 form of the question.
15    THE WITNESS:  It was in May
16 2001.
17 BY MR. VILLALOBOS:
18    Q.   And do you know why he
19 approached you to drive the van?
20    A.   Because he couldn't find
21 other people to drive and it is hard for
22 him to look for anybody else, so --
23    Q.   And this is after your
24 father's license was suspended?

19 (Pages 70 to 73

74

1    A.   Yes,
2    Q.   And what did Mr. Thatch say
3 to you when he first approached you?
4    A.   He said that I can still
5 work at Pack & Process as employee there
6 and also for me to transport people to
7 work there it shouldn't be a problem.
8    Q.   Did your father ever come to
9 you and ask you to drive workers to Pack
10 & Process in May or June of 2001?
11   A.   Yes.
12   Q.   When was it that your father
13 asked you if you could drive?
14   A.   After they suspended his
15 license.
16   Q.   Do you recall who came to
17 you first, whether it was Mr. Thatch or
18 your father?
19       MR. MC NULTY:  Objection.
20   The question was asked and
21   answered.
22 BY MR. VILLALOBOS:
23   Q.   You can answer the question.
24   A.   My father told Mr. Thatch

1 BY MR. VILLALOBOS:
2    Q.   Do you remember the words
3 that Mr. Newsome used when he first spo
4 with you about driving the van?
5    A.   He told me that I can still
6 work at Pack & Process as an employee
7 there and also I can also transport
8 people to work there.  It's not going to
9 be a problem.
10   Q.   Did you ask Mr. Newsome for
11 permission to drive or did he come to you
12 to discuss the issue of your driving?
13   A.   He came to talk to me.
14   Q.   Other than you, after your
15 father's license was suspended, did
16 anyone else drive that van to and from
17 Pack & Process?
18   A.   No.
19   Q.   For instance, if you were
20 out sick, if you were absent from work
21 one day, is there someone else that could
22 have stepped in to drive the van in May
23 or June of 2001?
24       MR. MC NULTY:  Objection to

75

1 that I cannot transport or drive the
2 vehicle anymore because his license got
3 suspended and Mr. Thatch told me that --
4 I told him that I can drive people.
5    Q.   Just so that I'm clear on
6 this, did you speak directly with
7 Mr. Thatch or was this information
8 communicated between you and Mr. Thatch
9 through your father?
10   A.   He spoke to my father.
11   Q.   Did you, personally, speak
12 with Mr. Thatch about this issue?
13   A.   No.
14   Q.   You indicated earlier that
15 you had had a conversation with Sterling
16 Newsome about driving the van.  Did he
17 tell you to drive the van or did he ask
18 you if you could help out by driving the
19 van?
20       MR. URBAN:  Objection to the
21   form of the question.
22       MR. MC NULTY:  Objection to
23   the form of the question.  I
24   instruct her not to answer.

1    the form of the question.  I
2    instruct her not to answer.
3 BY MR. VILLALOBOS:
4    Q.   Are you aware of any other
5 persons who drove that van in May or Jun
6 of 2001 other than yourself and other
7 than your father?
8        MR. MC NULTY:  Objection.
9    Instruct her not to answer.
10       MR. VILLALOBOS:  I would
11   like to have this marked as Maly
12   Yan 4.  (Indicating).
13       (The above-referred-to
14   document was marked as Maly Yan
15   Exhibit 4 for identification.)
16       MR. URBAN:  Maybe your
17   question is going to be harmless
18   enough, but I have an objection
19   just looking at this, but where
20   are you going with this?
21       MR. VILLALOBOS:  Go halfway
22   down the narrative -- off the
23   record.
24       (Off the record discussion).

82

1    to look at what's been marked as Maly Yan
2    Exhibit 5. First of all, do you
3    recognize this document?
4        A.   Yes, I do remember.
5        Q.   And is that your signature
6    that appears at the bottom of the
7    document?
8        A.   Yes.
9        Q.   And what's the date that
10   appears next to your signature?
11       A.   July 24, 2001.
12       Q.   Do you remember when it was
13   that you first saw this document?
14       A.   It was after the accident.
15   I went back to work at that place.
16       Q.   When you returned to work,
17   did you have a discussion with Mr. Ames
18   about your driving a vehicle?
19       A.   I believe the discussion was
20   that when I come back to work at that
21   place, after the accident, I can not
22   drive people to work there anymore.
23       Q.   And who was it that told you
24   that?

1    this document was signed and dated.
2        A.   But I received this document
3    after the accident occurred. I did not
4    receive this document or have I read
5    anything like this before the accident
6    exist.
7        Q.   I understand that, but my
8    question is is it your understanding that
9    as of July 2001 driving a vehicle was not
10   a condition of your employment with Pack
11   & Process?
12       A.   What do you mean by that? I
13   don't understand it.
14       Q.   As of July 2001 was it your
15   understanding that you were -- if you
16   were to drive a vehicle that it was not a
17   requirement to drive the vehicle, a
18   requirement of Pack & Process?
19       A.   I still don't understand the
20   question.
21       Q.   Okay. On June 18, 2001, was
22   it your understanding that in order to
23   continue working at Pack & Process that
24   you would have to be the driver of that

83

1        A.   Mr. Steve Ames. And my
2    supervisor.
3        Q.   And who was your supervisor?
4        A.   Cheryl.
5        Q.   Cheryl Staniszewski.
6        A.   Yes.
7        Q.   Now, when you received this
8    document were you able to read the
9    document?
10       A.   Yes.
11       Q.   And were you able to
12   understand what the document says?
13       A.   Yes.
14       Q.   And was it your
15   understanding that driving was not a
16   condition of your employment at Pack &
17   Process?
18       MR. DRANOFF:  As of what
19   time?
20       MR. MC NULTY:  Objection to
21   the form of the question.
22       MR. URBAN:  Objection
23   BY MR. VILLALOBOS:
24       Q.   As of June 24, 2001, when

1    van?
2        MR. URBAN:  Objection to the
3    form of the question.
4        Go ahead.
5        THE WITNESS:  Yes.
6    BY MR. VILLALOBOS:
7        Q.   And who was it that placed
8    that requirement on you?
9        A.   Mr. Thatch. Still
10   Mr. Thatch.
11       Q.   If you didn't drive the van
12   as of May or June of 2001 how would you
13   have gotten to work?
14       MR. MC NULTY:  Objection.
15   BY MR. VILLALOBOS:
16       Q.   You can answer.
17       A.   If I don't get to drive that
18   van?
19       Q.   Yes.
20       A.   I use my own vehicle to
21   work.
22       Q.   Okay. I'm going to go back
23   to a conversation that you had with
24   Cheryl Staniszewski for a moment. When

86

1  you said that you could not switch from
2  day shift to night shift, what was
3  Cheryl's response to you?
4      A.  That I will find someone
5  else to work.
6      MR. VILLALOBOS:  I'm just
7  going to look over my notes for a
8  moment.  If somebody else has some
9  questions, they can follow up.
10      MS. HULLER:  I have no
11  questions.
12      MR. MC NULTY:  Steve, any
13  questions?
14      MR. DRANOFF:  Let me confer
15  with counsel.
16      MR. URBAN:  I can ask a
17  couple of questions just to clear
18  a couple of things up.
19      MR. DRANOFF:  At this point,
20  as things stand, I do not have any
21  questions.  Depending upon if
22  there's any further questioning we
23  might want some follow up.
24      MR. URBAN:  I just have two

87

1  things that I wanted to clarify in
2  the testimony.
3          - - -
4  BY MR. URBAN:
5      Q.  You had indicated in your
6  testimony earlier that you were not
7  reimbursed for gas.  Were you ever given
8  extra money for gas by anyone?
9      A.  Well, Pack & Process would
10  give it to Lam and Lam would give it to
11  me.
12      Q.  And they would give you some
13  extra money for gas sometimes as well?
14      A.  Yes.
15      Q.  Did Sterling Newsome ever
16  tell you how many workers to bring the
17  next day?
18      A.  He only -- that person only
19  spoke to Mr. Lam.
20      Q.  I'm sorry.  Did Sterling
21  ever speak to you directly about how many
22  workers to bring?
23      A.  Sometime, if Sterling
24  doesn't get to speak with Mr. Lam, then

88

1  he would speak with my father.
2      Q.  And how many workers would
3  he tell you to bring?
4      A.  If they only need like a few
5  people, then my father will hear from
6  them.
7      Q.  So it depended on how many
8  workers Pack & Process requested?
9      A.  Yes.
10      MR. URBAN:  No further
11  questions.
12      MR. VILLALOBOS:  I have some
13  questions regarding reimbursements
14  for gasoline.
15          - - -
16  BY MR. VILLALOBOS:
17      Q.  You testified a moment ago
18  that it is your understanding that Pack &
19  Process would give money to Mr. Thatch
20  which, in turn, Mr. Thatch would give to
21  you for reimbursement for gasoline.  What
22  do you base that statement upon?
23      A.  Because Mr. Lam told my
24  father.

89

1      Q.  Okay.  And how were the
2  monies, to your knowledge, distributed
3  between Pack & Process to Mr. Lam?
4      When you say Mr. Lam, I
5  think you mean Mr. Thatch?
6      A.  Yes.
7      Q.  How were the monies
8  transmitted, to your knowledge, between
9  Pack & Process and Mr. Thatch for
10  gasoline reimbursement?
11      A.  Pack & Process will give a
12  check to Lam, which is Mr. Thatch, and
13  Mr. Thatch gave me cash.
14      Q.  And did you ever see any of
15  these checks that were given to
16  Mr. Thatch from Pack & Process?
17      A.  No, never.
18      Q.  Were you given any or seen
19  any type of itemization for what the
20  monies represented that were being paid
21  by Pack & Process to Mr. Thatch?
22      A.  No, never seen it.
23      Q.  When gasoline money was
24  given, was it given to you or was it

90

1  given to your father or could it be
2  either one of you that would receive
3  gasoline money?
4      A.  If my father is the person
5  driving the van transporting people he
6  would be the one to get the gas money; if
7  I am the one who was the driver I would
8  get the gas money.
9      Q.  And how often would you
10 receive gasoline money from Mr. Thatch?
11     A.  Once a week.
12     Q.  And do you recall how much
13 money you would receive for gasoline each
14 week?
15     A.  20, sometimes $30.
16     Q.  And other than the
17 conversation between Mr. Thatch and your
18 father, do you have any other reason to
19 believe that Pack & Process was giving
20 money to Mr. Thatch in order to
21 compensate drivers for gasoline?
22         MR. MC NULTY:  Objection to
23     the form of the question.
24         You can answer.

1      Q.  But other than that does she
2  have any reason to believe that Pack &
3  Process was reimbursing drivers for
4  gasoline?
5      A.  Yes.
6      Q.  And what, then, is the basis
7  for your believing that Pack & Process
8  was paying, in essence, for the gasoline?
9      A.  I say because Mr. Lam told
10 my father that money is coming from Pack
11 & Process.
12     Q.  And that's the only reason?
13     A.  Yes.
14         MR. VILLALOBOS:  I have no
15     further questions for you.
16         - - -
17 BY MR. HOFFMAN:
18     Q.  I would just like to ask a
19 couple questions about this form that you
20 were given.  (Indicating).
21         MR. URBAN:  Is that Maly Yan
22     Exhibit 4?
23         MR. HOFFMAN:  The warm
24     wishes of welcome back from Pack &

91

1          THE INTERPRETER:  I'm sorry.
2      Can you repeat that again?
3  BY MR. VILLALOBOS:
4      Q.  Sure.  Other than the
5  conversation that your father had with
6  Mr. Thatch, do you have any other reason
7  to believe that Pack & Process was giving
8  money to Mr. Thatch to be distributed to
9  drivers to reimburse them for gasoline
10 expenses?
11     A.  Can you repeat the question?
12     Can I repeat the question?
13         MR. VILLALOBOS:  I will just
14     have it read back.
15         (The last question was read
16     back by the Court Reporter).
17         THE WITNESS:  Yes
18 BY MR. VILLALOBOS:
19     Q.  And what other basis for
20 that belief do you have?
21     A.  Mr. Lam told Pack & Process
22 to gave it.
23     Q.  Mr. Lam told whom?
24     A.  To my dad.

1      Process.
2  BY MR. HOFFMAN:
3      Q.  When you received this form,
4  did you have a belief that the conditions
5  that were set forth on this form
6  represented a change in your work
7  relationship with Pack & Process?
8      A.  Yes, in a way.
9      Q.  Well, let me see what we
10 mean by in a way.  Before you signed this
11 form did you believe that as a condition
12 of your employment with Pack & Process
13 you were to assist the transport of labor
14 to Pack & Process?
15     A.  My supervisors told me that
16 starting from this date that I sign,
17 which is July 24, I can no longer
18 transport people to work there.
19     Q.  But before you signed this
20 did you have a belief that as a condition
21 of your employment of working at Pack &
22 Process that you were to assist in the
23 transport of clients to Pack & Process?
24         MR. MC NULTY:  Wait a

94

1 minute. Didn't she just answer
2 that one? I'm going to object.
3    MR. HOFFMAN: Was her answer
4 yes?
5    MR. MC NULTY: Yes.
6    MR. HOFFMAN: So we have an
7 answer yes.
8 BY MR. HOFFMAN:
9    Q. Did you believe, prior to
10 signing this, when you were transporting
11 workers to Pack & Process, that you were
12 transporting people to Pack & Process to
13 assist Pack & Process?
14    A. Well, yes, but at the time
15 when I was transporting people to work
16 there, I never received this kind of
17 document. This is the first time I
18 received this document, which is under
19 date that I signed. (Indicating).
20    Q. You received this document
21 after the accident?
22    A. Yes.
23    MR. HOFFMAN: No further
24 questions.

95

1    MR. MC NULTY: Does anyone
2 else have any questions?
3    (There were none).
4    MR. VILLALOBOS: Okay. The
5 deposition is over.
6    (Witness excused.)
7    (Deposition concluded at
8 2:45 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

96

1    - - -
2    C E R T I F I C A T E
3    - - -
4
5    I hereby certify that the
6 witness was duly sworn by me and that the
7 deposition is a true record of the
8 testimony given by the witness.
9
10
11
12
13
14 John W. Begley, RPR
15 Dated: September 25, 2003
16
17 (The foregoing certification of this
18 transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying shorthand
22 reporter.)
23
24

97

1    INSTRUCTIONS TO WITNESS
2    Please read your deposition
3 over carefully and make any necessary
4 changes. You should assign a reason in
5 the appropriate column on the errata
6 sheet for any change made.
7    After making any change
8 which has been noted on the following
9 errata sheet, along with the reason for
10 any change, sign your name to the errata
11 sheet and date it.
12    You are signing it subject
13 to the changes you have made in the
14 errata sheet, which will be attached to
15 the deposition. You must sign in the
16 space provided.
17    Return the original errata
18 sheet to the deposing attorney within
19 thirty (30) days of receipt of the
20 transcript by you.
21
22
23
24

25 (Pages 94 to 97

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ST. PAUL MERCURY INSURANCE          :
COMPANY and PACK AND                :
PROCESS, INC.                       :          Case No. 05-0022 (KAJ)
                                    :
            v.                      :
                                    :
MALY YAN                            :
........................................................:
                                    :
YAN THOU, et al.                    :
                                    :
            v.                      :          Case No. 05-00513 (KAJ)
                                    :
PACK & PROCESS, INC., et al.        :          CONSOLIDATED CASES
                                    :
_____:

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' COUNTER
DEISGNATIONS OF MALY YAN DEPOSITION TAKEN 6-5-06**

| From Page/Line | | to Page/Line | | |
|---|---|---|---|---|
| 59 | 14 | 61 | 23 | Objection – hearsay |
| 63 | 3 | 63 | 23 | Objection – hearsay |
| 98 | 9 | 99 | 16 | Objection – hearsay |
| 99 | 22 | 100 | 24 | Objection – hearsay |
| 101 | 4 | 101 | 11 | Objection – hearsay |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ST. PAUL MERCURY INSURANCE
COMPANY and PACK AND
PROCESS, INC.                                    :          Case No. 05-0022 (KAJ)

               v.

MALY YAN
••••••••••••••••••••••••••••••••••

YAN THOU, et al.

               v.

                                 Case No. 05-005 13 (KAJ)
PACK & PROCESS, INC., et al.                    :          **CONSOLIDATED CASES**

DEFENDANTS' **DEPOSITION DESIGNATIONS - MALY YAN DEPOSITION TAKEN 6-5-06**

| From Page /Line | | to Page /Line | |
|---|---|---|---|
| 58 | 7 | 58 | 20 |
| 58 | 24 | 61 | 23 |
| 63 | 3 | 63 | 23 |
| 71 | 4 | 71 | 12 |
| 85 | 9 | 88 | 10 |
| 98 | 9 | 99 | 16 |
| 99 | 22 | 100 | 24 |
| 101 | 4 | 101 | 11 |
| 104 | 10 | 104 | 12 |

# CONDENSED COPY

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
      ST. PAUL MERCURY INS. CO.  : CASE NO. 05-0022 (KAJ)
 4              and              :
      PACK & PROCESS, INC.       :
 5                               :
 6              vs               :
                                 :
      MALY YAN                   :
 7    _____
      YAN THOU, et al.           : CASE NO. 05-00513 (KAJ)
 8                               :
                vs               :
 9                               :
      PACK & PROCESS, INC., et al:
10
                          - - -
11                 MONDAY, JUNE 5, 2006
                          - - -
12
13
14              Continuing videotape deposition of
15    MALY YAN, taken at the law offices of DEASEY,
16    MAHONEY & BENDER, LTD., 1800 John F. Kennedy
17    Boulevard, Suite 1300, Philadelphia, Pennsylvania,
18    on the above date, beginning at 10:20 a.m., before
19    Susan Lauer, Court Reporter-Notary Public, there
20    being present.
21                          - - -
22              LOVE COURT REPORTING, INC.
                    1500 MARKET STREET
23              12TH FLOOR, EAST TOWER
             PHILADELPHIA, PENNSYLVANIA  19102
24                  (215) 568-5599
```

Maly Yan

Page 55

1    A.    That's correct.
2    Q.    Have you ever -- have you had a job
3    in the United States other than at Pack & Process?
4    A.    No.
5    Q.    And while -- while you were employed
6    at Pack & Process you never filed any type of claim
7    for Workers' Compensation benefits; is that correct?
8    A.    That's correct.
9    Q.    In connection with the benefits that
10   you do receive, you told me that you went to see a
11   doctor that is -- that was located near Broad
12   Street; is that correct?
13   A.    Yes.
14   Q.    Can you be any more specific about
15   the address of the doctor you went to see?
16   A.    I was sent to that place by the SSI
17   worker and, therefore, I don't know exactly the
18   address of that doctor.
19   Q.    Were you represented by a lawyer
20   when you applied for benefits?
21   A.    There was no -- no lawyer.
22   Q.    How did you know that you were --
23   that you were entitled to apply for benefits?
24   A.    I don't know exactly, but I just

Page 56

1    went to the place to check it out, to see if I am
2    eligible to get that benefit or not when I got in
3    accident.
4    Q.    How did you know where to go?
5    A.    One of my neighbor told me about
6    that, and they brought me to that place.
7    Q.    Who was the neighbor?
8    A.    I forget his name.
9    Q.    Do you have any paperwork at home
10   concerning your application for benefits?
11   A.    I think so.
12   Q.    Do you have an application?
13   A.    After I fill out this application
14   form they -- and I gave to them, so they -- they
15   kept it.
16   Q.    You didn't keep -- you didn't get a
17   copy back?
18   A.    I think I have it.
19   Q.    Okay. Ms. Yan, when did you first
20   begin working at Pack & Process?
21   A.    I begin working in 1998.
22   Q.    And when you first went to work at
23   Pack & Process, what was your job, what did you do?
24   A.    It depends. Sometime they ask me to

Page 57

1    put the candy in the box; sometime they ask me to
2    leave -- to move the box.
3    Q.    How long did you put candy in the
4    boxes or move boxes around?
5    A.    I cannot say for sure because at
6    that time sometime I work, sometime I don't work,
7    because I have my baby at that time.
8    Q.    When you first went to work at
9    Pack & Process, were you paid directly by
10   Pack & Process, or paid by somebody else?
11   A.    I got it directly from the packing
12   company.
13   Q.    Was it a check or in cash?
14   A.    It was a check.
15   Q.    And when you first went to work
16   there, how much did you make?
17   A.    Seven dollars.
18   Q.    Is that $7 an hour?
19   A.    That's correct.
20   Q.    And between the time you first
21   started working at Pack & Process and the time of
22   the accident, how many times did you take off
23   because you were having children?
24   A.    During that time got off one or two

Page 58

1    weeks at a time and then I go back to work, but
2    during the accident year I go to work all the time.
3    Q.    How many children did you have --
4    have you had between the time you went to work for
5    Pack & Process and the time of the accident?
6    A.    I had one.
7    Q.    One child. When you first started
8    working at Pack & Process, how did you get to
9    your -- to the job?
10   A.    I went to that place with my
11   father. My father used to be the worker
12   transporter.
13   Q.    Your father drove a vehicle and you
14   rode in the vehicle to work; is that correct?
15   A.    That was before, but during the
16   accident years I am the one who drove the car.
17   Q.    No, no, I'm asking you when you
18   first started working at Pack & Process, did your
19   father drive the vehicle to work?
20   A.    Yes.
21   Q.    And this is your father who's here
22   with us today sitting next to your attorney?
23   A.    Yes.
24   Q.    And what type of vehicle did your

4 (Pages 55 to 58)

Maly Yan

Page 59

1  father drive when you first started working for
2  Pack & Process?
3     A.    It was Chevrolet Ram.
4     Q.    A van?
5     A.    That's correct.
6     Q.    The same van that was involved in
7  the accident?
8     A.    That's correct.
9     Q.    And how many people did your father
10  drive to work?
11     A.    Depends. Sometimes 10 people,
12  sometimes 12 people, sometimes 13 people. It depend
13  on the company's need.
14     Q.    Did you pay your father for
15  transportation?
16     A.    The company paid for him.
17     Q.    What company?
18     A.    Pack & Process.
19     Q.    How do you know that?
20     A.    Because my father talked to the
21  company.
22     Q.    Other than your father -- well, let
23  me withdraw the question.
24          Did your father tell you that

Page 60

1  Pack & Process was paying him?
2     A.    He didn't tell me about that, but he
3  say that the company pay for him. So if the company
4  didn't pay for him, how can he pay for the other
5  worker?
6     Q.    I want to know, how do you know that
7  Pack & Process paid him?
8     A.    Because the other guy's name -- by
9  name Sdey -- (interruption by the court reporter.)
10         THE INTERPRETER: By name Sdey.
11         MR. DEASEY: The other guy's what?
12  May?
13         THE WITNESS: His American name is
14  David.
15         MR. DEASEY: Oh, okay. The other
16  guy's name --
17         THE INTERPRETER: Sdey.
18         MR. DEASEY: Sdey?
19         THE INTERPRETER: Yeah.
20         THE WITNESS: Say that the company
21  pay my father.
22  BY MR. DEASEY:
23     Q.    Okay. You're talking about David
24  who's -- who's real -- one of his names is Sdey,

Page 61

1  right?
2     A.    His American name is David, and his
3  Cambodian name is Sdey.
4     Q.    What is his American last name; do
5  you know?
6     A.    I don't know exactly.
7     Q.    David Thatch, does that sound
8  familiar?
9     A.    Maybe, because he's Vietnamese.
10     Q.    Is it your testimony that David
11  Thatch told you that Pack & Process was paying your
12  father to transport workers?
13     A.    That's correct.
14     Q.    Do you have any -- do you have any
15  other knowledge -- or let me withdraw the question.
16          Other than David Thatch telling you
17  that Pack & Process paid your father, do you have
18  any other information that would prove that Pack &
19  Process paid your father for transportation?
20     A.    I didn't know exactly at that time.
21  The only thing that I did was just working and get
22  paid, and I know for sure that he got paid from that
23  company.
24     Q.    I understand. I understand, but

Page 62

1  that's not my question, ma'am.
2          My question is other than David
3  Thatch telling you, do you have any other facts to
4  support your testimony that your father was paid by
5  Pack & Process to transport workers?
6     A.    I don't have any -- any proof to
7  support that, but I know for sure that he got the
8  money from that company and --
9     Q.    And do you --
10         THE INTERPRETER: Sorry. I'm sorry.
11  Ask her to repeat that question again -- the
12  answer again.
13         THE WITNESS: I don't have any
14  evidence other than that to support the
15  payment that my father got from the company,
16  but I know for sure that he got the payment
17  from that company, and at that time I just
18  working and get paid from my father, and I
19  don't want to interfere with his business.
20  BY MR. DEASEY:
21     Q.    Is the reason you are sure that your
22  father got paid by Pack & Process is because David
23  Thatch told you?
24     A.    David Thatch never say anything

5 (Pages 59 to 62)

Maly Yan

Page 63

1  about that, but I saw him paying my father when he
2  got money from the company.
3      Q.    Who did you see pay your father?
4      A.    I saw David gave the money to my
5  father.
6      Q.    All right. How much did -- what did
7  David -- what did David Thatch give your father,
8  cash? Did he give your father cash?
9      A.    He got check from the company, and
10  he cash that check and gave my father cash.
11      Q.    So your father got cash from David
12  Thatch, correct?
13      A.    That's correct.
14      Q.    Okay. And did you ever see Pack &
15  Process give a check to David Thatch?
16      A.    I never seen it, but every time the
17  payment is up, David always get the check from that
18  company.
19      Q.    How do you know he got a check if
20  you didn't see him get it?
21      A.    There was one day when I met him by
22  chance, and I ask him where he's going, and he told
23  me that he just got a check from the company.
24      Q.    Do you know anything about the

Page 64

1  agreement between David Thatch and Pack & Process
2  for the -- for workers to be supplied to Pack &
3  Process?
4      A.    No, I don't know.
5      Q.    So you never saw Pack & Process give
6  your father any money directly for transporting
7  people; is that correct?
8      A.    They didn't give any money directly
9  to my father because my father just a subcontract
10  with David.
11      Q.    Thank you.
12          Now, did any -- before you started
13  driving the van, did anyone other than your father
14  drive the van to take workers to and from Pack &
15  Process?
16      A.    I don't know the other driver
17  because there were two or three vans at that time,
18  but -- (interruption by the court reporter.)
19          MR. DEASEY: Vans.
20          THE INTERPRETER: Two or three
21      vans. (Continuing for the witness.)
22          THE WITNESS: So I know for sure
23      that one van was driving by me.
24  BY MR. DEASEY:

Page 65

1      Q.    Did -- did you ever see any other
2  workers pay your father for transportation?
3      A.    I don't know exactly because I was
4  not involved in his business. I just working.
5      Q.    You never talked to your father
6  about how much money he was making transporting
7  people to and from work?
8      A.    When he drove the van, I was not
9  with him. I have my own family and we live
10  separately.
11      Q.    I understand. I'm asking you did
12  you ever speak with your father about his
13  arrangement for making money by driving people to
14  and from work?
15      A.    No.
16      Q.    Were you close to your father in
17  1998, 1999?
18      A.    Yes. We were close, but at the time
19  we have -- I have my own family so after work I just
20  went back to my family.
21      Q.    At some point in time did you become
22  an inspector at Pack & Process?
23      A.    Yes.
24      Q.    And were you a quality control

Page 66

1  inspector?
2      A.    Yeah.
3      Q.    When did you become a quality
4  control inspector?
5      A.    That was the accident years.
6      Q.    Did you become a quality control
7  inspector in 2001 or before?
8      A.    That was before 2001.
9      Q.    Was it in the year 2000?
10      A.    That's correct.
11      Q.    And what did you do as a quality
12  control inspector?
13      A.    I check the candy bag if they have
14  enough air. (Interruption by the court reporter.)
15          THE WITNESS: If they have enough
16      air inside or not. If the bag didn't have
17      enough air, I just asked them to put more
18      air.
19  BY MR. DEASEY:
20      Q.    When you became a quality control
21  inspector, who paid you, Pack & Process or somebody
22  else?
23      A.    Pack & Process the one who pay me.
24      Q.    Did they pay you by check?

6 (Pages 63 to 66)

Maly Yan

Page 71

1　Q.　Did you have one in 1995?
2　A.　No, I never --
3　Q.　Let me withdraw the question.
4　　　Did you first get your driver's
5　license in 1997?
6　A.　That's correct.
7　Q.　And you -- and did you have a valid
8　driver's license in 2001?
9　A.　Yes.
10　Q.　Was your driver's license ever
11　suspended or revoked between 1997 and 2001?
12　A.　No.
13　Q.　Okay. Ms. Yan, I'm going to have
14　the court reporter mark as Exhibit-1 some Answers to
15　Interrogatories.
16　　　　　- - -
17　　　(Exhibit St. Paul-1 was marked for
18　　　identification.)
19　　　　　- - -
20　BY MR. DEASEY:
21　Q.　Ms. Yan, have you -- have you seen
22　that document before today?
23　A.　No, I did not.
24　Q.　Can you take -- turn to the last

Page 72

1　page. Is that your signature?
2　　　MR. COHEN: Objection.
3　　　THE VIDEOGRAPHER: We are now going
4　off the video record. The time is 11:04.
5　　　MR. COHEN: The copy you handed me
6　ends with a signature block for attorneys
7　only. Do you have one that has a
8　verification on it?
9　　　MR. DEASEY: Sure. Let's re-mark
10　it.
11　　　　　- - -
12　　　(Exhibit St. Paul-1 was remarked for
13　　　identification.)
14　　　　　- - -
15　　　(Discussion off the record.)
16　　　　　- - -
17　　　MR. DEASEY: Let's go back on the
18　record.
19　　　All right. Let's go back on the
20　video record.
21　　　THE VIDEOGRAPHER: We are now on the
22　video record. The time is 11:05.
23　BY MR. DEASEY:
24　Q.　I'm going to hand you another

Page 73

1　Exhibit-1 which does have a verification.
2　　　MR. COHEN: This looks like a
3　different set of interrogatories. Is
4　that -- was that your intention?
5　　　MR. DEASEY: I don't know why
6　this got copied like this.
7　　　MR. COHEN: They may be the same.
8　It's just hard to tell with them separately,
9　because I don't have them in front of me.
10　The print's different on the face page.
11　　　MR. DEASEY: These are -- we're on
12　the record?
13　　　MR. COHEN: Yes.
14　　　THE VIDEOGRAPHER: Yes.
15　　　MR. DEASEY: What I handed you
16　before was the answers to a document
17　request. That's why there wasn't a
18　verification. These are the
19　interrogatories.
20　　　MR. COHEN: Okay. So this is meant
21　to be Exhibit 1? These are interrogatory
22　responses?
23　　　MR. DEASEY: Correct.
24　BY MR. DEASEY:

Page 74

1　Q.　Ms. Yan, can you tell me, is the
2　last page of that, is that your signature?
3　A.　Yes.
4　Q.　Have you ever seen this document
5　before?
6　A.　There were too many document that
7　were sent to me so I don't know exactly which one is
8　which one.
9　Q.　Well, why don't you take a minute
10　and look through it and see if you recognize any
11　portion of that document?
12　　　And while --
13　　　MR. COHEN: Wait. Do you want the
14　interpreter to read it all in her native
15　language?
16　　　MR. DEASEY: No, I want her to look
17　through it to see if she recognizes it.
18　　　MR. COHEN: Well, it's in English.
19　　　MR. DEASEY: I understand it's in
20　English. When it was presented to her, I
21　presume it was in English, too.
22　　　MR. COHEN: You haven't laid any
23　foundation for that, so I'm going to object
24　to it.

8 (Pages 71 to 74)

Maly Yan

Page 83

1  questions that had been sent to you in the Delaware
2  lawsuit?
3      A.    No.
4      Q.    Did you ever sit down, and without
5  an interpreter, with your lawyer and answer written
6  questions that had been sent to you in -- in
7  connection with this lawsuit in Delaware?
8      A.    No.
9      Q.    Do you know what an interrogatory
10  is?
11          THE INTERPRETER: Trouble. I need
12      lawyer to explain about the --
13          MR. DEASEY: Interrogatories are
14      written questions sent by one party to
15      another party.
16          THE WITNESS: No, because I don't
17      understand English.
18  BY MR. DEASEY:
19      Q.    Have you ever -- have you ever read
20  a legal document that's been translated into your
21  language --
22          MR. DEASEY: (To the interpreter)
23      Go ahead.
24  BY MR. DEASEY:

Page 84

1      Q.    -- in connection with this lawsuit?
2      A.    No, I did not.
3      Q.    Have you ever read written questions
4  that were filed in the Delaware lawsuit that had
5  been translated into your language?
6      A.    No, I have not.
7      Q.    Do you know when -- the van that
8  your father drove you to work when you first worked
9  at Pack & Process, do you know when he purchased
10  that van?
11      A.    No, I don't.
12      Q.    Do you know why your father's
13  license was suspended?
14      A.    Because my father didn't pay the
15  ticket so they suspend his driver license.
16      Q.    When was his license suspended?
17      A.    It was in the year of the accident.
18      Q.    The year of the accident, is that
19  what you said? The year of the accident?
20      A.    Yes, during that year.
21      Q.    When during that year?
22      A.    Before the accident.
23      Q.    When before the accident?
24      A.    I don't recall, but I know for sure

Page 85

1  that during that year.
2      Q.    Well, was it a day before the
3  accident?
4      A.    He didn't -- my father didn't know
5  exactly when his driver license was suspended, but
6  it seemed like they send the letter to him, but he
7  did not receive it. So he didn't know exactly when
8  the driver license was suspended.
9      Q.    When did your father stop driving
10  the van before the date of the accident?
11      A.    When he was arrested by a police
12  officer and the police officer told him that his
13  driver license was suspended.
14      Q.    How long before the accident did
15  that happen?
16      A.    It was a month.
17      Q.    Where was your father arrested a
18  month before the accident?
19      A.    When he pick up the worker.
20      Q.    When he got the what?
21          THE INTERPRETER: When he pick up
22      the worker at his house.
23  BY MR. DEASEY:
24      Q.    Okay. Was it in Pennsylvania?

Page 86

1      A.    Yes.
2      Q.    And was he picking up workers to
3  take them to Pack & Process?
4      A.    Yes.
5      Q.    And were you in the van?
6      A.    I was not at that time. At that
7  time he unload the people from his van.
8      Q.    Who drove you to work from the date
9  that your father was arrested by the police until
10  the date of the accident?
11      A.    There was someone else send from
12  David to replace my father and to drive the van for
13  one week.
14      Q.    And who was that?
15      A.    I don't know him.
16      Q.    And that was for one week?
17      A.    Yes.
18      Q.    All right. And then the next week
19  who drove the van?
20      A.    After that week that was me.
21      Q.    And did you start driving on a
22  Monday?
23      A.    Yes.
24      Q.    And drove Monday, Tuesday,

11 (Pages 83 to 86)

Maly Yan

Page 87

1    Wednesday, and Thursday?
2         A.    Yes.
3         Q.    And you had off that Friday?
4         A.    Yes.
5         Q.    And why did you drive the van that
6    first Monday that you drove everybody in to work?
7         A.    Because at that time there was no
8    other driver so David asked me to drive the van.
9         Q.    And David is David Thatch, correct?
10        A.    Yes.
11        Q.    And did David -- when David asked
12   you that, what day of the week was it?
13        A.    No, I don't recall.
14        Q.    Was it Monday morning or before
15   Monday morning?
16        A.    Okay. That was on Thursday,
17   Thursday before Monday. That was the last day of
18   the week, the workweek. David told me that he
19   didn't have any other driver, and he asked me to
20   drive the van so I told -- but I told him that I
21   could not drive the van because I was -- I was
22   working for the company. And so he told me that he
23   going to discuss this issues with Steve.
24        Q.    And other than saying that to you on

Page 88

1    Thursday, did you have any other conversation on --
2    on Thursday with David about driving the van?
3         A.    He has asked me to drive the van at
4    the lunchroom, and he told me that if Steve agree
5    that I would -- I could drive the van, I would drive
6    the van.
7         Q.    What -- where -- what lunchroom?
8         A.    In the company building.
9         Q.    At Pack & Process?
10        A.    That's correct.
11        Q.    Anybody else present when you had
12   that conversation?
13        A.    No, there was just me and David.
14        Q.    Did you ever -- did your father ever
15   give you the van? Well, let me withdraw the
16   question.
17             Did you ever take title to the van?
18        A.    What that mean exactly?
19        Q.    Own the van. Did you ever own the
20   van?
21        A.    Not before, but after my father
22   driver license was suspended, I own the van because
23   he sold that van to me.
24        Q.    How much did you pay for it?

Page 89

1         A.    I pay him $3,000.
2         Q.    Cash or check?
3         A.    Pay him monthly.
4         Q.    Monthly? By check or cash?
5         A.    Cash.
6         Q.    Did you purchase insurance for the
7    van?
8         A.    Yes, I did.
9         Q.    Who paid for the insurance?
10        A.    I did.
11        Q.    Do you remember filling out an
12   application for insurance?
13        A.    Yes.
14             - - -
15             (Exhibit St. Paul-2 was marked for
16        identification.)
17             - - -
18   BY MR. DEASEY:
19        Q.    Ms. Yan, I'm handing you a document
20   that we've marked as Yan-2. Can you take a look at
21   that document, please?
22        A.    (Witness reviews document.)
23        Q.    Does your signature appear anywhere
24   on that document?

Page 90

1         A.    Yes.
2         Q.    Where?
3         A.    Right here.
4         Q.    What page are you looking at, the
5    last page?
6         A.    Yes.
7         Q.    And --
8         A.    And the second last page.
9         Q.    Okay.
10        A.    And also the second page from the
11   first page.
12        Q.    Did you -- is any of the other
13   handwriting on this -- on this document yours?
14        A.    I know for sure that my -- the
15   signature is mine.
16        Q.    Well, look at the first page where
17   it says applicant's name. Do you see that?
18        A.    Yes.
19        Q.    Did you -- did you write in your
20   name?
21        A.    I think the -- the insurance people
22   wrote that.
23        Q.    Did you go to somebody's office to
24   get this insurance?

12 (Pages 87 to 90)

Maly Yan

Page 95

1   court reporter.)
2        THE INTERPRETER: Six hundred
3   something. (Interruption by the court
4   reporter.)
5        MR. DEASEY:  Ask her to repeat the
6   answer.
7        THE INTERPRETER:  Let me ask her
8   to repeat --
9   BY MR. DEASEY:
10    Q.   Let me withdraw the question.
11       Did you go with your father to the
12   office when he applied for Social Security benefits?
13    A.   No.
14    Q.   So you never translated for your
15   father when he was attempting to get any type of
16   benefits?
17    A.   No, because my English is not good.
18    Q.   Did you ever go with your father
19   when he attempted to get welfare?
20    A.   No.
21    Q.   So you -- did you ever translate for
22   your father when he was attempting to obtain any
23   type of welfare benefits?
24    A.   No.

Page 96

1    Q.   So if there's a note in the welfare
2   records for your father that says you translated for
3   him, that would be wrong?
4    A.   Because I never been with him.  I
5   think they have their own interpreter at that
6   place. (Interruption by the court reporter.)
7       THE INTERPRETER:  Their own -- they
8    have their own interpreter at that place.
9   BY MR. DEASEY:
10    Q.   So the answer is they'd be wrong,
11   the note would be wrong?
12    A.   Yes.
13    Q.   Did you ever apply for public
14   assistance or welfare?
15    A.   Yes.
16    Q.   Did you receive it?
17    A.   Yes, I did.  I received the food
18   stamp --
19    Q.   Are you still -- I'm sorry.
20    A.   -- and the medical assistance.
21    Q.   Are you still receiving food stamps
22   and medical assistance?
23    A.   Yes.
24    Q.   And what do you receive -- let me

Page 97

1   withdraw the question.
2       Did you go down to the Snyder
3   office?
4    A.   Yes, I did.
5    Q.   On Buttonwood Street?
6    A.   I went to the office between 10
7   Street and Spring Garden.
8    Q.   Do you recognize a doctor by the
9   name of -- I'll give it to the interpreter.
10    A.   He's my family doctor and my
11   father's family doctor.
12    Q.   Okay.  At -- at the time your father
13   sold the van to you, did he own any other cars?
14    A.   You're asking about -- you're asking
15   me or are you asking my father?
16    Q.   First your father.
17    A.   He own another car, but that car was
18   sold long time ago.
19    Q.   Did you own any cars at the time
20   your father sold you the van?
21    A.   No, did not.
22    Q.   Okay.  Have you ever received any
23   money directly from Pack & Process for transporting
24   people to and from Pack & Process?

Page 98

1    A.   I have received payment from David,
2   and David say that he received the money from the
3   company.
4    Q.   So the answer to my question would
5   be no, that you have not received money directly
6   from Pack & Process for transporting passengers; is
7   that correct?
8    A.   Yes.
9    Q.   Now, did any employee of Pack &
10   Process ever tell you that it was part of your job
11   to transport workers to and from Pack & Process?
12    A.   David and Steve who told me to do
13   that.
14    Q.   Well, David who?
15    A.   David, Sdey.
16    Q.   David Thatch?
17    A.   Yes.
18    Q.   And Steve who?
19    A.   The boss in the company.
20    Q.   Did they tell you that together or
21   in separate discussions?
22    A.   Steve told David and asked David to
23   tell me.
24    Q.   Did Steven -- does Steven, the boss,

14 (Pages 95 to 98)

Maly Yan

Page 99

1  ever tell you directly that you had to drive workers
2  to and from Pack & Process?
3      A.    No, he did not. He just told David.
4      Q.    Now, how do you know Steven told
5  David that?
6      A.    Because David told me that Steve was
7  agree to allow me to transport worker to and from
8  the company.
9      Q.    Did David tell you that in a
10  conversation or over the telephone or some other
11  means?
12      A.    Over the telephone.
13      Q.    And when did that happen?
14      A.    After I returned home.
15      Q.    Home from where?
16      A.    From working.
17      Q.    But when in relation to the
18  accident?
19      A.    I don't recall exactly, but I know
20  for sure that it was in the afternoon after I
21  finished working.
22      Q.    David -- David told you that Steve,
23  the boss, said it was okay for you to drive
24  passengers; is that what David said?

Page 100

1      A.    Yes.
2      Q.    Other than David telling you that,
3  did anyone else ever tell you that it was part of
4  your job to transport workers to and from Pack &
5  Process?
6      A.    No, just David.
7      Q.    Okay. Now, who paid for the gas in
8  the van when you were transporting workers to and
9  from work?
10      A.    Payment on the car, you mean?
11      Q.    No. Who -- who -- who paid for the
12  gas when you put gas in the van?
13      A.    Steve pay me $30 a week for gas.
14      Q.    Steve paid you -- Steve, the boss
15  man, paid you directly $30 a week for gas?
16      A.    Steve asked David to bring that
17  money to me.
18      Q.    How do you know that?
19      A.    Because David told me that Steve
20  pay -- pay me $30 for gas per week.
21      Q.    So the only -- so it's David Thatch
22  told you that Steven gave him money to give to you
23  for gas; is that correct?
24      A.    Yes.

Page 101

1      Q.    You never spoke with Steve, the
2  boss, about this directly, did you?
3      A.    No, because we never met.
4      Q.    You never received money directly
5  from Steven, the boss, for gas for the van, did you?
6      A.    No, because Steve gave that money to
7  David, and David pay me.
8      Q.    And the only reason you believe that
9  Steve gave that money to David is because that's
10  what David told you, correct?
11      A.    Yes.
12      Q.    Before the date of the accident but
13  during the period of time you were driving, did you
14  have any repairs made to the van?
15      A.    Yes, I did repair.
16      Q.    And who paid for the repairs?
17      A.    I'm the one who paid.
18      Q.    Let me show you what we'll mark as
19  three, I guess.
20              - - -
21          (Exhibit St. Paul-3 was marked for
22      identification.)
23              - - -
24  BY MR. DEASEY:

Page 102

1      Q.    I'll show you and your counsel.
2          Do you have -- is that -- do you
3  have Exhibit 3 in front of you?
4      A.    Which one?
5      Q.    The document, is that -- okay. Is
6  that your signature at the bottom?
7      A.    It is my brother's signature.
8      Q.    Okay. Do you recall your car being
9  serviced at Family Dodge in June of 2001?
10      A.    Yes.
11      Q.    And the cost was about $783?
12      A.    Yes.
13      Q.    And you paid for that?
14      A.    Yes.
15      Q.    And you were not paid any -- you
16  were not paid any money by David Thatch or Steve,
17  the boss, for this repair, were you?
18      A.    Because I'm the one responsible to
19  pay all the repair on the car.
20      Q.    I understand that. Is the answer
21  no, you did not get paid by David or Steve, the
22  boss?
23      A.    That's correct.
24      Q.    Let me show you what's -- we'll mark

15 (Pages 99 to 102)

Maly Yan

Page 103

1  as 4.
2            - - -
3            (Exhibit St. Paul-4 was marked for
4       identification.)
5            - - -
6  BY MR. DEASEY:
7       Q.    I'll show you and your counsel
8  Exhibit 4. Do you recognize the signature on
9  Exhibit 4?
10      A.    My brother's signature.
11      Q.    And do you recall having some work
12 done on the van regarding the steering?
13      A.    Yes.
14      Q.    And did you pay for the service that
15 was rendered in June of 2001 to correct the steering
16 problem?
17      A.    Yes.
18      Q.    It was about $603?
19      A.    Yes.
20      Q.    And am I -- is it true that neither
21 David Thatch nor Steve, the boss, paid you the $603
22 to have the van steering repaired; is that true?
23      A.    Yes.
24      Q.    Now, in June of 2001 you were being

Page 104

1  paid in -- in -- by -- in check -- let me withdraw
2  the question.
3            In June of 2001 you were being paid
4  by check as an inspector for Pack & Process,
5  correct?
6       A.    Yes.
7       Q.    And David paid you in cash for
8  transporting passengers, correct?
9       A.    Yes.
10      Q.    And did any of the passengers pay
11 you any money?
12      A.    No.
13      Q.    And how much did you get paid -- or
14 let me withdraw the question.
15           Were you -- were there approximately
16 anywhere from 10 to 15 people in the van during that
17 period of time?
18      A.    That's correct.
19      Q.    So you would get somewhere between
20 300 and $450 a week in cash from David to transport
21 passengers? David Thatch, I mean.
22      A.    That's correct.
23      Q.    And did David Thatch tell you what
24 route to take from Philadelphia down to Pack &

Page 105

1  Process?
2       A.    No, he did not --
3       Q.    Did anyone --
4       A.    -- because I know how to get there.
5       Q.    Did anyone from Pack & Process tell
6  you what road to take to get from Philadelphia down
7  to the Pack & Process plant?
8       A.    What you mean by asking me these
9  questions? That mean that I don't know how to get
10 there or what?
11      Q.    I just want to know if somebody from
12 Pack & Process told you which roads to take to and
13 from Pack & Process.
14      A.    No.
15      Q.    Did anyone from Pack & Process tell
16 you how many people could be in the van?
17      A.    No, no one told me about that, but
18 it depend on how many people they need.
19      Q.    I understand that. I'm asking did
20 anyone from Pack & Process tell you how many people
21 you could put in the van on any day?
22      A.    No.
23      Q.    Other than David Thatch telling you
24 that Steve told him it was okay for you to drive

Page 106

1  people to and from work, do you have any other facts
2  to support your position?
3            MR. DEASEY: Translate that.
4            THE INTERPRETER: (Complies.)
5  BY MR. DEASEY:
6       Q.    To support your position that you
7  were working for Pack & Process at the time of the
8  accident?
9            MR. COHEN: Objection.
10           THE VIDEOGRAPHER: We are now going
11 off the video record.
12           MR. COHEN: The objection is to the
13 form of the question in that it's phrased in
14 terms of a legal conclusion in asking the
15 witness to allege facts that would support a
16 legal conclusion. That's not her job in
17 this case.
18           MR. DEASEY: Let's go back on the
19 record.
20           THE VIDEOGRAPHER: We are now on the
21 video record.
22 BY MR. DEASEY:
23      Q.    I'm going to ask the question again,
24 and your attorney's objection is stated. So unless

16 (Pages 103 to 106)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ST. PAUL MERCURY INSURANCE          :
COMPANY and PACK AND                :
PROCESS, INC.                       :       Case No. 05-0022 (KAJ)
                                    :
              v.                    :
                                    :
MALY YAN                            :
.......................................................:
                                    :
YAN THOU, et al.                    :
                                    :
              v.                    :       Case No. 05-00513 (KAJ)
                                    :
PACK & PROCESS, INC., et al.        :       CONSOLIDATED CASES
                                    :
_____:

### PLAINTIFFS' OBJECTIONS TO DEFENDANTS' COUNTER
### DEISGNATIONS OF YAN THOU DEPOSITION TAKEN 9-26-03

| From Page/Line | | to Page/Line | | |
|---|---|---|---|---|
| 34 | 9 | 35 | 3 | Objection hearsay - relevancy |
| 35 | 8 | 36 | 15 | Objection hearsay – relevancy |
| 42 | 12 | 43 | 1 | Objection – relevancy, hearsay |
| 65 | 18 | 66 | 8 | Objection – hearsay |
| 69 | 10 | 69 | 20 | Objection – hearsay, relevancy |
| 70 | 4 | 71 | 17 | Objection – relevancy witness did not answer the question |
| 81 | 13 | 82 | 4 | Objection – hearsay |
| 83 | 5 | 83 | 19 | Objection – relevancy |
| 88 | 22 | 89 | 10 | Objection – relevancy, speculation |



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ST. PAUL MERCURY INSURANCE
COMPANY and PACK AND
PROCESS, INC.                                     :          Case No. 05-0022 (KAJ)

                    v.

MALY YAN
···································

YAN THOU, et al.

                    v.

PACK & PROCESS, INC., et al.                      :          Case No. 05-005 13 (KAJ)
                                                             **CONSOLIDATED CASES**

---

**DEPOSITION DESIGNATIONS- YAN THOU DEPOSITION TAKEN 9-26-03**

| From Page /Line | | to Page /Line | |
|---|---|---|---|
| 19 | 16 | 19 | 19 |
| 23 | 22 | 27 | 15 |
| 32 | 21 | 33 | 6 |
| 34 | 19 | 36 | 15 |
| 40 | 16 | 41 | 1 |
| 42 | 3 | 43 | 1 |
| 51 | 16 | 52 | 2 |
| 65 | 18 | 66 | 6 |
| 69 | 10 | 69 | 20 |
| 70 | 4 | 71 | 17 |
| 81 | 13 | 82 | 4 |

| 83 | 5 | 83 | 19 |
| 88 | 22 | 89 | 10 |

```
 1
 2              IN  THE  COURT  OF  COMMON  PLEAS
 3          PHILADELPHIA  COUNTY,  PENNSYLVANIA
 4                      -    -    -
 5    UNCHALEE  VONG              :  FEBRUARY  TERM
      LAWRENCE  VONG,  h/w        :      2003
 6    Et  al.                     :
                                  :
 7              v.                :
                                  :
 8    MALY  YAN,                  :
      Et  al.                     :  NO.  002882
 9
10
                         -    -    -
11
              Friday,  September  26,  2003
12
                         -    -    -
13
14                        Oral  deposition  of
      YAN  THOU,  taken  pursuant  to  notice,  was
15    held  at  the  law  offices  of  KLINE  &
      SPECTER,  1525  Locust  Street,  19th  Floor,
16    Philadelphia,  Pennsylvania,  commencing  at
      9:48  a.m.,  on  the  above  date,  before
17    MARIA  N.  DAMIANI,  Registered  Merit
      Reporter,  Certified  Shorthand  Reporter,
18    Notary  Public.
19                         -    -    -
20
              ESQUIRE  DEPOSITION  SERVICES
21         1880  John  F.  Kennedy  Boulevard
                      15th  Floor
22         Philadelphia,  Pennsylvania  19103
                    (215)  988-9191
23
24
```

18

1  A.  Yes.
2  Q.  And did you work there in
3  the capacity of a forklift operator?
4  A.  Okay.
5  THE INTERPRETER:  I'm
6  speaking a little -- I'm going to
7  speak Cambodian for him.
8  THE WITNESS:  Oh, forklift.
9  Uhm, I operate the forklift.
10  MR. VILLALOBOS:  Okay.
11  MR. COHEN:  Did you just say
12  you're speaking Cambodian?  Did
13  you switch languages, is that what
14  you said?
15  THE INTERPRETER:  I
16  translate forklift operator
17  license.
18  MR. COHEN:  In what
19  language?
20  THE INTERPRETER:  In
21  English, and he did not
22  understand, so I just wanted to
23  translate it to Cambodia.
24  MR. COHEN:  I want to make

19

1  sure you're sworn in both for all
2  the languages you switch him to,
3  in case you switch to all the
4  different dialects or languages,
5  so that all the testimony is
6  considered competent.
7  MR. VILLALOBOS:  Just for
8  our purposes, you're speaking
9  English and Cambodian?
10  THE INTERPRETER:  Yes.
11  MR. VILLALOBOS:  And no
12  other languages?
13  THE WITNESS:  No.
14  MR. COHEN:  Sorry for that.
15  BY MR. VILLALOBOS:
16  Q.  When did you first start
17  working for that company, sir, that
18  company being Pack & Process?
19  A.  I start in 1995.
20  Q.  Okay.  And in what capacity?
21  A.  Okay.  I wrap and pack candy
22  and operate forklift.
23  Q.  I think you said you wrap
24  and pack candy?

20

1  THE INTERPRETER:  Yes,
2  that's right.
3  MR. VILLALOBOS:  All right.
4  BY MR. VILLALOBOS:
5  Q.  All right.  Now, how was it
6  that you first started working at Pack &
7  Process?
8  THE INTERPRETER:  Can you
9  repeat?  I'm sorry.
10  BY MR. VILLALOBOS:
11  Q.  How was it that you first
12  started working at Pack & Process?
13  A.  Uhm, I do not understand.
14  Could you please rephrase?
15  Q.  Sure.  How did you first
16  learn about a job being available at Pack
17  & Process?
18  A.  When I start and then they
19  allow me to work there and I just work
20  there.
21  Q.  But how was it that a
22  gentleman living in Philadelphia came to
23  learn of and go to work at a company in
24  Delaware?

21

1  VANNAK YAN:  Can I jump in?
2  MR. VILLALOBOS:  Let me see
3  what his answer is and then we
4  will go off the record.
5  THE INTERPRETER:  Could you
6  rephrase that question because he
7  does not understand?
8  MR. VILLALOBOS:  Sure.
9  Let me try to resolve that
10  issue and then we will probably
11  use your assistance.
12  BY MR. VILLALOBOS:
13  Q.  Did somebody tell you that
14  there was a job available at Pack &
15  Process?
16  A.  Uhm, when I first arrived, I
17  was asked by someone to go to work over
18  there, and then when I work over there,
19  and then I continued to work there.
20  Q.  Okay.  And is that someone,
21  or excuse me, -- strike that.
22  Who was that someone that
23  asked you to go to work there?
24  A.  The first person by the name

22

1    of Sday, S-d-a-y.
2        Q.    Okay.  And was that
3    gentleman affiliated with a company of
4    some sort?
5        A.    Sday and the company had
6    some kind of relationship, and then when
7    they have some kind of relationship they
8    asked me to go to work, and then I
9    continue to work, and then he asked me to
10   drive people to work.
11       Q.    Okay.  This company that had
12   the relationship with Pack & Process,
13   what was the name of that company?
14       A.    I don't know.
15       Q.    Okay.  Does the name Asians
16   Plus refresh your recollection?
17       A.    I don't know how to read
18   English.
19       Q.    Okay.  Have you ever heard
20   of Asians Plus?
21       A.    I used to hear.
22       Q.    Was that the company that
23   originally brought you to work at Pack &
24   Process?

23

1        A.    Yes.
2        Q.    Okay.  Are you familiar with
3    a gentleman by the name of David Thach?
4        A.    It was his alias name.
5        Q.    I don't understand that
6    answer.
7            MR. COHEN:  Alias name.
8            MR. VILLALOBOS:  David Thach
9        was the alias name for the
10       gentleman that we're talking
11       about?
12           THE WITNESS:  Okay.  That is
13       his alias name and David Thach is
14       probably his real name.
15   BY MR. VILLALOBOS:
16       Q.    Is David Thach also known as
17   Sday Thach?
18       A.    Yes.
19       Q.    Okay.  Are you familiar with
20   a company called Point & Fortune?
21       A.    I don't know that company.
22       Q.    Okay.  Are you familiar with
23   a company called LAM Staff?
24       A.    I don't know.

24

1        Q.    Okay.  In 2001, was he still
2    working for Mr. Thach?
3        A.    Yes, I work there.
4        Q.    And in 2001, what was the
5    name of Mr. Thach's company, to your
6    knowledge?
7        A.    I don't know the name, but I
8    just know that he brought the people to
9    there.
10       Q.    Okay.  From 1995 until the
11   end of 2000, who paid you to work?
12       A.    Sday the one who pay me
13   directly.
14       Q.    Mr. Thach?
15       A.    Yes, David Thach.
16       Q.    And how much were you being
17   paid by Mr. Thach to work at Pack &
18   Process?
19       A.    Uhm, they pay me for
20   transportation $3.00 each person.
21       Q.    Okay.  I want to explore
22   that with you.
23           Were you paid by Mr. Thach
24   for operating a forklift and packing as

25

1    well as being paid to transport people to
2    and from Pack & Process?
3        A.    Yes.
4        Q.    Okay.  How much were you
5    being paid per hour for packing and for
6    operating a forklift at Pack & Process?
7        A.    I -- I was paid for $6.00
8    per hour.
9        Q.    Okay.  And did you receive
10   your money in cash or did you receive a
11   check?
12       A.    I received in cash.
13       Q.    Okay.  And did you receive
14   those monies from Mr. Thach?
15       A.    Every Monday he went to pick
16   up money from the company and then he pay
17   us.
18       Q.    Okay.  And then aside from
19   the $6.00 per hour, you were also paid
20   $3.00 per person for transporting people
21   to and from work?
22       A.    Yes.
23       Q.    And was it Mr. Thach that
24   paid you $3.00 per person to transport

26

1    people to and from work?
2        A.   Yes.
3        Q.   And was that $3.00 per
4    person per day?
5        A.   Yes.
6        Q.   Did the actual passengers in
7    the van or in the vehicle pay you any
8    money directly for transporting them?
9        A.   No.
10       Q.   Okay.  Before we get any
11   further into driving, what I would like
12   to do is ask you a little bit about the
13   vehicle.
14            From 1995 until the date of
15   the accident in 2001, was there only one
16   vehicle that you would use to transport
17   the workers or were there more than one
18   vehicle?
19       A.   Only one car.
20       Q.   Okay.  And who owned that
21   car?
22       A.   First I was the owner.
23       Q.   And then after you were the
24   owner, was someone else the owner?

27

1        A.   Maly.
2        Q.   And Maly is your daughter?
3        A.   Yes.
4        Q.   And when was it that the
5    ownership of the vehicle transferred from
6    you to Maly?
7        A.   When I got my license
8    suspended, I was told by Thach to
9    continue to drive because he may -- he
10   afraid that he may lose his customers,
11   and then the ownership was transferred in
12   1991.  Okay?
13       Q.   And this is a 1992 Dodge
14   van; is that accurate?
15       A.   Yes.
16       Q.   Okay.  Sir, did you buy --
17           MR. VILLALOBOS:  I'm sorry.
18   He was saying something else.
19           THE WITNESS:  You're talking
20   about the purchase date?  Are you
21   talking about the date I purchase,
22   I bought it?
23   BY MR. VILLALOBOS:
24       Q.   What I am asking is, is this

28

1    a vehicle that you bought or is this a
2    vehicle that you leased?
3        A.   I lease.
4        Q.   From whom did you lease the
5    vehicle?
6        A.   I borrow one of my relative
7    to buy that car -- money from one of my
8    relative to buy a car, to buy a car.
9        Q.   Just so that I am clear, did
10   you buy the vehicle or did you lease the
11   vehicle?
12       A.   Okay.  I borrow money from
13   my relatives to pick up that vehicle.
14       Q.   I understand what you're
15   saying, sir.
16           How much did you spend to
17   acquire the vehicle?
18       A.   $10,000.
19       Q.   Did Pack & Process give you
20   the $10,000 to purchase that vehicle?
21       A.   No, that company did not
22   give me.
23       Q.   Who paid for the insurance
24   on the vehicle?

29

1        A.   Myself.
2        Q.   Did Pack & Process reimburse
3    you the money to pay for the insurance?
4        A.   No.
5        Q.   If the vehicle needed
6    maintenance, who would pay for the
7    maintenance on the vehicle?
8        A.   Okay.  When the car needed
9    repair, I had to pay portion of that and
10   also Sday had to pay a portion of that.
11       Q.   And did Sday work for the
12   same company that Thach worked with?
13       A.   Sday is Thach.
14       Q.   Stay is Thach?
15       A.   Yeah.
16       Q.   Did Pack & Process ever pay
17   you or reimburse you for maintenance on
18   that vehicle?
19       A.   I do not know relationship
20   between Sday and the company.  I only
21   know that Sday do something for me when I
22   have something needs to be done.
23       Q.   Okay.  But you never
24   received any money directly from Pack &

30

1  Process to pay for maintenance on the
2  vehicle?
3      A.  Yes, I received from Sday
4  only.
5      Q.  So you only received from
6  Sday?
7      A.  Yeah.  Okay.  I do not
8  understand what process mean.  As in the
9  name of the company, that's what it is.
10     Q.  Right.
11         THE INTERPRETER:  You want
12  me to explain to him?
13         MR. VILLALOBOS:  Explain to
14  him that I am talking about the
15  company that he was working at.
16         THE INTERPRETER:  Okay.
17         THE WITNESS:  Okay.
18  BY MR. VILLALOBOS:
19     Q.  All right.  Does he
20  understand that now?
21     A.  Yes.
22     Q.  Who paid for the gasoline
23  that was used in the van?
24     A.  Uhm, myself and also Sday

31

1  paid portion of the bill.
2      Q.  Sday paid a portion of the
3  bill?
4      A.  Sday.  Sday.
5      Q.  Okay.  And are you familiar
6  with the term, and I don't know if
7  there's necessarily a translation for it,
8  but are you familiar with the term crew
9  leader?
10     A.  I do not understand.
11     Q.  Okay.  When he would
12  transport people to Pack & Process, how,
13  to his knowledge, did the people know
14  where to be and when to be for the
15  purposes of being picked up?
16     A.  I knew some of the people,
17  and also Sday, the one that who look for,
18  and then told me about where they are and
19  what time supposed to be picked up.
20     Q.  Okay.  And would all of the
21  workers who would be transported to Pack
22  & Process all be at one location for
23  pick- up in the morning?
24     A.  I have to pick up from the

32

1  end of your house.
2      Q.  From each individual house?
3      A.  Yes.
4      Q.  Okay.  From 1995 up until
5  the end of 2000, was there one particular
6  shift at Pack & Process that you were
7  assigned to?
8      A.  No, my -- okay.  I always
9  work at the first shift.  I have -- have
10  never switched to another shift.
11     Q.  Okay.  And what time did
12  that shift begin in the morning?
13     A.  Start at 6:00 and end at
14  4:30.
15     Q.  It ended at 4:30 in the
16  afternoon?
17         THE INTERPRETER:  That is
18  correct.
19         MR. VILLALOBOS:  Okay.
20  BY MR. VILLALOBOS:
21     Q.  Now, from 1995 up until the
22  end of 2000, were you the only individual
23  that drove that van for the purposes of
24  transporting workers to Pack & Process?

33

1      A.  Could you repeat, please?
2      Q.  Sure.  From 1995 until the
3  end of 2000, were you always the van
4  driver that would take the people to Pack
5  & Process?
6      A.  Yes.
7      Q.  Okay.  And when was it that
8  your license was suspended?
9      A.  2001.
10     Q.  Do you recall which month in
11  2001?
12     A.  I don't remember the date,
13  but I believe it was by the first --
14  early of the year, early of the year.
15     Q.  Toward the beginning of
16  2001?
17     A.  Approximately -- okay.
18  Approximately May of 2001, because this
19  been suspended one year and six months
20  and I receive it back in 2002.
21     Q.  Now, when your licensed was
22  suspended, did you continue to drive the
23  vehicle or did you stop driving the
24  vehicle altogether?

34

1    A.  Uhm, when my driver's
2   license was suspended, I -- I have -- I
3   told that -- I -- I told Sday that I am
4   going to stop driving and also I'm going
5   to stop working; however, Sday already
6   asked me to please do not stop, go with
7   some -- with Maly.
8       Q.  Where did you have this
9   discussion with Sday?
10      A.  I --
11          THE INTERPRETER:  I have to
12  clarify.  He said in company, in
13  the company.  I'm going to say
14  that.
15          THE WITNESS:  In the
16  company.
17          MR. VILLALOBOS:  Okay.
18  BY MR. VILLALOBOS:
19      Q.  Did the conversation take
20  place face-to-face with someone from the
21  company?
22      A.  Sday had told me that the
23  company, the Pack & Process, do not want
24  me to work -- or do not want me to stop

35

1   working, therefore, he was asking me
2   maybe I can drive it with Maly.
3       Q.  Okay.  How did Sday learn
4   that your license was suspended?
5       A.  When I asked to stop working
6   and then I told him that my driver's
7   license was suspended.
8       Q.  To your knowledge, how did
9   Pack & Process know that your license had
10  been suspended?
11      A.  Yes, because I talk about
12  that.
13      Q.  He told Pack & Process that
14  his license was suspended?
15      A.  I talked to Sday and Sday
16  talked to the company, Pack & Process.
17      Q.  Did you have any direct
18  discussions with anyone from Pack &
19  Process about your license suspension?
20      A.  Could you repeat that?
21      Q.  Sure.
22          MR. VILLALOBOS:  Actually,
23  could you read that one back?
24          (Whereupon, the pertinent

36

1   portion of the record was read by
2   the court stenographer.)
3       THE WITNESS:  I discussed
4   that with Sday in front of the
5   staff of the -- staff of the Pack
6   & Process, but I only speak
7   Cambodian, so I don't know if they
8   say something to company, but I
9   don't know if Pack & Process
10  understood.
11          MR. VILLALOBOS:  Okay.
12  BY MR. VILLALOBOS:
13      Q.  Who was present for that
14  discussion?
15      A.  The owner.
16      Q.  Mr. Steven Ames?
17      A.  I don't know the name.  I
18  never -- I don't know the name and I also
19  never -- I have never talked with him
20  because he is the owner.
21      Q.  Okay.  Could you physically
22  describe the person that you're speaking
23  of?
24      A.  You're talking about the

37

1   owner?
2       Q.  The person that was present
3   during the discussion with Mr. Thach, I
4   want to know what he looked like.
5       A.  Uhm, the owner is heavy.
6       Q.  Okay.  Heavy-set?
7       A.  Heavy-set.
8       Q.  Okay.  And where did this
9   discussion take place that you had with
10  Sday and the heavy-set gentleman?
11      A.  Inside the company.
12      Q.  Okay.  Was anyone else
13  present for that discussion or was it
14  just the three of them?
15      A.  Uhm, only the worker is
16  around there and also at that time I was
17  driving a forklift and then I stopped and
18  I told him.
19      Q.  Okay.  I understand that
20  there may have been some people in the
21  general vicinity, but did anyone else
22  participate in that discussion other than
23  the three of them?
24      A.  It's only the people who is

38

1 a big shot, two big shot.
2     Q.   Okay.  Were there more than
3 three people that participated in the
4 discussion?
5     A.   You are talking during the
6 discussion, at that discussion?
7     Q.   Correct.
8     A.   Only three people, including
9 myself.
10    Q.   Okay.  All right.  But you
11 have -- strike that.
12        Do you have any idea of what
13 this heavy-set gentleman said during that
14 discussion?
15    A.   Uhm, during that discussion
16 the -- the heavy-set, meaning the owner,
17 do not talk or speak anything.  The --
18 only Sday was talking and then I was
19 speaking Cambodian to Sday.  I do not
20 know what transpired between Sday and the
21 owner.
22        Sday say to him, to me, that
23 next time if you have something, you let
24 us know, and that we don't want you to

39

1 stop working.
2     Q.   Okay.  Now, do you recall
3 what else you said to Sday during the
4 course of that discussion?
5     A.   I only told him that the
6 reason I stop working is because my
7 driver license is suspend.
8     Q.   Did you say anything else to
9 Mr. Sday at all during the course of that
10 discussion?
11    A.   I only speak that word.
12    Q.   Okay.  What did Mr. Sday or
13 Mr. Thach say during that discussion?
14    A.   Uhm, during that discussion,
15 Sday told me that he is going to help me
16 to get the attorney to restore the -- the
17 -- the driver license, and, also, he also
18 say that he told me not to stop working
19 in the future.  He will help me.  He also
20 expressed that if you don't have any
21 means of transportation, you should come
22 with Maly.
23    Q.   How was it that Maly first
24 became a driver to Pack & Process?

40

1     A.   Sday the one who told Maly
2 to drive.
3     Q.   Okay.  And were you present
4 for that discussion between Sday and
5 Maly?
6     A.   Sday have told me about --
7 asked me to transport the title of my car
8 to Maly, and also during that discussion
9 between Sday and Maly I was not there.
10    Q.   Okay.  But do you know for a
11 fact, sir, that Sday and Maly did, in
12 fact, have a discussion regarding her
13 assuming the duties of transporting
14 workers?
15    A.   I don't know.
16    Q.   Okay.  Well, do you know,
17 sir, how it was that Maly was approached
18 to assume the driving duties, was it by
19 you or was it by Sday?
20    A.   Because -- because Maly is
21 also working for the same company.  They
22 was talking about that.  I didn't know
23 what's going on; however, I was told
24 to -- just to transfer the title, the

41

1 car, to Maly.
2     Q.   Okay.  And my question is,
3 to your knowledge, did Sday go to Maly
4 and ask Maly to drive?
5     A.   They was talking over the
6 telephone.  I don't know.
7     Q.   Who is they?
8     A.   Uhm, I don't know whether or
9 not they was talking over telephone or
10 they were talking in person about --
11    Q.   About?
12    A.   About the transfer -- about
13 the driving, they meaning Sday and Maly.
14    Q.   But, to your knowledge, was
15 there, in fact, a discussion between Sday
16 and Maly regarding her driving, whether
17 it be in person-to-person or over the
18 telephone?
19    A.   As I told you before, that I
20 don't know whether or not they -- they
21 had the talk over the telephone or in
22 person.  I don't know.
23    Q.   But, to his knowledge, there
24 was a discussion between Maly and Sday?

42

1    A.   I never -- I have never seen
2  they was talking in person.
3    Q.   That's not what I am asking.
4  I want to know whether or not he is aware
5  of a discussion between Maly and Sday
6  regardless of them speaking directly or
7  over the telephone.
8    A.   Uhm, I didn't know that Maly
9  was told to drive and that's why -- so
10  Maly is driving the car -- is driving to
11  transport people.
12    Q.   Who told her to transport
13  people?
14    A.   Sday. Sday -- okay. I
15  don't know if it answered your question.
16  Sday have told Maly to transport people
17  and then there was discussion between the
18  owner of the company and Sday.
19    Q.   Is that the discussion that
20  he told us about before or is that a
21  separate discussion?
22    A.   Okay. The -- Sday the one
23  who talked to Maly before the -- the --
24  the title was transferred, so Sday have

43

1  discussed with owner.
2    Q.   My question is, he told us
3  about a discussion that the heavy-set
4  gentleman was present for. Is the
5  conversation he's referring to now a
6  different conversation or was it the same
7  conversation?
8    A.   The only one discussion that
9  I have is when I was talking to him that
10  I stop working and then Sday told me that
11  just transfer the title to Maly.
12    Q.   Did you ever have any
13  discussions with Maly about her assuming
14  the driving responsibilities?
15    A.   I have told her that, the
16  way what should she drive -- what -- what
17  should she drive the car.
18    Q.   Okay. When did you have the
19  discussion with Maly about Maly driving
20  the van?
21    A.   Uhm, I told her that
22  whenever she drives, she has to be very,
23  very careful when she come to my house.
24    Q.   Okay. When did the

44

1  discussion take place between you and
2  Maly?
3    A.   Okay. At night after we got
4  home from work, we all -- I always tell
5  her that.
6    Q.   Okay. And, well, did you
7  ever have a discussion with Maly in which
8  you asked her to drive?
9    A.   I never asked her.
10    Q.   Okay. Okay. Now --
11    MR. COHEN:  Can we take a
12  break?
13    MR. VILLALOBOS:  Yeah. We
14  are going to take a five-minute
15  break.
16    (Whereupon, there was a
17  recess held at this time, 10:51 to
18  11:14 a.m.)
19    (Whereupon, the pertinent
20  portion of the record was read by
21  the court stenographer.)
22  BY MR. VILLALOBOS:
23    Q.   Do you recall the date when
24  Maly first started driving the van to

45

1  Pack & Process?
2    A.   May, 2001.
3    Q.   From that point, did Maly
4  drive the van to Pack & Process every
5  morning up until the time of the
6  accident?
7    A.   Yes.
8    Q.   Okay. And was there anyone
9  else between May of 2001 and the date of
10  the accident in June of 2001 who would
11  drive the van from Philadelphia to
12  Wilmington in the morning?
13    A.   There -- there is someone
14  else.
15    Q.   And who is that someone
16  else?
17    A.   Uhm, that person live down
18  in North Philadelphia and that person, I
19  only know the name by the name of Siem,
20  S-i-e-m, to the best of interpreter's
21  knowledge.
22    Q.   Okay. Why is it that Siem,
23  I assume it's Mr. Siem, why is it that
24  Mr. Siem would drive on occasion in --

50

1      A.   Yeah.
2      Q.   Okay.  Who paid Maly to
3   drive or to transport people in that van
4   in May and June of 2001?
5      A.   Sday.
6           You're talking about a car?
7      Q.   Yes.
8      A.   Sday.
9      Q.   Okay.  And that would be the
10   $3.00 per person per day?
11      A.   Yes.
12      Q.   Okay.  Sir, are you aware of
13   any other discussions that -- strike
14   that.
15           Did you participate in any
16   other discussions with anyone at Pack &
17   Process regarding Maly driving the van
18   instead of you driving the van?
19      A.   No, I don't know.
20      Q.   Okay.  And other than what
21   you have already told us, are you aware
22   of any other discussions between Maly and
23   Sday regarding her driving the van?
24      A.   Uhm, is not my duty, so I

51

1   don't know.
2      Q.   Okay.  Are you aware of any
3   discussions between Maly and any of the
4   Pack & Process management regarding her
5   driving the van?
6      A.   No.
7      Q.   Okay.
8      A.   I only stopped working.
9      Q.   I don't understand that.
10      A.   I only stopped working.  Oh,
11   I -- I stopped driving.
12           THE INTERPRETER:  That's
13   what he said.
14           MR. VILLALOBOS:  Okay.
15   BY MR. VILLALOBOS:
16      Q.   When you were the driver of
17   the van before May of 2001, were you ever
18   reimbursed by Pack & Process for the gas
19   that was used in the van?
20      A.   Uhm, he only gave me the
21   money that I work in the company and also
22   the money that I drive people to work
23   with.
24      Q.   And the person that gave you

52

1   that money would be Sday?
2      A.   Yeah.
3      Q.   Okay.  Let me just look
4   through my notes for a moment.
5           When you would work at Pack
6   & Process, when you would arrive there,
7   was there a clock that you had to punch
8   in?
9      A.   No.
10      Q.   Okay.  Were you aware of any
11   of the other Pack & Process employees
12   utilizing a time clock punch?
13      A.   Could you repeat the
14   question, again?
15      Q.   Sure.  Are you familiar with
16   the time clock?
17      A.   Okay, because all the people
18   who receive cash do not have to punch a
19   punch clock.
20      Q.   Okay.  Now, the people who
21   received a check from Pack & Process, did
22   they have to punch a time clock?
23      A.   Yeah, including Maly.
24      Q.   Okay.  And would Maly punch

53

1   in at the beginning of her shift and then
2   punch out at the end of her shift?
3      A.   I don't know how many time
4   that Maly had to punch the card, but I
5   only know that when she got to the
6   company she had to punch one and also at
7   the time -- at the end time she had to
8   punch another one.
9      Q.   Did the accident on June 18
10   occur after Maly would have punched her
11   card out at the end of her shift?
12      A.   Before June 19 -- she
13   punched before the June 19th.
14      Q.   Okay.  My question is, at
15   the end of the shift on June 18th, would
16   Maly have punched out on the clock?
17      A.   Yeah, she always punch the
18   card.
19      Q.   And would the accident have
20   occurred after her punching out at the
21   end of the shift?
22      A.   Yes.
23      Q.   Okay.  And when you did work
24   at Pack & Process, was the work always

62

1    Q.    When you described the man
2  named Bob, were you describing somebody
3  who was a different person than the
4  person you had a conversation with at
5  Pack & Process about Maly driving your
6  van?
7    A.    It -- it is -- it is
8  different person, because Bob is now
9  retired and that he was retired prior to
10  the accident took place.
11    Q.    I want to ask you some more
12  questions about the conversation you had
13  with the man about Maly driving your car.
14        You told us that you spoke
15  to David, also known as Sday; is that
16  correct?
17    A.    Yes.
18    Q.    When you were speaking to
19  him, there was another man from Pack &
20  Process standing there with you; correct?
21    A.    Could you repeat the
22  question, please?
23    Q.    Yes. When you were speaking
24  to that man, David, or Sday, there was

63

1  another man from Pack & Process standing
2  there?
3    A.    Yes.
4    Q.    Was this conversation on the
5  floor of the factory?
6    A.    Uhm, I -- I just want to
7  reiterate that your question was kind of
8  confusing to me because I don't know
9  which -- which time period you're talking
10  about.
11    Q.    I will clarify.
12        When you lost your license
13  to drive, you had a conversation at the
14  factory about Maly taking over your
15  driving?
16    A.    Yes.
17    Q.    That's the time I'm talking
18  about.
19    A.    Yes.
20    Q.    Was that conversation held
21  between you and David with the third man
22  there while you were all three of you on
23  the floor of the factory?
24    A.    It's in the company. We was

64

1  talking in the company.
2    Q.    I understand. Where
3  specifically in the company were you?
4    A.    At the floor next to the --
5  my station.
6    Q.    Where the candy gets
7  packaged; correct?
8    A.    Yes, because I saw Sday was
9  talking to the owner and then I only
10  speak Cambodian to Sday.
11    Q.    Did Sday speak English?
12    A.    Uhm, Sday speak Cambodian to
13  me.
14    Q.    Do you know if he spoke in
15  English to the other man?
16    A.    I -- I heard he spoke
17  English to that man, but I didn't know
18  what he was talking about.
19    Q.    I understand, and that is
20  because you do not speak English;
21  correct?
22    A.    Yes.
23    Q.    Was David, also known as
24  Sday, translating for you like the

65

1  interpreter is translating for us here
2  today?
3    A.    Uhm, he didn't tell me what
4  he was talking about and I don't know
5  what he was talking about.
6    Q.    So you can't tell if he was
7  translating accurately; correct?
8    A.    No, I don't know.
9    Q.    Did David listen to you for
10  a little bit and then turn to the other
11  man and speak in English?
12    A.    I -- he only -- he told me
13  when I got home, he's saying that --
14  okay, the company do not -- the owner do
15  not want me to stop working, and then
16  because -- and then I don't know what's
17  going on, what he said to the company.
18    Q.    Did David tell you that the
19  owner of Pack & Process wanted Maly to
20  drive your van?
21    A.    I don't know what the
22  discussion all about because I only know
23  what David have told me.
24    Q.    What did David tell you?

66

1   A.  I -- he told me that the
2  company, they don't want me to stop
3  working and then he's saying the company
4  does not want me to stop working, too,
5  and then he's saying that the company
6  want some -- want Maly to drive.
7      Q.  When you say "company that
8  wants Maly to drive," right --
9      VANNAK YAN:  Can I repeat
10    what my dad said.
11     My dad said the owner -- the
12    boss told Sday that they can't
13    afford my dad to quit, they want
14    the title to switch to Maly so
15    that Maly could drive and my dad
16    could take a ride with Maly to go
17    to work at the same time so they
18    could both work at a same place so
19    no one quits.
20    MR. COHEN:  Okay.
21  BY MR. COHEN:
22     Q.  Did you believe that these
23  instructions were coming from the owner
24  of Pack & Process?

67

1      THE INTERPRETER:  He didn't
2   understand so can you repeat the
3   question again?
4      MR. COHEN:  You told me --
5      MR. COSTIGAN:  I will
6   interject.  I think his son said
7   something, but that was -- what
8   his son said was not translated to
9   him, and I think the question
10    assumed that it was.
11    MR. COHEN:  No, it didn't.
12    MR. COSTIGAN:  Okay.  All
13    right.
14  BY MR. COHEN:
15     Q.  You told me that the company
16  did not want you to quit and they wanted
17  Maly to drive.  When you said "company,"
18  did you mean Pack & Process?
19     A.  Yeah.
20     Q.  And did you believe that
21  these instructions about having Maly
22  drive for you came from the owner of Pack
23  & Process than through David to you?
24     MR. VILLALOBOS:  Before you

68

1   answer, I'm just going to object
2  to the word instruction, but go
3  ahead.
4      THE WITNESS:  Yeah.
5      MR. COHEN:  Okay.  Hold on a
6   second.  Give me just a minute.
7  BY MR. COHEN:
8      Q.  Okay.  Is it true that
9  before Maly had the car you had the title
10  to the car?
11     A.  Yes.
12     Q.  Okay.  And you understand
13  when I said car, I mean the van?
14     A.  Yes.
15     Q.  How did you know to switch
16  the title to Maly?
17     A.  Can you repeat the question
18  again?
19     Q.  Yes.  How did you know you
20  were supposed to switch the title from
21  your name to Maly's name?
22     A.  I have gone to the place
23  that I don't remember to transfer the
24  title to Maly.

69

1      Q.  How did you know you were
2  supposed to switch the title to Maly to
3  begin with?
4      A.  Sday told me that.
5      Q.  Who is they?
6      A.  Sday.
7      Q.  That's the man who is also
8  named as David; correct?
9      A.  Yes.
10     Q.  Okay.  Did you have an
11  understanding that David was telling you
12  to do that because the owner of Pack &
13  Process or somebody at Pack & Process
14  wanted David to tell you that?
15     A.  Sday told me that, just
16  transfer title to Maly.
17     Q.  Did you believe he told you
18  that because the owner wanted him to tell
19  you that?
20     A.  Yes.
21     Q.  There were some people like
22  Maly who worked for Pack & Process
23  directly; correct?
24     A.  That story, I don't know.

18 (Pages 66 to 69)

70

1    Q.   Okay.  Do you know if Maly
2  Yan was an employee of Pack & Process?
3    A.   I do not understand.
4    Q.   Okay.  Do you know if she
5  worked at Pack & Process and was paid by
6  Pack & Process for her work directly by
7  Pack & Process?
8         THE INTERPRETER:  Can I ask
9  you --
10        MR. COHEN:  Yes.
11        THE INTERPRETER:  When you
12 say "she," do you know who you're
13 talking about?
14        MR. COHEN:  When I say what?
15        THE INTERPRETER:  When you
16 say "she," what do you mean?
17        MR. COHEN:  She, Maly.
18        THE INTERPRETER:  Oh, Maly.
19 Okay.
20        THE WITNESS:  Yeah.
21 BY MR. COHEN:
22    Q.   But she also received money
23 for driving the van; correct?
24    A.   Yes.

71

1    Q.   How much money?
2    A.   $3.00 each person.
3    Q.   That was the same amount
4  that you used to earn when you drove the
5  van; correct?
6    A.   Yeah, the same, because for
7  the transportation fee.
8    Q.   Did that money originally
9  come from Pack & Process?
10   A.   Uhm, from that -- Sday the
11 one who pay those -- the money.
12   Q.   And he paid with money that
13 he got from somebody at Pack & Process;
14 correct?
15        MR. VILLALOBOS:  Object to
16 form.
17        THE WITNESS:  Yes.
18 BY MR. COHEN:
19   Q.   Do you know how the money
20 went from Pack & Process to David for the
21 payment for driving?
22   A.   Could you repeat the
23 question?
24   Q.   Yes.  You told me that the

72

1  money that was used to pay Maly for
2  driving the van originally came from Pack
3  & Process; correct?
4         MR. VILLALOBOS:  Same
5  objection.
6         THE WITNESS:  Yes.
7  BY MR. COHEN:
8    Q.   Who did it come from at Pack
9  & Process?
10   A.   If you asked me that
11 question, what money coming from the
12 company, I don't know who gave me -- give
13 him the money.
14   Q.   Okay.  Do you know if David
15 got that money in cash or in a check?
16   A.   I don't know, because it's
17 not my business, so it's his business.  I
18 only got what I got, and I don't know
19 what happened -- what going on with that
20 -- with David.
21        VANNAK YAN:  Can I repeat
22 what my dad just said?
23        MR. COHEN:  Yes.
24        VANNAK YAN:  My dad said

73

1  that --
2         MR. VILLALOBOS:  Can we do
3  this off the record, though
4  because, he's not sworn?
5         (Whereupon, there was a
6  discussion held off the record at
7  this time.)
8         MR. COHEN:  Fine.
9         (Whereupon, the pertinent
10 portion of the record was read by
11 the court stenographer.)
12        THE INTERPRETER:  I stand
13 corrected.  I mean, I stand that
14 my interpretation is correct.
15        MR. COHEN:  I don't want you
16 to respond to that.
17        I want to have the court
18 reporter read back the question
19 and have you retranslate it to the
20 witness and have the witness
21 re-answer it.
22        THE INTERPRETER:  Okay.
23 Repeat the question.
24        (Whereupon, the pertinent

78

```
 1   BY MR. VILLALOBOS:
 2       Q.   Do you remember a few
 3   moments ago you testified that it was
 4   your understanding that someone at Pack &
 5   Process wanted the van to be transferred
 6   from your name to Maly's name?
 7       A.   Sday the one who told me.
 8       Q.   Okay.  You testified that it
 9   was your belief that it was Pack &
10   Process that wanted that transfer to take
11   place.  Why do you believe that?
12       A.   Uhm, Sday have told me to
13   change -- to transfer the title and I --
14   it is my understanding that when I told
15   -- when I talk to Sday, Sday had talked
16   to -- and then the -- and then all of us
17   in the company, so it's my understanding
18   the company probably know what's going on
19   and then so Sday told me to change the
20   title.
21       MR. VILLALOBOS:  Let's go
22   off the record for a second.
23       MR. SIEGEL:  Sday was in the
24   company?
```

79

```
 1       THE INTERPRETER:  Yes.
 2       MR. SIEGEL:  With the owner
 3   at the time; is that what you were
 4   trying to translate?
 5       MR. VILLALOBOS:  Let's go
 6   off the record for a second
 7   because I think the son wants to
 8   say something.
 9       (Whereupon, there was a
10   discussion held off the record at
11   this time.)
12       MR. VILLALOBOS:  During the
13   last exchange, during the last
14   question and answer, the
15   deponent's son had indicated that
16   he believed that perhaps there was
17   a misinterpretation or
18   mistranslation.
19       We then went off the record
20   and a brief discussion took place
21   amongst counsel, the interpreter,
22   and the deponent, as well as the
23   son, and as a consequence of that
24   conversation off the record, we
```

80

```
 1   are now going to have the question
 2   read back to the deponent and then
 3   await a response to that question.
 4       (Whereupon, the pertinent
 5   portion of the record was read by
 6   the court stenographer.)
 7       MR. CIESLIK:  In addition, I
 8   think that the witness should make
 9   it clear when he's giving his
10   answer if he's correcting his
11   previous answer or if he's just
12   stating his answer so we know
13   what's happening.
14       MR. COHEN:  How will he know
15   if he's correcting his answer
16   because he doesn't know the answer
17   we all heard because he doesn't
18   understand English?
19       MR. CIESLIK:  Right.
20       MR. COHEN:  So that's silly.
21   Let's just do what Rafael said.
22       MR. CIESLIK:  Okay.
23       MR. VILLALOBOS:  I would
24   like you to now interpret that
```

81

```
 1   last question to the deponent.
 2   Okay?
 3       THE INTERPRETER:  Okay.
 4       THE WITNESS:  Because --
 5   okay.  I have to -- I have to
 6   listen to Sday because Sday the
 7   one who pay me and Sday told me
 8   about that.
 9       MR. VILLALOBOS:  Okay.
10   BY MR. VILLALOBOS:
11       Q.   What do you believe --
12   strike that.
13       What is the basis for your
14   understanding that Pack & Process wanted
15   the vehicle to be transferred from your
16   name to Maly's name -- and there's going
17   to be more to this question, but
18   translate that part.
19       THE INTERPRETER:  Okay?
20   BY MR. VILLALOBOS:
21       Q.   -- did Sday say that to you
22   specifically or is that something that
23   you assumed to be the case?
24       A.   Sday have told me that the
```

82

1  company -- that Pack & Process told him
2  to tell me that just to transfer title
3  from my name to Maly's name and then just
4  -- just go to work, do not stop working.
5      Q.   Did Sday tell you who at
6  Pack & Process told that to Sday?
7          THE INTERPRETER:  Can you
8  repeat?  I'm sorry.
9          MR. VILLALOBOS:  Sure.
10  BY MR. VILLALOBOS:
11      Q.   Did Sday say who it was at
12  Pack & Process that instructed him or
13  told him to tell you that the vehicle
14  should be transferred from one name to
15  another name?
16      A.   I don't know.  I only know
17  they told me.
18      Q.   Okay.  I have another
19  question about one other issue and then I
20  have nothing further.
21          You testified a few moments
22  ago that the $3.00 transportation fee
23  originally came from Pack & Process.  Why
24  do you say that?

83

1      A.   Because they the one who
2  took money from there.
3      Q.   Does -- do you know --
4  strike that.
5          Have you ever seen an
6  invoice from Sday to Pack & Process?
7      A.   I have never seen the
8  invoice; however, but it was Sday who
9  took the money from the company and then
10  he -- he pay me.
11      Q.   But you don't know through
12  your own independent knowledge that a
13  portion of those monies were for purposes
14  of paying the $3.00 transportation fee,
15  do you?
16      A.   I only know that I -- I get
17  $3.00.  I -- whenever he met me, he said
18  that I am going to go get money and pay
19  you.
20      Q.   Okay.  But you don't know --
21  strike that.
22          Do you have knowledge that
23  Pack & Process transferred monies to Sday
24  specifically for purposes of paying the

84

1  $3.00 per person per day transportation
2  fee?  Do you know for a fact whether or
3  not that's the case?
4          MR. COHEN:  We missed the
5  answer.
6          MR. VILLALOBOS:  Yeah, well,
7  strike the last question and let's
8  get an answer to that question.
9          Go ahead.
10          MR. SIEGEL:  Why don't you
11  just ask the court reporter to
12  read back exactly which question
13  you want.
14          MR. VILLALOBOS:  Yeah.
15          MR. SIEGEL:  Let me just
16  place an objection on the record
17  at this point that that's been
18  asked and answered about three
19  times.
20          MR. COHEN:  I join in the
21  objection, but you should answer.
22          (Whereupon, the pertinent
23  portion of the record was read by
24  the court stenographer.)

85

1          THE WITNESS:  I only know
2  that Sday went to take the money
3  from the company.
4          MR. VILLALOBOS:  Okay.
5  That's fine.
6          I don't have any further
7  questions for this witness.  Does
8  anyone else?
9          MR. SIEGEL:  One quick one.
10          MR. VILLALOBOS:  Sure.
11          MR. COHEN:  Sure.
12          - - -
13          EXAMINATION
14          - - -
15  BY MR. SIEGEL:
16      Q.   When you were told to
17  transfer the title to Maly by Sday, that
18  was in the presence of the owner of the
19  company of Pack & Process; correct?
20          MR. VILLALOBOS:  Objection
21  to the form.
22          THE WITNESS:  No, they
23  didn't see.  They didn't see.
24          VANNAK YAN:  Repeat the

**Page 86**

1 question. The translator
2 misunderstood.
3      THE INTERPRETER: I will
4 translate again if you --
5      MR. SIEGEL: Let me ask the
6 question again. I don't believe
7 that -- I don't believe that it
8 was understood by the witness.
9      MR. CIESLIK: Maybe she can
10 read it back again and translate
11 it again or if you want to try and
12 rephrase it.
13      MR. SIEGEL: Let me try and
14 rephrase it.
15 BY MR. SIEGEL:
16   Q.   You have testified before
17 that when Sday told you to transfer the
18 title to Maly, that was in the presence
19 -- well, strike that, that the president
20 of the company of Pack & Process, the
21 owner, was there talking to Sday at that
22 time.
23      MR. VILLALOBOS: Objection.
24      THE INTERPRETER: I need you

**Page 87**

1 to interpret -- I need you to
2 rephrase that.
3      MR. SIEGEL: I will rephrase
4 the whole question. Strike that
5 question and let me rephrase it.
6 BY MR. SIEGEL:
7   Q.   When you were told to
8 transfer the title of the vehicle to
9 Maly, you had previously testified that
10 the owner of the company was with you at
11 the time.
12      MR. SIEGEL: Translate the
13 question, but there's a little bit
14 more to the question.
15      And that the --
16      THE INTERPRETER: I don't
17 think he understands yet. He
18 didn't answer that.
19      VANNAK YAN: I don't think
20 he understands it.
21      MR. SIEGEL: He didn't
22 understand the question?
23      MR. COHEN: How do you know
24 that? He didn't say anything.

**Page 88**

1      THE INTERPRETER: Because he
2 just said -- he didn't say
3 anything.
4      MR. COHEN: Did he just
5 whisper to you?
6      THE INTERPRETER: No, sir.
7      MR. COHEN: Are you going by
8 his body language that he doesn't
9 understand?
10      THE INTERPRETER: Yes.
11      MR. COHEN: Well, that's
12 reasonable. I didn't see body
13 language, but all right.
14      MR. SIEGEL: I will do it
15 again.
16      MR. COHEN: Try one more
17 time I guess.
18      MR. SIEGEL: Translate in
19 portions for me.
20      THE INTERPRETER: Okay.
21 BY MR. SIEGEL:
22   Q.   Previously you had testified
23 that there was a conversation at Pack &
24 Process where Sday was present, you were

**Page 89**

1 present, and the owner was present; is
2 that correct?
3   A.   Yes.
4   Q.   And at that meeting, Sday,
5 in discussing with the owner of the
6 company, came to the conclusion that you
7 should transfer your title of your
8 vehicle to Maly; is that correct?
9      MR. VILLALOBOS: Objection.
10      THE WITNESS: Okay.
11      VANNAK YAN: Talk slowly.
12      THE INTERPRETER: Okay. He
13 is trying to say that --
14      MR. COHEN: Can we take a
15 break for two seconds?
16      MR. SIEGEL: Obviously, the
17 questioning is not clear so let me
18 strike that question and then we
19 will rephrase.
20      MR. COHEN: Let me get the
21 lunch orders in because this one
22 question will take a long time.
23      (Whereupon, there was a
24 recess held at this time, 12:43 to

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ST. PAUL MERCURY INSURANCE     :
COMPANY and PACK AND          :
PROCESS, INC.                    :     Case No. 05-0022 (KAJ)
                               :
          v.                    :
                               :
MALY YAN                        :
..................................................................
                               :
YAN THOU, et al.                :
                               :
          v.                    :     Case No. 05-00513 (KAJ)
                               :
PACK & PROCESS, INC., et al.      :     CONSOLIDATED CASES
                               :

## PLAINTIFFS' OBJECTIONS TO DEFENDANTS' COUNTER
## DEISGNATIONS OF YAN THOU DEPOSITION TAKEN 6-5-06

| **From Page/Line** | | **to Page/Line** | | |
|---|---|---|---|---|
| 25 | 13 | 25 | 21 | Objection – hearsay, relevancy |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ST. PAUL MERCURY INSURANCE
COMPANY and PACK AND
PROCESS, INC.                                    :        Case No. 05-0022 (KAJ)

        v.

MALY YAN
********************************

YAN THOU, et al.

        v.

PACK & PROCESS, INC., et al.                     :        Case No. 05-005 13 (KAJ)
                                                          **CONSOLIDATED CASES**

---

### DEPOSITION DESIGNATIONS - YAN THOU DEPOSITION TAKEN 6-5-06

| From Page /Line | | to Page /Line | |
|---|---|---|---|
| 18 | 1 | 18 | 19 |
| 19 | 14 | 20 | 17 |
| 22 | 20 | 25 | 21 |
| 28 | 2 | 28 | 13 |
| 36 | 1 | 37 | 3 |

CONDENSED COPY

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
    ST. PAUL MERCURY INS. CO.  : CASE NO. 05-0022 (KAJ)
 4           and                :
    PACK & PROCESS, INC.        :
 5                              :
 6              vs              :
                                :
 7  MALY YAN                    :
    _____
 8  YAN THOU, et al.           : CASE NO. 05-00513 (KAJ)
                                :
 9              vs              :
                                :
10  PACK & PROCESS, INC., et al:
11                       - - -
12                 MONDAY, JUNE 5, 2006
                         - - -
13
14              Videotape deposition of YAN THOU,
15  taken at the law offices of DEASEY, MAHONEY &
16  BENDER, LTD., 1800 John F. Kennedy Boulevard, Suite
17  1300, Philadelphia, Pennsylvania, on the above date,
18  beginning at 1:46 p.m., before Susan Lauer, Court
19  Reporter-Notary Public, there being present.
20                       - - -
21
22              LOVE COURT REPORTING, INC.
                  1500 MARKET STREET
23              12TH FLOOR, EAST TOWER
            PHILADELPHIA, PENNSYLVANIA  19102
24                  (215) 568-5599
```

Yan Thou

Page 18

1   Q.   Okay. Who gave you your checks?
2   A.   To me?
3   Q.   Who gave you -- did you ever get
4   paid by a check at this company in Delaware?
5   A.   No.
6   Q.   Always in cash?
7   A.   Yes.
8   Q.   Always from David Thatch?
9   A.   Yes.
10  Q.   How much did David Thatch give you a
11  week?
12       THE INTERPRETER: Interpreter just
13  want to mention that he want to -- he want
14  me to speak loudly.
15       MR. DEASEY: Louder?
16       THE INTERPRETER: Yeah.
17       MR. DEASEY: Okay. That's all
18  right.
19       THE INTERPRETER: Could you repeat
20  that question again?
21  BY MR. DEASEY:
22  Q.   How much did David -- I guess I
23  don't have to speak loud for you.
24       How much did David Thatch pay you a

Page 19

1   week?
2   A.   It depend. Depend on the hours. I
3   got paid like $6 an hour.
4   Q.   Did you file tax returns?
5   A.   No, that was cash.
6   Q.   No, no. Did you file tax returns
7   with the government?
8   A.   No.
9   Q.   In 2001 did -- let me withdraw the
10  question.
11       How did you get to work in 1995?
12  A.   Could you repeat that question
13  again?
14  Q.   How did you get to work? Well, let
15  me withdraw the question.
16       Were you living in Philadelphia in
17  1995?
18  A.   Yes.
19  Q.   Were you working in Delaware?
20  A.   Yes.
21  Q.   How did you get back and forth from
22  work?
23  A.   By car.
24  Q.   Who drove?

Page 20

1   A.   I drove by myself at that time.
2   Q.   Did -- were -- did you drive any
3   other workers back and forth from work in 1995?
4   A.   Yes.
5   Q.   Did you charge -- did those workers,
6   other workers pay you to drive them to and from
7   work?
8   A.   No, they did not pay us. They paid
9   me.
10  Q.   Who paid you to drive workers to and
11  from work?
12  A.   Sdey.
13  Q.   David Thatch?
14  A.   Yes.
15  Q.   How much did David Thatch pay you to
16  drive people to and from work?
17  A.   Six dollars for each person.
18  Q.   Did -- does -- does Stanley speak --
19  let me withdraw the question.
20       What is your native language?
21  A.   Cambodian.
22  Q.   Does Stanley speak Cambodian?
23  A.   Yes.
24  Q.   Stanley speaks Cambodian?

Page 21

1   A.   No, no, no.
2   Q.   Did anybody -- well, let me withdraw
3   the question.
4       Before 1995 where -- did you work
5   somewhere?
6   A.   Yes, I did, yes.
7   Q.   Where did you work?
8   A.   Just collect the fruit.
9   Q.   Collecting -- say that again.
10  Collecting fruit?
11  A.   Pick the fruit. Pick the fruit from
12  the farm.
13  Q.   Where -- what farm?
14  A.   I pick the fruit, the blueberry in
15  the farm, and then I met Sdey, and Sdey told me
16  about the job.
17  Q.   Where was the farm located, what
18  state?
19  A.   That's a public farm in -- near the
20  Route 42.
21  Q.   In New Jersey?
22  A.   Yes.
23  Q.   And how did you get back and forth
24  from Philadelphia to New Jersey when you worked on

6 (Pages 18 to 21)

Yan Thou

Page 22

1   the farm?
2       A.    I rode a car with someone else.
3       Q.    Did -- did you pay that person to
4   get a ride back and forth from work?
5       A.    No.
6       Q.    What shift did you work at this
7   company in Delaware?
8       A.    First shift.
9       Q.    First shift?
10      A.    Yes.
11      Q.    During the day?
12      A.    Yes.
13      Q.    Did you ever work second shift?
14      A.    No.
15      Q.    And when you started working at the
16  company in Delaware, did you have the Dodge van?
17      A.    I don't hear clearly.
18      Q.    Well --
19      A.    Repeat that question.
20      Q.    What -- what car did you -- did you
21  sell to your daughter?
22      A.    A Ram.  A Ram.
23      Q.    A Ram van?
24      A.    Yes.

Page 23

1       Q.    Were you driving that van in 1995?
2       A.    Yes.
3       Q.    And did you drive that van
4   continuously up until you sold it to your daughter?
5           MR. DEASEY:  Do you want me to
6   repeat it?
7           THE INTERPRETER:  I think, yeah.
8           MR. DEASEY:  Okay.
9   BY MR. DEASEY:
10      Q.    Did you drive that van to work every
11  day between 1995 and the time you sold it to your
12  daughter?
13      A.    Yes.
14      Q.    And during that period of time did
15  David Thatch pay you to transport people to and from
16  work?
17      A.    Yes.
18      Q.    Did -- and when did you transfer the
19  van -- excuse me.  When did you sell the van to your
20  daughter?
21      A.    I don't recall exactly.
22      Q.    What year?
23      A.    Probably 2006.
24      Q.    2006?

Page 24

1       A.    2001, sorry.
2       Q.    That's all right.  Why did you sell
3   it to your daughter?
4       A.    Because I was not able to drive the
5   car anymore at that time, because I don't speak
6   English and I don't know why my driver license was
7   suspended.  So I told David that I could not drive
8   anymore, and so David asked Maly to replace me.
9       Q.    Is -- is this David Thatch who told
10  Maly to replace you -- Maly to replace you?
11      A.    Yes.  David told me that he going to
12  ask Maly to drive the van, and then he going to pay
13  her.
14      Q.    Did anyone that -- from the company
15  that you were working for in Delaware tell you to
16  sell the van to Maly?
17      A.    Can you repeat that question again,
18  please?  I cannot hear well.
19          MR. DEASEY:  Okay.  Well, it's your
20  translation that he has to hear, not my
21  question.
22  BY MR. DEASEY:
23      Q.    Did anyone from the company in
24  Delaware tell you to sell the van to Maly Yan?

Page 25

1       A.    That was Sdey because everything I
2   have, I had to talk to him, and he's the only one
3   person at that time to, you know, to run everything.
4       Q.    Do you know who Sdey, or David
5   Thatch, his American name, who he worked for?
6       A.    I didn't see him working, but at the
7   end of the week he -- he pay me.
8       Q.    Okay.  So you do not know who David
9   Thatch worked for, do you?
10      A.    I don't know exactly, but the only
11  thing I know, that he went to the company and got
12  the money and pay it to me.
13      Q.    Did you ever see David Thatch get
14  any money from the company?
15      A.    I didn't see it exactly, but I -- I
16  know for sure that he got a check from the company
17  and he cash that check and he then pay me cash.
18      Q.    And how do you know that?
19      A.    Most of the time he show me the
20  check that he got from the company, and then he told
21  me he going to cash that check and give me the cash.
22      Q.    Did you ever get paid anything
23  directly by the company, any money?
24      A.    No.

Love Court Reporting, Inc.

Yan Thou

Page 26

1    Q.    And the entire time -- well, let me
2  withdraw that.
3        From 1995 until the day of the
4  accident any money you got paid while working at the
5  company in Delaware came from David Thatch; is that
6  correct?
7        MR. COHEN: Objection.
8        THE VIDEOGRAPHER: We are now going
9  off the record. The time is 2:24.
10       MR. COHEN: Objected to on the basis
11  it's been asked and answered in substance.
12  The use of the word came from is ambiguous
13  and vague and suggests either origin or last
14  possessor, and it's unclear as to what you
15  mean by that question.
16       THE VIDEOGRAPHER: We are now on the
17  video record. The time is 2:25.
18  BY MR. DEASEY:
19       Q.    Mr. Thou, the only money you
20  received while working at the company in Delaware
21  was handed to you by David Thatch; is that correct?
22       A.    Yes.
23       Q.    Do you know why your license was
24  suspended?

Page 27

1        A.    No, I don't. When I was aware of
2  that suspension, I was told that I didn't pay my
3  ticket, and I didn't know what kind of ticket I have
4  to pay.
5        Q.    Do you have a license today?
6        A.    Now?
7        Q.    Yes.
8        A.    No.
9        Q.    Have you had a license since 2001?
10       A.    No. What kind of --
11       Q.    A Pennsylvania driver's license.
12       THE INTERPRETER: Could I explain to
13  him again? Could I explain to him again?
14       MR. DEASEY: Certainly.
15       THE WITNESS: I got my old driver
16  license.
17  BY MR. DEASEY:
18       Q.    Got it back from the state?
19       A.    Yes.
20       Q.    And when was that?
21       A.    One year-and-a-half.
22       Q.    Sometime in 2005?
23       A.    I don't recall.
24       Q.    Okay. How many -- in -- withdraw

Page 28

1  that.
2        In 2001, before your license was
3  suspended, how many people did you drive to and from
4  work each day?
5        A.    How many people?
6        Q.    Approximately.
7        A.    It depend how many people the
8  company need. Sometime they need more people, I
9  drove about 20 people. Sometime they need less than
10  that, I drove 15 or 10, sometimes 7 people.
11       Q.    Did any of those people ever hand
12  you money for driving them to and from work?
13       A.    No.
14       MR. DEASEY: Mark that as six.
15  
16       (Exhibit St. Paul-6 was marked for
17  identification.)
18  
19  BY MR. DEASEY:
20       Q.    Mr. Thou -- Mr. Thou, I'm putting in
21  front of you as an exhibit, I think it's
22  St. Paul-6. Can you please turn to the last page?
23       Are you okay?
24       A.    All right.

Page 29

1        Q.    Can you turn to the last page,
2  please?
3        A.    Checking now.
4        Q.    Is that your signature?
5        A.    Yes.
6        Q.    When you signed that, was it
7  explained to you what you were signing?
8        A.    No.
9        Q.    Did -- do you even know what this
10  document is that's in front of you?
11       A.    No, I don't.
12       Q.    Did anyone ask you questions that
13  you answered for them?
14       A.    I don't recall.
15       Q.    Do you recall anybody interpreting
16  written questions from English to Cambodian so you
17  could answer them?
18       A.    I remember last year I have that
19  kind of conversation one time.
20       Q.    With whom?
21       A.    I don't know exactly. I think that
22  was with the other interpreter that we had last
23  time.
24       MR. COHEN: He's thinking of court.

8 (Pages 26 to 29)

Yan Thou

Page 34

1    MR. DEASEY: We're on now?
2    THE VIDEOGRAPHER: Yes.
3    BY MR. DEASEY:
4    Q.    Okay. Mr. Thou, did you know what
5    document you were signing when you signed your name
6    to that piece of paper?
7    A.    No, I don't.
8    MR. DEASEY: I want you to translate
9    what the document says, what the page says,
10    without the caption. You don't need to do
11    the caption. Start with verification.
12    THE INTERPRETER: (Complies.)
13    MR. DEASEY: You translated
14    verification?
15    THE INTERPRETER: Yes.
16    BY MR. DEASEY:
17    Q.    It then says, "I, Thou Yan, hereby
18    verify that my answers to defendant's
19    interrogatories and request for production of
20    documents are true and correct to the best of my
21    knowledge, information, and belief. I understand
22    that this verification is subject to the penalties
23    relating to unsworn falsification to authorities."
24    Now, when you signed your name to

Page 35

1    that, did anyone explain to you in Cambodian what
2    answers to interrogatories are?
3    A.    No.
4    Q.    What did you think you were signing?
5    A.    This document was sent to me, and so
6    I got to sign, so I got to sign. I don't know
7    exactly what it mean.
8    Q.    Did you ever ask?
9    A.    No.
10    Q.    When -- when you drove people to and
11    from the company in Delaware, who paid for the gas
12    for the van?
13    A.    Paid by myself.
14    Q.    Who paid -- did you have car
15    insurance? Did you have insurance on the car?
16    A.    Yes.
17    Q.    Who paid for the insurance?
18    A.    I paid.
19    Q.    Did you -- did you pay for repairs
20    to the car?
21    A.    Yes.
22    Q.    Did you pay for maintenance to the
23    car?
24    A.    Yes.

Page 36

1    Q.    Did anyone from the company in
2    Delaware tell you what roads to take to and from
3    work?
4    A.    I know how to get there, so I get
5    used to it.
6    Q.    I understand that, but did anyone
7    from the company tell you which roads to take to and
8    from work?
9    A.    Sdey told me.
10    Q.    Did you pick the people up in one
11    place or did you pick them up in more than one place
12    to take them to work?
13    A.    I pick them from their own house.
14    Q.    How did you know who to pick up?
15    A.    They call me.
16    Q.    Who called you, the people that you
17    were picking up called you?
18    A.    Yes, they call. Sometime if I
19    didn't have enough people, I told Sdey. Sdey found
20    the people and he called me and asked me to go there
21    and pick them up.
22    Q.    Did anyone from the company ever
23    tell you who to pick up?
24    A.    No. They were just Sdey. Sdey,

Page 37

1    who's -- he is the only one who ran the business,
2    and he took everything from the boss and manage
3    everything.
4    Q.    Any instructions you got on who to
5    pick up came from Sdey; is that correct?
6    A.    That's correct.
7    MR. DEASEY: I have nothing
8    further. Thank you, sir.
9    MR. COSTIGAN: I have no questions.
10    MR. COHEN: One question.
11    - - -
12    EXAMINATION
13    - - -
14    BY MR. COHEN:
15    Q.    Did Dizo ever ask you questions
16    about your job and the accident?
17    A.    Who Dizo?
18    Q.    Dizo is the American name for Maly's
19    brother, Vannak.
20    A.    So could you ask me that question
21    again?
22    Q.    Yes. Does Vannak -- did Vannak ever
23    help translate information about your job and the
24    accident?

10 (Pages 34 to 37)